Slip Copy, 2009 WL 1620181 (N.Y.Sup.), 2009 N.Y. Slip Op. 51162(U)
(Table, Text in WESTLAW), Unreported Disposition
(Cite as: 2009 WL 1620181 (N.Y.Sup.))

NOTE: THIS OPINION WILL NOT APPEAR IN A
PRINTED VOLUME. THE DISPOSITION WILL
APPEAR IN A REPORTER TABLE.

Supreme Court, New York County, New York.
In the Matter of the Application of Daniel P.
WISOTSKY, Petitioner,

v.

Raymond KELLY, as the Statutorily Designated
Handgun Licensing Officer, and As the Police Com-
missioner of the City of New York, and His Succes-
sors in Office,, Respondent.
No. 104213/09.

June 2, 2009.

John S. Chambers, Law Offices of John S. Chambers,
New York, NY, for Petitioner.

Louise Moed, Corporation Counsel of the City of
New York, New York, NY.

EILEEN A. RAKOWER, J.

*1 Petitioner Daniel Wisotsky ("Petitioner") brings
this Article 78 Petition by order to show cause seek-
ing that the court annul the November 26, 2008 deci-
sion of Respondent Raymond Kelly ("Respondent"),
Commissioner of the New York Police Department
("NYPD"), denying Petitioner the issuance of a
"premises residence" pistol license.

According to the Petition, Petitioner is a 46 year old
male who served in the United States Marine Corps
for twenty years and retired as a Warrant Officer.
Petitioner states that he is presently employed by the
Rockefeller family as a Security Supervisor. This
position entails being responsible for the security of
the Rockefeller offices at 30 Rockefeller Plaza, New
York, N.Y. during the week, and providing personal
security for the 93 year old David Rockefeller, as
well as security to the Rockefellers' private residence
in Manhattan. Petitioner states that he has been em-
ployed in this capacity, in which he supervises six
other security officers, for the past nine years. In ad-

dition, Petitioner states that he has no convictions of
any kind on his record, and that he is of sound mind.

Petitioner first applied for a premises residence li-
cense with the NYPD on November 15, 2001. The
License Division initially denied Petitioner's applica-
tion on the grounds that, as indicated by Petitioner in
his application form, Petitioner's discharge from the
Marines was under "other than honorable condi-
tions." Specifically, discharge records submitted by
Petitioner indicated that Petitioner's discharge from
the armed forces was "involuntary" and predicated
upon "unacceptable conduct." After Petitioner's ap-
peal of the License Division's initial denial of his
application, Petitioner commenced an Article 78 pro-
ceeding in December of 2002. By order of the Hon.
Louise Gruner Gans, the court remanded the matter
to the License Division to adduce more evidence for
the denial of a premises residence license, and to
provide a more detailed explanation of the reasoning
underlying the determination. The matter was ulti-
mately settled by the parties and Respondent agreed
to issue a premises residence license to Petitioner.
Petitioner was issued a premises residence license on
October 12, 2004.

Petitioner's license was thereafter suspended and sub-
sequently revoked by Respondent in connection with
Petitioner's involvement in an incident outside of
Petitioner's house on January 22, 2005 for which Pe-
titioner was arrested. On that date, Petitioner was
arrested and charged with criminal possession of a
weapon in the third degree (in violation of Penal Law
§ 265.02(4), a class D felony); criminal impersona-
tion in the third degree (in violation of Penal Law §
190.26(1), a class E felony); and assault in the third
degree (in violation of Penal Law § 120.00(1), a class
A misdemeanor). The circumstances surrounding
Petitioner's arrest are disputed by the parties.

According to Petitioner, Petitioner was in his base-
ment cleaning his handgun when he responded to a
ring at his doorbell. The person at the door was a
young man who was offering to shovel the snow in
front of Petitioner's house for a fee (Petitioner states
that it was snowing heavily at the time). Petitioner

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1620181 (N.Y.Sup.), 2009 N.Y. Slip Op. 51162(U)
(Table, Text in WESTLAW), Unreported Disposition
(Cite as: 2009 WL 1620181 (N.Y.Sup.))

and the young man agreed on a price and the young man went to work. At this time, Petitioner observed two men outside who appeared to be looking into his house from the sidewalk. Petitioner found the presence of these two individuals to be somewhat peculiar since, due to the inclement weather, there were virtually no cars out on the street, and no pedestrians at all-save for these two individuals. Petitioner adds that he was in the process of having the windows in his house replaced, and that passers-by could look into his house because he did not have any curtains or blinds installed yet. Petitioner went back downstairs and returned to cleaning his handgun.

*2 Petitioner returned upstairs fifteen minutes later, responding to another ring on his doorbell. It was young man who was shoveling the snow in front of Petitioner's house, telling Petitioner that he had finished the work. When Petitioner opened the front door, he became concerned when he noticed that the two men were still outside, looking into his home. Petitioner is a father of three children, aged 4, 7, and 10 at the time. Petitioner had received a notification from the school his children attend twelve days earlier informing parents that there had been reports of two males following students and directing "verbal vulgarities" toward them. Petitioner also notes that six months earlier, the school notified parents that a former sex offender was released to "a residence within the school's region."

Petitioner states that, given the circumstances, he decided to go outside and see what the two men were doing "[w]ithout thinking any further about it." As Petitioner went outside, the two men, in Petitioner's words, "bolted" down the street. Petitioner then got into his car and "took off after them." Petitioner claims that, upon driving down the block, he realized that he had inadvertently taken his handgun with him (the handgun was on his waist). He removed it from his waist and placed it under the front seat of his vehicle. He immediately made a left turn at the corner with the intent to return to his home, aware that his premises residence license allowed only for possession of a handgun inside his residence or transporting it to or from a target range unloaded and in a locked case.

However, upon making the turn, Petitioner observed

two men on the corner who appeared to be similar in build and wearing similar clothing to the men he had previously observed outside his house. Unsure as to whether these two individuals were the men who were previously outside his house, Petitioner approached them, reasoning that either these were the individuals, or that they may have seen them as they ran by. He displayed his security badge, identifying him as a security officer. As he approached the men and began to speak, one of the men responded "you're not a [expletive] cop." Petitioner explained that he never identified himself as a police officer. He then slipped on some ice and fell, and one of the men held Petitioner to the ground by placing his boot on Petitioner's face. At this time, the other man went to Petitioner's car, where he found Petitioner's handgun. The police subsequently arrived, and Petitioner was arrested.

According to the NYPD (based upon the License Division's investigation, which relies upon NYPD reports generated after the incident), Petitioner approached two individuals-a male and a female ("complainants")-as they were crossing the street and said, "You, get over there," to the female complainant. Petitioner then exited his vehicle and asked the female complainant what was going on and what she had in her bag. Petitioner also showed a badge to the complainants. When the male complainant asked to see the badge again, Petitioner refused and told him that he worked for the state. Petitioner and the male complainant got into a verbal dispute, and Petitioner punched the male complainant in the left eye with a closed fist. Petitioner was subsequently arrested by the NYPD. A search incident to arrest uncovered bullets and two magazines from Petitioner's front right jacket pocket. In addition, a loaded black handgun was found in plain view on the driver's seat of Petitioner's car. Petitioner's handgun was seized and vouchered upon his arrest, as per NYPD procedure. Several days later, Petitioner was notified that his premises residence license was suspended.

*3 On April 6, 2006, a temporary order of protection was issued in Queens Criminal Court against Petitioner in favor of the two complainants in connection with the January 22, 2005 incident. Two more orders of protection were issued against Petitioner on June 20, 2006 in favor of the complainants.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1620181 (N.Y.Sup.), 2009 N.Y. Slip Op. 51162(U)
(Table, Text in WESTLAW), Unreported Disposition
(Cite as: 2009 WL 1620181 (N.Y.Sup.))

Based upon the License Division's investigation, which involved reviewing Petitioner's permit and arrest report, as well as conversations with Petitioner, the License Division revoked Petitioner's premises residence license by Notice of Determination dated September 21, 2006. This letter advised Petitioner that the revocation was based upon the facts and circumstances surrounding your arrest on January 22, 2005 that cast grave doubt upon your ability to maintain the requisite good character for your possession of a firearm license; and your failure to abide by the Rules and Regulations governing your firearm license.

In addition, the letter advised Petitioner that he was entitled to request a hearing within thirty days of the date of the determination letter. Petitioner did not request a hearing.

On December 19, 2006, Petitioner's criminal case was adjourned in contemplation of dismissal, and was dismissed on June 18, 2007.

On June 8, 2008, Petitioner submitted a new application for a premises residence license to the License Division. On his application, Petitioner checked "yes" to question No.23, which asks if the applicant has ever been either arrested, indicted, or summonsed, and provided a letter of explanation as required if an applicant answers the question in the affirmative. Petitioner gave his account of events (noted above), and acknowledged that he violated the conditions of his license by taking his handgun outside of his house. However, Petitioner stated that his doing so was unintentional, and asked that the License Division take Petitioner's otherwise upstanding background (including his military service) into account and grant him a premises residence license. Petitioner checked "no" to question # 24, which asks whether the applicant has ever had an order of protection issued against him, despite having three orders of protection issued against him in the past (two involving the January 22, 2005 incident, and one involving a domestic dispute with Petitioner's wife which did not culminate in an arrest, or any further action by police). Petitioner later stated that he had no recollection of having any orders of protection against him.

On July 10, 2008, Petitioner was interviewed by a License Division investigator, who subsequently recommended that Petitioner's application be disapproved. Petitioner received a written Notice of Disapproval on September 16, 2008, which stated the grounds for disapproval as follows:

The events involving your arrest for criminal possession of a weapon in which you were charged with impersonating a police officer by [flashing] a fake shield are very disturbing. The incident is even more alarming because you were [outside] of your residence with your handgun on your person not properly secured in locked container. Your license was for a premise residence and your violation of the rules and regulations and the poor judgment you displayed with your weapon out of your home is inexcusable.

*4 The letter also advised Petitioner he could file a written appeal of the determination with thirty days of the date of the Notice of Disapproval.

Petitioner, by counsel, submitted a letter dated November 11, 2008 appealing the License Division's determination. The letter reiterated Petitioner's account of the January 22, 2005 incident, and also stated that Petitioner is a responsible individual, as evidenced by his employment as a security officer for the Rockefeller family and his years of military service. The appeal letter also states that Petitioner is an active and respected member of the community.

Petitioner's appeal was denied by Thomas M. Prasso, Director of the License Division, by letter dated November 26, 2008. The letter stated that the License Division did not find Petitioner's account of events on January 22, 2005 to be credible. Moreover, the letter notes that Petitioner violated the Rules of the City of New York governing handgun possession and licensure when taking his handgun outside of his premises, failing to report his arrest after the incident, and failing to disclose the prior orders of protection. The letter stated that Petitioner's asserted lack of memory as to having orders of protection against him was not credible. The letter also notes that Petitioner did not request a hearing to challenge the License Division's prior revocation of his premises residence license. Based upon the foregoing, the License Division found that Petitioner "lack[s] the necessary character

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1620181 (N.Y.Sup.), 2009 N.Y. Slip Op. 51162(U)
(Table, Text in WESTLAW), Unreported Disposition
(Cite as: 2009 WL 1620181 (N.Y.Sup.))

and fitness for a license to possess a handgun."

Petitioner subsequently commenced this Article 78 proceeding by order to show cause on March 26, 2009. Petitioner argues that Respondent's denial of a premises residence license to Petitioner is arbitrary and capricious, in that Respondent's denial of a pistol license to Petitioner is based upon a single arrest, for which charges were subsequently dismissed against Petitioner, and ignores Petitioner's otherwise "stellar" history, including twenty years of military service, and his present position as a security officer for the Rockefeller family. Petitioner also argues that Respondent's decision violates his rights under the Second Amendment to the United States Constitution, citing *District of Columbia v. Heller,* (1289 S.Ct. 2783 [1998] ).

Penal Law § 400.00[1] provides, in pertinent part,

No license shall be issued ... except by the licensing officer, and then only after investigation and finding that all statements in a proper application for a license are true. No license shall be issued ... except for an applicant,

(b)of good moral character; and

(g)concerning whom no good cause exists for the denial of the license.

Penal Law § 400.00[2] provides, in pertinent part,

A license for a pistol or revolver, other than an assault weapon or a disguised gun, shall be issued to

(a)have and possess in his dwelling by a householder

Pursuant to § 10-131 of the NYC Admin. Code The Commissioner of the NYPD is the licensing officer for firearms in the City of New York.

*5 In addition to the New York State Penal Law, Chapter 5 of the Rules of the City of New York governs the issuance of pistol licenses in the City of New York. 38 RCNY § 5-01(a) defines "premises license" as follows:

This is a restricted handgun license, issued for a specific business or residence location. The handgun shall be safeguarded at the specific address indicated on the license. This license permits the transporting of an unloaded handgun directly to and from an authorized small arms range/shooting club, secured unloaded in a locked container. Ammunition shall be carried separately.

38 RCNY § 5-02 sets forth the parameters for issuance of a premises license as follows, in pertinent part:

The applicant shall

(a)Be of good moral character;

(c)Disclose whether s/he is or has been the subject or recipient of an order of protection or a temporary order of protection;

(h)Be an applicant concerning whom no good cause exists for the denial of such license.

It is well settled that Penal Law Article 400 confers "extraordinary power" upon Respondent with respect to the issuance of pistol licenses in the City of New York, and that Respondent's determinations in such matters are not to be overturned by a reviewing court in an Article 78 proceeding unless the decision is found to be arbitrary and capricious or an abuse of discretion. Conversely, Respondent's decision must stand if supported by a rational basis. A rational basis exists when the evidence adduced is sufficient to support Respondent's determination. ( *Papaioannou v. Kelly,* 14 AD3d 459, 460 [1st Dept.2005] ) (citations omitted). It is also firmly established that a reviewing court is to defer to Respondent's weighing of the evidence and assessments of credibility ( *Sewell v. City of New York,* 182 A.D.2d 469, 473 [1st Dept.1992] ) (citations omitted).

