

Alfred G. Osterweil
310 Rossman Fly Road *(P.0.Box 173.)*
Summit, New York 12175

September 16, 2009

U.S. DISTRICT COURT
N.D. OF N.Y.
**RECEIVED**

SEP 1 7 2009

LAWRENCE K. BAERMAN, CLERK
ALBANY

The Honorable Gary L. Sharpe
Judge, USDC
James T. Foley Courthouse
445 Broadway, Room 441
Albany, New York  12207

Re: *Osterweil v. Bartlett, et al.*
        Northern District of New York
        09-CV-0825 GLS/DRH

Dear Judge Sharpe:

Enclosed please find Plaintiff's Memorandum and Appendix in opposition to Defendants' motion to dismiss the complaint.

By copy of this letter, we are forwarding another copy of the materials noted above to the Office of the Clerk.

Respectfully yours,

Alfred G. Osterweil

cc. Office of the Clerk
    encl.

U.S. DISTRICT COURT
N.D. OF N.Y.
FILED
AL

SEP 1 7 2009

LAWRENCE K. BAERMAN, CLERK
ALBANY

UNITED STATES DISTRICT COURT
NOTHERN DISTRICT OF NEW YORK

ALFRED G. OSTERWEIL,

                                                Plaintiff          09-CV-825

        -against-                                                  GLS/DRH

GEORGE R. BARTLETT, III, in his official capacity as
Licensing Officer in the County of Schoharie, DAVID A.
PATERSON, in his official capacity as Governor of New
York, and ANDREW M. CUOMO, in his official capacity as
Attorney General of New York

_____ _Defendants_

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

ALFRED G. OSTERWEIL, *pro se*
310 Rossman Fly Road
Summit, New York  12175
Telephone:  518-287-1646

# Table of Contents

**Preliminary Statement**...................................................................................2

**Argument**

    POINT 1

        THE MOVANT HAS FAILED TO ESTABLISH THAT
        PLAINTIFF CAN PRESENT NO PROOF TO SUPPORT
        HIS CLAIM WHICH WOULD ENTITLE HIM TO  RELIEF...............4

    POINT II

        PLAINTIFF SEEKS RELIEF FOR VIOLATIONS OF HIS
        FEDERAL    RIGHTS...............................................................5

    POINT III

        THE RIGHT TO BEAR ARMS AND THE SECOND CIRCUIT
        CIRCUIT COURT OF APPEALS.............................................6

        **A. THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT
        INCORPORATES THE SECOND AMENDMENT
        AND APPLIES IT TO THE STATES**.......................................6

        **B. SECTION 4 OF THE NEW YORK CIVIL RIGHTS LAW INCORPORATES
        THE SECOND AMENDMENT AND MAKES IT APPLICABLE TO
        THE STATE**................................................................. 7

    POINT IV

        BECAUSE PLAINTIFF IS ENTITLED TO POSSESS A GUN IN
        HIS NEW YORK HOME, DEFENDANT'S MOTION MUST
        BE DENIED...............................................................10

**CONCLUSION**................................................................................14

## Preliminary Statement

Plaintiff brings this action as a result of being denied a handgun permit by the Defendant Bartlett, the licensing officer of Schoharie County. In a written "decision" dated May 29, 2009, which contains some erroneous facts, Bartlett stated: "Since applicant admittedly is not a resident of the State of New York, his application for a pistol permit is denied."

The New York gun law designates different classes of people to serve as licensing officers, dependant upon the county. In Schoharie County, and other rural areas, the local County Court Judge is so designated. The process begins in Schoharie with the applicant filling out an application, naming references, being fingerprinted by the Sheriff's office after paying a fee to do so, and presumably, an investigation by the Sheriff comprised in part by contact with the named references. An FBI and state police check apparently is also performed by the Sheriff. There is no hearing, either judicial or administrative. There is no opportunity to call witnesses or to cross examine witnesses. In Schoharie, the County Court Judge, although not really sitting as a jurist, either grants or denies the applicant a license. In the case of Schoharie, the County Court Judge seems to portray the system as judicial in nature, clothing it with the trappings of his office, although the process is not even close to that. There is no due process.

Because there is no stenographic transcript to serve as a means of determining if the decision is consistent with the facts and the law, Plaintiff retained all the correspondence between himself and the licensing officer. Thus,  there are a number of letters between Plaintiff and the licensing officer as well as several affidavits submitted by Plaintiff

which we submit are relevant and necessary for a proper review of this matter. Plaintiff contends that these documents should properly serve as a *de facto* record of an administrative ruling made without live testimony. Accordingly, Plaintiff has appended to this Memorandum, all of the aforesaid documents, in chronological order. Plaintiff relies upon all matters sworn to by him during the application process.

Based upon the language of the "decision", it would appear that the only issue standing in the way of Plaintiff being granted a permit is the issue of residence. Presumably, if Plaintiff can prevail factually on the residence issue, he is entitled to a permit. On the other hand, Plaintiff acknowledges that there are other issues of great public concern associated with this matter, and Plaintiff chose to raise them in the complaint so that, in the event the State felt that the licensing officer did not adequately address them, they could be dealt with at this time without some sort of remand.

It was for that reason that Plaintiff, fully cognizant of the ruling in <u>Bach v. Pataki</u>, 408 F.3d 75, joined the Governor and Attorney General as parties. Plaintiff, a retired attorney, comes from a jurisdiction where the practice was to name the governor and attorney general to ensure the state's interests are fully protected rather than have a subdivision of the state take positions antithetical to those of the state. Plaintiff does not object to a dismissal as to those two Defendants if the court deems that to be appropriate.

3

<u>POINT I</u>

<u>THE MOVANT HAS FAILED TO ESTABLISH THAT PLAINTIFF CAN PRESENT
NO PROOF TO SUPORT HIS CLAIM WHICH WOULD ENTITLE HIM TO RELIEF</u>

We need go no further than to review <u>Smitherman</u>, annexed to defendant's motion, to review the standard applied by our courts. Clearly, such motions are granted in those rare situations where it appears beyond a reasonable doubt that irrespective of the proofs a plaintiff might provide, such proofs would not support a claim.

In addition, the case sets forth the safeguards which the court employs with respect to a *pro se* plaintiff. More specifically, the court reads the complaint and any accompanying papers with a view "to raise the strongest arguments they may suggest".

In this matter we have attempted to "put flesh on the bare bones of the complaint", by providing the Court with all the correspondence between the Plaintiff and the licensing officer, as well as the several affidavits the Plaintiff forwarded during the process. We trust that the Court will review this material as <u>Smitherman</u> suggests. We submit that these documents should serve as the "record" leading to the within matter.

We trust that the Court will not view our reliance on that standard of review as being disingenuous. Plaintiff is not the average *pro se* plaintiff. He is not unschooled in the law. However, it is equally true that a long time retired attorney from another jurisdiction who is without the library resources, the computer assets, the staff, a "file cabinet" of cases previously argued which are significant in this matter and even such mundane equipment as a heavy duty stapler to be utilized on his Memorandum, is at a distinct disadvantage to the Office of the New York Attorney General.

We submit that the within motion by the defendants should be denied in its entirety.

## POINT II

### PLAINTIFF SEEKS RELIEF FOR VIOLATIONS OF HIS FEDERAL RIGHTS

Plaintiff submits that all claims embodied in the complaint are Federal in nature with the single most important item of "damages" being his right to possess a gun in his home. Plaintiff maintained this action, not as an opportunity to even have a handgun, but rather to establish his right to possess same. That position was made clear in the several affidavits submitted to the licensing official, annexed to this memorandum.

There is a single item of money damages which Plaintiff seeks to recover. The Court will note from the accompanying documents that Plaintiff paid $105.00 to the County of Schoharie as a charge for fingerprinting. While the County may have the right to insist upon such fingerprinting, Plaintiff submits that the cost should have been borne by the County. A governmental entity has no right to charge a citizen a fee when he chooses to exercise a constitutionally guaranteed right. Murdock v. Pennsylvania, 319 U.S. 105 (1943).

## POINT III

### THE RIGHT TO BEAR ARMS AND THE SECOND CIRCUIT COURT OF APPEALS

#### A. THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT INCORPORATES THE SECOND AMENDMENT AND APPLIES IT TO THE STATES

Fully aware of U.S. v. Cruikshank, 92 U.S. 542 (1875), Presser v. Illinois, 116 U.S.252 (1886), and their progeny, Maloney v. Cuomo, 554 F. 3d 56 (2009), Plaintiff is prepared to approach the case at bar with a different view.

Initially, it should be noted that the Maloney court never delved into the incorporation theory as have other courts. See Nordyke v. King, 563 F. 3d 56 (2009).

While a District Court jurist is generally bound by the rule within his circuit, we see some avenues of rational disagreement if the facts can be distinguished. Let us compare the case at bar where the applicant sought the right to possess a handgun, and Maloney, where the weapon involved in a criminal proceeding was a chuka stick, also referred to as nununchakus.

If we examine the majority opinion in District of Columbia v. Heller, 128 S. Ct. 2783 (2008), we take a journey into history, replete with a search for the rights which free Englishmen enjoyed. Indeed it was precisely the rights which free Englishmen had that led the Court to determine that the Second Amendment protected an individual right. Justice Scalia's research confirmed the fact that, at the time the Bill Of Rights was

drafted, guns were a  common means of self protection in one's home.. We respectfully submit that our research fails to find any reference indicating that free Englishmen utilized nunchukaus at the time the Second Amendment was drafted. We concede that Maloney did not distinguish between various weapons, although it could have done so, thus avoiding its  broad ruling that followed

We submit that Maloney  made no effort to review all the other Supreme Court cases which held that other fundamental rights, embodied in the Bill of Rights, were made applicable, and incorporated, by the Fourteenth Amendment. We need not enumerate all of those rights here.

Beyond the views set forth herein, we request the court to take a second look at Maloney, after it has reviewed the two New York cases cited in this Memorandum in III B, *infra*.


## B. SECTION 4 OF THE NEW YORK CIVIL RIGHTS LAW INCORPORATES THE SECOND AMENDMENT AND MAKES IT APPLICABLE TO THE STATE

The proposition that the New York Civil Rights Law causes the Second Amendment to be incorporated into the fabric of New York law, was neither analyzed by the Court in Maloney, nor advanced by the plaintiff therein.

The language of the two documents dealing with the issue at hand  are virtually identical. The Second Amendment reads: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed." The New York statute removes the words "shall not" and replaces them with the word "cannot". It is axiomatic that when one governmental entity enacts the same

language which exists in another entity's body of law, it is presumed that it intended to accept all the interpretations given to the original document. We are unable to locate any authority in the Second Circuit dealing with this precise issue.

Further, New York's Constitution, <u>ARTICLE XII, SECTION 1</u>, states: "The defense and protection of the state and the United States is an obligation of persons within the state." The reference here is not limited to residents but encompasses all persons within the state.

We submit that when the Civil Rights Law is read in *para materia* with the constitutional provision, it becomes apparent that New York intended all persons within the state to protect the state using the tools which were considered as included within the ambit of the Second Amendment. More particularly, all persons, not merely "residents", would have the right to bear arms, more particularly guns, and the duty to protect the State of New York to the same extent the right and duty existed under the Second Amendment with respect to the Federal Government.

It further appears that several New York state courts have taken positions contrary to <u>Maloney,</u> and closer to the arguments advanced herein. In <u>Chwick v. Mulvey,</u> 2008, NY Slip OP 33486(U), the court dealt with challenges to a local statute which banned certain colors from being used on handguns. While plaintiffs were unsuccessful in their challenge, there is little doubt that the court went to great lengths to distinguish the facts from those in the <u>Heller</u> case, something which would have been unnecessary if it did not consider <u>Heller</u> applicable.

Thereafter, on May 21, 2009, some four months after the decision in <u>Maloney,</u> the Appellate Division decided the case of <u>People v. Perkins,</u> 2009 NY Slip Op 03962. That

case involved a conviction for criminal possession of a weapon. While the conviction was upheld, we call the Court's attention to the following language: "Defendant's reliance on ... *Heller* is misplaced. While the United States Supreme Court concluded in that case that the Second Amendment confers a constitutionally protected individual right to keep and bear arms as a means of self-defense within the home, it also held that the right conferred by the Second Amendment-and by extension, Civil Rights Law Section 4-is not absolute..."

This is powerful language and it appears to place the state court in a position which is totally antagonistic to the view of the Second Circuit.

The Plaintiff herein seeks to have this Court rule that he too has a constitutionally protected individual right to possess a gun in his home in Summit, New York as a means of protecting his family.

Plaintiff submits that this result may be achieved if the Court relies upon the referenced state court cases, the New York Civil Rights Law, the New York Constitution and the facts advanced by Plaintiff in the documents comprising the Appendix.

Point IV

## BECAUSE PLAINTIFF IS ENTITLED TO POSSESS A GUN IN HIS NEW YORK HOME, DEFENDANT'S MOTION MUST BE DENIED

Plaintiff submits that the Court should determine that Heller applies to the State of New York, and thus. Plaintiff would be entitled to a gun permit. Obviously, the entire thrust of Heller would be obliterated if citizens were not permitted to protect themselves and their families in their homes. And if a citizen, such as Plaintiff, has two homes, should he only be permitted to protect his loved ones in just one of those homes. Can it possibly be that the framers, who themselves were in Pennsylvania when the Second Amendment was drafted, away from their homes in the then thirteen colonies, believed that they could not protect themselves until they returned to their colony of domicile. We think not.

Nowhere in Heller is there a reference to residence, principal residence, domicile or other limiting terms. There is a single identified locus where a citizen has the right to be protected and that is his home. Justice Scalia was almost redundant with his constant reference to one's home and the right to protect its inhabitants. Plaintiff could go on further but this issue was raised at length by him before the licensing officer in the many letters and affidavits provided, all of which are appended to this brief as an Appendix.

The movant takes the position that even assuming, *arguendo,* the Second Amendment and Heller are applicable to the states, New York may, nevertheless enact reasonable standards for gun possession. We agree with that principle in the abstract. Justice Scalia mentioned several behavioral problems which might disqualify one from

gun ownership such as alcoholism, certain mental abnormalities and the like. All these dealt with personal traits. Then too, he indicated that guns might be disallowed in certain venues. At no time did he waver from the view that the core purpose of the Amendment was to protect the home and the family who lived in it.

Defendant, at page 8 of his brief, misstates Plaintiff's position when he writes: "Plaintiff argues that the simple purchase of real property in the State of New York grants him an enforceable, constitutional right to possess a handgun in that property". Continued reference is made to the <u>Bach</u> case which dealt with a visitor whose family resided in New York, he having no other contacts. The <u>Bach</u> court wrote: " ...New York can best monitor the behavior of those licensees who spend significant time in the State." On page 18 of his Memorandum, the Attorney General states, to argue the rationality of the New York statute, the following: " ...the state has endeavored to permit only those individuals with a **substantial connection** to New York to carry guns while in the state".

It is with the steadfast position of the State of New York that one must be domiciled within the state with which Plaintiff takes issue. Plaintiff submits that there is a violation of the Equal Protection Clause of the Fourteenth Amendment in the application of that rule to Plaintiff.

An issue before the Court is whether a gun applicant must be domiciled in New York to meet the test, or does he have to be within the state a certain number of days, and if so, how many days. If Plaintiff had done exactly what he did in terms of purchasing a second home out of state but retained his domicile within New York, would he be eligible to possess a gun. If Plaintiff had retained his New York domicile but had a practice of living in Europe or traveling cross country in a motor home for a significant portion of

the year would he still be eligible to possess a gun.

Permit us to analyze and compare the situation of a person who works in New York and is thus eligible for a gun license and a non domiciliary who has a home in New York where he spends his summers, some 3-4 months. Assume the employee works 40 hours per week and works 50 weeks annually. He is in the state a total of 2000 hours, if he performs no work in any other state. On the other hand, if a homeowner resides in the state for a period of 4 months, we can say that he is here for 120 days, and 24 hours per day or 2880 hours. In which situation is the state in a better position to monitor the gun owner.

