UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ALFRED G. OSTERWEIL,

|                                  | *Plaintiff*,          | 09-CV-825 |
|----------------------------------|-----------------------|-----------|
| -against-                        |                       | GLS/DRH   |

GEORGE R. BARTLETT, III., in his official capacity as
Licensing Officer in the County of Schoharie,

*Defendant*.

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY MOTION AND IN SUPPORT OF DEFENDANT BARTLETT'S
CROSS MOTION FOR SUMMARY JUDGMENT**

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
Attorney for Defendant Bartlett
Office of the Attorney General
The Capitol
Albany, New York  12224

Roger W. Kinsey
Assistant Attorney General, of Counsel
Bar Roll No. 508171
Telephone:  (518) 473-6288
Fax:  (518) 473-1572 (Not for service of papers)
Date: March 11, 2011

## Table of Contents

**Preliminary Statement** ……………………………………………………………………… **1**

**Statutory Framework** …………………………………………………………………….. **1**

**Statement of Facts** ……………………………………………………………… **2**

**Point I - The Proper Standard of Review** ………………………………………… **6**

**Point II - New York Statutory Scheme is Permissible Under Current Law** ……….. **8**

**Point III - Plaintiff Has Failed to Demonstrate Any Due Process Violation**………. **13**

**Point IV - New York's Residency Requirement is Rationally Related to a Legitimate  Government Interest** ………………………………………………… **17**

**Point V - There is Not a Substantive Due Process Claim** …………………………  **19**

**Point VI - The Allegations by Plaintiff Do Not Give Rise to a Procedural Due Process Claim** …………………………………………………………… **21**

**Point VII - Plaintiff's State Law Claims Should Be Dismissed** ……………………….. **22**

**Conclusion** …………………………………………………………………  **24**

**Preliminary Statement**

Plaintiff pro se commenced this action challenging New York's statutory mechanism by which individuals apply for permits to carry or possess concealed firearms.  Plaintiff contends that he was denied a handgun permit by defendant Bartlett due to defendant Bartlett's "imperfect performance of his sworn duties." Complaint ¶12.  Plaintiff urges that the denial of the handgun permit violated rights granted to plaintiff under the Second Amendment to the United States Constitution and New York's Civil Rights Law.  Complaint "Second Cause of Action."  Simply stated, plaintiff contends that the New York statute unlawfully discriminates against individuals who own residential property in the State of New York but are domiciled in another state.

Defendant Bartlett now moves for  Summary Judgment and dismissal of  the complaint on the following grounds:

1) The challenged statute does not run afoul of *District of Columbia, et al., v. Heller*, 128 S.Ct. 2783 (2008) or *McDonald v. City of Chicago*, 130 S.Ct. 3020 (U.S. 2010) which addresses the United States Constitution's restrictions on prohibition of gun possession under the Second Amendment;

2) Penal Law § 400.00(3) is rationally related to legitimate state interests and thus does not deprive plaintiff of equal protection; and

3) Plaintiff has failed to state a claim alleging any violation of his due process rights.

**Statutory Framework**

New York Penal Law §400.00 provides the statutory framework under which individuals may apply for permits to carry and possess firearms[1] in New York.  A permit issued under §400.00

---

[1]      This case, of course, concerns only plaintiff's request for a license for a pistol or revolver. See N.Y. Penal Law § 400.00(3)(a) (application process for pistol or revolver permit).  Though they  may not be plaintiff's weapons of choice, on these facts it appears that nothing prohibits plaintiff from carrying a rifle or shotgun while

1

of the Penal Law can exempt an individual from felony prosecution for possession of a handgun or

pistol.  Penal Law § 265.20(3).  Subdivision three of section 400.00 provides, in relevant part:

> (a) Applications shall be made or renewed, in the case of a license to carry or possess
> a pistol or revolver, to the licensing officer in the city or county, as the case may be,
> where the applicant resides, is principally employed or has his principal place of
> business as merchant or storekeeper; and in the case of a license as gunsmith or
> dealer in firearms, to the licensing officer where such place of business is located.

A variety of persons with significant contacts with the State, therefore, are statutorily eligible to

apply for a permit, namely New York residents and non-residents who have their principal place of

employment or principal place of business as a merchant or storekeeper in New York.  *Id.*; S*ee also*

*New York State Rifle & Pistol Ass'n v. Mt. Vernon*, 148 A.D.2d 616, 617 (2d Dep't 1989); *People v.*

*Moore*, 127 Misc. 2d 402 (Crim. Ct. N.Y. City 1985) (discussing case of Pennsylvania resident

holding permit under §400.00).  The identity of the licensing officer referred to in this section

depends on the locality.  *See* Penal Law § 265.00(10).  Whether a permit is, in turn, actually granted

is within the discretion of that licensing officer.  Under these provisions, persons, even when granted

a permit, are not provided a blanket license to carry any weapon.  Instead, each license specifies in

detail each weapon covered by that license and whether that license is issued as a license to carry or

possess on the premises.  Penal Law § 400.00(7); S*ee also Moore*, 127 Misc.2d at 403-05.

### Statement of Facts

Plaintiff's allegations set forth two distinct types of claim.  One is a broad-based challenge to

New York's qualifications for firearms permits, premised on an asserted fundamental right to bear

arms under the Second Amendment.  Plaintiff's remaining claims allege that the New York statute

has denied plaintiff his constitutionally protected rights to possess a firearm in his New York

---

traveling in New York.  <u>See</u> N.Y. Penal Law, Practice Commentary to Article 263, McKinney's p. 95 ("the Penal Law
does not make it a crime per se for a citizen to possess a rifle or shotgun").

residence on an unjustifiable distinction between domiciled and non-domiciled residents with regard to the ability to seek firearms permits.