Here, even if the court were to take *Petitioner's* account of events as true, a rational basis exists for the denial of a premises residence license. By Petitioner's own admission, Petitioner violated the terms of his license when he left his house with his handgun and

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1620181 (N.Y.Sup.), 2009 N.Y. Slip Op. 51162(U)
(Table, Text in WESTLAW), Unreported Disposition
(Cite as: 2009 WL 1620181 (N.Y.Sup.))

ammunition in pursuit of the two individuals outside of his house. While Petitioner maintains that this was inadvertent, Petitioner's own account has Petitioner stopping his car, exiting his vehicle, and approaching two people whom he believes might be the individuals who were standing outside his house *after* realizing that he had left his house with his handgun and clips of ammunition. Crediting Petitioner's recitation of facts, his approaching the two individuals-again, whom Petitioner believed might have been dangerous criminals-actually led to one of these individuals gaining access to his firearm. Even assuming the worst of the two individuals, they clearly presented no immediate danger to Petitioner or his family, and Petitioner was free to call the police to report any suspicious activity. Indeed, if Petitioner's account of events is accurate, Petitioner demonstrated "a startling lack of judgment" that calls into question his fitness to possess a handgun license ( *Tolliver v. Kelly,* 41 AD3d 156, 158 [1st Dept.2007] ).

*6 Moreover, Petitioner failed to disclose in his 2008 application that he had been the subject of three separate orders of protection in the past-a violation of 38 RCNY § 5-02(c) and the Penal Law (*see Kozhar v. Kelly,* 2009 N.Y. Slip Op 3950 [1st Dept.2009]; *Broadus v. The City of New York Police Department (License Division),* 2009 N.Y. Slip Op 3934 [1st Dept.2009]. While Petitioner claims that this omission was due to a lack of memory and was inadvertent, Respondent was acting within his discretion in discrediting Petitioner's proffered excuse. Indeed, Respondent has submitted evidence establishing that Petitioner was advised in court of the orders of protection against him regarding the January 22, 2005 incident no more than two years prior to his most recent application.

Accordingly, even based upon the facts which are not in dispute, Petitioner's challenge fails.

Nor is it of any consequence that Petitioner has an otherwise unblemished record. While Petitioner cites to a number of cases in which the Supreme Court has reversed the NYPD's denial of a pistol license to applicants whose pasts are arguably more checkered than Petitioner's, there is no authority which states that pistol licensees and applicants are automatically entitled to a "second chance." A decision to deny

issuance of a pistol license will invariably depend a number of variables, including the applicant's need to possess a pistol license, mitigating factors such as the applicant's involvement in his/her community, as well as other factors (*see Tolliver* ) (reversing Supreme Court's granting of petitioner's Article 78 petition on the grounds of his "unblemished record of outstanding character ... his military service, his higher education, and his acknowledgment that his behavior during the [underlying] incident was inappropriate."). Moreover, unlike any of the authority supplied by Petitioner, the instant matter involves conduct by Petitioner *specifically pertaining to his possession and use of a firearm as a premises resident licensee.*

Nor does the United States Supreme Court's decision in *Heller* alter the court's analysis in any way. *Heller* involved an outright ban of possession of handguns-including in one's own home. In striking down the District of Columbia statute, the Supreme Court noted that nothing in the Court's decision should be interpreted as disapproval of longstanding regulations on ownership or possession of firearms such as, for example, bans against convicted felons, mentally ill persons, or the carrying of firearms in sensitive areas such as government buildings (*id.* at 2816-17). Importantly, the Court noted that it named but a few examples of permissible regulations, not a list that purported to be exhaustive (*id.* at 2817 n. 26).

Moreover, the Second Circuit has recently held that the *Heller* decision does not apply to the states, since the Second Amendment only applies to the federal government ( *Malonev v. Cuomo,* 554 F.3d 56 [2d Cir.2008]; *see also People v. Abdullah,* 2008 N.Y. Slip Op 28527 [Sup.Ct. Kings 2008] ). However, even if the *Heller* decision is applicable in the case at bar, the Appellate Division, Third Department recently held that "New York's [pistol] licensing requirement remains an acceptable means of regulating the possession of firearms and will not contravene *Heller* so long as it is not enforced in an arbitrary and capricious manner." (*People v. Perkins,* 2009 N.Y. Slip Op 3962 [3rd Dept.2009] ).

*7 Wherefore, it is hereby

ADJUDGED that the petition is denied and the proceeding is dismissed.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1620181 (N.Y.Sup.), 2009 N.Y. Slip Op. 51162(U)
**(Table, Text in WESTLAW), Unreported Disposition**
 **(Cite as: 2009 WL 1620181 (N.Y.Sup.))**

This constitutes the decision and order of the court.
All other relief requested is denied.

N.Y.Sup.,2009.
Wisotsky v. Kelly
Slip Copy, 2009 WL 1620181 (N.Y.Sup.), 2009 N.Y.
Slip Op. 51162(U)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

COnly the Westlaw citation is currently available.

United States District Court, S.D. New York.
Jesse SMITHERMAN, Plaintiff,
v.
NEW YORK CITY DEPARTMENT OF
CORRECTION HEALTH SERVICES, Defendant.
No. 94 CIV. 2795(BSJ).

Feb. 3, 1999.

Opinion and Order

JONES, District J.

*1 Before this Court is the motion of defendant, New York City Department of Correction Health Services, for dismissal of plaintiff's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Because it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief, defendant's motion is granted.

## BACKGROUND

Plaintiff pro se, Jesse Smitherman, ("Smitherman"), an inmate in the custody of the New York State Department of Correctional Services, initiated this action pursuant to 42 U.S.C. § 1983, alleging that he was unlawfully subjected to a second Tuberculosis Skin Test ("Test") that caused adverse medical side effects. Following a determination by Chief Judge Griesa that plaintiff's complaint failed to state a claim, plaintiff was given leave to amend the complaint.

The following facts are alleged in the amended complaint. They are construed in the light most favorable to plaintiff with due consideration of plaintiff's pro se status. See *Papeskov v. Brown*, No. 97 Civ. 5351, 1998 WL 299892, at *2 (S.D.N.Y. June 8, 1998). On August 4, 1993, Jesse Smitherman, a prison inmate awaiting trial, was taken to St. Vincent's Hospital for a medical examination which included administration

of the Test. During this examination, plaintiff informed the medical officials that he had already taken the Test; however, over plaintiff's objections, the medical officials administered another Test. As a result, Smitherman suffered side-effects from the second Test including the permanent scarring of his right forearm, "extremely painful headaches," and "suffocating shortness of breath." When plaintiff indicated to prison personnel that he was suffering from these ailments, medical personnel from the Montefiore Medical Center conducted numerous blood tests and x-rays to determine the cause of plaintiff's symptoms.

## DISCUSSION

### I. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); see *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir.1994). The court must take all the facts alleged in the complaint as true and draw all reasonable inferences in favor of the non-moving party. See *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 699-700 (2d Cir.1994).

In reviewing the pleadings on a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a court looks only to the four corners of the complaint and evaluates the legal viability of the allegations contained therein. See Fed.R.Civ.P. 12(b)(6); *Cortec Indus., Inc v. Sum Holdings L.P.*, 949 F.2d 42, 47 (2d Cir.1991), *cert. denied*, 503 U.S. 960 (1992). The court's function is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980). A complaint will not be dismissed unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 47236 (S.D.N.Y.)
(Cite as: 1999 WL 47236 (S.D.N.Y.))

the relief requested. *See Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991).

*2 Because the court reads the pleadings of a pro se plaintiff generously, *Haines v. Kerner,* 404 U.S. 519, 520 (per curiam), *reh'g denied,* 405 U.S. 948 (1972), all materials Smitherman submitted have been considered as part of his complaint. *See Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering pro se plaintiff's affidavit in opposition to defendant's motion to dismiss); *Lucas v. New York City,* 842 F.Supp. 101, 104 (S.D.N.Y.1994) (including pro se plaintiff's opposition papers as part of the complaint). Indeed, not only are a pro se litigant's submissions be read liberally, but they are also "interpret[ed] ... to raise the strongest arguments that they suggest." *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994)).

II. PLAINTIFF'S 42 U.S.C. § 1983 CLAIM

To state a claim under 42 U.S.C. § 1983 a plaintiff must allege conduct that deprived him of rights, privileges, or immunities secured by the Constitution or laws of the United States; and that the conduct complained of was committed by a person acting under the color of law. *See Gomez v. Toledo,* 446 U.S. 635, 640 (1980).

Here, plaintiff's allegations fail to establish either that his injuries were caused by a person acting under color of law or that he was deprived of any rights secured to him by the Constitution or laws of the United States.

A. PLAINTIFF FAILS TO IDENTIFY A RELEVANT STATE ACTOR.

Municipalities may be sued under 42 U.S.C. § 1983 for constitutional deprivations that result from an officially adopted policy or custom.[FN1] *See Monell v. Department of Soc. Sevs.,* 436 U.S. 658, 690 (1978); *Sarus v. Rotundo,* 831 F.2d 397, 400 (2d. Cir.1987). A plaintiff must show three elements to hold a municipality liable under 42 U.S.C. § 1983:(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right. *See Batista v. Rodriguez,* 702 F.2d 393, 397 (2d

Cir.1983); *see also Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986).

> FN1. As an initial matter, the Court notes that Smitherman has sued the wrong party. The New York City Department of Correction Health Care Services ("DOCHCS") as a municipal agency of the City of New York, lacks an independent legal existence, and cannot be sued in its own name under section 1983. In deference to Smitherman's pro se status, however, the Court treats his claims as if they had been brought against the correct party, the City of New York ("City").

Chief Judge Griesa held that Smitherman's original complaint was legally insufficient because it alleged neither the existence of an officially adopted policy or custom nor a causal relationship between that policy or custom and the deprivation of plaintiff's federal rights. *See Smitherman v. New York City Dep't of Correction Health Care Servs.,* No. 94 Civ. 2795 (S.D.N.Y. Apr. 18, 1994). Smitherman was ordered by Chief Judge Griesa to amend his complaint to allege facts sufficient to show that his injury was caused by any policy or custom of the defendant. *Smitherman,* No. 94 Civ. 2795.

Plaintiff's amended complaint fails to do so. Plaintiff claims that he was given a second Test over his objections and that this caused adverse side effects. To prove that the defendant's actions were an officially adopted DOCHCS policy, plaintiff submitted a DOCHCS Memorandum ("Memo") outlining procedures which detail the proper administration of the Test. The Memo states "[i]f the skin test reaction is positive, future reactions tend to remain positive" and "if a person with proof of a positive skin test reaction has symptoms of TB ... he/she should not have a skin test but should have a chest X-ray and exam."

*3 Smitherman alleges that he was subjected to the second Test in violation of this Memo.[FN2] Because plaintiff contends that this Test "was done in clear violation of the tuberculosis skin test" policy, rather than that the Test was administered pursuant to that policy, the plaintiff has no actionable section 1983 claim against the municipality.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 47236 (S.D.N.Y.)
(Cite as: 1999 WL 47236 (S.D.N.Y.))

FN2. Despite Smitherman's allegations, no
violation of the policy occurred. The policy
requires that prisoners document that they
have previously taken the Test by retaining
records from prior Tests. Smitherman kept
no such records.

Plaintiff misunderstands the requirement that his in-
jury be caused by a "policy or custom" of the mu-
nicipality. *See Monell v. Dep't of Soc. Sevs.*, 436
U.S. 658, 690 (1978). The obvious purpose of the
instant policy is to promote better treatment for those
testing positive for tuberculosis by recommending
further diagnostic procedures, rather than repeating
skin tests which merely confirm prior findings. A
salutary effect of the policy is to shield individuals,
like plaintiff, from duplicative Tests. If plaintiff was
injured in violation of the policy set forth in the
Memo, plaintiff has demonstrated negligent imple-
mentation of the policy, not that the policy itself
caused his injuries. This allegation does not state a
claim for relief under 42 U.S.C. § 1983 against the
City of New York.<sup>FN3</sup> As a result, under Rule
12(b)(6), defendant's motion for dismissal of plain-
tiff's section 1983 claim is granted. *See Conley v.
Gibson*, 355 U.S. 41, 45-46 (1957); *Cohen v. Koenig*,
25 F.3d 1168, 1172 (2d Cir.1994).

FN3. As an alternative to identifying a pol-
icy or custom of the municipality, Chief
Judge Griesa directed Smitherman to iden-
tify an individual or individuals who, acting
under color of law, deprived him of his
rights under the Constitution or laws of the
United States. *See Smitherman v. New York
City Dep't of Correction Health Care Servs.*,
No. 94 Civ. 2795 (S.D.N.Y. Apr. 18, 1994).
Smitherman's amended complaint fails to
follow Chief Judge Griesa's direction to
name the individuals who "exposed plaintiff
to hazardous medical conditions" which re-
quired only "a short plain statement of the
relevant facts supporting each claim against
each individual defendant." This order did
not create an onerous burden, allowing that
"[i]f plaintiff cannot identify the individuals,
he may designate them as "John Doe # 1 ...
and include descriptive information on each

individual." *Smitherman*, No. 94 Civ. 2795
(S.D.N.Y. Apr. 18, 1994). Plaintiff neglects
to provide even this minimal identification.
The amended complaint does not make ref-
erences to any relevant facts supporting a
claim against individual defendants, nor
does the complaint identify or describe any
physical characteristics of possible defen-
dants.