New York courts have long recognized that in our modern and mobile society, an individual may maintain more than one bona fide residence. See, e.g., Matter of Gallagher v. Dinkins, 41 A.D. 946, aff'd 32 N. Y. 2d 839 (1973); Matter of Gladwin v. Power, 21 A.D. 2d 665, aff'd 14 N. Y. 2d 771 (1964); Matter of Chance v. Power, 14 A.D. 595, aff'd 10 N.Y. 2d 792 (1961). The facts in this matter demonstrate that this Plaintiff has more than one bona fide residence.

We assume, based upon his erroneous assertion as to Plaintiff's position that mere ownership of real estate entitles Plaintiff to a gun permit, that the movant prepared his argument in the absence of the materials we have provided in the Appendix. In the months leading up to the denial by the licensing officer, Plaintiff dealt comprehensively with virtually every issue raised in this motion. Perhaps the single issue which had the greatest amount of time spent in terms of analysis and "proofs" was the issue of residence. See, in particular, A-7, A-8, A-10, A-11 and A-18 of the Appendix.

Plaintiff, as an officer of the Court, now represents that he returned to New York

from Louisiana on June 4, 2009, and has been within this state continuously from that date at least to the date of mailing of this brief. Of course, the date of his departure will no doubt extend beyond the mailing date. If the Court prefers to have Plaintiff provide this information in affidavit form, Plaintiff will do so at the time the motion is heard.

A fair reading of those parts of the Appendix referenced above should establish that Plaintiff is not a mere landowner or one traveling through New York from time to time He has a home in Summit, indeed two homes as the "record" will reflect. He has numerous contacts and participates in local affairs in Summit. We submit that the test enunciated by Bach, has been met and even surpassed in the case at bar.

Can the Attorney General reasonably argue that New York's residency requirement, as applied to the facts in this case, can pass muster as a rationally related exercise of power which does not violate the Equal Protection Clause of the Fourteenth Amendment? We think not, and we urge the Court, irrespective of its view of Heller, to ultimately rule that Plaintiff's Fourteenth Amendment rights were violated as a result of being denied a permit to possess a gun in his home. We submit that the standard as applied to this Plaintiff was not rationally related to a legitimate governmental interest.

## Conclusion

For all the reasons set forth in this Memorandum and the Appendix annexed thereto, the motion by the defendants to strike the complaint should be denied in its entirety.

Alfred G. Osterweil, *pro se*
310 Rossman Fly Road
Summit, New York, 12175
Phone: (518) 287-1646

_____
Alfred G. Osterweil

14

## New York Miscellaneous Reports

CHWICK v. MULVEY, 13564/08 (12-18-2008)

2008 NY Slip Op 33486(U)

ALAN J. CHWICK, THOMAS G. FESS, and EDWARD L. BOTSCH, Petitioner, v.

LAWRENCE W. MULVEY, as Commissioner of the Nassau County Police

Department, the NASSAU COUNTY POLICE DEPARTMENT, and the COUNTY OF

NASSAU, Respondents.

13564/08.

Supreme Court of the State of New York,

Nassau County.

December 18, 2008.

[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]

KENNETH A. DAVIS, Judge.

The following papers read on this motion:

```
Notice of Motion/ Order to Show Cause .......... XX
Answering Papers' ............................. X
Reply ......................................
Briefs: Plaintiff's/Petitioner's ..........    X
Defendant's/Respondent's .............
```

Proceeding pursuant to, *inter alia*, CPLR Article 78 by the petitioners Alan Chwick, Thomas G. Fess and Edward L. Botsch for an order: (1) permanently enjoining the respondents from enforcing Nassau County Miscellaneous Laws, Title 69, Local Law 5-2008, as amended; and (2) for, in effect, a declaration that Local Law 5-2008, as amended, is: (i) unconstitutional under the **Second** Amendment to the United States Constitution and/or violative of New York Civil Rights Law § **4**; (ii) void as unduly vague, both facially and "as applied" to the petitioners; and (iii) pre-empted by relevant State Law enactments governing the regulation and

**Page 2**

licensing of handguns.

In May of 2008, the Nassau County Legislature enacted Local Law 5-2008, which, in sum, prohibits the possession of "deceptively colored handguns" (*see*, County of Nassau, Miscellaneous Laws, Title 69, Local Law, 5-2008 [1] [b], et *seq.*, as amended, Local Law 9-2008).

The statement of legislative intent accompanying the foregoing enactment reveals that the law was primarily created to: (1) protect police officers who might assume that a "deceptively" colored handgun is a toy; and (2) prevent injury or death to children or others who might similarly mistake such a weapon for a toy (Local Law 5-2008, § 2; Pet., Exh., "9" Tr., 37-69).

In part, the subject Local Law, as amended, defines a deceptively colored handgun as "any handgun which has a substantial portion of its exterior surface colored any color other than black, brown, grey, silver, nickel or army green" (Local Law, § 3 [b]). The Local Law further states that "[a] substantial portion of the exterior surface of a handgun shall be considered colored any color * * * [other than those listed above] if such color is used alone or as the predominate color in combination with other colors in any pattern * * *" (Local Law § 3 [b]). Section 3[c] defines the term "substantial portion of the exterior surface of a handgun" as either (1) "at least twenty five percent of the entire surface area of the handgun"; or (2) "the exterior surface of either the receiver or the slide of a handgun".

However, the Local Law excepts from its reach, handguns which
**Page 3**
are: (1) substantially plated with gold; (2) shaded blue by virtue of a so-called "bluing" process designed to limit rust or corrosion; (3) guns which qualify as antique firearms, as defined by Penal Law § 265; and (4) guns whose handles are "composed of ivory, colored so as to appear to be composed of ivory, composed of wood, or so colored as to appear to be composed of wood" (Local Law 5-2008, § 1[b], 6 [c]). Pursuant to section 6, it is unlawful to possess a deceptively colored handgun, which possession constitutes a misdemeanor punishable by a fine of not more than $1000.00 and "imprisonment of not more than one year or both" (Local Law 5-2008, § 5).

The Local Law also provides in substance, that within 30 days after the law's effective date, any one who possesses a hand gun covered by its provisions must turn the gun in to the County Police Commissioner to be disposed of; or (2) alternatively, must modify its appearance to conform with the law or face potential criminal liability (Local Law 5-2008, § 6 [a]). Subdivision 7 of the Local Law authorizes the Commissioner of Police to make and promulgate rules and regulations necessary to carry out its provisions.

By *pro se* verified petition filed July, 2008, the petitioners Alan J. Chwick, Thomas G. Fess and Edward L. Botsch commenced the within proceeding pursuant to CPLR article 78 for judgment permanently enjoining enforcement of, and/or striking down, the subject local law.

The petitioners primarily contend that the subject Local Law: (1) is preempted by applicable State law enactments which allegedly
**Page 4**
and fully, occupy the field of handgun regulation (Pet., ¶¶ 30-50 see, Penal Law §§ 265, 400, et *seq*.); (2) is unconstitutionally vague and ambiguous (Pet., ¶¶ 50-61); and (3) violates the **Second** Amendment to Federal Constitution and New York State Civil Rights Law § **4** (Pet., ¶¶ 62-66).

In further support of the petition, petitioner Chwick, a Nassau county resident, advises that he lawfully possesses two duly registered handguns, to wit: (1) a Kel-Tec, model P32 pistol, the substantial portion of which is a pink polymer color; and (2) a J. P, Sauer [& Sohn], Model 1930 pistol with a brown-colored lower frame, which is allegedly a family heirloom and valuable collector's piece, brought back by Chwick's father from World War II (Pet., ¶¶ 3-4; Exhs., "1" "3").

Petitioner Fess — a resident on Monroe County who attends sanctioned target shooting competitions in Nassau and Suffolk County — possesses a duly registered Glock, Model 20 pistol with a refinished slide piece styled in a multi-colored woodland camouflage pattern containing shades of brown, tan, green and black (Pet., ¶¶ 5-10; Exh., "3") (The petitioners have advised that co-petitioner Botsch is no longer a party to the proceeding)(Pets' Reply at 1, fn 1).

Contemporaneously with the submission of their verified petition, the individual petitioners sought a temporary restraining order predicated on the theory that absent an immediate stay of the law's enforcement, they would be subject to potential criminal liability by virtue of their continued possession of handguns which
**Page 5**
they claim qualified as "deceptively colored". However, during the pendency of that application, that parties entered into a stipulation by which the County agree, inter alia, to suspend its enforcement of the local law pending the disposition of this proceeding (Ans., Exh., "C," Tr. at 6-8).

The matter is now before this Court for review and resolution of the claims and assertions advanced by the petitioners. The petition should be dismissed. Preliminarily, while it is true, as the respondents assert, that a proceeding pursuant to CPLR Article 78 generally does not lie to challenge the validity of a legislative enactment (*New York City Health and Hospitals Corp. v. McBarnette*, **84 NY2d 194**, **203-204** [1994]; *Press v. Monroe County*, **50 NY2d 695**, **702** [1980] *see, Council of City of New York v. Bloomberg*, **6 NY3d 380**, **388** [2006]; *Timber Point Homes, Inc. v. County of Suffolk*, **155 AD2d 671**, **674**), "courts are empowered and indeed directed to convert a civil judicial proceeding not brought in the proper form into one which would be in proper form, rather than to grant a dismissal, making whatever order is necessary for its proper prosecution" (*Matter of First Nat. City Bank v. City of New York Fin. Admin.*, **36 NY2d 87**, **94**, [1975]; CPLR **103** [c]).

To the extent there is any technical infirmity in the petition by virtue of the statutory challenge advanced therein, the Court will construe that branch of the petition as requesting relief within the context of an appropriately framed action for declaratory relief (*e.g., Press v. Monroe County, supra*, at 702; *Matter of Ames Volkswagen v. State Tax Comm.*, **47 NY2d 345**, **348** [1979]; *Hudson*
**Page 6**
*Valley Oil Heat Council, Inc. v. Town of Warwick*, **7 AD3d 572**, **574**; *Janiak v. Town of Greenville*, **203 AD2d 329**, **331**; *Anonymous v. Peters*, **189 Misc.2d 203**, **206-207** [Supreme Court, Nassau County 2001]; CPLR **103** [c]).

Turning then to the merits of the dispute, the respondents initially contend that the camouflaged Glock weapon on which petitioner Fess' claims are predicated, is exempt from the reach of the statute, thereby undermining his claims of potential injury and alleged standing in the matter (Resp. Ans., ¶¶ 87-89, 107-108). The Court agrees.

Although the camouflaged, slide portion of the Fess Glock handgun is pattered with brown, green, tan and black colors (Pets' Exh., "3"), the only color which would arguably be prohibited by the law, is the tan component of the pattern, which: (1) constitutes, at most, perhaps 25% of the top or slide part of the handgun; and (2) is therefore not a "predominate" color component of the weapon, as defined by section 3[b].

Nor does the Fess weapon fall within the definitions contained in section 3[c]. Section 3[c] — which is framed in the alternative — defines the term "substantial portion of the exterior surface of a handgun" in the alternative, as *either*: (1) at least twenty five percent of the *entire* surface area of the handgun; or — separately, and with no qualifying requirements or reference to percent of composition — (2) "the *exterior surface* of either the receiver or the slide of a handgun"[emphasis added].

Since subdivisions 3 [c] [2] does not qualify its reference to
**Page 7**
the exterior surface of the slide or receiver by referring to a proportionate section thereof, the Court reads the phrase "exterior surface" in accord with its plain, textual meaning (Matter *of Theroux v. Reilly*, **1 NY3d 232**, **239** [2003], i.e., as a reference to the entire exterior surface of the slide or receiver. Inasmuch as the prohibited, tan color of the Fess weapon is not "prominent;" does not comprise at least 25% of the "entire" surface of the weapon; and does not by itself cover the "exterior surface" of "either the receiver or the slide of a handgun," the gun does not fall within the prohibitions of the Local Law with respect to deceptive coloration.

Similarly, the respondents contend (Ans., ¶¶ 107, 112) — and the petitioners reply papers do not dispute — that Chwick's J. P. Sauer [& Sohn], Model 1930 pistol, is not an illegal weapon under the law as amended, inasmuch as it is finished in brown and blue — colors which are not defined as prohibited under the Local Law, as amended. There is no dispute, however, that Chwick's pink, Kel-Tec, model P32 would fall within the scope of the Local Law's provisions.

With respect to those provisions, the petitioners' first contend that the subject Local Law has been pre-empted by Penal Law Articles 400 and 265, which respectively, govern handgun licensing and contain, *inter alia*, definitions of various firearms and other dangerous weapons.

It is settled that although "[l]ocal governments have been delegated broad powers to enact local legislation consistent with
**Page 8**
the State Constitution and general State laws relating to the welfare of its citizens (see, N.Y. Const. art. **IX**, § **2**; Municipal Home Rule Law § **10**) * * * [t]he doctrine of preemption represents a fundamental limitation on this delegation by prohibiting local legislation in an area that the State has clearly evinced a desire to preempt" (*Ba Mar,*

*Inc. v. County of Rockland*, <u>164 AD2d 605</u>, <u>612</u> *see; People v. Judiz*, <u>38 NY2d 529</u>, <u>531-532</u> [1976] *see also, DJL Restaurant Corp. v. City of New York*, <u>96 NY2d 91</u>, <u>95</u> [2001]; *Albany Area Builders Ass'n v. Town of Guilderland*, <u>74 NY2d 372</u>, <u>376-377</u> [1989]; *Jancyn Mfg. Corp. v County of Suffolk*, <u>71 NY2d 91</u>, <u>97</u> [1987]; *People v. De Jesus*, <u>54 NY2d 465</u>, <u>468</u> [1981]).

"Where the State has preempted the field, a local law regulating the same subject matter is deemed inconsistent with the State's transcendent interest, whether or not the terms of the local law actually conflict with a State-wide statute," since "`were they permitted to operate in a field preempted by State law, would tend to inhibit the operation of the State's general law and thereby thwart the operation of the State's overriding policy concerns'" (*Albany Area Builders Ass'n v. Town of Guilderland, supra*, at 377, *quoting from, Jancyn Mfg. Corp. v County of Suffolk, supra*, <u>71 NY2d at 97</u> *see, Vatore v. Commissioner of Consumer Affairs of City of New York*, <u>83 NY2d 645</u>, <u>649</u> [1994]; *Hertz Corp. v. City of New York*, <u>80 NY2d 565</u>, <u>569</u> [1992]; *Incorporated Village of Nyack v. Daytop Village, Inc.*, <u>78 NY2d 500</u>, <u>505</u> [1991]).

Significantly, "the Legislature need not express its intent to preempt * * * [since] [t]hat intent may be implied from the nature
**Page 9**
of the subject matter being regulated and the purpose and scope of the State legislative scheme, including the need for State-wide uniformity in a given area" (*Albany Area Builders Ass'n v. Town of Guilderland, supra*, at 377 *see, Cohen v. Board of Appeals of Village of Saddle Rock*, <u>100 NY2d 395</u>, <u>400-401</u> [2003]; *Vatore v. Commissioner of Consumer Affairs of City of New York, supra*, at 649; *Village of Lacona v. State, Dept. of Agr. and Markets*, <u>51 AD3d 1319</u>). Accordingly, in considering whether an intent to preempt exists, courts "will examine whether the State has acted upon a subject and whether, in taking action, it has demonstrated a desire that its regulations should preempt the possibility of discordant local regulations" (*Cohen v. Board of Appeals of Village of Saddle Rock, supra*, at 400).

However, the fact that "State and local laws touch upon the same area is insufficient to support a determination that the State has preempted the entire field of regulation in a given area" (*Jancyn Mfg. Corp. v. County of Suffolk, supra*, at 99 *see, Incorporated Village of Nyack v. Daytop Village, Inc., supra*, at 505). Indeed, "Local laws of general application — which are aimed at legitimate concerns of a local government — will not be preempted if their enforcement only incidentally infringes on a preempted field" or tangentially "impact on the State's interests" (*DJL Restaurant Corp. v. City of New York, supra*, <u>96 NY2d at 96-97</u>; *Incorporated Vil. of Nyack v. Daytop Vil., supra*, at 506).