Defendant Bartlett is the duly elected Schoharie County Judge.  In that capacity as Schoharie County Judge, he is the licensing officer in Schoharie County for pistol (firearm) permits (Penal Law §400).  Bartlett Declaration ¶ 1.  On or about May 21, 2008, Alfred Osterweil submitted an application with the Schoharie County Sheriff's Department for a New York State Pistol permit.  In this application, he listed his residence as being in Schoharie County, New York.  Bartlett Declaration ¶ 2, Exhibit 1A.  Pursuant to Penal Law §400.00[4], the Schoharie County Sheriff ("Sheriff") conducts investigations regarding pistol permit applications.  Part of the investigation involves verifying information set forth in the application, receiving references from the applicant's references, obtaining criminal background checks, obtaining the applicant's fingerprints and then submitting the fingerprints to the New York State Division of Criminal Justice Services and the FBI for records check.   Bartlett Declaration ¶ 3.

By letter dated June 24, 2008 the Sheriff advised Mr. Osterweil that he needed to come into the Sheriff's office "to correct and/or complete some information on your permit."  Bartlett Declaration ¶ 4, Exhibit1.  In response, Mr. Osterweil sent a letter dated June 25, 2008 to the Sheriff stating that since he applied for a permit, he had purchased a home in another state which he intended to utilize as his primary residence and to now use his Schoharie County property as a vacation home.  Accordingly, he asked "Under those circumstances, am I still eligible for a permit . . . Obviously, if my move to another state rules out a pistol permit, there is no sense in correcting the application."  Bartlett Declaration ¶ 5, Exhibit 2.

By memo dated July 8, 2008,  the Sheriff forwarded Mr. Osterweil's "incomplete" application to the Court together with Mr. Osterweil's letter of  June 25, 2008.  Bartlett Declaration ¶ 6,Exhibit

3. On July 16, 2008, the Court also received a letter from Mr. Osterweil.  Bartlett Declaration ¶ 7, Exhibit 4.  According to court secretary, the Sheriff then requested that the application be given back to him and this was done.  Bartlett Declaration ¶ 7.  Apparently, the Court also sent Mr. Osterweil's letter received July 16, 2008 to the Sheriff without responding.  *Id*.

On or about August 13, 2008, the New York State Division of Criminal Justice Services ("*DCJS*") advised the Schoharie County Sheriff that "Due to the poor quality of the fingerprint impressions received, DCJS is unable to determine whether this individual has any other criminal record in New York State."  Bartlett Declaration ¶ 8, Exhibit 5.  On or about July 31, 2008, Mr. Osterweil's fingerprints were rejected by the FBI as "the quality of the characteristics in too low to be used."  Bartlett Declaration ¶ 9, Exhibit 6.  By letter dated August 18, 2001, the Schoharie County Sheriff requested Mr. Osterweil to come into his office to be re-fingerprinted.  Bartlett Declaration ¶ 10, Exhibit 7.  On or about September 8, 2008, Mr. Osterweil's fingerprints were apparently again rejected by the FBI because the "quality of the characteristics is too low to be used."  Bartlett Declaration ¶ 11, Exhibit 8.

After Mr. Osterweil's fingerprints were again rejected a series of e-mails ensued between the Sheriff and Mr. Osterweil.  Bartlett Declaration ¶ 12, Exhibit 9.  By letter dated February 18, 2009, the Sheriff advised Mr. Osterweil that he was sending Mr. Osterweil application to Defendant Bartlett.  Bartlett Declaration ¶ 13, Exhibit 10.  By letter to Mr. Osterweil dated February 20, 2009, Defendant Bartlett set forth what he felt were the issues regarding Mr. Osterweil's application *(i.e., the lack of quality fingerprints that could be used by the FBI and New York State Division of Criminal Justice Services and his residency [domicile])*.  Accordingly, the Court scheduled an appearance on March 24, 2009 for Mr. Osterweil and/or his attorney.  Bartlett Declaration ¶ 14, Exhibit 11.

4

Specifically, the letter scheduling the matter explained that this Court appearance was to allow Mr. Osterweil or his attorney the opportunity to "present any arguments in support of your application. In particular, I would be interested in your supplying any legal precedent supporting your position with regard to residency and in support of a fingerprint check waiver. Moreover, I would like the Sheriff to be present to explain the fingerprint situation and answer any questions you or your attorney may have." Bartlett Declaration ¶ 15, *Id.* By letter to the Court dated March 3, 2009, Mr. Osterweil, sent information on special steps that could be taken with respect to persons with worn fingerprints. Mr. Osterweil indicated that none of these "special steps" were utilized by the Schoharie County Sheriff in his case. Bartlett Declaration ¶ 16, Exhibit 12. By letter dated March 4, 2009, Mr. Osterweil advised the Court that he would not be available to attend Court on March 24, 2009 as scheduled, and would not be available until the summer. In this letter, Mr. Osterweil sets forth several issues he had with New York law and the process used in processing pistol permits. Mr. Osterweil's submission contained several enclosures and an affidavit. Bartlett Declaration ¶ 17, Exhibit 13. By another letter dated March 4, 2009 to the Court, Mr. Osterweil forwarded a supplemental affidavit. Bartlett Declaration ¶ 18, Exhibit 14. By letter dated March 13, 2009, the Court responded to Mr. Osterweil's correspondence.