B. PLAINTIFF FAILS TO ALLEGE A
DEPRIVATION OF RIGHTS GUARANTEED BY
THE LAWS OR CONSTITUTION OF THE
UNITED STATES.

Were plaintiff to identify a relevant state actor, his
complaint would nevertheless fail to state a claim
because the conduct of which he complains falls
short of alleging deprivation of any right secured to
him by either the laws or Constitution of the United
States. Smitherman asserts that the court should "pro-
tect the rights of institutionalized persons because
they themselves are incapable of doing so for them-
selves." <sup>FN4</sup> Although the particular rights to which
plaintiff refers are not explicitly stated, the Supreme
Court has held that a prisoner's Eighth Amendment
rights are violated whenever there is evidence of "de-
liberate indifference to the prisoner's serious medical
needs." *Estelle v. Gamble*, 429 U .S. 97, 104 (1976);
*see Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d
Cir.1994). Accordingly, the Court reads Smither-
man's complaint as if it alleged a deprivation of his
Eighth Amendment rights.

FN4. Plaintiff cites the Civil Rights of Insti-
tutionalized Persons Act, 42 U.S.C. § 1997
(1994), as support for his claim. The statute,
however, does not create new substantive
rights; rather, Congress enacted this statute
to ensure that the Attorney General of the
United States has legal standing to protect
existing constitutional and statutory rights of
institutionalized persons. *See Patsy v. Board
of Regents of Florida*, 457 U.S. 496, 507-08
(1982).

"[O]nly those deprivations denying 'the minimal
civilized measure of life's necessities' are sufficiently
grave to form the basis of an Eighth Amendment

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 47236 (S.D.N.Y.)
**(Cite as: 1999 WL 47236 (S.D.N.Y.))**

violation." *Wilson v. Seiter,* 501 U.S. 294, 298 (1991) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). Thus, plaintiff's medical condition must be "sufficiently grave", *Wilson,* 501 U.S. at 298, and the response from prison officials must be deliberately indifferent, in order to make out an Eighth Amendment violation.

To state a claim, plaintiff must allege that defendant made intentional efforts to delay access to medical care while plaintiff was in extreme pain or that the defendant acted with callous indifference to his safety. *See Harding v. Kuhlmann,* 588 F.Supp. 1315, 1316 (S.D.N.Y.1984), *aff'd,* 762 F.2d 990 (2d. Cir.1985).

**\*4** Even assuming that the symptoms about which plaintiff complains (scarring on his right forearm, "extremely painful headaches," and "suffocating shortness of breath") are sufficiently serious to make out a violation of plaintiff's Eighth Amendment rights, and further assuming that their seriousness was communicated to the proper governmental officials, plaintiff fails utterly to allege that the response he received was one of deliberate indifference.

Deliberate indifference is not an "inadvertent failure to provide adequate medical care." *Helling v. McKinney,* 509 U.S. 25, 32 (1993); *Estelle,* 429 U.S. at 103-04. Plaintiff must allege conduct that is repugnant to the conscience of mankind and contemplates a condition of urgency with a sufficiently culpable state of mind. *See Estelle,* 492 U.S. at 104-05. Deliberate indifference requires more than negligence, but less than actions undertaken for the purpose of causing harm. *See Farmer v. Brennan,* 511 U.S. 825, 837 (1994) (stating that a prison official does not act in a deliberately indifferent manner towards inmate unless he "knows of and disregards an excessive risk to inmate health or safety").

Plaintiff in this instance does not show either in his original or amended complaint that prison officials were indifferent to his medical condition or they delayed his access to medical care. The Test itself is administered to preserve a healthy environment for prison inmates in the correctional facility. As a result, the Test policy protects inmates from serious health risks. Nor did the City's response to plaintiff's symp-

toms from the second Test indicate deliberate indifference to his condition. According to plaintiff, when he complained of post-Test maladies, "medical officials [ ] conducted numerous blood tests and x-rays." These detailed medical treatments, at Montefiore Medical Center, were provided in direct response to plaintiff's complaints. The provision of such medical care should be commended, not condemned. The medical officials did not act in a reckless or callous indifference to his health. *See Harding,* 588 F.Supp. at 1316. To the contrary, according to plaintiff's original complaint, the City has been quite attentive to any malady plaintiff reported.

Insofar as plaintiff contends an Eighth Amendment violation based on deliberate indifference to his serious medical needs, defendant's motion for dismissal is granted.

**C. APPEAL OF THIS ORDER.**

The plaintiff may not appeal this order to the Court of Appeals unless "a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1). A certificate will be granted "only if the applicant has made a showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see generally United States v. Perez,* 129 F.3d 255, 259-60 (2d Cir.1997) (discussing the standard for issuing a certificate of appealability). This Court finds that plaintiff will not be able to sustain this burden. Thus, this Court declines to issue a certificate of appealability. Further, this Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 444 (1962).

**CONCLUSION**

**\*5** For the foregoing reasons, defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is granted as to all of plaintiff's claims.

SO ORDERED:

S.D.N.Y.,1999.
Smitherman v. New York City Dept. of Correction
Health Services

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 47236 (S.D.N.Y.)
**(Cite as: 1999 WL 47236 (S.D.N.Y.))**

Not Reported in F.Supp.2d, 1999 WL 47236
(S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2397610 (E.D.N.Y.)
**(Cite as: 2004 WL 2397610 (E.D.N.Y.))**

**C**Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Stephanie Francis SORIANO, An infant, by her
Mother and Natural Guardian, Maribel Garcia, and
Maribel Garcia, individually, Plaintiff,
v.
THE BOARD OF EDUCATION OF THE CITY OF
NEW YORK, et al. Defendants.
**No. 01 CV 4961(JG).**

Oct. 27, 2004.

Susan Penny Bernstein, Cronin & Byczek, LLP, Lake
Success, New York, for Plaintiff.

Michael A. Cardozo, Corporation Counsel of the City
of New York, New York, New York, By: Kimberly
Conway, Assistant Corporation Counsel, for Defendant.

*MEMORANDUM AND ORDER*

GLEESON, J.

*1 Plaintiff Maribel Garcia, on her own behalf and on
behalf of her daughter, Plaintiff Stephanie Soriano,
brings this sexual harassment and civil rights suit
under Title IX of the Education Law of 1972, 20
U.S.C. § 1681 *et seq.,* and under 42 U.S.C. § 1983,
against the Board of Education of the City of New
York, the City of New York, Community School
District 28, and Public School 40 (the municipal defendants); and Judith Tyler, Jecrois Jean-Baptiste,
Harold O. Levy. Neil Kreinik, Etta F. Carter, and
Rita Glaramita (the individual defendants), seeking
money damages. Plaintiffs allege that Stephanie Soriano, while in the fourth grade, was twice the victim
of sexual harassment by other students in her elementary school, and that defendants failed to adequately
respond to these incidents. in violation of both Title
IX and the Equal Protection Clause of the Fourteenth
Amendment. Plaintiffs also bring claims under New
York law; specifically, plaintiffs allege a claim pur-

suant to Educational Law § 3201-a [FN1] against the
municipal defendants, and a negligent supervision
claim against all defendants.

> FN1. N.Y. Edueation Law § 3201-a, entitled
> "Discrimination on account of sex," reads,
> in pertinent part: "Notwithstanding any general, special, local law or rule or regulation
> of the education department to the contrary,
> no person shall be refused admission into or
> be excluded from any course of instruction
> offered in the state public and high school
> systems by reason of that person's sex."

Defendants now move for summary judgment on the
grounds that (1) Garcia does not have standing to
bring an action under Title IX on her own behalf or
on behalf of her daughter; (2) plaintiffs' claims under
Title IX lack merit as a matter of law; (3) plaintiffs
have no cause of action under Title IX against the
individual defendants; (4) plaintiffs' claims under §
1983 are precluded; (5) plaintiffs' claims under §
1983 lack merit as a matter of law; (6) the individual
defendants are immune from liability under the doctrine of qualified immunity; (7) the individual defendants were not personally involved in the events giving rise to plaintiffs' case; (8) this Court should not
exercise supplemental jurisdiction to hear plaintiffs'
state law claims; and (9) plaintiffs' state law claims
lack merit as a matter of law. For the following reasons, the motion for summary judgment is granted.
Specifically, the federal claims are dismissed, and I
decline to exercise supplemental jurisdiction with
respect to plaintiffs' state claims.[FN2]

> FN2. At oral argument, plaintiffs' counsel
> conceded that Maribel Garcia, as an individual, did not have standing to bring a claim
> under either Title IX or § 1983. To the extent such claims were presented by plaintiffs, they are dismissed on consent. I will,
> however, continue to refer to plaintiffs in the
> plural for the purposes of this motion. In addition, plaintiffs' counsel explicitly abandoned claims brought against individuals
> under Title IX and § 1983. Counsel vacil-

lated as to whether plaintiffs were abandoning the § 1983 claims against the municipal defendants, which they had failed to address in their opposition to the summary judgment motion except in connection with an issue of standing. Even if such claims have not been abandoned, they are dismissed as a matter of law. In order to maintain a § 1983 action against a municipality for the unconstitutional acts of a municipal employee below the policymaking level, a plaintiff must establish that a municipal custom or policy caused the violation of her constitutional rights. *See Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir.1995) (citing *Monell v. Dep't of Social Servs.*, 435 U.S. 658, 694 (1978)). Plaintiffs have presented no evidence that would suggest that there was a municipal policy or custom that deprived Stephanie Garcia of her constitutional rights. To the contrary, both at oral argument and in their papers, plaintiffs relied on defendants' alleged *violation* of the New York City Board of Education's disciplinary policy to buttress their argument that defendants had been deliberately indifferent to the student-on-student harassment giving rise to the case. Because plaintiffs have failed to meet their evidentiary burden under Rule 56, the § 1983 claims against the municipal defendants are dismissed. *See* Fed.R.Civ.P. 56 (an adverse party must "set forth specific facts showing that there is a genuine issue for trial.").

In sum, in light of plaintiffs' concessions and the failure of the *Monell* claim as a matter of law, the only federal claim remaining is the claim addressed below, *i.e.,* plaintiffs' claim against the municipal defendants under Title IX.

## BACKGROUND

The facts of this case, viewed in the light most favorable to Garcia and Stephanie Soriano ("Stephanie"),[FN3] are as follows: In the fall of 1999 and the spring of 2000, Stephanie was in the fourth grade at Public School 40 in Jamaica, Queens. On two occa-

sions, once in November 1999 and the other in May 2000, Stephanie was sexually harassed by another student.

> FN3. These facts are drawn primarily from plaintiffs' Local Rule 56.1 statement and their depositions. Facts drawn from defendants' Rule 56.1 statement are facts not controverted by plaintiffs. *See* Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").

### 1. *The November 30, 1999 Incident*

On November 30, 1999, three male fourth-grade students approached Stephanie in the cafeteria of P.S. 40. One of the boys, Michael, sat next to Stephanie. Two other boys, Cory and Sean, told Michael to "rape her." Michael subsequently touched Stephanie's vagina over her skirt against her will. Stephanie pushed Michael's hand away and slapped and pinched Michael. Michael then pinched Stephanie's arm, leaving a bruise on her arm. Stephanie did not see any lunch aides around to whom to report the attack, and she did not report the incident to the principal or to any teachers.

*2 After school, Stephanie told her aunt (who is also a student at P .S. 40) about the incident. The next day, she told her parents. On December 2, 1999, Garcia's husband, Luis Garcia ("Luis"), reported the incident to the principal of P.S. 40.[FN4] An administrator of P .S. 40 told Luis that she was going to take care of the situation by suspending or expelling the boys, and by speaking to the parents of the students involved.

> FN4. Luis recalls that he spoke to Judith Tyler about this incident. Tyler, however, did not begin working at P.S. 40 as principal until March 2000.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2397610 (E.D.N.Y.)
(Cite as: 2004 WL 2397610 (E.D.N.Y.))

That day, the administrator instructed Stephanie, Michael, Cory, and Sean to prepare written statements describing the incident. The administrator also informed Luis that he had the option of contacting the police. Luis subsequently reported the incident to the police, who investigated the claim, sending a detective to the Garcia home. While the police were there, Garcia, Luis, and the police spoke with Cory and Cory's mother about the incident. On December 6, 1999, Michael and Cory were both suspended from school. and Michael was subsequently transferred to another classroom.[FN5] From December 1, 1999 through May 23, 2000, Stephanie did not complain to Garcia of any subsequent harassment.

> FN5. At oral argument, plaintiffs' counsel asserted that factual disputes exist regarding (1) whether Cory was suspended; and (2) whether, and for how long, Michael was transferred out of Stephanie's class.
>
> On the merits, these arguments are baseless. First, Exhibit L to the Declaration of Kimberly Conway includes (1) the school's December 6, 1999 letter to Michael's parents notifying them of his five-day suspension for "engaging in sexual aggression"; and (2) its December 6, 1999 letter to Cory's parents notifying them of his five-day suspension for "using slurs based on gender." Second, plaintiffs' own Rule 56.1 statement *asserts* (at ¶ 42) that Cory was disciplined, and Stephanie, Garcia, and Luis all testified at their depositions that Michael was transferred out of Stephanie's classroom, at least for a time. *See* Defendants' Rule 56.1 Statement at ¶ 15 (citing deposition transcripts).
>
> Procedurally, plaintiffs' counsel's attempt to use oral argument to establish a genuine issue of fact about these events misapprehends counsels obligation in fending off a motion for summary judgment. The defendants' Rule 5.1 statement, at paragraphs 14 and 15, clearly asserts, with citations to admissible evidence, *i.e.,* the school's letters and Stephanie's testimony, that Michael and Cory were suspended

and Michael was transferred to another classroom. To establish a triable issue with regard to those assertions, plaintiffs were required to controvert the defendants' assertions in their own Rule 56.1 Statement, followed by citations to admissible evidence. Local Rule 56.1(b)-(d). Here, plaintiffs' opposing statement failed to controvert defendants' assertions about the disciplining of Michael and Cory, and thus they are deemed to have admitted those assertions. Local Rule 56.1(c). The mere incantation by counsel at oral argument that facts are disputed is not a substitute for the specific, evidence-based showing required by the rule.