Additionally, "if the State, through its legislative enactments, does not regulate the entire area of activities, a local
**Page 10**
law is not preempted merely because it prohibits conduct permitted by state law" (*Citizens for a Safer Community v. City of Rochester*, <u>164 Misc.2d 822</u>, <u>833</u> [Supreme Court, Monroe County 1994] *see also, Jancyn Mfg. Corp. v County of Suffolk, supra*, at 100; *People v New York Trap Rock Corp.*, <u>57 NY2d 371</u>, <u>378</u> [1982]; *People v. Judiz, supra*,

CHWICK v. MULVEY, 13564/08 (12-18-2008)

**38 NY2d at 531-532**
[1976]; *People v. Cook*, **34 NY2d 100**, **109** [1974]; *Belle v. Town*
*Bd. of Town of Onondaga*, **61 AD2d 352**, **356**; *People v. Ortiz*,
**125 Misc.2d 318**, **329** [New York City Criminal Court 1984]). Indeed,"unless
pre-emption is limited to situations where the intention is clearly to
preclude the enactment of varying local laws, `the power of local
governments to regulate would be illusory'" (*People v. Judiz*,
*supra*, at 532, *quoting from, People v Cook*, **34 NY2d 100**, **109** [1974]).
"Because Local Ordinances carry a strong presumption of validity, the
burden in on the challenger to show that an ordinance is preempted"
(*Black Car Assistance Corp. v. The County of Nassau*, Misc.3d,
2007 WL 4473344
at 18 [Supreme Court, Nassau County 2007]; *MHC Greenwood Village*
*NY, L.L.C. v. County of Suffolk*, **18 Misc.3d 312**, **319** [Supreme Court,
Suffolk County 2007]).

Upon applying these principles to the facts presented, the Court
concludes that the challenged Local Law neither infringes upon a
preempted field nor is otherwise invalid by virtue of any conflict with
existing State-law enactments.

Initially, the Court notes that the petitioners have not identified
legislative history or a specific statutory provision which expressly
advises that the State intended to preempt the
**Page 11**
entire field of handgun regulation "to the exclusion" of all local law
enactments (*Zorn v. Howe*, **276 AD2d 51**, **54-55** see, *People v. Judiz*,
*supra*, at 532 see generally, *Town of Concord v. Duwe*, **4 NY3d 870**, **873**
[2005]; *Vatore v. Commissioner of Consumer Affairs of City of New York*,
*supra*, **83 NY2d at 649-650**; *Jancyn Mfg. Corp. v County of Suffolk*,
*supra*, **71 NY2d at 98**; *People v New York Trap Rock Corp., supra*, at 377).

To the contrary, "[i]n the area of weapon regulation, the courts in
this state have upheld local laws limiting possession and use"
(*Citizens for a Safer Community v. City of Rochester, supra*, at 833
see also, *People v. Judiz, supra*; *People v. Ortiz, supra*; *Grimm v. City*
*of New York*, **56 Misc.2d 525** [Supreme Court, Queens County, 1968]). It
has been relatedly concluded that "[c]learly the State has not, either
directly or indirectly, regulated all aspects of gun possession and use
as to time, place and circumstance" (*Citizens for a Safer Community v.*
*City of Rochester, supra*, at 833 see also, *de Illy v. Kelly*, **6 AD3d 217**,
**218**; *People v. Ortiz, supra*).

To be sure, "Article 265 creates a general ban on handgun possession,"
while Article 400 of the Penal Law creates "a locally controlled
process" which constitutes "the exclusive statutory mechanism for the
licensing of firearms in New York State" (*Bach v. Pataki*, **408 F.3d 75**,
**79-81** [2nd Cir. 2005]; *O'Connor v. Scarpino*, **83 NY2d 919**, **920** [1994]).
However, the subject Local Law does not legislate in the area of
licensing criteria or, by its terms, directly preclude an applicant from
registering a handgun pursuant to Penal Law § 400. Moreover, neither
Article 265 nor Article 400
**Page 12**
prohibits — much less comprehensively addresses — the subject of
deceptively colored weapons of the sort at issue here, and thus neither
enactment evidences "any design or intention by the State to pre-empt

the entire field" relating to such weaponry (*Grimm v. City of New York, supra*, at 528 *cf., People v. Judiz, supra*). When so viewed, the Local Law "does not allow what the State law specifically forbids" (*People v. Ortiz, supra*, at 330), but rather, supplements "the State statute by adding" further restrictions applicable to a narrow species of weaponry not specifically addressed by the Penal Law (*Zorn v. Howe, supra*, **276 AD2d at 56** *see, People v. Judiz, supra*).

   It is settled that a local law is not preempted merely because it prohibits conduct permitted by state law (*Incorporated Village of Nyack v. Daytop Village, Inc., supra*, at 505; *Zorn v. Howe, supra*, **276 AD2d at 53-55**).
Additionally, the assertedly comprehensive nature of the Penal Law does not alone establish that the field has been occupied with respect to particular subject areas which it addresses (*Zorn v. Howe, supra*, **276 AD2d at 55** *see also, Incorporated Village of Nyack v. Daytop Village, Inc., supra*, at 507; *People v. Judiz, supra*). Indeed, it has been held that "[e]ven though the Penal Law listing of prohibited weaponry is comprehensive, * * * the weight of authority in this State is that the draftsmen of article 265 of the Penal Law did not intend to prevent municipalities from enacting reasonable supplementary legislation" (*People v. Ortiz, supra*, at 330; *see, People v. Judiz, supra; Citizens for a Safer Community v. City of Rochester, supra*).
**Page 13**
Nor does the Local Law directly supplant any specific State law enactment governing handguns. While Penal Law § **265.00** [20] currently refers to "disguised" weapons — defined, inter alia, as a weapon that "is designed and intended to appear to be something other than a gun" — the challenged Local Law addresses a distinct class of weapons implicating unique, underlying policy concerns and objectives, i.e., it is "aimed at the prevention of a particular type of abuse" (*People v. Judiz, supra*, at 532). Accordingly, the fact that Penal Law **265.00** [20] prohibits disguised weapons, does "not mean that local efforts to further control [handgun] use through direct prohibition upon possession itself * * * [are] precluded" (*People v. Judiz, supra*, at 531; *Citizens for a Safer Community v. City of Rochester, supra cf., Zorn v. Howe, supra*, **276 AD2d at 53-55**).

   Further, the exclusively local, Nassau County applicability of the subject law does not establish that the Local Law is invalid because of an alleged policy generally favoring statewide uniformity with respect weapons regulation. Indeed, a similar objection could have been made to the New York City "toy gun" ordinance which locally criminalized possession of certain toy pistols resembling real guns — an ordinance which the Court of Appeals upheld even though State Law, already expressly addressed and also criminalized the use of imitation or toy pistols (*People v. Judiz, supra see,* Penal Law §§ **265.01** [2], [4]).

   Lastly, the fact that a proposed — but as yet unadopted — amendment to the Penal Law relating to deceptively colored handguns,
**Page 14**
is now pending before the Legislature (see, New York Assembly Bill No. 2868; Pet., ¶ 35), does not alter this conclusion.

   The petitioners further assert both "as applied" and facially based claims to the effect that the challenged Local Law is unconstitutionally

vague since the provisions defining prohibited exterior colorations are
allegedly ambiguous and contradictory (see, Pets' Reply Brief at 8).

More particularly, the petitioners argue that sections 3[b] and 3[c]
are inconsistent and conflicting with respect to the key definition of
what constitutes "a substantial portion of the exterior surface of a
handgun" -- the language which effectively defines and thereby
criminalizes the colored weapons covered by the law (Pet., ¶ 61; Pets'
Reply Mem., 8-10; Chwick Aff., ¶ 14). Additionally, and according to the
petitioners, there is internal ambiguity in section 3 [c],
i.e., they argue that 3[c] [2] -- which refers, without qualification, to
the slide or receiver (frame) of a handgun -- can allegedly be read to
mean either the entire exterior portion of the slide/receiver or "any
portion" thereof "no matter how small" (Pet. ¶ 61; Chwick Aff., ¶ 14).
The Court disagrees.

Preliminarily, it has been held that "[w]here the State has delegated
the power to exercise the police power to a municipality * * * its
ordinances are entitled" to "an exceedingly strong presumption of
constitutionality", which plaintiffs must overcome beyond a reasonable
doubt (People v. Judiz, supra, at 531; People v. Ortiz, supra,
125 Misc. 2d at 321; Robert E. Kurzius, Inc. v. Incorporated Village
of Upper
Brookville, **51 NY2d 338**, **344** [1980];
**Page 15**
Dalton v. Pataki, **5 NY3d 243**, **255** [2005]; LaValle v Hayden, **98 NY2d 155**,
**161** [2002]). Further, and in general, when "determining the
constitutionality of the statute, the court must attempt to read it in a
manner which renders it constitutional and enforceable" (Anonymous v.
Peters, supra, **189 Misc. 2d at 214** see generally, People v.
Santorelli, **80 NY2d 875**, **876** [1992]; Alliance of American Insurers v.
Chu, **77 NY2d 573**, **584-585** [1991]; McKinney's Cons Laws of NY., Book 1,
Statutes § 150 [c]).

With these concepts in mind, and turning to the petitioners' vagueness
claim, it has been observed that "due process requires that a civil
statute or administrative regulation contain `a reasonable degree of
certainty so that individuals of ordinary intelligence are not forced to
guess at the meaning of statutory terms' "(Pringle v. Wolfe,
**88 NY2d 426**,
**435** [1996], quoting from, Foss v. City of Rochester, **65 NY2d 247**,
**253** [1985] see also, People v. Taylor, **9 NY3d 129**, **150-151** [2007];
Town of Concord v. Duwe, supra, **4 NY3d at 874**; County of Nassau v.
Canavan, **1 NY3d 134**, **138** [2003]; People v. Stuart, **100 NY2d 412**, **420**
[2003]; People v. Jang, **17 AD3d 693**, **694**).

On the other hand, "[t]he failure to define each term in a criminal
statute does not render the statute void for vagueness" (People v.
Garson, **6 NY3d 604**, **617** fn 7 [2006]). Nor will "imprecise language * * *
render a statute fatally vague so long as that language `conveys
sufficiently definite warning as to the proscribed conduct when measured
by common understanding and practices'" (People v. Foley, **94 NY2d 668**,
**681** [2000], quoting from,
**Page 16**
People v Shack, **86 NY2d 529**, **538** [1995]; United States v Petrillo,
**332 US 1**, **8** [1947] see also, People v. Kozlow, **8 NY3d 554**, **560** [2007];

*Ulster Home Care, Inc. v. Vacco*, 96 NY2d 505, 509 [2001]).

"As the term implies, an as-applied challenge calls on the court to consider whether a statute can be constitutionally applied to the defendant under the facts of the case" (*People v. Stuart, supra,* at 421). In contrast, when "pursuing a facial challenge, the defendant must carry the `heavy burden' of showing that the statute is impermissibly vague in all of its applications" (*People v. Stuart, supra,* at 421 *quoting from, Matter of Wood v Irving,* 85 NY2d 238, 244-245 [1995][emphasis in original]), i.e., the challenger must show that the statute is "`invalid *in toto* — and therefore incapable of any valid application"' (*People v. Stuart, supra,* at 421, *quoting from, Village of Hoffman Estates v Flipside,* 455 US 489, 495, fn5`[1982]; *Steffel v Thompson,* 415 US 452, 474 [1974]).

Significantly, where as here, a court is confronted with "both a facial and as-applied argument," the Court must first "decide whether the assailed statute is impermissibly vague as applied to the defendant. If it is not and the statute provides the defendant with adequate notice and the police with clear criteria, that is the end of the matter" (*People v. Stuart, supra,* at 422 *see also, Town of Concord v. Duwe, supra; People v. Taylor, supra,* at 150; *People v. Rubin,* 96 NY2d 548, 551 [2001]; *Ulster Home Care, Inc. v. Vacco, supra,* at 510).

Applying the foregoing principles to the facts presented, supports the respondents' assertion that the subject local law is
**Page 17**
not impermissibly vague as applied to the petitioner Chwick and his Kel-Tec, model P32 pistol. To the contrary, the foregoing weapon falls within the law's applicable and plainly crafted provisions relating to deceptively colored finishes and/or surface areas. Specifically, a review of the record — including the high quality color picture annexed as an exhibit to the petition (Pet., Exh., "2") — clearly establishes that the weapon's pink coloration is both "predominate" in its impact, as well as in its overall coverage of the weapon's exterior surface area — coverage which plainly and materially exceeds 25% thereof (cf., Pet., ¶ 4; Exh., "2").

Pursuant then, to sections 3[b], and 3 [c], which both define, *inter alia,* the phrase "substantial portion" of a handgun's surface area pink is: (1) a prohibited color; (2) it is also the "predominate" color in the weapon's exterior pattern, since it comprises the majority of the weapon's entire surface finish; and (3) in accord with subdivisions 3[c] [1], [2], it obviously exceeds 25% of the surface area of the entire weapon — and indeed, covers the entire lower potion/receiver of the weapon, and more. The Court discerns no conflicting provisions — and none have been expressly identified by the petitioners — which otherwise state or imply that Chwick's Kel-Tec handgun could, at the very same time, be viewed as legally colored and thereby exempt from the reach of the Local Law.

When so viewed, the applicable portions of the Local Law are not vague or ambiguous with respect to their particular and specific application to Chwick's weapon, but instead, "`convey[] sufficiently definite warning as to the proscribed conduct when measured by
**Page 18**

common understanding and practices'" (*People v Shack, supra,*
**86 NY2d at 538;**
*see also, People v. Foley, supra,* **94 NY2d at 681**). Nor do these
provisions of the local law, as applied to Chwick, leave the authorities
with "arbitrary rather than proper standards for enforcement"
(*People v. Stuart, supra,* at 424, fn 10 *see, Town cf Concord v. Duwe,
supra,* **4 NY3d at 874-875;** *County of Nassau v. Canavan, supra,*
**1 NY3d at 138-139**). Notably, the Court notes that the petitioners have not
addressed the respondents' "as applied" analysis in their reply
submissions.

    As noted previously (*see,* this decision, *supra,* at 5-6), the Court
also disagrees with the petitioners' additional theory that there is
internal ambiguity in section 3 [c], i.e., that 3[c][2] — which refers,
without qualification, to the slide or receiver (frame) of a handgun
— can allegedly be read to mean all or "any portion" of the slide or
receiver "no matter how small" (Pets' Reply, at 9-10: Pet. ¶ 61; Chwick
Aff., ¶ 14). In any event, where as here, "a person of ordinary
intelligence should know that the conduct at issue is prohibited by a
statute" that individual "should not benefit from any superfluous
discrepancy" not implicated by the specific factual circumstances
presented (*People v Taylor, supra,* at 151).

    In light of the above, the petitioners' alternative claim of facial
invalidity similarly fails, since when "there exists at least one
constitutional application of the statute, it is not invalid on its
face" (*People v. Stuart, supra,* at 422; *People v. Nelson, supra,*
at 308).
**Page 19**

    Lastly, the petitioners' reliance on the recent United States Supreme
Court holding in *District of Columbia v. Heller,* US, 128

    S.Ct. 2783 [2008] — and by extension — New York Civil Rights Law
§ **4**, is misplaced. In *Heller,* the Court engaged in a detailed textual
analysis of the **Second** Amendment and concluded, *inter alia,* that the
amendment created a constitutionally protected "individual right to
possess and carry weapons in case of confrontation" and for home self
defense (*Heller, supra,* at 2797, 2822).