Pursuant to Mr. Osterweil's request, the Court cancelled the appearance scheduled for March 24, 2009 and asked Mr. Osterweil if he wished to reschedule the March 24, 2009 appearances or if he wished to waive an appearance. Bartlett Declaration ¶ 19, Exhibit 15. By letter dated March 19, 2009, Mr. Osterweil responded, explaining in some detail his position regarding the lack of fingerprints and a residency requirement. He also stated that he would not be available to appear in the Court prior to April 15, 2009. Bartlett Declaration ¶ 20, Exhibit 16. As Mr. Osterweil's letter of March 19, 2009 did not indicate if he wished to personally appear in Court or waive a personal

appearance, by letter dated April 10, 2009, Defendant Bartlett wrote Mr. Osterweil a letter to inquire whether he wished to reschedule the March 24, 2009 Court date or waive a personal appearance and consider his application fully submitted on papers.  Bartlett Declaration ¶ 21, Exhibit 17.

By letter dated April 13, 2009, Mr. Osterweil responded that " . . . I do not wish to leave any stone unturned in the prosecution of this matter, I will appear before you if you request me to do so . . ."  "I expect to be in Summit [Schoharie County] commencing on or about June 15, 2009, and will be available to appear at your convenience thereafter."  Bartlett Declaration ¶ 22, Exhibit 18. *(emphasis supplied)*.  By letter dated May 1, 2009, Defendant Bartlett acknowledged receipt of Mr. Osterweil's letter of April 13, 2009 and responded that: "It appears from this correspondence that you do not wish to submit any further information or personally appear in support of your application.  Accordingly, unless I hear from you to the contrary on or before May 15, 2009, I will consider your application fully submitted and will proceed to determine it."  Bartlett Declaration ¶ 23, Exhibit 19.  By letter dated May 6, 2009, Mr. Osterweil wrote to the Court indicating he did not wish a personal appearance and referred the Court to a recent decision by the Ninth Circuit Court of Appeals in support of his argument concerning the constitutionality of New York's pistol permitting law.  Bartlett Declaration ¶ 24, Exhibit 20.

On May 29, 2010, the Court issued a written decision denying Mr. Osterweil's pistol permit application.  Bartlett Declaration ¶ 25, Exhibit 21.  In denying Mr. Osterweil's application, the Court noted Mr. Osterweil's  candid acknowledgment that he was not a resident of New York State.

## POINT I

### THE PROPER STANDARD OF REVIEW

In *McDonald,* the Court stated, "[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to

our system of ordered liberty." *McDonald* at 3042. While a majority of the Court held that, as a fundamental right, the Second Amendment is applicable to the states, the Court was unable to agree on how or by what mechanism it applied. *See id.* at 3030-31, 3044-50 (Alito, J., writing the plurality opinion) (holding that the Second Amendment right is incorporated to the states through the Due Process Clause of the Fourteenth Amendment); *id.* at 3058-88 (Thomas, J., concurring in part and concurring in the judgment) (arguing that the Second Amendment right "is a privilege of American citizenship that applies to the States through the Fourteenth Amendment's Privileges or Immunities Clause"). The plurality opinion stressed, however, that the *Heller* "holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill'.... We repeat those assurances here.... [I]ncorporation does not imperil every law regulating firearms." *See Id. 3047* (plurality opinion) ( *quoting Heller,* 128 S.Ct. at 2816-17).

Although *Heller* rejected the rational basis test, (*Id.* at 2817 n. 27), the Court "declin[ed] to establish a level of scrutiny for evaluating Second Amendment restrictions." *Id.* at 2821. Whether or not strict scrutiny may apply to particular Second Amendment challenges, it is not the case that it must be applied to all Second Amendment challenges. Strict scrutiny does not apply automatically any time a fundamental right is involved. The First Amendment challenges strict scrutiny is determined by content-based restrictions on speech in a public forum and not as a blanket standard. S*ee Pleasant Grove City v. Summum,* 129 S.Ct. 1125, 1132 (2009).

For example, in order to evaluate a statute with regard to the Equal Protection Clause of the 14th Amendment, the level of scrutiny depends on classifications of those affected by the legislation. *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Once a statutory scheme is determined to be rationally related to a legitimate governmental purpose, the standard applied depends on the classification of the individuals affected. *Id.* In order "[T]o withstand intermediate scrutiny, a statutory

classification must be substantially related to an important governmental objective." *Id*.

Application of strict scrutiny would require a determination that the statute in question "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end," *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 45 (1983).

Several factors weigh in favor of applying intermediate scrutiny as opposed to strict scrutiny. In the present case, no suspect class is impacted. Equally compelling is the fact that neither the *Heller* Court or the *McDonald* Court dealt with any question other than the prohibition of fire arms and took pains to reaffirmed the States right to regulate. *McDonald* at 3047 (plurality opinion) (*quoting Heller*, at 2816-17). Thus, intermediate scrutiny is proper.

## POINT II

## NEW YORK STATUTORY SCHEME IS PERMISSIBLE UNDER CURRENT LAW

The regulation of fire arms is unquestionably a legitimate governmental purpose and the statute outlines and provides for an important governmental objective. While the Supreme Court's determination in *District of Columbia v. Heller*, 128 S.Ct. 2783, and *McDonald v. City of Chicago*, 130 S.Ct. 3020 (U.S. 2010), addressed the United States Constitution's restrictions on prohibition of gun possession under the Second Amendment, those decisions did not preempt or alter the State's ability to control gun ownership. Indeed, the *Heller* Court itself commented that nothing in the Court's decision should be interpreted as disapproval of longstanding regulations on ownership or possession of firearms such as, for example, bans against convicted felons, mentally ill persons, or the carrying of firearms in sensitive areas such as government buildings (128 S. Ct. at 2816-17). Importantly, the Court noted that it named but a few examples of permissible regulations, not a list that purported to be exhaustive. I*d.* at 2817 n. 26. *See also Wisotsky v. Kelly*, 2009 WL 1620181 *6 (N.Y. Supp. 2009). The Court took great pains to reiterate that licensing and control of licensing

8

that did not create a total ban was permissible.  *Id.* at 2819.