> Finally, plaintiffs' counsel suggests that one of the letters in Exhibit L to the Conway Declaration-the letter from the school to Cory's parents-was not provided in discovery. I need not resolve the dispute between counsel on that issue because plaintiffs' counsel does not even attempt to argue that the allegedly belated disclosure has prejudiced plaintiffs, or that there is even the slightest doubt as to the authenticity of the letter.

### 2. *May 24, 2000 Incident*

On May 24, 2000,[FN6] Darnell, a fourth-grade student in Stephanie's class, sat next to Stephanie and slapped her buttocks. He also put his arms around her and started "sweet talking" to her, saying "baby baby," among other words. Darnell had slapped Stephanie on the buttocks on another occasion prior to this incident. In response to this earlier incident, Stephanie had slapped Darnell in the face and then hid behind a teacher. The teacher told Darnell to leave Stephanie alone. Around the time of the incident on May 24, Judith Tyler, the principal of P.S. 40, was aware that Darnell had a history of disciplinary problems.

> FN6. Plaintiffs date this incident as on or about May 31, 2000, but the documentary evidence provided by defendants establishes that May 24, 2000, is the appropriate date. For the purposes of this motion, the May 24

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

date will be adopted. The date of the incident has no bearing on the outcome of this motion.

After school on the day of the May 24 incident, Stephanie told Garcia about Darnell's harassive behavior. The next day, Garcia reported the incident to Tyler. Subsequently, Tyler met individually with Stephanie, Darnell and the teachers allegedly present during the incident, Ms. Vails and Ms. Post. Tyler instructed them to prepare written statements describing the incident. On May 26, 2000, Garcia met with Tyler and Paul Arroyo, the Director of Pupil Personnel Services to discuss what to do about the May 24 incident. On June 1, 2000, Tyler met with Garcia and police officers from the New York City Police Department, including officers from the special victim's unit. On June 6, 2000, Tyler met with Luis, who informed Tyler that he was going to remove his children from the school. Subsequently, Luis removed Stephanie and other members of the family from the school.

After these incidents of harassment, Stephanie had various problems, including being afraid to go out and play, getting lower grades,[FN7] and having nightmares. At some point, Stephanie began to see a therapist.

> FN7. Plaintiffs allege that Stephanie's grades suffered because of these incidents. Defendants have submitted Stephanie's report card, however, which shows that her grades remained consistent throughout the fourth, fifth, and sixth grades. *See* Declaration of Kimberley Conway, Ex. 1.

## DISCUSSION

### A. *The Rule 56 Standard*

Under Rule 56 of the Federal Rules of Civil Procedure, the moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56(c). The substantive law governing the case identifies the facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is warranted only if "the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party." *Id.*

*3 Moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quotation marks omitted); *see also, e.g., Michalski v. Home Depot, Inc.,* 225 F.3d 113, 116 (2d Cir.2000) ("[W]e ... view [the facts] in the light most favorable to, and draw inferences in favor of, the non-moving party...."). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial." ' Matsushita,* 475 U.S. at 586-87 (quoting Fed.R.Civ.P. 56(e), emphasis in original).

### B. *Title IX Claim Against the Municipal Defendants*[FN8]

> FN8. Defendants initially suggested that because Stephanie's claim was being brought on her behalf by her mother, Stephanie lacked standing. Defendants have apparently not pursued that argument. In any event, it is without merit.

Title IX provides, with certain exceptions not at issue here, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...." § 20 U.S.C. 1681(a). A school board receiving federal funding can be held liable under Title IX for student-on-student sexual harassment.[FN9] *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 633 (1999). To establish such a claim, a plaintiff must demonstrate that: (1) the school authorities had actual knowledge

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

of the harassment; (2) they were deliberately indifferent to the harassment; and (3) the harassment was "so severe, pervasive, and objectively offensive" that it deprived the plaintiff of "access to the educational opportunities or benefits provided by the school." *Id.* at 650.

> FN9. Defendants do not contest that the New York City Board of Education is a recipient of federal education funding that could be held liable under Title IX.

a. *Actual Notice*

To prevail in a claim bought pursuant to title IX, a plaintiff must demonstrate that someone "vested with authority to address the alleged discrimination and to institute corrective measures" on behalf of the funding recipient had actual knowledge, as opposed to constructive knowledge, of the discrimination. *Hayut v. State Univ. of New York,* 352 F.3d 733, 750 (2d Cir.2003). (internal quotations omitted). The actual knowledge requirement imposes a significant evidentiary burden on a Title IX claimant. *Id.* In *Hayut,* for example, plaintiff alleged that she was harassed by a professor at SUNY New Paltz during the fall semester. *Id.* at 738. Hayut did not complain about the harassment to any of the SUNY defendants, however, until late in the semester. *Id.* at 751. Accordingly, the Second Circuit held that the SUNY defendants could not be held liable under Title IX for any harassment that occurred prior to the date that she made her complaint. *Id.*

Here, plaintiffs have made no claim that Stephanie was subjected to harassment prior to November 30, 1999, or that anyone reported any incidents of harassment prior to Luis Garcia's initial report to an administrator at P.S. 40 on December 2, 1999. Instead, plaintiffs claim, first, that defendants were on notice because of the alleged perception that the school as a whole was undisciplined, and plaintiffs have submitted newspaper articles and television news reports to buttress their claim.[FN10] Even if school administrators perceived the student body as a whole to be undisciplined, however, such a perception is insufficient to place those administrators on actual notice of sexual harassment of a particular student by another student. Second, plaintiffs apparently claim that defendants

had actual notice of Michael's "known reputation for inappropriate sexual conduct." Pl.'s Rule 56.1 Statement, ¶ 20. In support of this proposition, plaintiffs rely on Garcia's deposition testimony that Stephanie complained to her that Michael "would just kiss like the girls and the other girls would let them touch him. He would go to a girl, they would let him touch their butt or any other part of the body, and they liked it. They let him do it." 88:17-23. Garcia does not recall, however, when Stephanie made these complaints to her, *Id.* at 88:24-89:3, nor do plaintiffs provide any evidence that any school administrator had actual notice of Michael's behavior. Accordingly, because defendants did not have actual notice of harassment prior to December 2, 1999, they cannot be held liable for any harassment that occurred prior to that date.

> FN10. Defendants argue, in a different context, that the newspaper articles and televised news reports are hearsay, and not admissible for the truth of the matters asserted in them. *See* Defs.' Mem. of Law in Further Supp. of Mot. for Summary Judgment, at 6. I assume for the purposes of this motion that the news reports are admissible circumstantial evidence of the school administrators' awareness of the reported disciplinary problems.

\*4 Whether defendants had actual knowledge of harassment by Darnell against Stephanie prior to the May 24, 2000 incident presents a closer question. Stephanie testified that sometime prior to the May 24, 2000 incident, Darnell slapped her buttocks. Stephanie responded to this initial incident by slapping Darnell in the face, and then hiding behind a teacher. The teacher then told Darnell to leave Stephanie alone. Defendants correctly argue that Stephanie testified to a difference between the two incidents in the way Darnell touched her buttocks, and that it is uncertain whether such behavior from a fourth grader rises to the level of sexual harassment. In addition, it is undisputed that Stephanie told neither her mother nor the principal about the pre-May 24 incident with Darnell. However, drawing all inferences in favor of the non-moving party, I cannot say that there is no genuine issue of material fact with regard to this element of plaintiffs' claim. Stephanie told her teacher about Darnell slapping her in the buttocks prior to the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

May 24, 2000 incident. Although she was unclear during her deposition about which teacher she spoke to, or what she said to the teacher, Stephanie was a twelve-year-old testifying about events that happened several years earlier, and as such is entitled to a fair degree of latitude. A rational juror could conclude that Stephanie's statement to the teacher was sufficient to place defendants on actual notice of Darnell's harassive behavior towards Stephanie.

b. *Deliberate Indifference*

The muncipal defendants may be held liable for a Title IX claim of student-on-student sexual harassment only where the school's "response to the harassment or lack thereof is clearly unreasonable in the light of known circumstances." *Davis,* 526 U.S. at 648. The Supreme Court made clear that it wanted to preserve flexibility for school administrators, noting that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id.* (citation omitted). "Clearly unreasonable" is not a "mere" reasonableness standard, and there is "no reason why courts, on a motion ... for summary judgment ... could not identify a response as not "clearly unreasonable" as a matter of law. *Id.* at 648-49. For the following reasons, I find that, as a matter of law, defendants response to both the November 1999 and May 2000 incidents was not clearly unreasonable.

Plaintiffs fail to offer any specific facts to controvert defendants' assertions that, upon notice of the November 30, 1999 incident: a school administrator informed Luis Garcia of his right to contact the police; a school administrator instructed Stephanie and the harassing students involved to prepare written statements describing the incident, which the students prepared; the adminstrator contacted the parents of the harassing students; two of the those students were suspended for five days; and the student who had inappropriately touched Stephanie was transferred to another classroom, at least for a time. It is also undisputed that none of the students involved in the November 1999 incident harassed Stephanie again. Plaintiffs claim that the administrators were indifferent because, among other things, they failed to promptly respond to the first incident by contacting police, and failed to take measures to secure Stepha-

nie's safety. While plaintiffs may have preferred a different response from the school administrators, the standard is not whether the administrators responded in a particular manner, but whether their response was clearly unreasonable in light of all the known circumstances. Here, no reasonable jury could conclude that the administrators' response to the November 30, 1999 incident was clearly unreasonable, and consequently the defendants cannot be held liable under Title IX for that incident.

**\*5** With respect to the May 24, 2000 incident, plaintiffs also fail to controvert defendants' evidence that after plaintiffs complained to Principal Tyler: Tyler instructed Stephanie, Darnell, and the teachers allegedly present during the incident to prepare written statements describing it; Tyler and Raul Arroyo, the Director of Pupil Personnel Services, met with Garcia to discuss how to respond to the incident; Tyler recommended that Darnell be suspended from school; Tyler met with Garcia and police officers from the New York City Police Department, including officers from the special vietims unit, to discuss the incident; and Tyler met with Luis Garcia regarding the incident. Subsequent to this meeting between Tyler and Luis Garcia, Luis removed all his children, including Stephanie, from P.S. 40.

In lieu of proffering specific facts to support their argument of deliberate indifference by the school administrators, plaintiffs' again point to several newspaper articles and television news reports as evidence that defendants were "clearly indifferent to the health and safety of the students," and that the school was in total chaos. Even if this evidence was admissible for its truth, which is uncertain at best, it demonstrates only that the school was in deplorably bad condition; it does not provide specific facts to demonstrate that plaintiffs' response *to Stephanie's harassment* was clearly unreasonable. Given the undisputed actions taken by the school authorities in response to the incident, I conclude as a matter of law that their response was not clearly unreasonable in light of the known circumstances. Accordingly, the defendants may not be held liable under Title IX for any harassment related to the May 24, 2000 incident.

c. *Depriving Stephanie of Access to Educational Opportunities or Benefits*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiffs claim also fails because they have not pointed to specific facts to create a genuine issue for trial as to whether the harassive behavior was "so severe, pervasive, and objectively offensive that it can be said to [have] deprive[d] the victim[ ] of access to the educational opportunities or benefits provided by the school." *Davis,* 526 U.S. at 650. The *Davis* Court noted that it would be unlikely that a single instance of peer-on-peer harassment would be sufficiently severe to rise to the level where relief is appropriate "in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment." *Id.* at 652-53. Instead, private damages actions under Title IX are limited to cases having a systemic effect of denying the victim equal access to an educational program or activity. *Id.*

In *Davis,* for example, the Court found allegations of harassment sufficient to survive a motion to dismiss where the victim alleged that she had been subject to repeated acts of sexual harassment by one student over a five-month period; the harassment included numerous acts of objectively offensive touching; the harasser student ultimately pleaded guilty to criminal sexual misconduct; multiple victims of the harasser's conduct unsuccessfully sought the assistance of the school principal; and the harassment had a concrete negative effect on the victim's ability to receive an education. *Id.* at 653-54.

*6 Here, plaintiffs have not presented any facts that suggest the existence of a genuine issue requiring trial with respect to this prong of the Title IX analysis. They have alleged two instances of sexual harassment by two different fourth-graders taking place nearly six months apart. Both involved discrete encounters, one involving a boy touching Stephanie's vagina through her skirt, and the second involving a slap on her buttocks. These are strikingly offensive acts indeed, but plaintiffs have failed to demonstrate that they rise to the level of pervasive harassment such that Stephanie was deprived of "equal access to an institution's resources and opportunities." *Davis,* 526 U.S. at 651.

The allegations that Stephanie was afraid to go out and play, had nightmares and declining grades, and had to see a therapist, though disturbing, do not produce a contrary result. Stephanie faced no harrasive behavior between November 30, 1999 and May 24, 2000. Shortly after the May 24, 2000 incident, Garcia and her husband removed Stephanie from the school. This sequence of events does not reflect a denial of access to the school's resources and benefits, which is a further reason why plaintiffs' Title IX claim fails.

In sum, plaintiffs have failed to create a genuine issue of fact as to (1) whether defendants had actual notice of the November 30, 1999 incident; (2) whether the defendants response to either of the incidents of harassment was clearly unreasonable in the light of known circumstances; and (3) whether the harassment was so pervasive that it amounted to the effective denial of equal access to the school's resources and benefits. Accordingly, the motion for summary judgment is granted with respect to the Title IX claims.

*C. Claims Under New York Law*

Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction if the court has dismissed all claims over which it had original jurisdiction. Dismissal of such claims is committed to the district judge's discretion. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966). Because I have dismissed all federal claims brought by plaintiffs, I decline to exercise supplemental jurisdiction over the remaining state law claims. Accordingly, plaintiffs' state law claims are dismissed as well.

## CONCLUSION

The defendants' motion for summary judgment is granted in its entirety, and the action is dismissed.

So Ordered.