    The flawed statute in *Heller,* however, differs materially from the
local law at issue here, since a determinative consideration which
influenced the Court was that the fact that the challenged enactment,
among other things "totally" and "absolutely" banned all handgun
possession within the District of Columbia (*Heller, supra,* at 2817-2818,
2822 *see, People v. Ferguson,* Misc3d, 2008 WL 4694552 at 3-4 [New York
City Criminal Court 2008]).

    Nor, in any event, did the *Heller* Court preclude all limitations upon
the individual use of handguns, but rather and to the contrary, was
careful to observe that its holding in no way precluded the imposition
of otherwise lawfully permissible restrictions upon the possession and
use of firearms (*Heller, supra,* at 2816, 2817, fn 26).

    The Court has considered the petitioners' remaining contentions and
concludes that they are lacking in merit.

# PEOPLE v. PERKINS

State of New York
Supreme Court, Appellate Division
Third Judicial Department

Decided and Entered:   May 21, 2009                    101608
_____

THE PEOPLE OF THE STATE OF
    NEW YORK,
                            Respondent,

        v                                    MEMORANDUM AND ORDER

SHAWN PERKINS, Also Known as
    CHARLES SHAWN PERKINS,
                            Appellant.
_____

Calendar Date:   March 27, 2009

Before:   Mercure, J.P., Spain, Kavanagh, Stein and McCarthy, JJ.

                        _____

        Brendan O'Donnell, Interlaken, for appellant.

        Robert M. Carney, District Attorney, Schenectady (Gerald A.
Dwyer of counsel), for respondent.

                        _____

Stein, J.

        Appeal from a judgment of the County Court of Schenectady
County (Drago, J.), rendered August 17, 2007, upon a verdict
convicting defendant of the crimes of criminal possession of a
weapon in the second degree and criminal possession of a weapon
in the third degree.

        In September 2006, defendant was involved in a verbal
confrontation with another person, which escalated to a point
when defendant drew a handgun and fired two shots at the victim
in front of the victim's home.   The victim was uninjured and
defendant fled the scene.   Defendant was subsequently indicted

for one count each of reckless endangerment in the first degree,[1] criminal possession of a weapon in the second degree, criminal possession of a weapon in the third degree, attempted assault in the first degree and attempted murder in the second degree. After a trial, the jury returned a verdict convicting defendant of criminal possession of a weapon in the second degree and criminal possession of a weapon in the third degree and acquitting him of the remaining charges. Defendant was thereafter sentenced to 8½ years in prison and 3½ years of postrelease supervision on the conviction for criminal possession of a weapon in the second degree and a concurrent sentence of 6½ years in prison with three years of postrelease supervision on the conviction for criminal possession of a weapon in the third degree. Defendant now appeals and we affirm.

We reject defendant's contention that the statutes under which he was convicted violate the Second Amendment of the US Constitution and Civil Rights Law § 4. Defendant's reliance on District of Columbia v Heller ( ___ US ___, 128 S Ct 2783 [2008]) is misplaced. While the United States Supreme Court concluded in that case that the Second Amendment confers a constitutionally protected individual right to keep and bear arms as a means of self-defense within the home, it also held that the right conferred by the Second Amendment — and, by extension, Civil Rights Law § 4 (see Chwick v Mulvey, 2008 NY Slip Op 22486[U], *19 [2008]) — is not absolute and may be limited by reasonable governmental restrictions (see District of Columbia v Heller, 128 S Ct at 2816).

Unlike the statute at issue in Heller, Penal Law article 265 does not effect a complete ban on handguns and is, therefore, not a "severe restriction" improperly infringing upon defendant's Second Amendment rights. Moreover, in our view, New York's licensing requirement remains an acceptable means of regulating the possession of firearms (see People v Morrill, 101 AD2d 927, 927 [1984]; People v Ferguson, 21 Misc 3d 1120[A], 2008 NY Slip Op 52112[U], *4 [NY City Crim Ct 2008]) and will not contravene

---

[1]   The People consented to the dismissal of this count on the first day of trial.

Heller so long as it is not enforced in an arbitrary and capricious manner (see District of Columbia v Heller, 128 S Ct at 2819).

   Here, defendant was not in his home at the time of the crime and did not have a valid pistol permit. Inasmuch as the relevant sections of the Penal Law are constitutionally sound and defendant's conduct did not conform to that which is protected by the Second Amendment and Civil Rights Law § 4, defendant's constitutional challenge lacks merit.

   Defendant failed to preserve his objection to the jury pool based upon comments made by two prospective jurors (both of whom were successfully challenged for cause), as he failed to raise the objection to the jury pool before the jury was empaneled (see People v Cosmo, 205 NY 91, 100 [1912]; People v O'Keefe, 281 App Div 409, 415 [1953], affd 306 NY 619 [1953]). Nor did defendant either request a curative instruction or object to its absence. Were we to consider defendant's arguments, we would find them to be unavailing in any event, as the prospective jurors' comments did not warrant a curative instruction and County Court's general admonishments to the jury pool adequately addressed any potential problems that defendant now raises on appeal.

   Defendant's challenge to his conviction of criminal possession of a weapon in the third degree based upon the absence of an inclusory concurrent count charge to the jury under CPL 300.43 (3) (b) is similarly unpreserved as he failed to request such charge or object to its absence before the jury retired to deliberate (see People v Dennis, 263 AD2d 618, 618 [1999], lvs denied 94 NY2d 822, 830 [1999]).

   Defendant's contentions concerning County Court's bases for sentencing are unpreserved for appellate review and, in all events, are unpersuasive. Moreover, "'[t]he mere fact that a sentence imposed after trial is greater than that offered in connection with plea negotiations is not proof [positive] that defendant was punished for asserting his right to trial'" (People v Riback, 57 AD3d 1209, 1218 [2008], quoting People v Simon, 180 AD2d 866, 867 [1992], lvs denied 80 NY2d 838 [1992]). With regard to defendant's claim that the sentences were harsh and

-4-                              '101608

excessive, inasmuch as we do not find that County Court abused
its discretion or that extraordinary circumstances exist to
warrant a reduction in the interest of justice, we decline to
disturb them (see People v Massey, 45 AD3d 1044, 1048 [2007], lv
denied 9 NY3d 1036 [2008]).

    Mercure, J.P., Spain, Kavanagh and McCarthy, JJ., concur.


    ORDERED that the judgment is affirmed.




            ENTER:

            Michael J. Novack
            Clerk of the Court

**APPENDIX TO PLAINTIFF'S MEMORANDUM OF LAW**

TABLE OF CONTENTS

A-1   Application Instruction Sheet

A-2   Application

A-3   Letter to Licensing Officer dated July 7, 2007

A-4   Letter to Plaintiff dated February 20, 2009

A-5   Letter to Plaintiff dated February 27, 2009

A-6   Letter to Licensing Officer dated March 3, 2009

A-7   Letter to Licensing Officer March 4, 2009

A-8   Affidavit by Plaintiff dated March 4, 2009

A-9   Letter to Plaintiff dated March 13, 2009

A-10  Letter to Licensing Office dated March 19, 2009

A-11  Affidavit by Plaintiff dated March 19, 2009

A-12  Letter to Plaintiff dated April 10, 2009

A-13  Letter to Licensing Officer dated April 13, 2009

A-14  Letter to Plaintiff dated May 1, 2009

A-15  Letter to Licensing officer dated May 6, 2009

A-16  Decision dated May 29, 2009

A-17 Second letter to Licensing Oficer dated March 4, 2009*

A-18  Supplemental Affidavit by Plaintiff dated March 4, 2009*

*  Denotes that document is not in proper chronological order

# INSTRUCTIONS FOR COMPLETING PISTOL PERMIT APPLICATION FORMS

1. ALL ENTRIES MUST BE TYPED OR PRINTED USING **BLACK INK ONLY**.

2. COMPLETE ALL SHADED AND UNSHADED AREAS <u>BELOW</u> THE "DATE OF ISSUE" LINE.

3. FILL OUT BOTH APPLICATION FORMS **EXACTLY** ALIKE.

4. PLACE ONLY **ONE** LETTER OR NUMBER IN EACH BOX.

5. USE THE FOLLOWING ABBREVIATIONS FOR   **EYE COLOR**:

   | | | |
   |---|---|---|
   | BK – BLACK | GN – GREEN | ML - MULTICOLORED |
   | BL – BLUE | HZ – HAZEL | OT - OTHER |
   | BR – BROWM | MR - MAROON | |
   | GY – GREY | PK - PINK | |

6. USE THE FOLLOWING ABBREVIATIONS FOR **HAIR COLOR** :

   | | |
   |---|---|
   | BK – BLACK | SD - SANDY |
   | WH – WHITE | BN – BLONDE/STRAWBERRY |
   | BR - BROWN | RD – RED/AUBURN |
   | GY – GRAY/PARTIALLY GRAY | |

7. HEIGHT MUST BE STATED IN **INCHES.**

8. CHARACTER REFERENCES SHOULD HAVE KNOWN YOU FOR **AT LEAST (6) SIX MONTHS**. THEY **MUST SIGN** BOTH APPLICATIONS IN PERSON AND GIVE THEIR **MAILING ADDRESS.   USE BLACK INK.**

9. CHARACTER REFERENCES SHOULD **NOT BE** YOUR RELATIVES, RELATED TO EACH OTHER, OR EMPLOYEES OF ANY LAW ENFORCEMENT AGENCY.

10. SIGN THE **FRONT AND BACK** OF EACH APPLICATION FORM, AND THE **BACK** OF THE LICENSE FORM. **USE BLACK INK**.

11. HAVE YOUR SIGNATURE SWORN TO BEFORE A NOTARY PUBLIC.  REMIND THE NOTARY TO **USE BLACK INK**.

12. SUBMIT **(3) THREE IDENTICAL** 2"x2" PHOTOGRAPHS, TAKEN WITHIN 30 DAYS.  THEY MUST CLEARLY SHOW YOUR FACIAL FEATURES, INCLUDING EYES, IF YOU WEAR GLASSES. **DO NOT ATTACH THE PHOTOGRAPHS TO THE FORMS.**

13. FEES : PAYABLE BY **U.S. POSTAL MONEY ORDER ONLY** - **2 REQUIRED**

   $   5.00   PAYABLE TO :   SCHOHARIE COUNTY SHERIFF   (application fee)

   $ 105.25  PAYABLE TO :   NYS DIVISION OF CRIMINAL JUSTICE SERVICES
   (fingerprint fee)

---

**\*\*\* PISTOL PERMIT APPLICATIONS CAN NOT BE PROCESSED UNLESS THESE INSTRUCTIONS ARE FOLLOWED EXACTLY \*\*\***

# SCHOHARIE COUNTY

## PISTOL PERMIT APPLICATION PROCESS INSTRUCTIONS

A. TWO TYPES OF PERMITS ARE ISSUED :

  1. CARRY CONCEALED ON PERSON
  2. POSSESS ON PREMISES

B. BASIC REQUIREMENTS :

  1. AT LEAST 21 YEARS OLD
  2. **FULL TIME RESIDENT** OF SCHOHARIE COUNTY
  3. NO CRIMINAL CONVICTION WHICH PROHIBITS POSSESSION OF FIREARMS
  4. FOUR CHARACTER REFERENCES **WHO ARE RESIDENTS OF SCHOHARIE COUNTY**
  5. COMPLETION OF THE BASIC HANDGUN COURSE

C. INSTRUCTIONS FOR COMPLETING APPLICATION FORM :   **** SEE OTHER SIDE ****

D. SUBMISSION OF APPLICATION :

  1. BRING COMPLETED APPLICATIONS, PHOTOGRAPHS, AND FEES, IN PERSON, TO THE SHERIFF'S OFFICE, 157 DEPOT LANE, SCHOHARIE, NY .

  2. APPLICATIONS WILL ONLY BE ACCEPTED WEDNESDAY NIGHTS IN THE JAIL FROM 6:30 – 8:30PM.

  3. THE APPLICATION WILL BE CHECKED FOR COMPLETENESS AND YOUR FINGERPRINTS WILL BE TAKEN.

  4. YOU WILL BE NOTIFIED AT A LATER DATE, WHEN THE BASIC HANDGUN COURSE WILL BE CONDUCTED. IT IS YOUR RESPONSIBILITY TO **ATTEND AND COMPLETE** THIS COURSE.

E. QUESTIONS REGARDING YOUR APPLICATION SHOULD BE DIRECTED TO :

  PISTOL PERMIT CLERK
  SCHOHARIE COUNTY SHERIFF'S OFFICE
  PO BOX 689
  157 DEPOT LANE
  SCHOHARIE,  NY  12157

  (518)  295-7080 OR  296-8888

  OFFICE HOURS MONDAY – FRIDAY  9:00am – 4:00pm

A – 1 a

INSTRUCTIONS: Print or type in black ink only

| NYSID NUMBER | | |
| LICENSE NUMBER | | |
| OF     E | | |

PPB-3 REV. 10/03

**STATE OF NEW YORK**

**PISTOL/REVOLVER LICENSE APPLICATION**

COUNTY OF ISSUE                                    CODE

EXPIRATION DATE          MONTH   DAY   YEAR

| MONTH | DAY | YEAR |
| --- | --- | --- |

LAST NAME

FIRST NAME     MI   MONTH   DAY   YEAR   SEX
                    DATE OF BIRTH

RESIDENCE ADDRESS                    CITY, VILLAGE, TOWN AND STATE IF OTHER THAN NEW YORK    ZIP CODE

HGT(INS)   WGT (LBS)   EYES   HAIR   RACE    SOCIAL SECURITY NUMBER    PRESENT OCCUPATION    CITIZEN OF U.S.A
                                                                         ☐ YES   ☐ NO

EMPLOYED BY                    NATURE OF BUSINESS    BUSINESS ADDRESS

I HEREBY APPLY FOR A PISTOL/REVOLVER LICENSE TO:     (Check one only)    ☐ CARRY CONCEALED    * POSSESS ON PREMISES

☐ * POSSESS/CARRY DURING EMPLOYMENT (* Premise address or place of employment must be provided)

A LICENSE IS REQUIRED FOR THE FOLLOWING REASON:
STREET ADDRESS OR OTHER LOCATION         CITY, VILLAGE, TOWN                ZIP CODE

**GIVE FOUR CHARACTER REFERENCES WHO BY THEIR SIGNATURE ATTEST TO YOUR GOOD MORAL CHARACTER**

| LAST, FIRST, MI | STREET ADDRESS | CITY, VILLAGE, TOWN | SIGNATURE |
| --- | --- | --- | --- |
| | | | |
| | | | |
| | | | |
| | | | |

HAVE YOU EVER BEEN ARRESTED, SUMMONED, CHARGED OR INDICTED ANYWHERE FOR ANY OFFENSE, INCLUDING DWI (EXCEPT TRAFFIC INFRACTIONS)?     ☐ YES   ☐ NO    IF YES, FURNISH THE FOLLOWING INFORMATION:

| DATE | POLICE AGENCY | CHARGE | DISPOSITION - COURT AND DATE |
| --- | --- | --- | --- |
| | | | |
| | | | |

| | | |
| --- | --- | --- |
| HAVE YOU EVER BEEN TERMINATED/DISCHARGED FROM ANY EMPLOYMENT OR THE ARMED FORCES FOR CAUSE? | ☐ YES | ☐ NO |
| HAVE YOU EVER UNDERGONE TREATMENT FOR ALCOHOLISM OR DRUG USE? | ☐ YES | ☐ NO |
| HAVE YOU EVER SUFFERED ANY MENTAL ILLNESS, OR BEEN CONFINED TO ANY HOSPITAL, PUBLIC OR PRIVATE INSTITUTION, FOR MENTAL ILLNESS? | ☐ YES | ☐ NO |
| HAVE YOU EVER HAD A PISTOL LICENSE, DEALER'S LICENSE, GUNSMITH LICENSE, OR ANY APPLICATION FOR SUCH A LICENSE DISAPPROVED, OR HAD SUCH A LICENSE REVOKED OR CANCELLED? | ☐ YES | ☐ NO |
| DO YOU HAVE ANY PHYSICAL CONDITION WHICH COULD INTERFERE WITH THE SAFE AND PROPER USE OF A HANDGUN? | ☐ YES | ☐ NO |
| HAVE YOU EVER BEEN CHARGED, PETITIONED AGAINST, A RESPONDENT, OR OTHERWISE BEEN A SUBJECT OF A PROCEEDING IN FAMILY COURT? | ☐ YES | ☐ NO |

IF ANSWER TO ANY QUESTION IS YES, EXPLAIN HERE:

PHOTOGRAPH
OF APPLICANT
TAKEN WITHIN 30 DAYS

———

FULL FACE ONLY

ANY OMISSION OF FACT OR ANY FALSE STATEMENT WILL BE SUFFICIENT CAUSE TO DENY THIS APPLICATION AND CONSTITUTES A CRIME PUNISHABLE BY FINE, IMPRISONMENT, OR BOTH.