The Supreme Court further resolved the applicability of the Second Amendment to the states and  licensing and control issues in *McDonald v. City of Chicago*. The plaintiffs in *McDonald* were residents of the City of Chicago and a Chicago suburb, the village of Oak Park, who wanted to keep handguns in their homes for self-defense. Several of the plaintiffs had been "targets of threats and violence.  But the City and Oak Park had ordinances that prohibited the possession of handguns by most private citizens within their jurisdiction.  Plaintiffs sought declaratory relief from the United States District Court for Northern Illinois, specifically requesting that the ordinances be declared unconstitutional because they violated the Second and Fourteenth Amendments to the United States Constitution.  The District Court rejected plaintiffs' arguments.  On appeal, the United States Court of Appeals for the Seventh Circuit affirmed.  The United States Supreme Court granted writs for certiorari and heard oral argument on March 2, 2010. Subsequently on June 28, 2010, the Supreme Court reversed the lower court's judgment and remanded the case, holding in *McDonald* that the Second Amendment applies to the states by incorporation through the Fourteenth Amendment. The *McDonald* Court cited its own reasoning from *Heller* as follows:

> [i]t is important to keep in mind that *Heller*, while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not 'a right to keep and carry weapons whatsoever in any manner whatsoever and for whatever purpose.' We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such a schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' We repeat those assurances here. *Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms.*

*McDonald*, at *25. (internal citations omitted)(emphasis added).

9

It is clear from the Supreme Court's language in both *Heller* and *McDonald* that it expected the states to continue enacting and enforcing laws regulating firearms.  Likewise, it is clear that neither case has granted an unrestricted right to gun possession nor destroyed the State's ability to regulate gun ownership.

Plaintiff argues that the simple purchase of real property in the State of New York grants him an enforceable, constitutional right to possess a handgun on and in that property.  Not only does Plaintiff fail to properly read *Heller* and *McDonald* but his argument would effectively destroy any licensing requirement for property owners anywhere in the United States.  One would simply have to buy a piece of property, no matter how small, in any location, in order to have unfettered access to a handgun.  In effect, Plaintiff's reasoning would virtually do away with any vetting, control, felony exclusions or supervision for those persons who could buy real estate in any state.  Such an outcome was specifically rejected by the Court.  *District of Columbia,* at 2819; *McDonald* at 10.  Thus, contrary to Plaintiff's assertion, there is no constitutional right to unregulated possession of a handgun.

As noted by the Second Circuit Court of Appeals, the New York State regulatory process is designed to ensure that all persons granted permits in New York State are subject to rigorous local monitoring to ensure that the State's substantial and legitimate interest in insuring the safety of the general public from individuals who, by their conduct, have shown themselves to be lacking the essential temperament or character appropriate for one entrusted with a dangerous instrument.  *See Bach v. Pataki*, 408 F.3d 75, 87 (2 Cir. 2005).  When the Second Circuit upheld the New York statutory scheme, it specifically acknowledged that New York State discriminates against non-domiciliaries (*Id.*, n. 13) but also found that non-domiciliaries distinction was substantially related to the threatened danger.  *See, Id.*, 408 F.3d at 91.  The mere fact that plaintiff has purchased residential

property in New York, of course, does nothing to address the State's needs to monitor the permit-holders' entire behavior, within and without the State, recognizing that it is much more difficult to monitor the behavior of mere visitors who live elsewhere. *See, Id.*, 408 F.3d at 92.  In essence, by the State limiting its residency-based permits to domiciliaries, the State best guarantees it is able to monitor those permit-holders.  Plaintiff's passing and sporadic residency does nothing to ensure the State' ability to monitor his out-of-state conduct at his other residences.  New York's non-resident distinction, with the in-state worker exception, is tailored to meet the State's monitoring interest. New York State's residency and other licensing qualifications under Penal Law §400 have long been found to pass constitutional muster in the Second Circuit  *Id.*, 408 F.3d 75.  The *Bach* Court, upheld and reinforced the compelling state interest in monitoring the behavior of New York firearms license holders who may reside in other jurisdictions.  *Id.*, 408 F.3d  at 92-93.  Clearly, plaintiff's lack of readable fingerprints makes the monitoring concerns of plaintiff's activities in other jurisdictions not only difficult but reinforces the legitimate concerns or the licensing officer.