E.D.N.Y.,2004.
Soriano ex rel. Garcia v. Board of Educ. of City of New York
Not Reported in F.Supp.2d, 2004 WL 2397610 (E.D.N.Y.)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2397610 (E.D.N.Y.)
**(Cite as: 2004 WL 2397610 (E.D.N.Y.))**

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2004 WL 2937803 (S.D.N.Y.)
(Cite as: 2004 WL 2937803 (S.D.N.Y.))

COnly the Westlaw citation is currently available.

United States District Court,
S.D. New York.
NEW YORK STATE MOTOR TRUCK
ASSOCIATION, New Jersey Motor Truck Associa-
tion, and Motor Transport Association of Connecti-
cut, Inc., Plaintiffs,
v.
George E. PATAKI, in his official capacity as Gov-
ernor of the State of New York, Eliot Spitzer, in his
official capacity as Attorney General of the State of
New York, and Antonia C. Novello, M .D., in her
official capacity as Commissioner of Health of the
State of New York, Defendants.
No. 03 CV 2386(GBD).

Dec. 17, 2004.

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

\*1 Plaintiffs are moving, pursuant to Fed.R.Civ.P. 56,
for an order granting summary judgment on counts
one and three of the complaint on the grounds that
subdivision (2) of the New York Public Health Law
("PHL") § 1399-ll (McKinney 2001) ("the statute") is
preempted by the Federal Aviation Administration
Authorization Act of 1994 ("FAAAA"). Defendants
move, pursuant to Fed.R.Civ.P. 12(b), for an order
dismissing the complaint.

Subdivision (2) of the statute makes it unlawful for
any common or contract carrier to knowingly trans-
port cigarettes to any person in New York State that
the carrier reasonably believes not to be: (a) a person
licensed as a cigarette tax agent or wholesale dealer;
(b) an export warehouse or proprietor or an operator
of a customs bonded warehouse; or (c) a person who
is an officer, employee or agent of the federal or state
government who is acting in accordance with his or
her official duties. PHL § 1139-ll(1-2). If cigarettes
are transported to a home or residence, it shall be
presumed that the common or contract carrier knew

that such person was not a statutorily authorized re-
cipient. PHL § 1139-ll(2). Both civil and criminal
penalties can be imposed for violation of the statute.
PHL § 1399-ll(5). A party can be charged with a fel-
ony for a second or subsequent violation. *Id.* Persons,
other than a common or contract carrier, are not pro-
hibited from transporting eight hundred or less ciga-
rettes to any person in the state. PHL § 1399-ll(2).

Plaintiffs are trade associations whose members are
primarily common and contract carriers. The associa-
tions' mission is to advance the interests of motor
carriers. (Compl. §§ 8-11). Plaintiffs' first cause of
action seeks injunctive relief against the enforcement
of subdivision (2) of PHL § 1399-ll because it is pre-
empted by the FAAAA under the Supremacy Clause
of the United States Constitution. The third cause of
action seeks a declaratory judgment declaring that, as
to common and contract carriers, subdivision (2) of
PHL § 1399-ll is preempted.[FN1] The second count,
which is not the subject of the summary judgment
motion, seeks an injunction against the enforcement
of the challenged statute on grounds it violates the
Equal Protection Clause of the Constitution.

> FN1. The declaratory judgment sought, in
> count two of the complaint, additionally
> seeks a declaration that subdivision (2) of
> the statute violates the Equal Protection
> Clause of the United States Constitution.
> Plaintiff is not seeking summary judgment
> in this regard. (Pls.' Mem. Supp. Summ. J. at
> 7 n 7.)

Plaintiffs argue that partial summary judgment is
warranted as subdivision (2) of PHL § 1399-ll relates
to a "service of any motor carrier ... with respect to
the transportation of property," and hence the statute,
on its face, is preempted by the FAAAA. The
FAAAA provides, in pertinent part, "a State ... may
not enact or enforce a law ... related to a price, route,
or service of any motor carrier ... with respect to the
transportation of property." 49 U.S.C. § 14501(c)(1)
(West 1997). Additionally, they argue that the statute
has a forbidden significant effect on carriers' trans-
portation services, and is therefore preempted on that

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2937803 (S.D.N.Y.)
(Cite as: 2004 WL 2937803 (S.D.N.Y.))

basis as well.

When PHL § 1399-ll was signed into law on August 16, 2000, subdivision (2) was to take effect on January 1, 2001. L.2000, c. 262 Legislation § 13. On November 13, 2000, however, a district court in the Southern District of New York issued a temporary restraining order, in two related cases, prohibiting the statute's enforcement. *See, Santa Fe Natural Tobacco Co., Inc. v. Spitzer,* 2000 WL 1694307 (S.D.N.Y. Nov. 13, 2000). In those cases, plaintiffs were challenging subdivision (1) of PHL § 1399-ll as unconstitutional because it restricted cigarette sales to face-to face transactions at in-state retail locations, and hence violated the Commerce Clause. *Santa Fe Natural Tobacco Co., Inc.,* 2001 WL 636441, *1-2 (S.D.N.Y. June 8, 2001). The parties in those cases had agreed that the temporary restraining order would expire on June 8, 2001, at 12:01AM. *Id.* at *2 n 1. On the expiration date, the district court declared PHL § 1399-ll unconstitutional in its entirety, and permanently enjoined its enforceability. *Id.* at *30. On February 13, 2003, the Second Circuit reversed the lower court and directed the district court to enter judgment in favor of the defendants. *Brown & Williamson Tobacco Corp. v. Pataki,* 320 F.3d 200 (2d Cir.2003), *rev'g sub nom. Santa Fe Natural Tobacco Co., Inc.,* 2001 WL 636441.

*2 On February 27, 2003, a rehearing was sought, and the Second Circuit denied that application on April 3, 2003. (Tr., 4/9/03, at 59). Seven days after the denial of a rehearing, the mandate issues. Fed.R.App.P. 41(b). Therefore, the statute was to go into effect on April 10, 2003. An order to show cause hearing was held by this Court, on April 9, 2003, with regard to plaintiffs' applications for a temporary restraining order and a preliminary injunction. This Court denied plaintiffs' request for a restraining order and denied, without prejudice, the motion for a preliminary injunction. (Tr., 4/9/03, at 63-64). The Court did stay the enforcement of subdivision (2) of PHL § 1399-ll for 48 hours so that plaintiffs could have an opportunity to seek a stay from the Second Circuit. Plaintiffs did not seek such relief, and hence the statute has been in effect since April 10, 2003.

At the hearing, defense counsel was instructed to notify the Court and plaintiffs when the state makes

its decision to begin enforcement of the statute as to common and contract carriers, and to provide 48 hours notice prior to any intended enforcement action. (Tr., 4/9/03, at 65, 69-72). By letter dated June 10, 2003, defense counsel indicated that the State reserves the right to begin enforcement of the statute on June 18, 2003. (Letter from Asst. Attny. Gen. Elizabeth A. Forman of 6/10/03). Attached to the letter, was a six page notice sent by the New York State Department of Taxation and Finance on June 9, 2003, to various parties affected by the terms of the statute. The notice indicated that on the Tax Department's website is a current list of licensed and registered cigarette agents, wholesale dealers, and retail dealers, and advised of the upcoming enforcement date and the provisions of the statute itself.

At oral argument on the instant motions, defense counsel stated that she was unaware of any instance when anyone was charged with violating the statute, be it criminally or civilly. (Tr., 6/22/03, at 75-76). Her co-counsel indicated that the statute is "in force" as oppose to having yet been "enforced." (Tr., 6/22/03, at 76). After oral argument, defense counsel submitted the decision in *Ward v. State of New York,* 291 F.Supp.2d 188 (W.D.N.Y.2003). The defense maintained that the court in *Ward* held that the FAAAA should not preempt the statute, which is the "exact same issue as currently before this Court on the cross motions to dismiss and for summary judgment." (Letter from Asst. Attny. Gen. Elizabeth A. Forman of 9/19/03, at 1). The *Ward* plaintiffs were members of the Seneca Indian Nation challenging the constitutionality of § 1139-ll. They contended the statute violates certain rights secured to Indian Nations under the Constitution, and that the statute is preempted by federal legislation governing the regulation of common and contract carriers. That court denied plaintiffs' motion for a temporary restraining order finding, in relevant part, that "plaintiffs are ... unlikely to establish that the statute is preempted by the FAAAA." *Ward,* 291 F.Supp. at 211. Thus, the *Ward* court's finding was restricted to the question of plaintiffs' success on the merits under the standard of proof applicable to temporary restraining orders. This Court, like the court in *Ward,* denied plaintiffs' motion for a temporary restraining order. But such a limited preemption analysis does not, in and of itself, determine the issue of whether the statute is pre-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2937803 (S.D.N.Y.)
(Cite as: 2004 WL 2937803 (S.D.N.Y.))

empted by the FAAAA under the standard of proof applicable for summary judgment motions and motions to dismiss pursuant to 12(b)(6).

*3 Summary judgment, pursuant to Rule 56, is warranted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists if, based on the record as a whole, a reasonable trier of fact could return a verdict for the nonmoving party. *Anderson v., Liberty Lobby, Inc.,* 477 U.S. 242 (1986). The Court must view the record in the light most favorable to the non-movant by resolving all ambiguities and drawing all reasonable inferences in favor of that party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp .,* 475 U.S. 574, 587-88 (1986); *Anderson,* 477 U.S. at 255; *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995). The burden to show that there are no genuine issues of fact rests with the party seeking summary judgment. *Anderson,* 477 U.S. at 256; *Tomka,* 66 F.3d at 1304. Nevertheless, the party opposing the motion bears the ultimate burden of proof to demonstrate that there is some evidence which would create a genuine issue of material fact. *Twin Labs., Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568 (2d Cir.1990). The non-movant cannot meet this burden by simply relying on mere conclusory allegations, speculation or conjecture. *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986). Constitutional challenges do not typically lend themselves to summary disposition. *See, Uryevick v. Rozzi,* 751 F.Supp. 1064, 1067 (E.D.N.Y.1990); *Voorhees v. Shull,* 686 F.Supp. 389, 393 (E.D.N.Y.1987); *Transp. Limousine of Long Island, Inc. v. Port Auth. of N.Y. and N.J.,* 571 F.Supp. 576, 580 (E.D.N.Y.1983). Nevertheless, a claim that a statute is facially unconstitutional generally raises only questions of law, and hence is an appropriate subject for a summary judgment motion. *See, Uryevick,* 751 F.Supp. at 1067-68; *Voorhees,* 686 F.Supp. at 393.

In reviewing a complaint for dismissal under Rule 12(b)(6), the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in plaintiffs' favor. *Bolt Elec ., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). The complaint should only be dismissed where it appears beyond doubt that the plaintiffs can present no set of

facts entitling them to relief. *Conley v. Gibson,* 355 U.S. 41, 46 (1957); *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984). Although a court considering a motion to dismiss for failure to state a claim is limited to the facts stated in the complaint, the complaint includes any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *Paulemon v. Tobin,* 30 F.3d 307, 308-309 (2d Cir.1994).

## FACIALLY UNCONSTITUTIONAL CLAIM

To successfully challenge a statute as facially unconstitutional, plaintiffs must establish that no set of circumstances exists under which the challenged statute could be applied in a valid manner. *United States v. Salerno,* 481 U.S. 739, 745 (1987); *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 797-98 (1984). Plaintiffs maintain that PHL § 1399-ll(2) is facially unconstitutional because it is preempted by the FAAAA. The Supremacy Clause invalidates any state law that is contrary to federal law. *see,* Const., Art. VI, cl. 2; *Gibbons v. Ogden,* 22 U.S. 1, 211 (1824). "Where the Constitution grants the Federal Government the power to act, the Supremacy Clause dictates that federal enactments will prevail over competing state exercises of power." *United States v. Gillock,* 445 U.S. 360, 370 (1980). Simply stated, a state law that conflicts with federal law is of no effect. *Cippollone v. Liggett Group, Inc.,* 505 U.S. 504, 516 (1992) (quoting *Maryland v. Louisiana,* 451 U.S. 725, 746 (1981)). The exercise of federal supremacy is not to be lightly presumed. *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 522 (1981) (citations omitted). In fact, there is a strong presumption against federal preemption of state and local legislation. *Richmond Boro Gun Club, Inc. v. City of New York,* 97 F.3d 681, 687 (2d Cir.1996) (citing *California v. ARC America Corp.,* 490 U.S. 93, 101 (1989)). This presumption is especially strong in the fields of traditional state regulations such as health and safety measures. *Richmond Boro Gun Club, Inc.,* 97 F.3d at 687 (citing *English v. General Elec. Co.,* 496 U.S. 72, 79 (1990)). "In [ ] pre-emption jurisprudence, where 'federal law is said to bar state action in fields of traditional state regulations, ... [there is an] assumption that the historic police powers of the States

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2937803 (S.D.N.Y.)
(Cite as: 2004 WL 2937803 (S.D.N.Y.))

were not to be superceded by the Federal Act unless that was the clear and manifest purpose of Congress." ' *California Div. of Labor Standards Enforcement v. Dillingham Constr. N.A.. Inc.,* 519 U.S. 316, 325 (1997) (quoting *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655 (1995)). PHL § 1399-ll was enacted primarily to promote the health and safety of New York State's citizens, especially minors, an area traditionally regulated by the state pursuant to their policing powers. *Brown & Williamson Tobacco Corp.,* 320 F.3d at 217-218; *see also,* 2000 N.Y. Laws ch. 262 § 1.[FN2] Thus, plaintiffs bear a "considerable burden of overcoming 'the starting presumption that Congress does not intend to supplant state law." ' *De Buono v. NYSA-ILA Med. and Clinical Servs. Fund,* 520 U.S. 806, 814 (1997) (quoting *Travelers,* 514 U.S. at 654).