I AM AWARE THAT THE FOLLOWING CONDITIONS AFFECT ANY LICENSE WHICH MAY BE ISSUED TO ME:

1. NO LICENSE ISSUED AS A RESULT OF THIS APPLICATION IS VALID IN THE CITY OF NEW YORK.
2. ANY LICENSE ISSUED AS A RESULT OF THIS APPLICATION WILL BE VALID ONLY FOR A PISTOL OR REVOLVER SPECIFICALLY DESCRIBED IN THE LICENSE PROPERLY ISSUED BY THE LICENSING OFFICER.
3. IF I PERMANENTLY CHANGE MY ADDRESS, NOTICE OF SUCH CHANGE AND MY NEW ADDRESS MUST BE FORWARDED TO THE SUPERINTENDENT OF THE STATE POLICE AND IN NASSAU COUNTY AND SUFFOLK COUNTY, TO THE LICENSING OFFICER OF THAT COUNTY, WITHIN 10 DAYS OF SUCH CHANGE.
4. ANY LICENSE ISSUED AS A RESULT OF THIS APPLICATION IS SUBJECT TO REVOCATION AT ANY TIME BY THE LICENSING OFFICER OR ANY JUDGE OR JUSTICE OF A COURT OF RECORD.

JURAT:
SIGNED AND SWORN TO BEFORE ME

THIS_____ DAY OF _____, 20_____

AT _____, NEW YORK

SIGNATURE OF APPLICANT

SIGNATURE OF OFFICER ADMINISTERING OATH

THIS FORM APPROVED BY SUPERINTENDENT OF STATE POLICE AS
REQUIRED BY PENAL LAW SECTION 400.00. SUBD. 3.

TITLE OF OFFICER

**APPLICATION NOT VALID UNLESS SWORN**

PPB3/PPB3A

| 1.   RIGHT THUMB | 2.   RIGHT FOREFINGER | 3.   RIGHT MIDDLE FINGER | 4.   RIGHT RING FINGER | 5.   RIGHT LITTLE FINGER |
|---|---|---|---|---|
|  |  |  |  |  |

| 6.   LEFT THUMB | 7.   LEFT FOREFINGER | 8.   LEFT MIDDLE FINGER | 9.   LEFT RING FINGER | 10.   LEFT LITTLE FINGER |
|---|---|---|---|---|
|  |  |  |  |  |

## PLAIN IMPRESSIONS TAKEN SIMULTANEOUSLY

LEFT FOUR FINGERS                          RIGHT FOUR FINGERS

THUMBS TAKEN TOGETHER

IMPRESSIONS
TAKEN BY:          NAME                                    RANK                SHIELD              DATE

APPLICANT'S SIGNATURE AND ADDRESS:

INVESTIGATION REPORT  -  ALL INFORMATION PROVIDED BY THIS APPLICANT HAS BEEN VERIFIED:

NAME                                         RANK              ORGANIZATION

RECOMMEND   APPROVAL - DISAPPROVAL:       (STRIKE OUT ONE)

THIS APPLICATION IS    APPROVED - DISAPPROVED   (STRIKE OUT ONE)         SIGNATURE OF INVESTIGATING OFFICER
                                                                 THE FOLLOWING RESTRICTION(S) IS (ARE) APPLICABLE TO
                                                                 THIS LICENSE:

          TITLE AND SIGNATURE OF LICENSING OFFICER

IF LICENSING OFFICER AUTHORIZES THE POSSESSION OF A PISTOL OR REVOLVER AT THE TIME OF ISSUE OF
ORIGINAL LICENSE, FURNISH THE FOLLOWING INFORMATION:

| MANUFACTURER | PISTOL OR REVOLVER | CALIBER | SERIAL NUMBER | MODEL | PROPERTY OF: |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

DUPLICATE OF THIS APPLICATION MUST BE FILED WITH THE SUPERINTENDENT OF STATE POLICE WITHIN 10 DAYS OF ISSUANCE AS REQUIRED BY PENAL LAW SECTION 400.00 SUBD.5.

PPB3A(PPB3)

A - 2. 1e



**Alfred G. Osterweil**
**P.O. Box 173**
**Summit, New York  12175**

July 10, 2008


The Honorable George R. Bartlett, III
P.O. Box 429
Schoharie, New York   12157

## Re:  <u>Handgun License</u>

Dear Sir:


Some months ago, I filed for a license to purchase and hold a handgun.  At that time I had been a full-time resident of Summit.  Shortly thereafter, it became expedient for me to change my primary residence and to become domiciled in another state.  When the Sheriff wrote to me with respect to a minor issue on my application, I took it upon myself to be entirely forthright and to advise him of the change in my status.  Thereafter, Sheriff Bates called me to discuss the issue.  He was most courteous and professional and suggested that there might be a problem because the State has been taking the position that an applicant must have his primary residence in New York. I intend to continue to own a home in New York as I do now; however, I intend to vote and obtain a driver's license in that other state.  I will utilize this Summit home as a summer home, spending the great majority of the year outside New York.

I have read the <u>Heller</u> case, which was decided shortly after I wrote to Sheriff Bates advising him of my projected move to another state.  That case was quite clear, it seems to me, stating that the Second Amendment was adopted to permit all citizens to own and bear arms to protect them in their homes.  The case never uses the term "residence", "principal residence", "domicile", or similar designation.  Justice Scalia referred to one's "home" throughout the majority opinion.  If the amendment was meant to permit me to protect myself in my home, is it not logical to assume that I have the same right in a second home?  Indeed, the founding fathers came to Philadelphia from all the thirteen states where they had their primary residences but stayed and lived in Philadelphia for long periods of time in a "second

A-3 a

home". They did not choose to limit the scope of the amendment to domicile, primary residences, and the like.

In the event the Court holds the same view as does Sheriff Bates and denies my application, I believe the issue is sufficiently significant for me to pursue the matter with vigor. While I am not admitted to practice law in New York, I am admitted to practice in New Jersey, the District of Columbia, the Third Circuit Court of Appeals and the United States Supreme Court. I am prepared to appear *pro se* to see this matter concluded as a natural extension of the <u>Heller</u> case.

Should the Court wish to establish a record, I would be very happy to appear before the Court at any time the Court feels it convenient. If the Court wishes to have me provide an affidavit to frame the issue, I would be happy to provide same. In short, I would hope that the Court will deal expeditiously with the issue before it with the knowledge that I will cooperate fully to meet any and all directives of the Court.

Respectfully yours,


Alfred G. Osterweil

Copy to Sheriff Bates


A-3 b



GEORGE R. BARTLETT III
COUNTY COURT JUDGE

WILLIAM J. MINKEL
COURT ATTORNEY

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF SCHOHARIE
THE COURTHOUSE - 290 MAIN STREET
P.O. BOX 669
SCHOHARIE, NEW YORK 12157
TEL: (518) 295-8342
FAX: (518) 295-7226

F. CHRISTIAN SPIES
CHIEF CLERK

February 20, 2009

Mr. Alfred G. Osterweil
310 Rossman Fly Road
Summit, New York  12175

      Re:    Pistol Permit Application

Dear Mr. Osterweil:

I met with Sheriff Bates on February 3, 2009 concerning various issues; and during that meeting, he indicated he had legal questions regarding your pistol permit application that he felt should be addressed by the Court prior to his office further processing your application. Accordingly, in order to avoid any <u>ex parte</u> discussions, I asked the Sheriff to forward your paperwork to me so that I could review your application and ascertain the issues involved with your permit application.

I have reviewed your file and it appears to me that there are two threshold issues. One being that the FBI has rejected your fingerprints twice due to the fact that the "quality of characteristics is too low to be used." Moreover, it appears that New York State DCJS was also unable to utilize your fingerprints in their record's check. There is also a note in your file, apparently from the Deputy who took your prints, indicating concern about the FBI being able to read your prints as, in his opinion, you did not have "prints to speak of. They are very worn."

Penal Law §400 requires an FBI fingerprint and NYS DCJS search prior to the issuance of a pistol permit, but does allow the issuing authority some discretion with respect to this requirement. As the failure to be able to read your prints is certainly not under your control, I would entertain a request to waive this requirement.

$A$-4$a$

Page 2

The second issue seems to be that you are not or will not be a resident of the State of New York. In this regard, New York Law has regularly held that pistol permits should be issued to residents only[1] (see, Mahoney v. Lewis, 199 A.D. 2d 734). However, I acknowledge your correspondence which sets forth your intention to maintain a second home in Schoharie County and certainly appreciate the fact that, as such, you will pay real estate taxes upon that property.

At this juncture, I would like to schedule an appearance in Court where you or your attorney can present any arguments in support of your application. In particular, I would be interested in your supplying any legal precedent supporting your position with regard to residency and in support of a fingerprint check waiver. Moreover, I would like the Sheriff to be present to explain the fingerprint situation and answer any questions you or your attorney may have.

I have, accordingly, scheduled this matter for an appearance on **Tuesday, March 24, 2009 at 1:30 p.m.** If you or your attorney wish to submit written, legal arguments prior to this date, please feel free to submit same. Also, should you wish to review your file, please call Kathy in my office to arrange for a convenient time to do so. Finally, if the date set for an appearance is not convenient for you, please call my office to reschedule.

Very truly yours,

GEORGE R. BARTLETT, III

GRB/klp

c:     Sheriff John S. Bates, Jr.
       F. Christian Spies, Chief Clerk

---

[1]In Mahoney v. Lewis, id. at p. 735 it was held that the "term residence [as used in Penal Law §400] is equivalent to domicile and requires something more than mere ownership of land."

A - 4 L



COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF SCHOHARIE
THE COURTHOUSE - 290 MAIN STREET
P.O. BOX 669
SCHOHARIE, NEW YORK 12157
TEL: (518) 295-8342
FAX: (518) 295-7226

GEORGE R. BARTLETT III
COUNTY COURT JUDGE

WILLIAM J. MINKEL
COURT ATTORNEY

F. CHRISTIAN SPIES
CHIEF CLERK

February 27, 2009

Mr. Alfred G. Osterweil
310 Rossman Fly Road
Summit, New York 12175

        Re:    Pistol Permit Application

Dear Mr. Osterweil:

        As set forth in my letter to you of February 20, 2009, a copy of which is
attached for your ready reference, Sheriff Bates has forwarded all your paperwork
on to me.

        This being the case, Sheriff Bates has forwarded me your e-mail dated
February 25, 2009 in which you ask him for a response.  I assume that from this e-
mail that you have not, as yet, received my letter.  Therefore, by copy of this letter
I ask the Sheriff to contact you by e-mail and verify that you have received the
Court's letters; and, if not, the Court will need your correct address.

                                Very truly yours,

                                GEORGE R. BARTLETT, III

GRB/klp
Enclosure
c:    Sheriff John S. Bates, Jr.

A — 5

**Alfred G. Osterweil**
P. O. Box 173
Summit New York 12175
March 3, 2009

Re: Pistol Permit

Dear Judge Bartlett

I will be sending you a package of materials with respect to my application, but I thought you might want to visit the FBI site with respect to fingerprinting, steps to take, the issue of worn fingerprints and other matters related to the fingerprinting done by sheriff's deputies..

None of the special steps suggested in the FBI article which is attached to this FAX were utilized when I was fingerprinted.

Respectfully.

Alfred G Osterweil.

Enclosures 12

By FAX to 518 295-7226

A - 6

Alfred G. Osterweil
P.O.Box 173
Summit, New York,12175
March 4, 2009

The Honorable George R. Bartlett,III
Schoharie County Courthouse
Schoharie, New York  12157

      Re: Pistol Permit Application

Dear Judge Bartlett,

I received your letter dated February 20, 2009, and wish to take this opportunity to reply to same.
At the outset, I cannot be present in Schoharie County on March 24, 2009. At this time I am  unable to
provide a date certain.

While I am aware of the adage that a lawyer who represents himself has a fool for a client, I will appear
*pro se* in this matter. I believe also that this case is important to many home owners in Schoharie
County who may vote in other states but return annually to Schoharie as their vacation residence.

I would like to take issue with several of the views set forth in your correspondence, and, in addition,
advance several facts and legal positions not touched upon by you.

Prior to analyzing the meaning and rationale of a  residency requirement, which you described as a
threshold issue, I should like to review some preliminary matters. It is my understanding that Schoharie
County, like many but not all counties,  falls into  that category where the statute requires that  a judge
be the "licensing officer". Because many categories of personnel, nonjudicial in nature, are designated
as licensing officers, and because this activity is administrative rather than judicial, I do not see any
basis to have a plenary hearing in this matter.  Indeed , I would strenuously object to such a hearing as I
believe it is unwarranted and might be construed to insulate any governmental entity and its agents,
servants and employees from the reach of  42 USC Sec.1983. Further it could  preclude me  from
proceeding directly to the  US District Court from any adverse decision. While I am not admitted to
practice in New York,  it is my understanding that if I were to proceed in a plenary hearing and be
denied a license, my remedy would be to appeal to a state court rather than a direct appeal to the federal
system. Beyond that, there is that old rule of law that I vaguely remember from law school that a
litigant must exhaust his administrative remedies prior to resorting to the courts.

A point which was omitted in your letter is the failure of the licensing officer to render a decision or
otherwise comply with the provisions of the statute within the prescribed time limits and its effect in
this case. My records reflect that I filed for the license on May 21, 2008, by handing a copy to a
sheriff's deputy who reviewed it and found it to comply with the statute. I thereafter received a letter

A-7a

from the sheriff dated June 24, 2008 (Attachment A), requesting me to stop down at his office to correct a minor matter on the application. I then wrote to Sheriff Bates, advising him that while I was still a full time resident of Summit New York, I intended to set up my primary residence in another state, retaining my Summit home as a vacation home (Attachment B). Sheriff Bates called me after receiving my letter and generally indicated that the issue of my future move would impact negatively on my application. At the time of his call, the U.S. Supreme Court had just decided the case of District of Columbia vs. Heller and I had obtained a copy of the slip opinion. I mentioned the case to Sheriff Bates but he had not yet read it. Based upon the holding in that case, I took it upon myself to write directly to you (Attachment C) to offer to provide you with additional information you might require to comfortably render a decision wherein you could adopt a new view of the residency requirements of the New York statute as now impacted by the Heller case.

I then met with Sheriff Bates on August 14, 2008, at which time he advised me that I would have to be re-fingerprinted. In fact I was re-fingerprinted on August 20, 2008. The only occasion I received any word from you was your recent letter dated February 20, 2009(Attachment D). I previously recognized that the residency requirement originally appearing in the statute probably dealt with the issue of monitoring and therefore, a detailed look into my background could convince the licensing official that perhaps I required less monitoring than other applicants.

I have provided, as Attachment E, some of the background facts I was prepared to provide by affidavit or otherwise had you responded to my letter.