On May 29, 2010, the Defendant Bartlett issued a written decision denying Mr. Osterweil's pistol permit application.  Bartlett Declaration ¶ 25, Exhibit 21.  In this decision, the Court rejected Mr. Osterweil's argument that, since more than six (6) months elapsed since he submitted his application, the Court was required to grant his application.  Bartlett Declaration ¶ 26, *Id.* The Court found there was good cause for the time taken in rendering a decision.  Bartlett Declaration ¶ 27, *Id.* The Court noted that Mr. Osterweil's application was as yet not complete as, due to the poor quality of his fingerprints, the Sheriff had been unable to complete the investigation required by New York Law (Penal Law §400).  The Court noted, as a courtesy to Mr. Osterweil, the Court held the issue of fingerprints in abeyance in order to address the threshold issue of whether New York Law allows the issuance of a pistol permit to a non-resident.  Bartlett Declaration ¶ 28, *Id.*  The Court noted that

when Mr. Osterweil originally submitted his application, he listed his residency as being in Schoharie County, New York.  It was after the application was submitted that Mr. Osterweil changed his residence (domicile) to that of another state, and so advised the Sheriff.  This change in the application led to much of the above-referenced communications and submissions.  Bartlett Declaration ¶ 29, *Id.*

In denying Mr. Osterweil's application, the Court noted Mr. Osterweil's candid acknowledgment that he was not a resident of New York State. That being the case, the Court adhered to long-standing New York precedent that a pistol permit may be issued to residents only and that the term residence *[as used in Penal Law §400.00]* is the equivalent to domicile as outlined in *Mahoney v. Lewis*, 199 AD2d 734. Bartlett Declaration ¶ 30, *Id.*  The Court rejected Mr. Osterweil's argument that New York's pistol permit system is unconstitutional.  The Court quoted extensively from *Bach v. Pataki,* 408 F3d 75, 87 wherein the Second Circuit Court of Appeals held that "New York's interest in monitoring gun licenses is substantial and that New York's restrictions to residents and persons working primarily within the State is sufficiently related to this interest . . ." Bartlett Declaration ¶ 31, *Id.*

The Court followed the Second Circuit's finding that the residency requirement is an important component of New York's regulation, and concluded that that requirement appears to be reasonable and constitutionally permissible as outlined in *District of Columbia v. Heller*, 128 S. Ct. 2783. Bartlett Declaration ¶32, *Id.*  The Court held that the statute in *Heller* differed significantly from the law in question here, since an important component of the District of Columbia law consisted of a total ban on all handgun possession within that jurisdiction.  Moreover, this Court noted that New York law allows a nonresident, such as Mr. Osterweil, to possess long guns.  Thus, unlike *Heller*, this Court found the New York statutory scheme does not preclude the applicant from

the possession of any firearms.  Bartlett Declaration ¶ 33, *Id.*

The Court cited to the controlling decision in this jurisdiction wherein the New York State Appellate Division, Third Department determined that  ". . . New York's firearms licensing requirement remains an acceptable means of regulating the possession of firearms *(citations omitted)* and will not contravene *Heller* so long as it is not enforced in an arbitrary and capricious manner as outlined in *District of Columbia v. Heller*, 128 S. Ct. at 2819; *People v. Perkins*, 62 AD3d 1160, leave denied 13 NY3d 748. Bartlett Declaration ¶ 34, *Id.*

### POINT III

### PLAINTIFF HAS FAILED TO DEMONSTRATE ANY DUE PROCESS VIOLATION

Plaintiff attributes the denial of a handgun license to an alleged statutory structure which unreasonably discriminates against nonresidents of New York.  However, the Second Circuit has upheld the rigorous local monitoring to ensure that the State's substantial and legitimate interest in insuring the safety of the general public from individuals who, by their conduct, have shown themselves to be lacking the essential temperament or character appropriate for one entrusted with a dangerous instrument.  *See Bach v. Pataki*, 408 F3d at 91.  Tellingly, when the Second Circuit upheld the New York statutory scheme, it specifically had in mind the fact that New York State discriminates against non-domiciliaries.  *Id.*, n. 13.

Notwithstanding plaintiff's complaint, the U.S. Constitution-Privileges and Immunities Clause does not prohibit all distinctions in treatment, instead barring only "discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States." *Toomer v. Witsell*, 334 U.S. 385, 396 (1948).  Because the statute at issue is substantially justified by strong governmental interests as articulated by the Second Circuit, as a matter of law it does not impinge upon plaintiff's rights.  *See Bach v. Pataki*, 408 F3d at

13

91, n.13.

As noted above, the statute permits residents of New York <u>and</u> those who either operate a business in New York or have their principal place of employment in New York to apply for a permit. *See* Penal Law § 400.00; *Moore*, 127 Misc.2d 402. As such, plaintiff's arguments that New York cannot discriminate against nonresidents as a class is not support for his claim that section 400 is unconstitutional. Instead, this Court must consider whether New York's substantial contacts test runs counter to the long established purpose of the Privileges and Immunities Clause.

The Privileges and Immunities Clause "was intended to create a national economic union." *Supreme Ct. of N.H. v. Piper*, 470 U.S. 274, 280 (1985). As such it is only "with respect to those privileges and immunities bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident and nonresident, equally." *Baldwin v. Fish & Game Comm'n*, 436 U.S. 371, 383 (1978) (internal quotations omitted). The Clause, therefore, protects those privileges necessary to help "fuse into one Nation a collection of independent, sovereign States." *Toomer*, 334 U.S. at 395. Indeed, while much of the Supreme Court's Article IV jurisprudence has focused on furthering interstate unity in the fields of employment, education and commerce, section 400.00 is entirely consistent with fostering these goals in permitting those who have their principal place of business or employment in New York to seek a permit.