> FN2. 2000 N.Y. Laws ch. 262 provides, " § 1. Legislative findings. The legislature finds and declares that the shipment of cigarettes sold via the internet or by telephone or by mail order to residents of this state poses a serious threat to public health, safety and welfare, to the funding of health care pursuant to the health care reform act of 2000, and to the economy of the state. The legislature also finds that when cigarettes are shipped directly to a consumer, adequate proof that the purchaser is of legal age cannot be obtained by the vendor, which enables minors to avoid the provisions of article 13-F of the public health law. It is also the legislature's finding that by preventing shipment of cigarettes directly to consumers, the State will be better able to measure and monitor cigarette consumption and to better determine the public health and fiscal consequences of smoking. The legislature further finds that existing penalties for cigarette bootlegging are inadequate. Therefore, the bill enhances existing penalties for possession of unstamped or unlawfully stamped cigarettes."

*4 An understanding of the scope of a preemption statute rest predominantly on a fair understanding of the congressional purpose, as that is the "ultimate touchstone' of any preemption question. *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 541 (2001) (citing *Cipollone,* 505 U.S. at 516); *Metronic Inc. v. Lohr,* 518 U.S. 470, 485-86 (1996) (citing *Cipollone,* 505 U.S. at 530, n. 27). The intent of Congress may either be explicitly stated in the language of the statute or implicitly contained in its structure and purpose. *Cipollone,* 505 U.S. at 516 (quoting *Jones v. Rath Packaging Co.,* 430 U.S. 519, 525 (1977)).

The FAAAA, with a few minor exceptions, effectively preempts state regulations of intrastate motor carrier activities. *Kelley v.. United States,* 69 F.3d 1503, 1505 (10th Cir.1995). Congress determined that such preemption was necessary because the states' regulations have "(A) imposed an unreasonable burden on intrastate commerce; (B) impeded the free flow of trade, traffic and transportation of intrastate commerce; and (C) placed an unreasonable cost on the American consumers." Federal Aviation Admin. Authorization Act of 1994, Pub.L. No. 103-305, 108 stat. 1569 tit. VI, § 601(a)(1)(A-C). As explained in the House Conference Committee Report, H.R. Conf. Rep. No. 103-677 at 86-88 (1994):

Currently, 41 jurisdictions regulate, in varying degrees, intrastate prices, routes and services of motor carriers. * * * Typical forms of regulation include entry controls, tariff filing and price regulation, and types of commodities carried. Not all 41 States regulate each of these aspects nor do they all regulate them in the same manner or in the same degree. * * * The need for section 601 has arisen from this patchwork of regulation ... * * * [P]reemption legislation is in the public interest as well as necessary to facilitate interstate commerce. State economic regulation of motor carrier operations causes significant inefficiencies, increased costs, reduction of competition, inhibition of innovation and technology and curtails the expansion of markets. * * * The sheer diversity of these regulatory schemes is a huge problem for national and regional carriers attempting to conduct a standard way of doing business. * * * Lifting of these antiquated controls will permit our transportation companies to freely compete more efficiently and provide quality service to their customers. Service options will be dictated by the marketplace; and not by artificial regulatory structure.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The FAAAA has specifically enumerated matters concerning motor carriers which are not preempted. States are free to enact or enforce laws or regulations with respect to (1) motor vehicle safety, (2) highway route controls or limitations based on size or weight of the vehicle or the hazardous nature of the cargo; (3) motor carriers' financial responsibility relating to insurance; (4) the transportation of household goods; and (5) price for-hire motor vehicle transportation by a tow truck provided such transportation is performed without prior consent or authorization of the owner or operator of the vehicle. 49 U.S.C. § 14501(c)(2)(A-C).

\*5 Despite the clear language as to the scope of the preemption, Congress has made it clear that these enumerated exceptions to preemption are not exhaustive, and that state regulatory powers may extend to other areas as well. The list was merely meant to identify some of the matters which are not price, route, or service related, and are therefore not preempted. H.R. Conf. Rep. No. 103-677 at 84. The states may not, however, exercise their regulatory authority "as a guise for continued economic regulation as it relates to prices, routes or services." Id.

It is beyond question that 49 U.S.C. § 14501(c) preempts a wide range of state regulations. It is not, however, all encompassing. Kelley, 69 F.3d at 1508. Not every state law that is related to price, route or service is automatically preempted by the FAAAA. The FAAAA preemption provision is identical to the preemption provision contained within the Airline Deregulation Act of 1958. Congress intended it to "function in the exact same manner with respect to its preemptive effect" so as "to create a completely level playing field" between air carriers and motor carriers. H.R. Conf. Rep. No. 103-677 at 85. The House Report discloses that "the conferees do not intend to alter the broad preemptive interpretation adopted by the United States Supreme Court in Morales v. TransWorld Airlines, Inc., 504 U.S. [374], 191 L.Ed. 157, 112 S.Ct. 2031 (1992)." Id . at 83. In Morales, 504 U.S. at 384, the Supreme Court defined the "relating to" language of the Airline Deregulation Act as having a connection with or reference to rates, routes, or services.

The Second Circuit has recognized that the "related

to" phrase "appears to be developing to some degree, to mean whether the state law actually 'interferes' with the purposes of the federal statute...." Abdu-Brisson v. Delta Air Lines, Inc., 128 F.3d 77, 82 (2d Cir.1997) (quoting Travelers, 514 U.S. at 655). It is not sufficient to merely demonstrate that a state statute affects rates, routes or services to any degree. Where the state statute's affect upon rates, routes or services in too tenuous, remote or peripheral a manner, preemption is unwarranted. Morales, 504 U.S. at 390 (quoting Shaw v. Delta Lines, Inc., 463 U.S. 85, 100, n. 21 (1983)); see also, American Airlines, Inc. v. Wolens, 513 U.S. 219, 224 (1995). Clearly, a state law must be struck down when it contains a requirement, or has a concomitant effect, that threatens the specific interest for which Congress sought to protect by enacting the preemption statute. The preemption doctrine does not, however, deprive states of the power to regulate an activity that is merely a peripheral concern of a federal law. Chicago and N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 317 (1981) (quoting San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 243 (1959)).

In Ace Auto Body & Towing, Ltd. v. City of New York, 171 F.3d 765 (2d Cir.1999), plaintiffs challenged a New York City towing ordinance on the grounds it was preempted by the FAAAA. The Second Circuit observed, Id. at 774:

\*6 On the one hand ... the broad "related to" language of § 14501(c)(1) generally preempts economic regulation by the states within the field of intrastate towing. On the other hand, the statutory text, Congress' aim to leave the states' residual control over safety and other local concerns intact, and the presumption against preemption of historic state police power, argue against finding preemption where only incidental economic burdens can be discerned.

PHL § 1399-ll was enacted to address the serious public health concerns and economic effects posed by smoking cigarettes, and to thwart any efforts by minors to have cigarettes shipped directly to them, thereby circumventing the legal requirement for age verification pursuant to Article 13-F of the Public Health Law. The aim of the statute was not to regulate the price, route or service of motor carriers with respect to the transportation of property, although it

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

may have an incidental effect in this regard. Plaintiffs nevertheless argue that the statute regulates whether and to whom carriers may transport certain goods, and therefore it explicitly regulates the service of motor carriers with respect to the transportation of property. However, the mere fact that a statute concerns the transportation of a particular cargo by common and contract carriers, in this case cigarettes, does not render it facially unconstitutional on preemption grounds.

For example, in *Robertson v. State of Washington Liquor Control Bd,* 10 P.3d 1079 (Wash.App. Div. 3 2000), the Court held that a state's statute which permitted forfeiture of vehicles used to transport contraband cigarettes into the state was not preempted by the FAAAA. The Court explained that Congress did not have any clear and manifest intent to preempt state laws prohibiting the "service" of transporting contraband such as unstamped cigarettes. Otherwise, motor carriers would be exempt from forfeiture for such things as transporting a methamphetamine lab or poached game. *Robertson,* 10 P.3d at 1084.

This Court finds that the challenged statute is not facially unconstitutional. Congress' goals in enacting 49 U.S.C. § 14501(c)(1) was two fold: "to free the motor carrier industry from state and local regulation and to put that industry on a playing field level with that of the air carrier industry ..." *Ace Auto Body,* 171 F.3d at 772. Nothing in the language of subdivision (2) of PHL § 1139-ll, itself, suggests that its enforcement would impede or frustrate those congressional objectives. Moreover, there is nothing within the body of the federal law or in the legislative history suggesting Congress intended to usurp the states' power to regulate the manner in which cigarettes are shipped into their borders in order to protect their citizenry from the pernicious effects of tobacco which negatively impacts on the states' economy. Accordingly, plaintiffs' motion for partial summary judgment on the grounds that the statute is facially unconstitutional is denied. Moreover, granting the defendants' motion, those portions of the complaint claiming that the challenged statute, on its face, is preempted, are dismissed.

UNCONSTITUTIONAL AS APPLIED CLAIM

*7 Plaintiffs are also seeking partial summary judgment on the alternative ground that the statute, as applied, is preempted by the FAAAA. Plaintiffs contend that in order to comply with PHL § 1399(2), carriers will have to adopt special handling procedures to deal with packages known to contain cigarettes including steps to determine whether the consignees are legally authorized recipients, and to dispose of packages that could not be delivered in compliance with the statute. They maintain that since carriers will have to alter the manner in which they provide transportation and delivery services, subdivision (2) of the statute has a prohibited significant effect on service, and hence must be preempted.

Defendants contend that plaintiffs lack standing to bring an "as applied" claim as such a claim is not ripe for adjudication. They argue that no motor carrier has ever been prosecuted under the statute, no interpretation of the statute has been issued by any regulatory agency or New York State court, no penalties have been issued, and there is no reasonable fear or imminent threat of prosecution for any specific activity. Therefore, they assert that an "as applied" claim would be entirely speculative and based on an injury, and an interpretation of the statute, which is conjectural and hypothetical.

The legal doctrines of standing and ripeness have their roots in Article III of the Constitution which limits federal courts to adjudicate actual cases and controversies. *Allen v. Wright,* 468 U.S. 737, 750 (1984). "A dispute is ripe for adjudication when there is a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical and abstract." *Motor Vehicle Mfrs. Assoc. of the United States, Inc. v. New York State Dep't of Envtl. Conservation,* 79 F.3d 1298, 1305 (2d Cir.1996) (citations and internal quotation marks omitted). It prevents federal courts from entangling themselves in abstract disagreements over matters which are premature for review since the injury complained of is speculative or may never occur depending on the state's administrative review. *Abbott Labs. v. Gardner,* 387 U.S. 136, 148-49 (1967); *New York Public Interest Research Group v. Whitman,* 321 F.3d 316, 326 (2d Cir.2003) (citations omitted); *Motor Vehicle Mfrs. Assoc.,* 79 F.3d at 1305 (citations omitted). Similarly, standing requires

that the plaintiff suffer an injury in fact, that is, an invasion of a legally protected interest which is concrete and particularized. It must be actual or imminent, not merely conjectural or hypothetical. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992) (citations omitted). An association, which has not suffered an injury to itself, may still have standing solely as the representative of its members provided it alleges "that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin,* 422 U.S. 490, 511 (1975) (citing *Sierra Club. v. Morton,* 405 U.S. 727, 734-41 (1972)).

**\*8** Absent a genuine threat of enforcement of the disputed statute, a case or controversy involving that statute does not exist. *CA 79-212 St. Martin's Press, Inc. v. Carey,* 605 F.2d 41, 44 (2d Cir.1979). In order to challenge the constitutionality of a statute, there must be a showing of a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement. *Babbitt v. United Farm Workers Nat. Union,* 442 U.S. 289, 298 (1979). There is no requirement that a plaintiff be charged or prosecuted under the challenged statute before he or she may bring suit. *Babbit,* 442 U.S. at 298-99; *see also, Ass'n of American Med. Colls. v. Carey,* 482 F.Supp. 1358, 1362 (N.D.N.Y.1980) ("[A] party need not await the occurrence of a threatened injury which will result from enforcement of a statute under attack before being allowed to seek preventive relief."). A ripeness analysis further requires an evaluation of both the fitness of the issue for judicial decision, as well as the hardship to the parties of withholding court consideration. *Abbott Labs.,* 387 U.S. at 149.

The statute in question is presently in effect and is enforceable. The notice sent out to common and contract carriers advised that "The Tax Department reserves the right to begin enforcing these restrictions commencing June 18, 2003" and in bold letter it warns, "You may be subject to criminal penalties and civil fines if you violate the law." Thus, the carriers are conducting their transportation business under the imminent threat of being charged, either civilly or criminally, for non-compliance with the dictates of the statute. They are operating with the knowledge, if

not the fear, that the state mandates that they conform their conduct consistent with the statute or risk the imposition of both criminal and civil penalties. This current and immediate threat of enforcement is sufficient to demonstrate an actual, not hypothetical, injury to the carriers sufficient for ripeness and standing purposes.

The Court finds similarly unpersuasive the defendants' contention that this matter is not ripe for adjudication by a federal court because the subject statute has not been interpreted by any state court or state administrative body. The absence of an authoritative state court or administrative construction of a challenged statute does not bar a litigant from bringing a federal action challenging the constitutionality of the statute. *Stenberg v. Carhart,* 530 U .S. 914, 945 (2000) (quoting *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 770 n. 11 (1988)). Since supremacy clause questions are essentially ones of federal policy, a federal court need not abstain from exercising its jurisdiction until such time as the state courts have had an opportunity to interpret the statute. *In re Pan American Corp.,* 950 F.2d 839, 847 (2d Cir.1991) (citations omitted); *see also, Pacific Gas and Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 201 (1983). "[I]t would be futile to abstain in deference to a state decisional body if it later should develop that it may not have jurisdiction over a dispute due to the preemptive jurisdiction of a federal body." *Christ the King Regional High School v. Culvert,* 815 F.2d 219, 223 n. 4 (2d Cir.1987).