But getting to the issue of the time lapse here and its effect, the statute provides that ..."Except upon written notice to the applicant specifically stating the reasons for any delay, in each case the licensing officer shall act upon any application for a license pursuant to this section within six months of the date of presentment of such an application to the appropriate party. Such delay may only be for good cause and with respect to the applicant. In acting upon an application, the licensing officer shall either deny the application for reasons specifically and concisely stated in writing or grant the application..." It is my contention based on the facts in this matter that my application must be considered as granted since I received no denial and no reasons for any such denial. Surely, every citizen is entitled to rely upon time limitations imposed upon public officials to the same extent that time limits are imposed upon him. For example, if I fail to file a civil complaint within the prescribed time, I am foreclosed from proceeding. There is a reason for the six month provision, and a general rule of statutory construction compels the courts to acknowledge this language and to give it meaning. If we do nothing with respect to a failure to act within six months, we will have written that provision out of the statute. Additionally, the statute provides that "The failure or refusal of the Federal Bureau of Investigation to make the fingerprint check...shall not constitute the sole basis for refusal to issue a permit..." I have never been given any reason for not receiving a permit.

Having dealt with the issue of timeliness required by the government, I should like to address the issue of residency and the Supreme Court decision in Heller. I have only the slip opinion and thus, cannot provide the official citation. The opinion of the court is clear and unequivocal. The language of the court is compelling. On page 64, :"In sum, we hold that the District's ban on handguns in the home violates the Second Amendment... the District must permit him to register his handgun and must issue him a license to carry it in the home." The term "home" is used repeatedly throughout the decision. There is no reference to residence, domicile, principal residence or any other term which could limit the scope of this protection in one's home. The entire purpose of the Second Amendment, to insure the safety of each individual in his home, compels us to insist that a so-called second home is entitled to no less protection than a single residence. What logic could possibly compel the Supreme Court to adopt a

$A - 7 \, b$

rule which leaves a citizen protected in only one of his homes. We contend that this ruling impliedly strikes down any state requirement that limits possession of a gun to a principal residence, domicile or other class of dwelling.

Admittedly, the court did refer to certain limitations that states could impose upon potential gun owners, but those limitations which appear on pages 54-56 deal with such issues as felons, persons with mental disorders and the like. There are no references to limitations on the type of dwellings in the recitation of the measures and areas of regulation and restriction a state might take. We submit that by enumerating areas of permissible regulation, and by omitting any reference to the type of home in that list, the court intended to strike down any such limitation. The axiom *expressio unius est exclusio alterius* seems applicable here. I hope I am forgiven if I have faltered in my Latin.

Further, we point to Article 2, Section 4 of the New York Civil Rights Law which provides: "A well regulated militia being necessary to the security of a free state, the right of the people to bear arms shall not be infringed," Thus, it is our contention that even absent the decision in Heller, any attempt by New York to limit gun ownership to certain classes of residents and deny such rights to other residents violate its own civil rights provision.

There is another rule of statutory construction which appears applicable, and that arises because New York copied, identically, the language for its Civil Rights Law as it appears in the United States Second Amendment. The rule of construction is that when a governmental entity enacts a statute, regulation or other legislation which contains the same language as appears in another entity's laws, the law presumes it had the same intent as the framers of the original document. Thus, in this situation, New York intended its act to have the same meaning and scope as the Federal provision. Since the Heller Court has interpreted the meaning of the Second Amendment, New York courts must adopt that same meaning. In this case, it means that the New York Civil Rights Act authorizes me to possess a gun in my home in Summit, irrespective of where I vote, so long as I continue to maintain a home there, as I do presently. This is not a rental property. It is my home

I will now deal with the issue of residency as though the Heller case did not exist and as though the New York Civil Rights Act was not a copy of the Second Amendment.. Your letter of February 20, 2009, cites Mahoney v. Lewis where it was held that the "term residence ...is equivalent to domicile and requires something more than mere ownership of land." Well, I have a rather large residence at 310 Rossman Fly Road and I have lived there for some years. I continue to live there and call it my home although I now vote in another state. In addition, we own another home in Summit, New York on Eagle Mountain Road in which we also live and which we also call home. Certain family situations compelled us to have these living arrangements but that is a personal matter and I need not burden anyone with those details. I have a great deal more here in Summit than mere ownership of land. But beyond that I am aware of the case of Bach vs. Pataki, decided by the 2nd CCA. I do not have the official case before me and thus, cannot provide the official citation. That case was brought by a person who had no home in New York but regularly visited his parents who did have a home somewhere upstate. That case was decided on the question of whether the Second Amendment was an individual right. The court ruled it was not an individual right, a position which is now in conflict with the Supreme Court..However, the Court of Appeals did provide its rationale for the residency requirement in *dicta* by Judge Wesley. The thrust of this *dicta* is that the state has an interest in monitoring citizens who have been licensed to have handguns to determine their continuing behavior and to be able to revoke licenses for poor judgment in the community. While *dicta* is not binding I believe I should deal with it in the event it were to become a factor here. Permit me to provide several alternative situations as follows: I continue to be domiciled in New York but I purchase a home in another state and spend

A-7 c

most of the year there while still retaining my Summit home. The only difference between that situation and mine is the change of the place I vote. Had I done that, there would be no residency issue here. Another situation which demonstrates the fallacy of the so-called monitoring issue would arise where I continue to be domiciled in Summit but I travel through Europe for a year or more, or if I purchase a motor home and spend most if not all of the year out of state. I submit that this monitoring issue might have had some efficacy when Summit, New York was inhabited solely by dairy farmers who took their product to market by horse and wagon. It has no validity in a modern society which is mobile and where citizens are more likely to vacation elsewhere for long periods and have second homes. Laws have to make sense. In some situations the passage of time or events not previously conceived cast a different light on a law.

With respect to my fingerprints, I do not wish to belabor the issue. The statute is clear that a license may be issued without them coming back from the FBI, and you indicated that it was not determinative to you. Obviously, it is beyond my control to provide fingerprints acceptable to the FBI. This is not an uncommon situation according to my research. Indeed, the sheriff's own printed form has a box to be checked for the failure to obtain acceptable prints. .The purpose of the prints is to assist in determining whether an applicant has a criminal record or other disqualifying aspect to his life, but there are other methods of investigation available to make these determinations.

Under all the circumstances set forth in this letter, I ask that you forthwith issue me a license for a handgun in my home.

As I indicated at the start of this letter I will not be available to speak to you personally in March, 2009, if you refuse to issue me a license at this time. I will be in Summit this summer, and if you order me to appear before you I will, as an officer of the court, comply. If I am so ordered, I would like to know whether this will be an administrative discussion or a court hearing, Further, because my case has generated so much interest from various not for profit organizations and so many gun owners in New York, I would like to bring along at least one interested New York journalist who is, himself, a gun enthusiast. Obviously, if you order a court hearing, such a hearing will automatically be open to the public.

Respectfully,

Alfred G. Osterweil

$A - 7\alpha$

# AFFIDAVIT

I, Alfred G. Osterweil, of 310 Rossman Fly Road, Summit, New York do hereby swear to the following statements as true to the best of my knowledge and belief and I acknowledge that I may be punished for contempt and convicted of other offenses if any of said statements are false:

1. I was born in Newark New Jersey,
2. I received a Bachelor of Arts degree from Rutgers University.
3. I received a Juris Doctor degree from Rutgers University School of Law
4. I was inducted into the Army of the United States and trained at Fort Dix, New Jersey
5. As part of that training I was qualified with trhe M1 Garand and won medals as a marksman and sharpshooter with it
6. I was also qualified with the 30 caliber air cooled machine gun, the 30 caliber water cooled machine gun, the Browning Automatic Rifle and the standard army 45 caliber sidearm.
7. I thereafter was shipped to Germany where I served in an elite group of 136 men scattered throughout Germany
8. That unit, The 66th Counter Intelligence Group required a security clearance several levels above top secret.
9. As a result I was fingerprinted and underwent a background check by the FBI which included interviews with my instructors from law school back to elementary school, a check with friends and associates, a review of all books in my home and even an interview with my dentist and family physician.
10. While in Germany I was in civilian clothes rather than uniform, I did not sleep nor eat in a military facility nor did I report to a military supervisor. I was authorized and did carry a 45 caliber sidearm.
11. Upon discharge, I commenced the practice of law which I followed until my retirement in 1998 in Edgewater New Jersey'.
12. I was admitted to practice and did appear in all courts in New Jersey, the District Court for the District of New Jersey and the 3rd Circuit Court of Appeals In Philadelphia. On motion, I argued before the New York Supreme Court at 10 Center Street, Manhattan. I never appeared before the courts in the District of Columbia nor the U.S.Supreme Court although I am admitted to practice in each of them.
13. For the last thirty or so years of practice I represented police organizations almost solely, Included in the one hundred or so organizations I represented were the police employed by the Port Authority of New York and New Jersey. As such I was privy to various anti-terror plans established at Kennedy International Airport, La Guardia Airport and Newark International Airport
14. I received an honorable discharge from the US Army and I was never the subject of discipline as an attorney.
15. I was never convicted of any crime, be it felony or misdemeanor nor have I ever been arrested
16. I have never been treated for any type of mental illness
17. I am not addicted nor have I ever been addicted to any drug or substance including alcohol
18. I am married with an adult daughter and two grandsons.

A-8a

19. I have two homes in Summit, New York and two homes in Many, Louisiana, I consider all of them my home and I rent out none of them

20. I have purchased guns in the past and have always been cleared to do so without any delay by the ATF. My most recent purchase which was within the past 30 days was a 22 caliber rifle

_____   3/4/09
Alfred G. Osterweil

This is to certify that the Affiant, Alfred G. Osterweil, did appear before me and swear to the truthfulness of the statements made therein.

_____   3/4/09
Cynthia A. Rollenhagen
Attorney-at-Law
State of New Jersey

A-8b



STATE OF NEW YORK
UNIFIED COURT SYSTEM
**SCHOHARIE COUNTY COURT**
THE COURTHOUSE PO BOX 669
SCHOHARIE, NEW YORK  12157
(518) 295-8342
FAX 295-7226

GEORGE R. BARTLETT, III
COUNTY JUDGE

March 13, 2009

Mr. Alfred G. Osterweil
P.O. Box 173
Summit, New York  12175

    Re:   Pistol Permit Application

Dear Mr. Osterweil:

    This will acknowledge receipt of your letter dated March 3, 2009 and two letters dated March 4, 2009.  I will attempt to answer your letters as best I can at this preliminary juncture.

    Pursuant to your request, the Court date scheduled for March 24, 2009 is cancelled.

    It was not my intention in my letter of February 20, 2009 to <u>order</u> you to attend a "plenary hearing" nor to preclude you from challenging any decision that you may disagree with as you seem to suggest in one of your letters of March 4, 2009.  Pursuant to common practice, and in fulfillment of my duties as licensing officer, I was merely trying to afford you an opportunity to, personally or through an attorney, present any facts and/or arguments you wished directly to the Court. Moreover, such an appearance would give you a full opportunity to set forth any facts you wished to present regarding your nexus to Schoharie County, New York, or to present other potentially pertinent facts concerning your application.

    In any event, if you do not wish to appear before the Court, I will certainly not require your attendance at this time.

*A-9  a*

Page 2

Accordingly, please advise the Court as to whether you would like me to reschedule the March 24, 2009 appearance, which you previously advised that you cannot attend, or whether you do not wish appear at all.

In answer to your concern about a hearing precluding your right to seek review of the Court's decision should it deny your application, I would suggest you consult with an attorney familiar with Article 78 proceedings[1] or any analogous federal challenges.

Next, I will attempt to address your concern about the fact that although your application was filed on May 21, 2008, you do not have a decision as yet. In this regard, I direct your attention to Article 400 of the New York State Penal Law. Penal Law §400.00 requires that prior to the issuance of a license, "the duly constituted police authorities of the locality where such application is made" (here the Schoharie County Sheriff) conduct an investigation. There are certain statutory requirements entailed in this investigation, including a fingerprint check by FBI and search by DCJS. It is my understanding that the Sheriff has not been able to complete his investigation, as he has been unable to obtain proper searches as your fingerprints have, to date, not been of sufficient quality to allow for completion of these checks.

I realize your frustrations and that this is not your fault. However, it is not the Sheriff's fault either. It simply remains an issue that prevents the completion of the necessary investigation.

For your information, at the time the NYS Legislature inserted the requirement of an FBI fingerprint check, the FBI did not honor requests for fingerprint search checks for pistol permit applications. Accordingly, in 1971, the Legislature amended Penal Law §400.00(4) to provide that the FBI's failure to run a fingerprint check shall not constitute the sole basis of a refusal to issue a permit (see, 39 _McKinney's Consolidated Laws of New York_, _Practice Commentary by William C. Donnino_, Penal Law §400.00 at pp. 68-69.) Subsequently, the FBI started honoring requests for fingerprint checks.[2]

---

[1]. See, NY Civil Practice Law and Rules (CPLR) §§ 7801 et. seq.

[2]Please note that, although the statute provides no exceptions to fingerprint search requirements in order to accommodate the fact the FBI may not perform a search, the Court may not deny an application solely because the FBI did not provide a check. In order to allow you to provide fingerprints, I will request the Sheriff to see if he can utilize any different methods; and, in this regard, will forward him the literature you sent to me. Also, it is my understanding that

A - 9 d

Page 3

## Conclusion

Rather than trouble you with the time and expense having your fingerprints retaken and resubmitted, without knowing an answer to your eligibility issue as a nonresident property owner, you may wish the eligibility issue be decided first. That way, if it is determined that you are not eligible, you need not to go to the additional trouble and expense of being re-fingerprinted. If, however, the Court determines that you are eligible for a permit, even though you are not a resident, you would need to resubmit your fingerprints to allow the Sheriff to complete his investigation. If you disagree with this process and wish to have the fingerprint process finished first, please advise on or before April 15, 2009.

Please advise on or before **April 15, 2009** whether you wish to appear before the Court. If you wish to appear, please plan to submit any supporting documentation or written arguments at or prior to that time. If you wish to waive an appearance, please advise the Court as soon as possible and submit any further written arguments on or before April 15, 2009, including, at a minimum, an affidavit or affirmation setting forth the facts as to your residence and your nexus with Schoharie County, New York. I note that you have submitted an affidavit dated March 4, 2009 and appreciate receiving the information contained therein. However if you do decide to appear, I would still request you to submit an affidavit or affirmation prior to your appearance detailing your residence status.

Thank you very much for your attention to this matter, and your efforts to properly frame the issue.

Date: March 13, 2009            Very truly yours,
      Schoharie, New York

                                GEORGE R. BARTLETT, III

GRB/klp

c:    Sheriff John S. Bates, Jr. (w/literature)

---

there has been some success in restoring fingerprints through treatment by a dermatologist or by the use of protective gloves until ridges grow back.

A - 9 · c

**ALFRED G. OSTERWEIL**
P.O. Box 173
Summit, New York, 12175

Dear Judge Bartlett,

I received your your letter dated March 13, 2009, and wish to respond to several of the positions you have set forth..

You now state that the reason for not complying with the requirement that a decision on the application must be reached within six months or the applicant be given reasons for non-compliance was the fact that "the Sheriff has not been able to obtain proper searches as your fingerprints have, to date, bot been of sufficient quality to allow for completion of these checks."

First, the statute requires the licensing officer to specifically state in writing the reasons for any delay and such delay may only be for good cause. I am sure you will acknowledge that I received no such notice from the licensing officer.

Additionally, you yourself, in your letter to me dated February 20, said that section 400 of the Penal Law " requires an FBI fingerprint and NYS DCJS search prior to the issuance of a pistol permit, but does allow the issuing authority some discretion with respect to this requirement. As the failure to be able to read your prints is certainly not under your control, I would entertain a request to waive this requirement."

I find it somewhat disquieting that you are now stating that the fingerprinting is a necessity and cannot or will not be waived.