Instructive in this area is the principle that "[T]he States possess primary authority for defining and enforcing the criminal law." *United States v. Lopez*, 514 U.S. 549, 561 n. 3 (1995). Though not criminalizing conduct, section 400.00 must be read together with Penal Law § 265.00 et seq., regarding criminal possession of a weapon and, therefore, viewed with the particular deference accorded the individual states in such matters. A review of state laws from around the nation is particularly instructive to the privileges and immunities analysis. That review reveals a wide

divergence in licensing practices for non-residents. California, like New York, requires applicants for a pistol permit to either live in the county of application or "spend[] a substantial period of time in the applicants's principal place of employment or business in the county." Calif. Penal Code § 12050(a)(1)(D) (2002). Connecticut requires applicants to have a "bona fide residence or place of business within the jurisdiction." Conn. Gen. Stat. § 29-28 (2002). Delaware maintains an even more restrictive policy, permitting only residents to obtain a firearms license. *In re Ware*, 474 A.2d 131, 132 (Del. Sup. Ct. 1984) (interpreting 11 Del. Code § 1441 to permit only residents to apply to carry a concealed weapon). Significantly, the *Ware* decision upheld Delaware's restrictive policy against challenges under the Privileges and Immunities and Equal Protection Clauses, relying in large part on a New York case affirming section 400.00. *Id.* at 133 (citing *People v. Perez*, 67 Misc.2d 911 (Co. Ct. Onondaga Co. 1971)). Minnesota too requires applications for a permit to be made "where the applicant resides." Minn. Stat. § 624.714 (2000). In addition to the states listed above, at least twenty-three other states impose a residency requirement for those seeking a concealed weapons permit, though some recognize permits issued in other states pursuant to mutual reciprocity agreements.[2] Plaintiff's argument that he has some ingrained federal protection to apply for a permit as a nonresident is significantly undermined by the fact that a majority of the States do not permit such applications by nonresidents. The particular right plaintiff asserts, therefore, is not among those protected under the Privileges and Immunities Clause.

---

[2]     Ala. Code § 13A-11-75 (2002); Alaska Stat. § 18.65.700 (2002); Ark. Code § 5-73-301 (1999); Ga. Code § 16-11-129 (2002); Ind. Code 35-47-2-3 (2002); Ky. Rev. Stat. § 237.110 (2002); La. Rev. Stat. Ann. § 1379.3 (2003); Mich. Comp. Laws § 28.425b (2002); Miss. Code Ann. § 45-9-101 (2002); Mo. Rev. Stat. § 571.090 (2002); Mont. Code Ann. § 45-8-321 (2002); Nev. Rev. Stat. Ann. § 202.350 (2002); N.C. Gen. Stat. § 14-415.12 (2002); N.D. Cent. Code § 62.1-04-03 (2001); Okla. Stat. tit. 21, § 1290.9 (2002); Or. Rev. Stat. § 166.291 (2001); S.C. Code. Ann. 23-31-215 (2002); S.D. Codified Laws § 23-7-7 (2002); Tenn. Code Ann. § 39-17-1351 (2002); Tex. Gov't Code Ann. § 411.172 (2002); Va. Code Ann. § 18.2-308 (2002); W. Va. Code § 61-7-4 (2002); Wyo. Stat. § 6-8-104 (2002).

Nor may plaintiff allege any abridgement of freedom to travel between the states due to the lack of a handgun permit.  Federal law protects plaintiff from criminal prosecution when traveling between states in which he may lawfully possess a firearm, even when passing through a state where he may not be licensed.  28 U.S.C. § 926A (2002).

New York's interest in licensing firearms is clear:

> Licensing allows the State to review the reasons individuals apply for a weapon permit, to determine the validity of those reasons, and ultimately to be informed of what individuals are legally armed and with what weapons.

*Moore*, 127 Misc.2d at 404.  Clearly, section 400.00 is readily justified by legitimate and compelling state interests in any event and, therefore, does not run afoul of the Privileges and Immunities Clause.  In furthering that state interest, the Legislature was justified in  acting to stem the "substantial danger to the public interest which would be caused by the unrestricted flow of dangerous weapons into and through the State, possessed by countless travelers." *Perez*, 67 Misc.2d at 913.  And in seeking to limit the number of weapons, New York acted reasonably in denying the privilege to those with remote contacts to New York.

Numerous other considerations provide ample justification for the dividing line adopted by New York.  Prior to granting a permit, a background investigation must be conducted.  N.Y. Penal Law § 400.00(4).  The practical implications of requiring New York to accept applications from all nonresidents are apparent.  First, the strain on investigatory resources would be significantly increased.  More importantly, however, the ability to obtain and verify information would be negatively impacted were New York officials required to make inquiries in other states.  Nor can it be argued that New York could simply enter into agreements with other jurisdictions to do such work for the licensing county as to do so would run a significant risk of a lack of uniformity in the licensing regime.

> Further, a rule permitting a person to obtain a pistol permit in any county where he or she is a temporary or occasional inhabitant could result in a person possessing multiple pistol permits covering different weapons and issued by different licensing officers. The revocation for proper cause of such a person's pistol permit in one county would not be effective to prevent that person from possessing weapons required to be licensed, as the licensing officer in one locality would not have knowledge of the existence of additional permits issued to the same person for different weapons. This result would be clearly inimical to the purpose of the statute, for the control of weapons possession intended to be afforded thereby would be defeated.

*In re Davies*, 133 Misc.2d 38, 41 (Oswego Co. Sup. Ct. 1986). This also creates an undue risk of forum shopping for those seeking the easiest means to obtain a firearms permit. *Id.* Likewise, the risk of New York officials not learning of a disqualifying event or subsequent action bearing on a person's ability to carry a weapon is heightened the further from New York the person may reside.

Because the New York statute is substantially justified in furtherance of legitimate state interests, plaintiff's assertion of a right to possess a firearm outside of New York's statutory scheme fails to state a claim for relief and should be dismissed.