**\*9** The "as-applied" preemption challenge raises purely a legal issue regarding preemption by federal law, and therefore it is an appropriate issue to be resolved by this Court. Plaintiffs claim that, in order to comply with the statute, they must institute operational changes that will cause them to incur significant costs, to such a degree, that it will adversely affect price, route and service. Thus they will suffer an economic harm even if they are never actually charged with violating the statute. If they choose not to comply with the statute, they must conduct their business affairs under the real threat of suffering serious criminal and civil penalties. Given that the complaint seeks solely injunctive and declaratory relief, it would be unfair to deny a party subjected to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

the restraints of a challenged statute the right to attack its constitutionality. Accordingly, this Court finds that the "as-applied" claim is ripe for judicial adjudication. *see, Abbott Labs.,* 387 U.S. at 153 ("Where the legal issue presented is fit for judicial resolution, and where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under ... the Declaratory Judgment Act must be permitted, absent a statutory bar or some other unusual circumstance ...").

Questions of fact exists with regard to the "as applied" preemption claim. Notwithstanding the statute's laudable goals and the established congressional policy supporting state laws prohibiting the sale of cigarettes to minors, federal law places limits on the states' ability to address this problem. *Lorillard Tobacco Co.,* 533 U.S. at 552, 571. It is conceivable that for common and contract carriers to adhere to the requirements of the statute, they will have to alter their standard way of doing business. Such a change could necessitate such a significant financial expenditure that it might ultimately affect the price, route or service of their transportation operations. Such an affect may violate the FAAAA preemption provision. At this stage of the litigation, however, plaintiffs have failed to adequately make such a showing. Accordingly, summary judgment is unwarranted.

### EQUAL PROTECTION CLAIM

Defendants are also seeking to dismiss plaintiffs' Equal Protection challenge to the statute. The statute does not apply to the United States Post Office, nor does it bar the transportation of 800 cigarettes (four cartons) or less by any person other than a common or contract carrier. The parties agree that the applicable standard of review is the "rational basis test." (Compl. ¶¶ 42, 43; Defs.' Mem. Supp. Mot. to Dismiss at 28). In determining whether legislation is in accord with equal protection principles, "at a minimum, a statutory classification must be rationally related to a legitimate governmental purpose." *General Media Communications, Inc. v. Cohen,* 131 F.3d 273, 285 (2d Cir.1997) (quoting *Clark v. Jeter,* 486 U.S. 456, 461 (1988)); *see also, Nordlinger v. Hahn,* 505 U.S. 1, 10 (1992). "In areas of social and economic policy, a statutory classification that nei-

ther proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313 (1993). There is a presumption that a classification in a statute is valid even if it results in some inequality. *Beach,* 508 U.S. at 314-15; *Weinstein v. Albright,* 261 F.3d 127, 139 n. 14 (2d Cir.2001). "[T]hose attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it." ' *Beach,* 508 U.S. at 315 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 394 (1973)). It is not incumbent upon the Legislature to articulate its reason for the disparate treatment under the statute. Therefore, it is irrelevant for purposes of rational-basis review, whether the conceived reason is in fact the basis upon which the Legislature was motivated. *Beach,* 508 U.S. at 315. Rational basis review is limited solely to whether there are plausible reasons for the classification, and it does not take into consideration the wisdom, fairness or logic of legislative decisions. *General Media,* 131 F .3d at 286 (citing *Beach,* 508 U.S. at 313-14); *see also, Dandridge v. Williams,* 397 U.S. 471 (1970) ("If the classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality. The problems of government are practical ones and may justify, if they do not require, rough accommodations-illogical, it may be, and unscientific.") *Dandridge,* 397 U.S. at at 485 (citations and internal quotation marks omitted).

**\*10** The Court finds that there are rational justifications for the statute's failure to include the United States Postal Service. The state lacks the authority to regulate the Postal Service. Equal Protection does not require a statute to cure all evils or none at all. *Ry. Express Agency Inc. v. New York,* 336 U.S. 106, 110 (1949). The fact that the Postal Service is not required to comply with PHL § 1139-ll (2) does not mean that the objectives of the statute cannot be realized. The Second Circuit recognized that although the state cannot prosecute the Postal Service itself for violating subdivision (2) of PHL § 1139-ll, it may still, pursuant to subdivision (1), prosecute direct

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

shippers who utilize the postal service to ship cigarettes to New York consumers. *Brown & Williamson Tobacco Corp.,* 320 F.3d at 219.

Plaintiffs also bring an Equal Protection challenge with regard to the 800-cigarette exception. Defendants have proffered three possible reasons justifying this exception, namely: (1) to conserve enforcement resources and to target those entities most properly charged with knowledge of the statute; (2) the Legislature is taking reform one step at a time addressing itself to the phase of the problem which seems most acute to the legislative mind; and (3) small shipments made by means other than contract and common carriers present less of a threat because they primarily consist of stores delivering cigarettes along with other goods to its customers. Defendants further argue that to the extent that the 800-cigarette exception is deemed to be discriminatory, any putative discrimination can be cured by enforcement. They contend that the Department of Taxation and Finance and the Department of Health have discretionary authority to enforce the statute so as to eliminate any potential disparities in treatment.

The Court is cognizant of the fact that the defendants are under no burden to produce evidence to sustain the rationality of the classification. *Jankowski-Burczyk v. I.N.S.,* 291 F.3d 172, 178 (2d Cir.2002) (quoting *Beach,* 508 U.S. at 320). Nevertheless, there is no basis upon which the Court can declare that the statute is merely phase one of a regulatory plan intended to be extended to others in the future. Such an unsubstantial claim could be argued in support of the rationality of a classification for any given statute. The rational basis test is not a toothless one, but rather the classification scheme must rationally advance a reasonable and identifiable governmental objective. *Schweiker v. Wilson,* 450 U.S. 221, 234-35 (1981).

Similarly unpersuasive, to support defendants' motion to dismiss, is the argument that the Legislature intended to exclude store delivery of cigarettes. The Second Circuit, in *Brown & Williamson Tobacco Corp., supra,* opined that the delivery exception may permit in-state retail sellers (such as grocery stores which deliver goods to their customers including up to four cartons of cigarettes), to reap a *de minimus*

advantage. *Brown & Williamson Tobacco Corp.,* 320 F.3d at 216. The Second Circuit concluded that such a minor advantage was insufficient to establish a discriminatory effect. *Id.* The Second Circuit did not, however, make any findings that retail stores deliveries were specifically considered by the New York State Legislature in enacting the statutory exception. Moreover, the legislative history fails to reveal that store deliveries were ever considered as a basis for the 800-cigarette exception. Certainly if this was the aim of the Legislature, it could have, within the body of the statute, narrowed the exception to such activities. The Legislative findings indicate that the primary justification for the statute is to protect the health of its citizens from the deleterious effects of cigarettes, and in particular to ensure cigarettes did not fall into the hands of minors. To allow everyone except common and contract carriers to deliver 800 cigarettes or less, without verifying the legal status of the recipients, does not advance that expressed goal of the statute.[FN3]

> FN3. The Second Circuit did recognize, however, that "[e]ven assuming ... that the exception undermines the goals of reducing consumption of cigarettes to minors, it serves the goal of reducing general demand for cigarettes by collection of New York's high excise tax as well as does in-store sales." *Brown & Williamson Tobacco Corp.,* 320 F.3d at 218 n. 2.

\*11 However, a sufficient reason for the classification scheme does not need to be the one actually considered by the Legislature. *Jankowski-Burczyk,* 291 F.3d at 179 (citation omitted). There may exist other plausible reasons for the classification such as the state's need to economize its resources. "Evils in the same field may be of different dimensions and proportions, requiring different remedies" *Williamson v. Lee Optical of Oklahoma,* 348 U.S. 483, 489 (1955); *see also, Minnesota v. Clover Leaf Creamery Co .,* 449 U.S. 456, 466 (1981) (The Legislature need not combat all evils at the same time or in the same way.). On the present record, however, the Court cannot determine, as a matter of law, that the classification was rationally related to any particular legitimate state purpose. There is also no basis to conclude that the Legislature believed that the state agencies

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

could or would use their discretionary authority to ensure that the statute is only enforced in such a manner as to eliminate disparate treatment. *cf., Jankowski-Burczyk,* 291 F.3d at 179-80.

Therefore, it is premature to conclude that the 800-cigarette delivery exception is reasonably related to a legitimate state purpose. Additionally, should the exception be found to be discriminatory, defendants have failed to make a sufficient showing, at this stage of the litigation, that the discriminatory effect can be cured by means of the statute's enforcement. Accordingly, dismissal of the Equal Protection claim is unwarranted.

## THE GOVERNOR AS A NAMED DEFENDANT

Defendants also seek to have the Governor dismissed as a defendant. The claims against the Governor are premised upon his responsibility for final approval of state legislation and his responsibility for ensuring that the laws are faithfully executed. The fact that the Governor was named as a defendant in *Brown & Williamson Tobacco Corp., supra,* has no bearing on this Court's determination as the defense of immunity was never raised in that case. There is no reason to attribute weight to the fact that such a defense was not previously asserted, as it could have simply been an oversight.

"The well-settled doctrine of absolute legislative immunity ... bars actions against legislators or governors ... on the basis of their roles in enacting or signing legislation." *Warden v. Pataki,* 35 F.Supp.2d 354, 358 (S.D.N.Y.1999), *aff'd sub nom. Chan v. Pataki,* 201 F.3d 430 (2d Cir.1999); *see also, Lajoie v. Connecticut State Bd. of Labor Relations,* 837 F.Supp. 34, 40 (D.Conn.1993). Furthermore, "the vast majority of courts ... have held ... that a state official's duty to execute the laws is not enough by itself to make that official a proper party in a suit challenging a state statute." *Warden,* 35 F.Supp.2d at 359. Similarly, the general duty to faithfully execute the laws does not, standing alone, make the Governor a proper party in an action challenging a state statute as unconstitutional. *Romeu v. Cohen,* 121 F.Supp.2d 264, 272 (S.D.N.Y.2000), *aff'd,* 265 F.3d 118 (2d Cir.2001). "[W]here the legislative enactment provides that entities other than the executive branch of

the state are responsible for implementation of the statute no claim against the Governor lies." *Wang v. Pataki,* 164 F.Supp.2d 406, 410 (S.D.N.Y 2001).

**\*12** The primary responsibility for the enforcement of the statute rests with the Department of Health. PHL § 1339-ll. The Governor does not have an affirmative role in its enforcement. The Governor does receive tobacco control reports from the Commissioner of Health detailing the progress that state and local governments have made in reducing cigarette use among minors. PHL § 1399-kk. But there is no indication that the Governor has any responsibility to take steps in response to these progress reports. Since the complaint fails to allege that the Governor has any connection with the enforcement of the statute, other than his general duty to ensure the laws are faithfully executed, he is immune from suit even though the remedy sought here is only injunctive and declaratory relief. *Ex Parte Young,* 209 U.S.123, 157 (1908); *Star Distrib., Ltd. v. Marino,* 613 F.2d 4 (2d Cir.1980).

## CONCLUSION

Accordingly, in light of the foregoing, the plaintiffs' motion for partial summary judgment is denied in its entirety. Defendants' motion to dismiss those claims premised on the facial unconstitutionality of PHL § 11139-ll(2), and the Equal Protection Clause because of the statute's inapplicability to the United States Post Office, is granted. Those claims are dismissed. All claims against Governor Pataki are similarly dismissed. Defendants' motions are denied is all other respects.

S.D.N.Y.,2004.
New York State Motor Truck Ass'n v. Pataki
Not Reported in F.Supp.2d, 2004 WL 2937803 (S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2490155 (N.D.N.Y.)
(Cite as: 2005 WL 2490155 (N.D.N.Y.))

COnly the Westlaw citation is currently available.

United States District Court,
N.D. New York.
John Jay HUMPHREY, Plaintiff,
v.
COURT CLERK, NDNY; Chief Judge Frederick J.
Scullin, Jr.; Court Clerk, Second Circuit; Court Clerk,
U.S. Supreme Court, Defendants.
No. 5:05-CV-1159(NAM)(GJ.

Oct. 7, 2005.

John Jay Humphrey, Plaintiff, pro se.

DECISION and ORDER

MORDUE, J.

*1 Presently before the Court is a complaint pursuant
to *Bivens v. Six Unknown Named Agents of the Fed-
eral Bureau of Narcotics,* 403 U .S. 388 (1971), filed
by *pro se* plaintiff John Jay Humphrey.[FN1] Dkt. No. 1.
Plaintiff has not paid any fee relating to this action,
and seeks leave to proceed *in forma pauperis.* Dkt.
No. 2.

> FN1. This is the seventh action plaintiff has
> filed in this District since January, 2005. *See*
> *Humphrey v. Carni,* 5:05-CV-0253
> (FJS/GHL); *Humphrey v. WIXT News*
> *Channel 9,* 5:05-CV-0636 (FJS/DEP),
> *Humphrey v. Rescue Mission,* 5:05-CV-0795
> (NAM/GJD); *Humphrey v. Rescue Mission,*
> 5:05-CV-0986 (FJS/GJD); *Humphrey v..*
> *Styers,* 5:05-CV-1036 (FJS/GHL); *Hum-*
> *phrey v. Onondaga Cty. DSS,* 5:05-CV-0987
> (NAM/GJD); *Humphrey v. Weichert,* 5:05-
> CV-1205 (NAM/GJD). *See also, Humphrey*
> *v. Onondaga Cty. Sheriff,* 5:02-CV-1524
> (NPM/DEP); *Humphrey v. State of New*
> *York,* 5:03-CV-1181 (HGM/GJD); *Hum-*
> *phrey v. United States Gov't,* 5:04-CV-0145
> (HGM/GJD).

In his complaint, plaintiff asserts claims arising out
of the requirement that, as a litigant in federal court, he
provide a current mailing address for purposes of
service and correspondence. Plaintiff alleges that the
Court Clerks named as defendants herein have re-
fused to communicate with him by e-mail, and claims
that the defendants' actions have cause him to suffer
severe mental distress. Dkt. No. 1 at 2-4.[FN2] Named
as defendants are the Chief Judge of the Northern
District of New York and the Clerks of the Northern
District, the United States Court of Appeals for the
Second Circuit and the United States Supreme Court.
For a complete statement of Plaintiff's claims, refer-
ence is made to the complaint.