Further you provide a bit of legislative history, presumably to bolster this new position you have enunciated where fingerprinting is apparently now essential. More specifically, "...at the time the the NYS Legislature inserted the requirement of an FBI fingerprint check, the FBI did not honor requests for fingerprint search checks for pistol permit applications. Accordingly, in 1971 the Legislature amended Penal Law...400.00(4) to provide that the FBI's failure to run a fingerprint check shall not constitute the sole basis of a refusal to issue a permit.....Subsequently, the FBI started honoring requests for fingerprint checks." May I respectfully point out that once the FBI started honoring these requests for fingerprint checks, the Legislature could have easily removed the language which to this day says that a failure by the FBI to return the check was not by itself grounds for refusal to grant a permit. Indeed, by keeping the language after the FBI commenced honoring requests, we should interpret that refusal by the legislature to modify the language as its strong intent to require more than a lack of an FBI check to deny an application.

You refer obliquely to the fact that I forwarded to you an article dealing with difficult fingerprinting situations and methods commonly used to create workable prints This was from an FBI site, and I stated that none of the techniques suggested by the FBI were utilized with me. How ironic it is that you

A-10a

are now suggesting that the Sheriff utilize those methods when I am once more fingerprinted.

I now refer to a sentence in your "Conclusion" which appears quite ominous and, I respectfully submit, inappropriate.. That sentence reads as follows: "If however, the Court determines that you are eligible for a permit even though you are not a resident,you would need to resubmit your fingerprints to allow the Sheriff to complete his investigation."

In this sentence, you once more elevate an FBI fingerprint report as being essential before any permit can be issued, contrary to my view of the statute and your own analysis. To me this represents a complete about face from your earlier position and I am having great difficulty in understanding how or why such diametrically opposing positions can exist or be compatible.

My position is that the Sheriff has done his investigation by contacting the references I named, all of whom have responded and by fingerprinting me on two separate occasions. That the fingerprints were not adequate has been dealt with by me, and until this recent letter of yours, appeared inconsequential. Beyond that the Sheriff is not the licensing official, and he is not charged with deciding what investigation is sufficient. That you may utilize his services does not make his judgment critical in this matter. I presume that he does those ministerial acts which you request of him. I do not believe that he is vested with any statutory decision making powers, and I do not believe that your powers are delegable to him or any other person.

Additionally, you state that I am "not a resident," I believe I am a resident of Schoharie County although I am domiciled elsewhere. Beyond that you seem to be prejudging this matter on the basis of residence, not withstanding the Supreme Court's reference to one's home as being the determinative factor for gun ownership.

With respect to testimony or affidavits, you will recall that I offered to appear before you to provide you with all the information you might need by letter of July 10, 2008, to which you never responded. That was long before six months elapsed. Thereafter, I provided you with two affidavits although your letter refers to a single affidavit. Perhaps that second affidavit was misplaced. In any event I will provide you with additional copies of both prior affidavits as well as a third affidavit with this letter. Frankly, I do not see the necessity of any proofs demonstrating my "nexus to Schoharie County." I recall that you relied on a state court decision, Mahoney v. Lewis, which in your view defined the term residence as more than mere ownership of land for the purpose of the penal code. While I believe I meet the definition as enunciated by that case, even if I do not, I submit that the Heller case trumps any existing law in conflict with it. As I have repeatedly maintained, I believe you should focus on whether I reside in a place that meets the definition of home, the word used repeatedly by the Supreme Court

I make no requests. If you ask something of me, I shall comply. In any event, I cannot be available and present in Schoharie County prior to April 15, 2009. Based upon the indications in your letter, you will bifurcate my application and first determine if I am otherwise entitled to a pistol permit, and if you so find, you will thereafter require another attempt to fingerprint me. While I do not believe such fingerprinting is necessary, in order to speed this process up, I will consent to be re-fingerprinted if you decide the eligibility issue favorably to me.

You suggested that I familiarize myself with Article 78 Proceedings. I have participated in such a hearing in New York, and in other jurisdictions where it is referred to as an Action In Lieu Of

A-10 b

Prerogative Writ. In such actions a Pettitioner seeks relief from an administrative ruling on the grounds that it is arbitrary and capricious. There is a heavy burden on the Petitioner and deference is given to the agency. Rather than take that route and stay within the state Ccourt system in Schoharie County, I believe a more direct method of challenging your ruling would be to go directly to the U.S. District Court by filing an action pursuant to 42 USC: Section 1983. In order to save your law clerk a few steps, I am enclosing a copy of the referenced statute.

What is interesting in this matter is that I, as an officer of the court and an honest citizen, chose to voluntarily advise the  sheriff that I was changing my domicile, without which information my application would probably  have sped through. I do not regret my forthrightness nor do I expect any accolades for doing what is right.

On the other hand, I am deeply disappointed in a system where  honest citizens are put through a painstaking process in which government officials are virtually dedicated to denying them rights guaranteed them by the Constitution. We seem to have lost sight of the fact that the Second Amendment was enacted to protect these citizens from those very same government officials who have erected the barriers to the exercise of their constitutional rights.

Respectfully,

Alfred G. Osterweil

3/19/09

A—10 C

# AFFIDAVIT

I,Alfred G. Osterweil,of 310 Rossman Fly Road, Summit, New York do hereby swear to the following statements as true to the best of my knowledge and belief and I acknowledge that I may be punished for contempt and convicted of other offenses if any of said statements are false.

1. This third affidavit is provided to Judge Bartlett consistent with his letter dated March 13, 2009.
2. I incorporate by reference herein, any statement of fact I made in any correspondence to Judge Bartlett, and swear to those statements as being true.
3. Title to my home located at 310 Rossman Fly Road was closed on April 1, 2003.
4. From that time to today, my wife and I have played and continue to play a role in town affairs and we continue to participate in all social, political and community affairs.
5. We continue to be members in and pay dues to the Summit Snowriders, a social group dedicated to the outdoors and snowmobiling.
6. We continue to be members in and pay dues to the Summit Conservation Club, a group dedicated to the preservation of the environment.
7. I was a commissioner on the Summit Fire District Board of Commissioners but chose not to run for reelection after receiving a legal opinion that I had to be a registered voter to hold this office.
8. I was an unpaid member of the Board of Directors of Western Catskills Revitalization Corporation, a not for profit entity that distributes grants and services to needy applicants in Delaware and Schoharie Counties principally. I was compelled to leave because of a by-law which had certain attendance requirements I could not achieve.
9. My wife was a member of the Study Committee to create a new town master plan, and she participated for approximately three years up to its completion. While I was not named to that committee, I would attend many of its meetings to add such comments and give as much input as I could based on my experiences with other master plan committees.
10. My wife was also appointed to the Summit Town Planning board, and she attended regularly until she received a legal opinion that she had to be a registered voter to continue to serve.
11. Even after we had purchased a home in another state, we continued to be involved in local matters, attending town board and other town meetings.
12. With respect to the Summit Fire Department, I have a close relationship with the former and present Chiefs, and I continue to monitor current fire department matters even when I am not in town, by phone and e-mail.
13. On or about June, 2007, we purchased a home located at 159 Eagle Mountain Road, Summit, New York. Even after we had decided to purchase a home in another state, we had a garage/barn built on the Eagle Mountain property at a cost in excess of 30,000 dollars. That work was completed on or about June,2008.
14. We continue to rent a mail box in Summit, New York,
15. We do not rent out either property nor have we put either of them up for sale.
16. We have many friends in Summit and we continuer to be in contact with them, This includes all

A-11-a

the references I supplied to the Sheriff on my application.

17. I am on a first name basis with the Town Supervisor, the members of the Town Board and the members of the Planning Board.

18. My wife continues to be a member of a church in Jefferson, Schoharie County, thus tithing and otherwise contributing to the church and the Schoharie County community.

19. I am on a first name basis with her Pastor and have contributed funds to many local charitable causes administered by the Pastor.

20. I remain a taxpayer of not inconsiderable sums, and I will continue to oversee my local and county governments to ensure a reasonable basis for any increases.

21. I purchased a home in another state for health reasons, an attempt to avoid the severe winters we have and other reasons personal to us.

22. I have attached to this affidavit a copy of the letter I faxed to Judge Bartlett with respect to the FBI site dealing with fingerprinting

23. During this past winter, while we were in warmer climes, my daughter had occasion to live in our home at 310 Rossman Fly Road.

24. My brother-in-law and my sister-in-law reside in their home on Lang Road, Summit, New York.

25. My mother-in-law resides in Summit, New York, and due to her age and infirmities, requires assistence provided regularly by Summit home care personnel.

26. With respect to the issue of "monitoring" I can be monitored quite adequately as compared to a gun owner in a county of a million or more people as is the case in other counties even assuming monitoring is a valid consideration in view of the Supreme Court ruling in the Heller case...

_____   3/19/09
Alfred G. Osterweil

This to certify that the Affiant, Alfred G. Osterweil,
did appear before me and swear to the truthfulness of the statements made therein.

_____   3/19/09
Cynthia A. Rollenhagen
An Attorney-at-Law
State of New Jersey

A-116



**COUNTY COURT OF THE STATE OF NEW YORK**
**COUNTY OF SCHOHARIE**
PO BOX 669
SCHOHARIE, NEW YORK 12157
(518) 295-8383 : FAX 295-8451

GEORGE R. BARTLETT III
JUDGE

April 10, 2009

Mr. Alfred G. Osterweil
192 Lawson Lane
Many, Louisiana 71449

      -and-                              Re: Pistol Permit Application

Mr. Alfred G. Osterweil
P.O. Box 173
Summit, NY 12175

Dear Mr. Osterweil:

      This will acknowledge you letter and affidavit dated March 19, 2009.

      To avoid any potential confusion or misunderstanding, you are not required to personally appear in Court on <u>April 15, 2009</u>, or at any other time. If you would like to appear in the future to be heard on your application, please advise the Court at your earliest convenience and I will schedule your appearance for a mutually convenient date.

      If I do not hear from you by <u>April 24, 2009</u>, I will assume that you have waived your right to a personal appearance, deem your application to be fully submitted and then proceed to determine it.

      Thank you.

Date: April *10*, 2009
      Schoharie, New York

                        Very truly yours,

                        George R. Bartlett III, J.C.C.

Papers considered:

*A-12*

Alfred G. Osterweil
310 Rossman Fly Road, Summit, NY 12175
195 Lawson Lane, Many, La. 71449
April 13, 2009

Judge George R. Bartlett lll
Schoharie County Courthouse
Schoharie, N.Y. 12157

Dear Judge Bartlett:

I received your letter dated April 10, 2009, on this date.

I previously indicated that I could not be present on April 15 to appear in your court. I also indicated that it was not my original intent to request such an appearance as the statute does not appear to have any procedure for the presentation of witnesses, cross examination of witnesses or the right to subpoena witnesses or physical evidence.

Quite frankly, it seems to me to be a simple question of whether you will follow the mandate of the U. S. Supreme Court and rule that I have an absolute right to possess a gun in each of my homes, barring any personal disqualification such as a criminal record, mental instability or the like.

When I first wrote to you shortly after the Heller case was decided, and offered to appear personally, I did so to provide you with any background information you might need to feel comfortable, knowing that this application might represent a departure from the traditional view I understand you have held. Since then, I have provided you with a plethora of information, all under oath, some of which you requested.

I believe that I have set forth all the information that might be relevant to my application, thus negating any need for me to appear personally, assuming, *arguendo,* that such personal appearances are contemplated by the statute.

However, because I believe so strongly in this cause, and I do not wish to leave any stone unturned in the prosecution of this matter, I will appear before you if you request me to do so for any reason you may have.

I expect to be in Summit commencing on or about June 15, 2009, and will be available to appear at your convenience thereafter.

Respectfully,

Alfred G. Osterweil

A-13



**COUNTY COURT OF THE STATE OF NEW YORK**
COUNTY OF SCHOHARIE
THE COURTHOUSE - 290 MAIN STREET
P.O. BOX 669
SCHOHARIE, NEW YORK 12157
TEL: (518) 295-8342
FAX: (518) 295-7226

GEORGE R. BARTLETT III
COUNTY COURT JUDGE

WILLIAM J. MINKEL
COURT ATTORNEY

F. CHRISTIAN SPIES
CHIEF CLERK

May 1, 2009

Mr. Alfred G. Osterweil
195 Lawson Lane
Many, Louisiana  71449
- and -
P.O. Box 173
Summit, New York 12175

     Re:   Pistol Permit Application

Dear Mr. Osterweil:

     This will acknowledge receipt of your letter dated April 13, 2009 in response to the Court's letter of April 10, 2009.

     It appears from this correspondence that you do not wish to submit any further information or personally appear in support of your application.

     Accordingly, unless I hear from you to the contrary on or before **May 15, 2009,** I will consider your application fully submitted and will proceed to determine it.

     Very truly yours,

GEORGE R. BARTLETT, III

GRB/klp

A-14

Alfred G. Osterweil
310 Rossman Fly Road, Summit N.Y. 12175
197 Lawson Lane, Many La. 71449,
May 6, 2009

Hon. George R. Bartlett lll

Dear Sir,

I have your most recent lettter dated May 1, 2009, and I wish to place a different interpretation on my prior correspndence from what you apparently gleaned.

I hoped to convey to you the thought that if you wanted any information which you believe is necessary for you to finally make a decision in this long standing application, I would cooperate fully. Thus, if you wished to meet with me personally, or have me submit additional information, I would comply, irrespective of my own view that you probably have more information about me than you have on any 100 or more applicants, cumulatively.To phrase it differently, while I am not requesting an opprtunity to appear or provide additional information or legal argument, I will not raise any legal or other issue if you, as the issuing official, feel you need anything, even after close to a year of the pendency of this application.I will comply fully.

While the doctrine of "justice delayed is justice denied" is a favorite axiom of mine, perhaps in this case, the delay may have proved to be helpful.

On April 20, 2009, the Ninth Circuit Court of Appeals decided the case of Allen v King. If there is any doubt in your mind about the impact of the Heller case on New York state law, I suggest that you focus on the powerful language and logic of this case.

Respectfully,

Alfred G. Osterweil

At a term of County Court of the State of
New York, held in and for the County of
Schoharie, New York.

PRESENT:   HON. GEORGE R. BARTLETT, III
Judge

-------------------------------------------------------------

In the Matter of

**Alfred G. Osterweil,**                                **DECISION/ORDER**

Applicant

Pistol Permit Application

-------------------------------------------------------------

## Background

By application dated May 16, 2008, Alfred G. Osterweil (applicant) applied for a
New York State Pistol Permit. In due course, the applicant submitted four references
dated June 30, 2008, July 1, 2008, July 14, 2008, respectively. After his initial review of
the application, by letter dated June 24, 2008, the Schoharie County Sheriff (Sheriff)
requested the applicant to come into the Sheriff's Office to "complete or correct" certain
information on the application.

By letter dated June 25, 2008, the applicant advised the Sheriff that "[s]ince I
applied for a pistol permit, I purchased a home in another state. My intention is to make
that state my primary residence while I still intend to have vacation property here in
Schoharie County. Under those circumstance [sic], am I still eligible for a permit. I note

A—16

that the application itself does not appear to require that the Schoharie County be my principal residence or domicile . . ."

By memorandum dated July 8, 2008, the Sheriff forwarded the subject application to this Court, advising that "[t]his incomplete application is being forwarded for review. Also, enclosed is a letter dated June 25, 2008 from Mr. Osterweil detailing his current residence plans.  Please advise how you wish me to proceed with this application. However, by note dated July 17, 2008, the Court's secretary returned the file to the Sheriff at his request.

By letter to the Court dated July 10, 2008 *(received on July 16, 2008)*, the applicant advised that his reading of the recent United States Supreme Court's *Heller* decision rendered New York's pistol permit residency requirement unconstitutional and, thus, a nullity.   As the Sheriff had previously requested the applicant's  file be returned to his office, the applicant's letter and file were so returned.

Thereafter, the FBI rejected applicant's fingerprint card. Accordingly, by letter dated August 18, 2008, the Sheriff requested the applicant to be re-fingerprinted.  This was apparently completed; however, on September 6, 2008, the FBI rejected the prints a second time, indicating that "the quality of the characteristics is too low to be used."  In addition, the fingerprint response from the New York State Division of Criminal Justice Services (DCJS)  advised the Sheriff that "Caution -Due to the Poor quality of the fingerprint impressions received, DCJS is unable to determine whether the individual has

2

any other criminal record in New York State" *( see, rap sheet, produced July 13, 2008).*

By e-mail dated December 15, 2008, the applicant wrote the Sheriff inquiring as to the status of his application. The Sheriff e-mailed applicant that his fingerprints were rejected a second time and that "I am meeting with Judge Bartlett next week and will ask him if he will consider your application without the FBI check."