### POINT IV

### NEW YORK'S RESIDENCY REQUIREMENT IS RATIONALLY RELATED TO A LEGITIMATE GOVERNMENT INTEREST

"The Equal Protection Clause of the Fourteenth Amendment 'is essentially a direction that all persons similarly situated should be treated alike'." *Roth v. City of Syracuse*, 96 F. Supp. 2d 171, 178 (N.D.N.Y. 2000) (Mordue, J.) (quoting *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985)). The Clause does not, of course, prohibit all classifications. "It simply keeps governmental decision makers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Because the scope of review depends on the nature of the right allegedly violated, the first step in equal protection analysis is identifying the proper standard of review.

17

When the objected to classification is made against a "suspect class" of persons or implicates a fundamental constitutional right, the highest level of review - strict scrutiny - is required. *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 457-58 (1988); *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976). "Where the alleged classification is not based on a suspect class or does not impair a fundamental right, the classification and the actions are reviewed on a rational basis standard, i.e., whether the legislative judgments are rationally related to a legitimate state purpose." *Benjamin v. Town of Fenton*, 892 F. Supp. 64, 67 (N.D.N.Y. 1995); *see also Romer v. Evans*, 517 U.S. 620, 631 (1996). Plaintiff does not contend that the New York statutory framework discriminates against any suspect class of individuals. Instead, he contends that it implicates what he asserts is his fundamental Second Amendment right to bear arms and that he is treated differently than other home owners and there is no rational basis for the different treatment.

The Second Circuit's rule, which of course controls in this case, is supported by authority from around the nation. *See, e.g., Olympic Arms v. Buckles*, 301 F.3d 384, 388-89 (6th Cir. 2002); *United States v. Hancock*, 231 F.3d 557, 565-66 (9th Cir. 2000), *cert. denied*, 532 U.S. 989 (2001); *Gillespie v. City of Indianapolis*, 185 F.3d 693, 709 (7th Cir. 1999), *cert. denied*, 528 U.S. 1116 (2000).

Plaintiff, admittedly, is not domiciled in New York. Complaint ¶ 7; Third, Forth & Sixth Causes of Action. Accordingly, plaintiff's equal protection claims must be dismissed if Penal Law § 400.00 is rationally related to a legitimate state purpose and rationally applied.

Guns are dangerous weapons which pose an undeniable risk of harm. Through New York's statutory framework, the state has endeavored to permit only those individuals with a **substantial connection** to New York to carry weapons while in the state. In its effort to delineate that group, New York chose to restrict permits to those who live, work or own a business in New York. This

18

was an entirely reasonable classification on which the Legislature could base its judgment. "Lines must inevitably be drawn, and it is the legislature's province to draw them." *Brown v. Bowen*, 905 F.2d 632, 635 (2d Cir. 1990), *cert. denied*, 498 U.S. 1093 (1991).

As outlined in much more detail in the preceding point, New York has strong interests in its permit restriction. Through that statute, the State seeks to guarantee the uniformity and accuracy of the background checks that are a predicate to the actual issuance of a license. It seeks to preserve resources in managing its application process and minimize the risk for fraud or abuse in the permitting process. Finally, the current mechanism limits the number of weapons permitted in the State. These factors and the similar, or more restrictive, statutes in many of New York's sister States more than amply demonstrate that the application limitations inherent in section 400.00 are rationally related to the State's legitimate interest in regulating guns.

Taken together, these factors preclude plaintiff from demonstrating his burden that there is no conceivable justification for the classification under attack. Plaintiff's equal protection claim, therefore, should be dismissed.

## POINT V

## THERE IS NOT A SUBSTANTIVE DUE PROCESS CLAIM

While plaintiff frames his complaint as a violation of the 14th Amendment "equal protection clause," it may be liberally read to claim a violation of his due process rights. Complaint Fourth, Fifth and Sixth Causes of Action.[3]  "The protections of substantive due process are available only against egregious conduct which goes beyond merely offending some fastidious squeamishness or private sentimentalism and can fairly be viewed as so brutal and offensive to human dignity as to

---

[3] Defendant does not believe that plaintiff has raised a due process claim but addresses due process in an abundance of caution, cognizant of the liberal pleading rules afforded pro se litigants by the Court.

shock the conscience." *Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 173 (2d Cir. 2002) (citing cases) (internal quotations omitted); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998). "Substantive due-process rights guard against the government's 'exercise of power without any reasonable justification in the service of a legitimate governmental objective'." *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir. 1999) (*citing County of Sacramento*, 523 U.S. at 846). Accordingly, "[o]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.* Indeed, the Second Circuit has noted that "[s]ubstantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999). Governmental action that is or may be viewed as merely "incorrect or ill-advised" does not give rise to a substantive due process claim. *Padberg v. McGrath-McKechnie*, 203 F. Supp.2d 261, 284 (E.D.N.Y. 2002) (*citing Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994)). Viewed in light of this "high standard," *Leeandy Dev. Corp. v. Town of Woodbury*, 134 F. Supp.2d 537, 543 (S.D.N.Y. 2001), plaintiff's due process allegations clearly fail to state a claim. Additionally, "[w]here another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process." *Conn v. Gabbert*, 526 U.S. 286, 293 (1999) (internal quotations omitted).