> FN2. The only other injury identified by
> plaintiff is the loss of his bicycle which was
> allegedly stolen while parked at the location
> of his mailing address. *Id.* at 2.

Based upon a review of plaintiff's *in forma pauperis*
application, the Court finds that plaintiff has demon-
strated sufficient economic need.

Since the Court has found that plaintiff meets the
financial criteria for commencing this case *in forma*
*pauperis,* the Court must consider the sufficiency of
the complaint in light of 28 U.S.C. § 1915(e). Section
1915(e) directs that when a plaintiff seeks to proceed
*in forma pauperis,* the Court:

(2) [S]hall dismiss the case at any time if the Court
determines that -

* * *

(B) the action ... (i) is frivolous or malicious; (ii) fails
to state a claim on which relief may be granted; or
(iii) seeks monetary relief against a defendant who is
immune from such relief.

28 U.S.C. § 1915(e)(2)(B). Thus, even if a plaintiff
meets the financial criteria to commence an action *in*
*forma pauperis,* it is the Court's responsibility to de-
termine that a complaint may properly be maintained

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

in the District before it may permit the plaintiff to proceed with his or her action *in forma pauperis. Id.*

As noted, plaintiff seeks to assert claims against the defendants for the violation of his civil and constitutional rights. *Bivens* actions, although not precisely parallel, are the federal analog to Section 1983 actions against state actors. *See Chin v. Bowen,* 833 F.2d 21, 24 (2d Cir.1987) (noting that there is a "general trend in the appellate courts" to incorporate Section 1983 law into *Bivens* cases) (citation omitted).[FN3]

> FN3. Section 1983 establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *German v. Fed. Home Loan Mortg. Corp.,* 885 F.Supp. 537, 573 (S.D.N.Y.1995) (citing *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted). *See Humphrey v. Rescue Mission,* 5:05-CV-0795 (NAM/GJD) (Dkt. No. 3 at 4).

For the reasons set forth below, the Court finds that plaintiff's complaint fails to state a claim against the defendants upon which may be granted by this Court and is, therefore, dismissed.

(a) Chief District Court Judge Frederick J. Scullin, Jr.

Plaintiff complains of a ruling made by Chief Judge Scullin in one of plaintiff's prior actions. *See Humphrey v. WIXT News Channel 9,* 5:05-CV-0636 (FJS/DEP) (Order filed June 23, 2005). In that case, Judge Scullin issued a Decision and Order which included the direction to plaintiff that he provide a current mailing address for purposes of service and correspondence as required by Rule 10.1(b)(2) of the Local Rules of Practice for the Northern District of New York, "if he files any additional papers in this, or any other action...." *Id.* (Dkt. No. 3 at 1 n.l).[FN4] Plaintiff claims that the Court did not clearly state that he must provide a mailing address, and did not advise plaintiff that an e-mail address was not sufficient. Dkt. No. 1 at 2. [FN5]

> FN4. Local Rule 10.1(b) prescribes specific

information required on all documents filed with the court. That information includes "the address of a pro se litigant; and the bar roll number, office address, telephone number, e-mail address and fax number of the attorney." While General Order No. 22 of the Northern District (filed Dec. 3, 2004) establishes administrative procedures for Electronic Case Filing, traditional means of serving and filing papers by mail continue to apply to all *pro se* litigants. *Id.,* § 2.

> FN5. When plaintiff next commenced an action, he provided only an e-mail address. Dkt. No. 1 at 2; see *Humphrey v. Rescue Mission,* 5:05-CV-0795 (NAM/GJD). By Decision and Order filed July 14, 2005 (dkt. no. 3 at 4), I admonished plaintiff that he must provide a mailing address when he files court papers, and that his failure to do so will result in those papers being rejected for filing.

*2 The law in this Circuit clearly provides that "[j]udges enjoy absolute immunity from personal liability under Section 1983 for 'acts committed within their judicial jurisdiction.' ' *Young v. Selsky,* 41 F.3d 47, 51 (2d Cir.1994) (quoting *Pierson v. Ray,* 386 U.S. 547 (1967)). "The absolute immunity of a judge applies however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff." *Young* 41 F.3d at 51 (internal quotations omitted).

It is clear that plaintiff's claim against Chief Judge Scullin arises solely out of the performance by Chief Judge Scullin of his judicial duties in presiding over the litigation commenced by plaintiff. Chief Judge Scullin is therefore absolutely immune from liability in a *Bivens* action, and is dismissed with prejudice as a defendant in this action.

(b) Court Clerk NDNY

Plaintiff appears to claim that the "Court Clerk" of the Northern District of New York improperly failed to advise him that the e-mail address plaintiff provided when he submitted his complaint for filing in *Humphrey v. Rescue Mission,* 5:05-CV-0795

Not Reported in F.Supp.2d, 2005 WL 2490155 (N.D.N.Y.)
(Cite as: 2005 WL 2490155 (N.D.N.Y.))

(NAM/GJD) was not an acceptable address for purposes of Local Rule 10.1, and would not be used by the court to communicate with plaintiff. Dkt. No. 1 at 2. Plaintiff does not claim to have suffered any specific harm attributable to this claim. Although plaintiff's case was dismissed, the dismissal was predicated upon plaintiff's failure to establish that the named defendant is a state actor for purposes of § 1983, not on plaintiff's failure to provide a mailing address. *Humphrey v. Rescue Mission,* 5:05-CV-0795 (NAM/GJD) (Decision and Order filed July 14, 2005 at 3). According to the docket in that action, plaintiff acknowledged service of the Court's Order within two weeks of the filing date, and filed a timely notice of appeal with the Second Circuit. Dkt. Nos. 5 and 6.

The Court also notes that plaintiff does not clearly allege that he had any direct, interaction or other communication with the individual who serves as the Clerk of Court for the Northern District of New York, as opposed to one or more of the individuals employed in the Clerk's Office. As with claims asserted under Section 1983, a plaintiff seeking to recover money damages in a *Bivens* action must establish that the named defendant was personally involved in the wrongdoing or misconduct complained of. Liability cannot be established under a theory of respondeat superior. *Elmaghrabv v. Ashcroft,* 2005 WL 2375202, *11 (E.D.N.Y. Sept. 27, 2005); *see Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (discussing supervisory liability in context of § 1983 claim).[FN6] In this case, plaintiff has not set forth facts sufficient to establish that the Clerk of the Court was personally involved in the actions complained of. Nevertheless, in light of plaintiff's *pro se* status, the Court has considered whether plaintiff's complaint states a claim upon which relief could be granted assuming, *arguendo,* that he has properly identified the defendant, and concludes that it does not.

> FN6. In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit detailed the various ways in which a supervisory defendant can be personally involved in a constitutional deprivation. A supervisory official is deemed to have been personally involved if that official directly participated in the infraction; if, after learning of a viola-

tion through a report or appeal, he or she failed to remedy the wrong; if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue; or if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

*3 Courts have extended judicial immunity to court clerks for the performance of tasks "which are judicial in nature and an integral part of the judicial process." *Rodriguez v. Weprin,* 116 F.3d 62, 66 (2d Cir.1997); *see also Kampfer v. Rodriguez,* 1998 WL 187364 *2 (N.D.N.Y. Apr. 15, 1998) (Pooler, D.J.). Court clerks enjoy absolute immunity even for functions which are administrative in nature if the task was undertaken pursuant to the explicit direction of a judicial officer or pursuant to the established practice of the court. *Id.* Since plaintiff's allegations arise out of and relate to actions taken by court personnel which were in accordance with the terms of the Local Rules of Northern District, and pursuant to the direction of a judicial officer, these actions constitute an integral part of the judicial process and are shielded from liability by judicial immunity. Accordingly, defendant "Court Clerk NDNY" is hereby dismissed with prejudice as a defendant herein.

(c) Court Clerk, Second Circuit; Court Clerk, U.S. Supreme Court

Plaintiff remaining claims are against the Clerk of the Court for the United States Court of Appeals for the Second Circuit and the Clerk of the United States Supreme Court. Plaintiff claims that the Clerks have refused to communicate with him by e-mail, thereby violating plaintiff's rights under the Fifth Amendment. Dkt. No. 1 at ¶¶ 4, 6. With respect to the Second Circuit Clerk, plaintiff states only that the Clerk "has failed to e-mail the plaintiff at this time." *Id.* at 2-3. Plaintiff states that he "wrote a letter" to the U.S. Supreme Court Clerk requesting an *in forma pauperis* application and claims that the Clerk "has failed to e-mail the plaintiff a copy as of today." *Id.* at 3.

For all of the reasons discussed by the Court in dismissing plaintiff's claims against the Court Clerk of the Northern District, plaintiff's claims against these

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2490155 (N.D.N.Y.)
**(Cite as: 2005 WL 2490155 (N.D.N.Y.))**

defendants are insufficient and are hereby dismissed.[FN7] Plaintiff has failed to set forth facts sufficient to identify the individual or individuals in either Court personally responsible for the actions complained of. In addition, plaintiff has failed to set forth any facts in support of his claim that he is entitled to communicate with these federal courts by e-mail, [FN8] nor has he demonstrated that he has suffered any harm from the actions complained of. It also appears that these defendants enjoy absolute immunity from plaintiff's claims.

> FN7. In addition, it is not clear that venue is appropriate in this District. *See* 28 U.S.C. § 1391(b).

> FN8. Rule 29 of the Rules of the Supreme Court clearly provides that all documents required or permitted to be presented to the Court or to a Justice shall be filed and served by one of three means: in person, by U.S. mail, or by a third party commercial carrier. Rule 25 of the Federal Rules of Appellate Procedure also authorizes the filing and service of court papers by these three methods.

In sum, plaintiff's complaint, as drafted, is not sufficient to state a claim for the violation of plaintiff's constitutional or statutory rights by the named defendants. The named defendants are immune from damages on the claims asserted in this *Bivens* action and the complaint lacks an arguable basis in law or in fact. Accordingly, plaintiff's complaint is dismissed pursuant to 28 U.S.C. § 1915(e).

WHEREFORE, it is hereby

ORDERED, that the complaint is dismissed with prejudice pursuant to 28 U.S.C. § 1915(e), and it is further

*4 ORDERED, that in light of the dismissal of this action, plaintiff's *in forma pauperis* application (Dkt. No. 2) is denied as moot, and it is further

ORDERED, that the Clerk of the Court serve a copy of this Order on plaintiff by regular mail.

IT IS SO ORDERED.

N.D.N.Y.,2005.
Humphrey v. Court Clerk, NDNY
Not Reported in F.Supp.2d, 2005 WL 2490155 (N.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

LexisNexis  *Total Research System*

Switch Client | Preferences | Sign Out | ? Help

Search  Research Tasks  Get a Document  *Shepard's®*  Alerts  Total Litigator  Transactional Advisor  Cour

**FOCUS™ Terms**                                    **Search Within** Original Results (1 - 1)    Go →

Advanced...

Source: Legal > / . . . / > **NY Cases, Administrative Decisions & Attorney General Opinions, Combined** ⁱ ¹
Terms: **1986 nyag lexis 26**  (Edit Search | Suggest Terms for My Search)

*1986 N.Y. Op. (Inf.) Att'y Gen. 120; 1986 N.Y. AG LEXIS 26, ***

OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF NEW YORK

Informal Opinion No. 86-59

1986 N.Y. Op. (Inf.) Att'y Gen. 120; **1986 N.Y. AG LEXIS 26**

September 24, 1986

### SYLLABUS:
**[\*1]**

PENAL LAW, §§ 265.00(10), 400.00(3) and (4).

The police authorities of the county or city where an application for a license to carry a firearm is made have responsibility for investigating the statements made in the application.

### REQUESTBY:
JAMES D. COLE, Assistant Attorney General in Charge of Opinions

### OPINION:

Bruce W. Musacchio, Esq.
Town Attorney
Town of Collins
P.O. Box 230
Gowanda, New York 14070

You have asked whether town supervisors of towns without police departments are required to perform pistol license investigations under section 400 of the Penal Law.

Applications for licenses to possess and carry firearms are made to the licensing officer of the city or county (Penal Law, § 400[3]). The licensing officers responsible for receiving these applications are defined by law (id., § 265.00[10]).

Before a license may be issued or renewed, the police authority "of the locality where such application is made" must conduct an investigation of all statements required in the application (id., § 400.00[4]). Because applications for firearm licenses and renewals are made to the licensing officer of the city or county, the police authority of the city or county where the application **[\*2]** is made is responsible for investigating the statements in the application (see, 1973 Op Atty Gen [Inf] 62). The town supervisor does not have responsibility to conduct such investigations. Applications for licenses by town residents would be made with the licensing officer of the county, and the investigation would be conducted by the police authority of the county.

We conclude that the police authority of the county or city where an application for a license to carry a firearm is made has responsibility for investigating the statements made in the application.

The Attorney General renders formal opinions only to officers and departments of the State government. This perforce is an informal and unofficial expression of views of this office.

## Legal Topics:

For related research and practice materials, see the following legal topics:

Criminal Law & Procedure > Criminal Offenses > Weapons > Licenses > Holders > Applications 
Criminal Law & Procedure > Criminal Offenses > Weapons > Licenses > Holders >
Carrying & Concealed Permits
Governments > Local Governments > Licenses


'Source: Legal > / . . . / > **NY Cases, Administrative Decisions & Attorney General Opinions, Combined** ⅰ ⅰ
  Terms: **1986 nyag lexis 26** (Edit Search | Suggest Terms for My Search)
  View: Full
Date/Time: Tuesday. September 1. 2009 - 11:48 AM EDT


Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator | Transactional Advisor |
Counsel Selector
History | Delivery Manager | Switch Client | Preferences | Sign Out | Help

**LexisNexis**    About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2009 LexisNexis, a division of Reed Elsevier Inc. All rights
reserved.