Thereafter, in early February 2009, applicant e-mailed the Sheriff, the Sheriff replied, and the applicant responded on February 2, 2009 as follows:

Applicant's e-mail of February 2, 2009:

> "Dear Sheriff Bates, I last received an E-mail from you on December 16, 2008. At that time you iondicated [sic] you were going to speak to Judge Bartlett, who would be acting not as a judge, but rather as a county's "issuing agent." I must insist on a response to my application forthwith. Dragging this out and denying me the right to gun ownership violates my rights as a US citizen under 42 USC 1983. I will not hesitate to seek damages and relief against the county and all lother [sic] persons who are in complicity in this matter.
> Very truly yours,
> Alfred G. Osterweil"

Sheriff's e-mail of February 3, 2009:

> "Mr. Osterweil,
>
> I met with Judge Bartlett on Tuesday, December 23, 2008 regarding other pistol permit matters. He was unable to address your application at that time. His secretary was asked by me to schedule an appointment to specifically discuss your application. I did not receive an appointment date until last week. I will now meet with Judge Bartlett on Friday, February 13, 2009. For your information, your fingerprints have been rejected for the second time by both the F.B.I. and NY State D.C.J.S. They will not process

another set of prints without an additional fee of $105.00.  I intend to ask the Judge if there is any way to avoid this additional fee for you.

Sincerely,

Sheriff John S. Bates, Jr."

Applicant's e-mail of February 4, 2009:

"Dear Sheriff Bates
Thank you for your response of 2/03/09.  It may be that I am simply not able to provide clear fingerprints.  Does that mean that I am disqualified from gun ownership in New York?  Your deputies noted that several fingers printed out clear;ly [sic] and only a few were difficult to read.  If the FBI can locate felons with only one finger's print at a crime scene, they should be able to run my prints.  Further, why should I be required to pay an additional fee and have the process linger on for several more months. Even the flawed NY statute indicates that the entire process must be completed within 6 months, irrespective of whether the prints come back from the FBI within that period of time.  We are well beyond 6 months at this juncture.

The way my matter is being handled, it appears that every efort[sic] is being *made to thwart my application for gun ownership.  I suppose an illegal alien* who lives in a tent in Schoharie as his only residence but whose fingerprints are clearer than mine would have been issued a permit within the prescribed 6 months.  I pay enormous property taxes in Schoharie County on two residences, I served in the Armed Forces of the USA, I pay my income taxes, unlike some of our highest ranking governmental officials, and our own Supreme Court, my right to protect myself and my family in my two homes in Summit NY is being stymied.  This is not the kind of country I grew up in and served.

I look forward to a speedy resolution of this matter.

Very truly yours,

Alfred G. Osterweil"

4

The Court met with the Sheriff on February 13, 2009.  Thereafter, by letter dated February 18, 2009 the Sheriff advised applicant that his permit application was being forwarded to the Court.  The Court wrote to the applicant on February 20, 2009 advising that:

> "I met with Sheriff Bates on February 3, 2009 concerning various issues; and during that meeting, he indicated he had legal questions regarding your pistol permit application that he felt should be addressed by the Court prior to his office further processing your application.  Accordingly, in order to avoid any ex parte discussions, I asked the Sheriff to forward your paperwork to me so that I could review your application and ascertain the issues involved with your permit application.
>
> I have reviewed your file and it appears to me that there are two threshold issues.  One being that the FBI has rejected your fingerprints twice due to the fact that the "quality of characteristics is too low to be used."  Moreover, it appears that New York State DCJS was also unable to utilize your fingerprints in their record's check.  There is also a note in your file, apparently from the Deputy who took your prints, indicating concern about the FBI being able to read your prints as, in his opinion, you did not have "prints to speak of.  They are very worn."
>
> Penal Law §400.00 requires an FBI fingerprint and NYS DCJS search prior to the issuance of a pistol permit, but does allow the issuing authority some discretion with respect to this requirement.  As the failure to be able to read your prints is certainly not under your control, I would entertain a request to waive this requirement.
>
> The second issue seems to be that you are not or will not be a resident of the State of New York.  In this regard, New York Law has regularly held that pistol permits should be issued to residents only[1] (see, Mahoney v. Lewis, 199 AD 2d 734).  However, I acknowledge your correspondence which sets forth your intention to maintain a second home in Schoharie County and certainly appreciate the fact that, as such, you will pay real estate taxes upon that property.

---

[1] In Mahoney v. Lewis, id. at p. 735 it was held that the "term residence [as used in Penal Law §400.00] is equivalent to domicile and requires something more than mere ownership of land."

At this juncture, I would like to schedule an appearance in Court where you or your attorney can present any arguments in support of your application.  In particular, I would be interested in your supplying any legal precedent supporting your position with regard to residency and in support of a fingerprint check waiver.  Moreover, I would like the Sheriff to be present to explain the fingerprint situation and answer any questions you or your attorney may have.

I have, accordingly, scheduled this matter for an appearance on **Tuesday, March 24, 2009 at 1:30 p.m.**  If you or your attorney wish to submit written, legal arguments prior to this date, please feel free to submit same.  Also, should you wish to review your file, please call Kathy in my office to arrange for a convenient time to do so.  Finally, if the date set for an appearance is not convenient for you, please call my office to reschedule."

Penal Law §400.00 sets forth the criteria and procedure for obtaining a "pistol permit" in New York State.  In particular, Penal Law § 400.00 [4] and [4-a] provide, inter alia, that:

4. Investigation.  Before a license is issued or renewed, there shall be an investigation of all statements required in the application by the duly constituted police authorities of the locality where such application is made.  For that purpose, the records of the appropriate  office of the department of mental hygiene concerning previous or present mental illness of the applicant shall be available for inspection by the investigating officer of the police authority.  In order to ascertain any previous criminal record, the investigating officer shall take the fingerprints and physical descriptive data in quadruplicate of each individual by whom the application is signed and verified.  Two copies of such fingerprints shall be taken on standard fingerprint cards eight inches square, and one copy may be taken on a card supplied for that purpose by the federal bureau of investigation . . .  When completed, one standard card shall be forwarded to and retained by the division of criminal justice services in the executive department, at Albany.  A search of the files of such division and written notification of the results

of the search to the investigating officer shall be made without unnecessary delay.  Thereafter, such division shall notify the licensing officer and the executive department, division of sate police, Albany, of any criminal record of the applicant filed therein subsequent to the search of its files. A second standard card, or the one supplied by the federal bureau of investigation, as the case may be, shall be forwarded to the bureau at Washington with a request that the files of the bureau be searched and notification of the results of the search be made to the investigating police authority.  The failure or refusal of the federal bureau of investigation to make the fingerprint check provided for in this section shall not constitute the sole basis for refusal to issue a permit pursuant to the provisions of this section.  Of the remaining two fingerprint cards, one shall be filed with the executive department, division of state police, Albany, within ten days after issuance of the license, and the other remain on file with the investigating police authority. . .  Upon completion of the investigation, the police authority shall report the results to the licensing officer without unnecessary delay.

4-a.    Processing of license applications.  Applications for licenses shall be accepted for processing by the licensing officer at the time of presentment. Except upon written notice to the applicant specifically stating the reasons for any delay, in each case the licensing officer shall act upon any application for license pursuant to this section within six months of the date of presentment of such an application to the appropriate authority.  Such delay may only be for good cause with respect to the applicant.  In acting upon an application, the licensing officer shall either deny the application for reasons specifically and concisely stated in writing or grant the application and issue the license applied for.

## QUESTIONS PRESENTED

I.    <u>Does the passage of time mandate that applicant's application be granted.</u>

Noting that it has been more than six months since he submitted his application for a pistol permit, applicant asserts that his permit application must be granted.

Penal Law §400.00(4-a) provides in pertinent part that "applications for licenses shall be accepted for processing by the licensing officer at the time of presentment. Except upon written notice to the applicant specifically stating the reasons for any delay, in each case the licensing officer shall act upon any application for a license pursuant to this section within six months of the date of presentment . . . Such delay may only be for good cause and with respect to the applicant . . ."

The Court did not render a decision denying or granting the application within six months. However, there appears to be good cause for any delay, which reasons were communicated to applicant by the Sheriff, who was conducting an investigation mandated by Penal Law §400.00 and then, after the application was forwarded to the Court, by the Court.

The application indicated that the applicant's residence was in Schoharie County. Following submission of the application, the applicant then advised of a change in his residence to another state. Communications made clear this was an issue that needed development-especially in light of the _Heller_ decision.

It should also be noted that applicant did not complete submission of his required character references until July 14, 2008.

Moreover, to date the Sheriff has still been unable to complete his investigation as applicant's fingerprints have been rejected by the FBI and DCJS, having been deemed to not be of sufficient quality to be used for comparison. Apparently, this is nobody's fault;

8

but rather, the result of applicant having worn fingerprints.  Although the Court has the discretion to issue a pistol permit without the completion of an FBI check, it lacks the authority to waive a DCJS search.  The applicant has been made aware of this issue through communications from the Sheriff and the Court.  Indeed, the applicant was even re-fingerprinted in an effort by the Sheriff to obtain fingerprints that could be used.

Accordingly, as the application remains incomplete and as applicant has been made aware of the issue with his fingerprints, it appears the statute has been complied with. Moreover, given the issue regarding the constitutionality of New York's residency requirement and the importance of this issue, good cause exists for any delay.  In any event, contrary to applicant's assertion, the fact that an application is not decided within six (6) months does not mandate that the application be granted.

Finally, this Court notes that the issue with respect to fingerprints has been held in abeyance to save the applicant the expense, time and trouble of being fingerprinted again until he receives a decision with respect to the threshold issue of whether a pistol permit may be issued to a nonresident of New York State.

## II.  Is New York State's Residency Requirement for Issuance of a Pistol Permit Unconstitutional?

Insofar as pertinent to this application ,it is well-established that New York pistol

9

permits may be issued to residents only [2]  (see, _Mahoney v. Lewis, 199 AD2d 734, supra.);_ and in this regard, it has been held that the "term residence [as used in Penal Law §400.00] is equivalent to domicile and requires something more than mere ownership of land" _(id. at p. 735)._

The applicant has candidly advised the Court that New York State is not his primary residence and, thus not his domicile.  However, citing the 2008 decision by the United States Supreme Court in _District of Columbia v. Heller_ (_!28 S Ct. 2783),_ applicant contends that the residency requirement in New York's licensing law is unconstitutional.

A.    **Does the Second Amendment impose a limitation on State legislation?**

Initially, in upholding New York's residency requirement, the Second Circuit Court of Appeals determined that, even if the Second Amendment conferred individual rights _(as Heller subsequently held)_, it would not affect New York State's gun laws as "we hold that the Second Amendment's right to keep and bear arms' imposes a limitation on only federal, not state, legislative efforts (see, _Bach v. Pataki, 408 F 3d 75,84_ .  The _Heller_ decision did not address the issue of whether the Second Amendment applies to state legislation and therefore _Bach_ remains the law in New York.  However,  it should be noted that the Ninth Circuit Court of Appeals has reached a contrary conclusion (see, _Nordyk v. King,_ ____ _F 3d_ ___, 2009 WL 1036086)._

---

[2]Under New York's licensing statutes, non-residents may only apply for a license if they work principally within the State.

**B.**     **Assuming the Second Amendment applies to State legislation, is New York's pistol permit system constitutional?**

In concluding that "the Second Amendment conferred an <u>individual's</u> right to keep and bear arms" *(emphasis supplied)*, the Supreme Court directly found, for the first time, that the right to keep and bear arms extends to individuals, not merely state-regulated militias.  Nevertheless, the Supreme Court in <u>*Heller*</u> specifically permitted <u>reasonable</u> <u>regulation</u>; and in this vain, since <u>*Heller*,</u> several courts have upheld New York's gun laws *(see, e.g., <u>People v. Abdullah,</u> 23 Misc. 3rd 232; <u>Chwick v. Mulvey,</u> 13564/08 [ Nassau County Supreme Court]; <u>People v. Ferguson,</u> 21 Misc. 3d 1120).*

In <u>*Bach v. Pataki*</u> *(408 F3d 75,87),* the Second Circuit Court of Appeals held that "New York's interest in monitoring gun licensees is substantial and that New York's restriction of licenses to residents and persons working primarily within the State is sufficiently related to this interest . . ."  The Second Circuit concluded that:

> There is no question that New York discriminates against non-residents in providing handgun licenses under Article 400.  Defendants do not contest this fact.  Instead, they argue that the discrimination is sufficiently justified by New York's public safety interest in monitoring handgun licenses.  We do not doubt, and <u>*Bach*</u> does not dispute, that '[t]he State has a substantial and legitimate interest . . . in insuring the safety of the general public from individuals who, by their conduct, have shown themselves to be lacking the essential temperament or character which should be present in one intrusted with a dangerous instrument.'
>
> New York's monitoring interest is, in essence, an interest in continually obtaining relevant behavioral information.  The State's licensing scheme vests broad revocation discretion in a licensing officer; permitting that officer to revoke a license on the basis of a wide variety of behavioral data; including information reported from local incidents . . .  (citation omitted)

11

does not essentially preclude the applicant from the possession of <u>any</u> firearms.

As to constitutionality of New York's pistol permit laws, additional support can be found in New York Practice Series, New York Criminal Law *(Richard A. Greenberg and Steven Y. Yurowitz, §33.1),* which concludes that:

> . . . Even if the Supreme Court ultimately holds that the Second Amendment applies to the states, as *Heller* appears to presage, the Second Amendment right vindicated by *Heller* appears to be quite limited and consistent with reasonable regulation of firearms, including possession of firearms by felons or the mentally ill, carrying firearms in "sensitive" places like schools and government building, law regulating the commercial sale of weapons, and prohibiting the carrying of "dangerous or unusual weapons like M-16 rifles. The Supreme Court expressly declined to address licensing requirements, but intimated that licensing schemes like New York's would not run afoul of *Heller* so long as they are not enforced in an arbitrary or capricious manner . . . Thus, the only real or substantial effect that *Heller* will likely have on New York Law is to increase the number of CPLR Article 78 petitions challenging the denial of licenses to carry or possess firearms on grounds that the denial was arbitrary and capricious.

In any event, in <u>*People v. Perkins,*</u>*( ___ AD3d___ [2009 N.Y. Slip Op. 03962]),* a controlling decision in this jurisdiction handed down on May 21, 2009, the Appellate Division, Third Department has reached the same conclusion regarding *Heller's* effect on New York State gun laws, determining as follows:

> "While the United States Supreme Court concluded in that case that the Second Amendment confers a constitutionally protected individual right to keep and bear arms as a means of self-defense within the home, it also held that the right conferred by the Second Amendment-and by extension, Civil Rights Law §4 *(see, Chwick v. Mulvey, 2008 N.Y. Slip Op 22486[U]),*is not absolute and may be limited by reasonable governmental restrictions *(see, District of Columbia v. Heller, 128 S Ct at 2816).*

15

### Alfred G Osterweil
P. O. Box  173
Summit, New York 12173
March 4, 2009

The Honorable George R. Bartlett,III
Schoharie County Courthouse
Schoharie, New York, 12157

Re: Pistol Permit Application

Dear Judge Bartlett,

Having already mailed a letter to you with enclosures, including an affidavit, kindly add to that submission this letter and the enclosed Supplemental  Affidavit which certainly bears rather strongly on the issue you raised with respect to an FBI check.

I submit that the fact that I successfully underwent a background check by the FBI on February 13, 2009, makes moot any possible issue about poor quality fingerprints prior thereto.

Respectfully,

Alfred G.terweil

A-17