This action challenges New York's Penal Law and New York's statutory judgment regarding what conduct should be criminalized; unlicensed handgun possession. In making that judgment, New York has established a regulatory scheme in which only those with significant ties to New York may apply for permission to carry a concealed weapon while in the state. In this regard, New York is not unlike some twenty-seven sister states which likewise restrict the ability of non-residents to apply for firearms licenses. *See* Footnote 4 *supra* & accompanying text. This common state

practice is justified by the strong interests of those states in regulating gun possession and transportation within their borders.  There can be no question that this is not the type of egregious, offensive and conscience shocking conduct at which the Due Process Clause is directed.  Plaintiff's substantive due process claim, if any, should be denied.

### POINT VI

### THE ALLEGATIONS BY PLAINTIFF DO NOT GIVE RISE TO A PROCEDURAL DUE PROCESS CLAIM

Plaintiff alleges a violation of his Fourteenth Amendment rights in the refusal of his handgun permit.  Complaint Sixth Cause of Action.  *See* Footnote 6, *supra*.  Plaintiff alleges that his rights were violated when defendants "failed to comply with their own statutory requirements . . ."  Complaint, Fifth Cause of Action.  However, it is well settled that "a violation of a state law is not cognizable under §1983." *Pollnow v. Glennon,* 757 F. 2d 496, 501 (2d Cir. 1985)(*citing Davis v. Scherer,* 468 US 183 (1984)); *see also Bolden v. Alston*, 810 F.2d 353 (2d Cir. 1987), *cert. denied*, 484 U.S. 896 (1987); *Deane v. Dunbar*, 777 F.2d 871 (2d Cir. 1985); *Cofone v. Manson*, 594 F.2d 934, 938 (2d Cir. 1979).  "State procedural requirements do not establish federal constitutional rights.  [A]t most, any violation of state procedural requirements would create liability under state law." *Bolden*, 810 F.2d at 353;  *Jerome Russell v. Selsky*, 35 F.3d 55 (2d Cir. 1994)(Violation of state regulation where review officer acted as hearing officer is not a violation of federal due process).

In this decision, the Court rejected Mr. Osterweil's argument that, since more than six (6) months elapsed since he submitted his application, the Court was required to grant his application.  Bartlett Declaration ¶ 26, *Id.*  The Court found there was good cause for the time taken in rendering a decision.  Bartlett Declaration ¶ 27, *Id.*  The Court noted that Mr. Osterweil's application was as yet not complete as, due to the poor quality of his fingerprints, the Sheriff had been unable to

complete the investigation required by New York Law (Penal Law §400). The Court noted, as a courtesy to Mr. Osterweil, the Court held the issue of fingerprints in abeyance in order to address the threshold issue of whether New York Law allows the issuance of a pistol permit to a non-resident. Bartlett Declaration ¶ 28, *Id.* The Court noted that when Mr. Osterweil originally submitted his application, he listed his residency as being in Schoharie County, New York. It was after the application was submitted that Mr. Osterweil changed his residence (domicile) to that of another state, and so advised the Sheriff. This change in the application led to much of the above-referenced communications and submissions. Bartlett Declaration ¶ 29, *Id.* While plaintiff may allege delay and inefficiency, he has failed to point to any part of the licensing process that was denied to him and the claims should be dismissed.

## POINT VII

### PLAINTIFF'S STATE LAW CLAIMS SHOULD BE DISMISSED

If plaintiff's claims are broadly read to state a pendant state law claim, then dismissal of the state law claim is the recommended procedure in cases where the federal claims are dismissed prior to trial. *Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 809 (2d Cir. 1979). As the Supreme Court wrote in *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7 (1988):

> [I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine - judicial economy, convenience, fairness, and comity -will point toward declining to exercise jurisdiction over the remaining state-law claims.

*See also, United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); *DiLaura v. Power Authority of the State of New York*, 982 F.2d 73, 80 (2d Cir. 1992) (same); *Castellano v. Board of Trustees of the Police Officers' Variable Supplements*

*Fund*, 937 F.2d 752, 758 (2d Cir.), *cert. denied*, 502 U.S. 941 (1991) (28 U.S.C. §1367(c)(3) codifies

existing case law and gives district courts discretion to decline to exercise supplemental jurisdiction

where "the district court has dismissed all claims over which it has original jurisdiction."); *Temple of*

*the Lost Sheep, Inc. v. Abrams*, 930 F.2d 178, 185 (2d Cir.), *cert. denied*, 502 U.S. 866 (1991)

("Given the absence of federal claims left to adjudicate, the district court properly dismissed the

pendant state-law claims.").

   In this case, if the federal claims are dismissed against defendant and the Court broadly

construes plaintiff's claims to contain a pendant state law claim, then the claims are precluded under

state law and there is certainly no special reason for this Court to maintain jurisdiction over the state

law claims.  Plaintiff's pendant state law claims, if any, should, therefore, be dismissed.

**Conclusion**

For the reasons set forth above, the plaintiff's Motion for Summary Judgment should be denied and the defendants' Motion for Summary Judgment should be granted and the complaint dismissed in its entirety.

Dated: Albany, New York
      March 11, 2011

                        ERIC T. SCHNEIDERMAN
                        Attorney General of the State of New York
                        Attorney for Defendant Bartlett
                        Office of the Attorney General
                        The Capitol
                        Albany, New York  12224

                        *s/ Roger W. Kinsey*
                        Roger W. Kinsey
                        Assistant Attorney General,   Of Counsel
                        Bar Roll No. 508171
                        Telephone:  (518) 473-6288
                        Fax:  (518) 473-1572 (Not for service of papers)
                        Email: Roger.Kinsey@ag.ny.gov
                        Dol #09-099033-O

TO:    Alfred G. Osterweil
         310 Rossman Fly Road
         Summit, New York 12175