**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ALFRED G. OSTERWEIL,**

                                        **Plaintiff,**

        **vs.**                                              **1:09-cv-825**
                                                             **(MAD/DRH)**

**GEORGE R. BARTLETT, III, in his official**
**capacity as Licensing Officer in the County of**
**Schoharie,**

                                        **Defendant.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

**ALFRED G. OSTERWEIL**
Many, Louisiana 71449
Plaintiff _pro se_

**OFFICE OF THE NEW YORK**                    **ROGER W. KINSEY, AAG**
**STATE ATTORNEY GENERAL**
The Capitol
Albany, New York 12224
Attorneys for defendant

**NEW YORK STATE DEPARTMENT OF LAW**          **JAMES B. MCGOWAN, ESQ**
The Capitol
Albany, New York 12224
Attorneys for defendant


**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

        Plaintiff _pro se_ commenced this action challenging New York's statutory mechanism by

which individuals apply for permits to carry or possess firearms.  Plaintiff urges that the denial of

his handgun permit application violated his rights under the United States Constitution, the New York State Constitution, and the New York State Civil Rights Law.

In a Memorandum-Decision and Order dated February 24, 2010, United States District Court Judge Gary L. Sharpe granted in part and denied in part defendant's motion to dismiss. *See* Dkt. No. 15.  Specifically, Judge Sharpe dismissed Governor Paterson and Attorney General Cuomo as improper parties, and further dismissed plaintiff's "first three causes of action [which] seek to mount a Second Amendment attack against only state legislation," but permitted plaintiff's claims brought pursuant to the Fourteenth Amendment to proceed. *See id.* at 6-7.  In light of the Supreme Court's subsequent decision in *McDonald v. City of Chicago* ___ U.S. ___, 130 S. Ct. 3020 (2010), which held that the Second Amendment applies to the states, Judge Sharpe granted plaintiff's unopposed motion for reconsideration and reinstated his Second Amendment claims. *See* Dkt. No. 26.

Currently before the Court are the parties' cross-motions for summary judgment.


## II. BACKGROUND

Defendant, as a Schoharie County Judge, is the licensing officer in Schoharie County for pistol (firearm) permits. *See* Dkt. No. 33-2 at ¶ 1.  On or about May 21, 2008, plaintiff submitted an application with the Schoharie County Sheriff's Department for a New York State pistol permit. *See id.* at ¶ 2.  In this application, he listed his residence as Schoharie County, New York. *See id.*

Pursuant to New York Penal Law § 400.00, the Schoharie County Sheriff ("Sheriff") conducts investigations regarding pistol permit applications. *See id.* at ¶ 3.  Part of the investigation involves verifying information set forth in the application, receiving information

2

from the applicant's references, performing criminal background checks, and obtaining the applicant's fingerprints, which are submitted to the New York State Division of Criminal Justice Services ("DCJS") and the Federal Bureau of Investigation for further investigation into the applicant's background.  *See id.*

By letter dated June 24, 2008, the Sheriff advised plaintiff that he needed to come into the Sheriff's office "to correct and/or complete some information" on his application.  *See id.* at ¶ 4. In response, plaintiff sent a letter dated June 25, 2008, stating that since he applied for a permit, he had purchased a home in another state which he intended to use as his primary residence and to now use his Schoharie County property as a vacation home.  *See id.* at ¶ 5.  In the letter, plaintiff asked whether, under the circumstances he set forth, he was still eligible for a pistol permit.  *See id.*

On or about August 13, 2008, the DCJS advised the Sheriff that, "[d]ue to the poor quality of the fingerprint impressions received, DCJS is unable to determine whether this individual has any other criminal record in New York State."  *See id.* at ¶ 8.  On or about July 31, 2008, plaintiff's fingerprints were rejected by the FBI because "the quality of the characteristics i[s] too low to be used."  *See id.* at ¶ 9.  On August 18, 2010, the Sheriff requested plaintiff to come into his office to be re-fingerprinted.  *See id.* at ¶ 10.  Thereafter, on September 8, 2008, plaintiff's fingerprints were again rejected by the FBI because of their poor quality.  *See id.* at ¶ 11.

In a letter dated February 18, 2009, the Sheriff advised plaintiff that he was sending his application to defendant.  *See id.* at ¶ 13.  In a February 20, 2009 letter, defendant set forth what he felt were the issues regarding plaintiff's application, *i.e.*, the lack of quality fingerprints that could be used by the FBI and the DCJS, as well as his residency.  *See id.* at ¶ 14.  Accordingly, defendant scheduled an appearance on March 24, 2009 to provide plaintiff and/or his attorney an

opportunity to "present any arguments in support of [his] application."  *See id.* at ¶¶ 14-15.

Specifically, defendant advised plaintiff that he "would be interested in . . . any legal precedent in

support of your position with regard to residency and in support of a fingerprint check waiver."

*See id.* at ¶ 15.  Moreover, defendant informed plaintiff that he would like the Sheriff to be present

to explain the fingerprint situation and to answer any questions that plaintiff or his attorney may

have.  *See id.*

    In a March 3, 2009 letter, plaintiff informed defendant of special steps that could be taken

with respect to persons with "worn" fingerprints and further indicated that none of these "special

steps" were used by the Sheriff in his case.  *See id.* at ¶ 16.  Following a series of letters between

the parties, plaintiff indicated that he did not want to make a personal appearance and provided

additional arguments regarding his concerns over New York's residency and fingerprint

requirements.  *See id.* at ¶¶ 17-24.

    On May 29, 2009, defendant issued a written decision denying plaintiff's pistol permit

application.  *See* Dkt. No. 33-1 at Exhibit "21."  In the decision, defendant rejected plaintiff's

argument that, since more than six months had elapsed since he submitted his application,

defendant was required to grant his application, finding "good cause" for the delay.  *See id.* at 7-9.

Although defendant found that the application was incomplete because the Sheriff was unable to

perform the requisite investigation due to the poor quality of plaintiff's fingerprints, defendant

held that issue in abeyance in order to address the threshold issue of whether New York law

allows the issuance of a pistol permit to a nonresident in plaintiff's situation.  *See id.* at 9-16.  In

denying plaintiff's application, defendant adhered to the long-standing New York precedent that a

pistol permit may not be issued to nonresidents in plaintiff's situation; and, relying on both federal

and New York State case law, rejected plaintiff's argument that New York's firearm licensing law

is unconstitutional.  *See id.* at 11-16.  Defendant held that "'New York's licensing requirement remains an acceptable means of regulating the possession of firearms . . . and will not contravene *Heller* so long as it is not enforced in an arbitrary and capricious manner *(see, District of Columbia v. Heller*, 128 S. Ct. at 2819)."'  *See id.* at 16 (internal citations and quotation omitted).

On July 21, 2009, pursuant to 42 U.S.C. § 1983, plaintiff filed the present action alleging violations of his constitutional rights stemming from the denial of his New York State pistol permit application.  *See* Dkt. No. 1.  Presently before the Court are the parties' cross-motions for summary judgment.


## III. DISCUSSION

### A.    Summary judgment standard

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried."'  *Id.* at 36-37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted).  Where the

non-movant either does not respond to the motion or fails to dispute the movant's statement of

material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the

court must be satisfied that the citations to evidence in the record support the movant's assertions.

*See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in

the record the assertions in the motion for summary judgment "would derogate the truth-finding

functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than

that accorded to 'formal pleadings drafted by lawyers.'"  *Govan v. Campbell*, 289 F. Supp. 2d 289,

295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d

652 (1972)) (other citations omitted).  "However, a *pro se* party's 'bald assertion,' completely

unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v.

Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d

Cir. 1991)).

## B.    Statutory framework

New York regulates handguns primarily through Articles 265 and 400 of the New York

State Penal Law ("Penal Law").  Article 265 creates a general ban on handgun possession, *see,

e.g.,* N.Y. Penal Law §§ 265.01(1), 265.02(4), with specific exemptions thereto, *see* N.Y. Penal

Law § 265.20.  At issue here is the residency requirement set forth in Penal Law § 400.00(3)(a),

which only allows New York residents and a narrow class of nonresidents to qualify for a

handgun permit.  *See* N.Y. Penal Law § 400.00(3)(a).

Article 400 of the Penal Law "is the exclusive statutory mechanism for the licensing of

firearms in New York State."  *O'Connor v. Scarpino*, 83 N.Y.2d 919, 920 (1994).  Licenses are

limited to persons over twenty-one years of age, of good moral character, without a history of crime or mental illness, and "concerning whom no good cause exists for the denial of the license." N.Y. Penal Law § 400.00(1).  There are several types of pistol and revolver licenses, including licenses for household possession, *see* N.Y. Penal Law § 400.00(2)(a), for workplace possession, *see* N.Y. Penal Law § 400.00(2)(b), and to "have and carry concealed," *see* N.Y. Penal Law § 400.00(2)(f).

Licensing is a rigorous and principally local process that begins with the submission of a signed and verified application to a local licensing officer.  *See* N.Y. Penal Law § 400.00(3). Applicants must demonstrate compliance with certain statutory eligibility requirements and provide any facts "as may be required to show the good character, competency and integrity of each person or individual signing the application."  *Id.*  Every application triggers a local investigation.  *See* N.Y. Penal Law § 400.00(4).  This investigation entails local police investigating the applicant's mental health history, criminal history, moral character, and, in the case of a carry license, representations of proper cause.  *See* N.Y. Penal Law § 400.00(1)-(4).  The investigating authority will also take the applicant's fingerprints and check them against the records of the New York State Division of Criminal Justice Services and the Federal Bureau of Investigation.  *See* N.Y. Penal Law § 400.00(4).  Upon completion of the investigation, the investigating authority reports its results to the licensing officer.  *See id.*

Local licensing officers, often local judges,[1] have considerable discretion in deciding whether to grant a license application. *See, e.g., Vale v. Eidens*, 290 A.D.2d 612, 613 (3d Dep't 2002) (citation omitted); *Kaplan v. Bratton*, 249 A.D.2d 199, 201 (1st Dep't 1998) (citation omitted); *Fromson v. Nelson*, 178 A.D.2d 479, 479 (2d Dep't 1991) (citation omitted); *Marlow v. Buckley*, 105 A.D.2d 1160 (4th Dep't 1984) (citations omitted). The officer may deny an application for any "good cause," *see* N.Y. Penal Law § 400.00(1)(g); *Brando v. Sullivan*, 290 A.D.2d 691, 691-92 (3d Dep't 2002) (citation omitted); may deny a carry license for what the officer deems a lack of "proper cause," *see* N.Y. Penal Law § 400.00(2)(f); and may restrict a carry license "to the purposes that justified the issuance," *O'Connor*, 83 N.Y.2d at 921. Moreover, a licensing officer can deny applications where he finds the applicant's personal background to be "troubling." *Vale*, 290 A.D.2d at 613. A licensing officer's decision will not be disturbed unless it is arbitrary and capricious. *See O'Brien v. Keegan*, 87 N.Y.2d 436, 439-40 (1996) (citing N.Y. Penal Law § 400.00).

As such, licensing is a locally controlled process. The only nonresidents eligible for a firearm license are nonresidents who are employed in New York, and they may apply to the licensing officer in the city or county of their principal employment or principal place of business. *See* N.Y. Penal Law § 400.00(3)(a). Section 400.00(3)(a) provides that

> [a]pplications shall be made and renewed, in the case of a license to carry or possess a pistol or revolver, to the licensing officer in the city or county, as the case may be, where the applicant resides, is principally employed or has his principal place of business as

---

[1] "'Licensing officer' means in the city of New York the police commissioner of that city; in the county of Nassau the commissioner of police of that county; in the county of Suffolk the sheriff of that county except in the towns of Babylon, Brookhaven, Huntington, Islip and Smithtown, the commissioner of police of that county; for the purposes of section 400.01 of this chapter the superintendent of state police; and elsewhere in the state a judge or justice of a court of record having his office in the county of issuance." N.Y. Penal Law § 265.00(10).

> merchant or storekeeper; and, in the case of a license as gunsmith or
> dealer in firearms, to the licensing officer where such place of
> business is located.

N.Y. Penal Law § 400.00(3)(a).  The statute does not provide a mechanism for any other

nonresident applications.  One New York appellate court has explained that nonresident

applications would be inconsistent with "the purposes underlying the pistol permit procedures,

namely, to insure that only persons of acceptable background and character are permitted to carry

handguns and to provide a method for reporting information on the identity of persons possessing

weapons and the weapons themselves. . . ."  *Mahoney v. Lewis*, 199 A.D.2d 734, 735 (3d Dep't

1993).  Nonresidents without in-state employment are completely excluded from the

license-application procedure.[2]

Some classes of nonresidents may nonetheless possess or carry handguns in New York

despite the fact that they are not eligible for a New York state firearm license.  Although New

York generally "does not recognize or give effect to licenses to carry firearms issued by . . . other

state[s]," 1997 N.Y. Op. Atty. Gen. 14, federal law grants a limited right to transport unloaded

firearms through the states.  *See* 18 U.S.C. § 926A.  Additionally, Article 265 of the Penal Law

sets forth a number of provisions permitting nonresidents to possess or carry firearms.  For

example, police officers of other states may possess pistols while conducting official business in

New York, *see* N.Y. Penal Law § 265.20(a)(11), and nonresidents licensed within their own states

may use pistols in competitive shooting matches in New York, *see* N.Y. Penal Law §

265.20(a)(13).

---

[2] New York courts have limited resident applications to persons who are New York
domiciliaries.  *See Mahoney*, 199 A.D.2d at 735 (rejecting application of a New York property
owner with his principal residence in Toms River, New Jersey).

As a nonresident, without New York State employment, plaintiff is not eligible for a New York State firearms license under the current state of the law.

**C.     Plaintiff's Second Amendment claims**

Plaintiff's first three causes of action allege violations of his Second Amendment right to bear arms.  *See* Dkt. No. 1 at 3.  The First Cause of Action alleges that defendant denied plaintiff the right to bear arms "in violation of the Second Amendment to the . . . United States Constitution, as made applicable to the states through 'selective incorporation' by the Fourteenth Amendment to the United States Constitution."  *See id.*  The Second Cause of Action appears to assert a New York Civil Rights law cause of action, "which tracks the language of the Second Amendment to the United States Constitution."  *See id.*  The Third Cause of Action asserts that defendant "denied plaintiff his right to bear arms within his home in Summit, New York, by using and applying a definition of residence akin to domicile, and determining that such residence is a prerequisite to a license, contrary to the *Heller* Court's use of the term 'home' as the situs within which a citizen has the right to bear arms."  *See id.* at 3.

Regarding these claims, plaintiff claims that strict scrutiny applies to any restrictions on a person's ability to possess handguns in the home because, as the Supreme Court made clear in *Heller* and *McDonald*, the right to bear arms in one's home is a "fundamental right."  *See* Dkt. No. 30 at 5-6.  Defendant claims that the *Heller* court rejected the rational basis test, but "'declin[ed] to establish a level of scrutiny for evaluating Second Amendment restrictions.'" *See* Dkt. No. 33-4 at 7 (quotation omitted).  Although defendant does not contend that strict scrutiny will never apply in a Second Amendment challenge, defendant argues that the proper level of scrutiny in this particular case is intermediate scrutiny.  *See id.* at 7-8.

The Second Amendment provides that, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court recognized that the Second Amendment protects the individual right to keep and bear arms for self-defense.  *See id.* at 595.  Two years later in *McDonald v. City of Chicago*, ___ U.S. ___, 130 S. Ct. 3020 (2010) (plurality), the Court evaluated restrictions "similar to the District of Columbia's" in *Heller* and held that the Due Process Clause of the Fourteenth Amendment "incorporates the Second Amendment right recognized in *Heller*."  *Id.* at 3026.[3]

In *Heller*, the Supreme Court examined the history of the Second Amendment and contemporaneous jurisprudence to determine whether several District of Columbia statutes, which generally prohibited the possession of handguns and required any other lawful firearms in the home to be kept inoperable (unloaded and disassembled or bound by a trigger lock), violated the Second Amendment.  The Court concluded that the Second Amendment confers an individual right to "possess and carry weapons in case of confrontation."  *Heller*, 554 U.S. at 592.  It found that the District of Columbia's prohibition on operable handguns in the home was unconstitutional because the inherent right to self-defense is central to the Second Amendment and the regulation extends to the home, "where the need for defense of self, family, and property is most acute."  *Id.* at 628.  The Court held, however, that the right is not unlimited, noting that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons

---

[3] While a majority of the Court held that, as a fundamental right, the Second Amendment is applicable to the states, the Court was unable to agree on how or by what mechanism it applied.  *See McDonald*, 130 S. Ct. at 3030-31, 3044-50 (Alito, J., writing for the plurality) (holding that the Second Amendment is incorporated to the states through the Due Process Clause of the Fourteenth Amendment); *id.* at 3059 (Thomas, J., concurring in part and concurring in judgment) (arguing that the Second Amendment right "is a privilege of American citizenship that applies to the States through the Fourteenth Amendment's Privileges or Immunities Clause").

were lawful under the Second Amendment or state analogues." *Id.* at 626 (citations omitted).  The Court went on to state that its opinion should not cast doubt on "longstanding prohibitions on the possession of firearms" by certain classes of persons, such as the mentally ill and convicted felons, and in certain places constituting security concerns. *Id.* at 626-27 & n.26 (noting that "[w]e identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive").[4]  In essence, the Court appears to suggest that the core purpose of the right conferred by the Second Amendment was to allow "law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635.

Notably, despite its lengthy analysis of the Second Amendment's history and text, the *Heller* Court declined to announce the appropriate level of constitutional scrutiny for the review of restrictions that touch upon a person's right to bear arms. *See id.* at 634 (acknowledging the dissent's criticism of the majority for failing to announce a level of scrutiny).  Instead, the Court found that, "[u]nder any of the standards of scrutiny that we have applied to enumerated

---

[4] In *McDonald*, the Court reiterated the point that the right to bear arms is not without restrictions. *See McDonald*, 130 S. Ct. at 3047.  Specifically, the Court held that,

> It is important to keep in mind that *Heller*, while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S., at ___, 128 S. Ct., at 2816. We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." . . . 128 S. Ct., at 2816-2817. We repeat those assurances here. Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms.

*Id.*

constitutional rights," the ban at issue "would fail constitutional muster." *Id.* at 628-29 (internal

footnote and citation omitted).  The Supreme Court did, however, rule out two levels of scrutiny

as inappropriate for Second Amendment analysis.  First, it held that rational basis review was

improper because the extent to which the legislature may regulate specific, enumerated rights in

the Bill of Rights requires more exacting scrutiny.  *Id.* at 628 n.27 (holding that "[i]f all that was

required to overcome the right to keep and bear arms was a rational basis, the Second Amendment

would be redundant with the separate constitutional prohibitions on irrational laws, and would

have no effect").  Second, the majority rejected the novel "interest-balancing approach" devised by

Justice Breyer in dissent.[5]  *See id.* at 634-35 (noting that "[w]e know of no other enumerated

constitutional right whose core protection has been subjected to a freestanding 'interest balancing'

approach").  Beyond eliminating rational basis and Justice Breyer's "interest-balancing approach,"

however, the Court gave no clear guidance to the lower courts regarding the appropriate level of

scrutiny applicable to firearms restrictions.

Perhaps the most important strand of the *Heller* opinion for purposes of the present

litigation was the Supreme Court's caution to the lower courts that its decision not be interpreted

so broadly as to invalidate all existing firearms regulation.  *See id.* at 626-27.  Instead, recognizing

that "the right secured by the Second Amendment is not unlimited," *id.* at 626, the Court, as

discussed above, identified a number of "longstanding prohibitions on the possession of firearms,"

derived from various historical provisions, as "presumptively lawful regulatory measures," *id.* at

626-27 & n.26 .  Among the longstanding prohibitions that the Court found presumptively lawful

---

[5] Justice Breyer's proposed "interest balancing inquiry" asks "whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests."  *Heller*, 554 U.S. at 689-90 (citation omitted) (Breyer, J., dissenting).

were those on the possession of firearms by felons, mentally ill individuals, and minors, as well as "laws forbidding the carrying of firearms in sensitive places . . . or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* 626-27. Expanding on this principle, the Court noted that "[w]e identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 626 n.26.

The Supreme Court, thus, identified a non-exclusive, illustrative list of constitutionally permissible restrictions on the Second Amendment, but declined to clarify the class of appropriate restrictions other than "longstanding prohibitions" on the right to keep and bear arms. This uncertainty has led to a deluge of litigation concerning the intersection of the individual right to keep and bear arms as defined by *Heller* and various firearms restrictions.

The Court is unpersuaded that strict scrutiny is warranted here. Contrary to plaintiff's suggestion, fundamental constitutional rights are not invariably subject to strict scrutiny. In the First Amendment context, for example, content-neutral restrictions on the time, place and manner of speech are subject to a form of intermediate scrutiny. *See United States v. O'Brien*, 391 U.S. 367, 377 (1968). Other restrictions on speech may be held to an even lower standard of review. *See Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 678–79 (1992) (noting that limitations on expressive activity conducted in a nonpublic forum need only be reasonable, as long as they are viewpoint neutral); *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 806 (1985) (same). Drawing on First Amendment jurisprudence, several courts have applied intermediate scrutiny in the Second Amendment context. *See, e.g., United States v. Smith*, 742 F. Supp. 2d 855, 861-62 (S.D.W. Va. 2010); *United States v. Walker*, 709 F. Supp. 2d 460, 466 (E.D. Va. 2010); *United States v. Marzzarella*, 595 F. Supp. 2d 596, 604-05 (W.D. Pa. 2009),

*aff'd* 614 F.3d 85 (3d Cir. 2010).  Accordingly, plaintiff is wrong in suggesting that the Court

must apply strict scrutiny.

Since the *Heller* and *McDonald* decisions are fairly recent, only several Circuit Courts of

Appeals have had the opportunity to opine on how to implement their principles.  The Tenth

Circuit is one of them, and it adopted an approach outlined by the Third Circuit in *United States v.*

*Marzzarella*, 614 F.3d 85 (3d Cir. 2010).  *See United States v. Reese*, 627 F.3d 792, 800 (10th Cir.

2010).  This is a two-pronged approach, whereby the reviewing court examines: (1) "'whether the

challenged law imposes a burden on conduct falling within the scope of the Second Amendment's

guarantee'"; and, if it does, (2), whether the law passes muster under "'some form of means-end

scrutiny.'"  *Reese*, 627 F.3d at 800–01 (quoting *Marzzarella*, 614 F.3d at 89).

The *Marzzarella* court examined a Second Amendment challenge to a federal law

prohibiting the possession of firearms with obliterated serial numbers.  Analogizing to the First

Amendment, the Third Circuit concluded that the Second Amendment can trigger more than one

type of scrutiny, depending on the type of restriction.  *See Marzzarella*, 614 F.3d at 96–97.  The

court decided intermediate scrutiny was appropriate in the case before the court because the law

did not "severely limit the possession of firearms." *Id.* at 97.[6]  In *United States v. Skoien*, 614 F.3d

---

[6] In *Marzzarella*, the court discussed the different ways in which courts have applied "intermediate scrutiny" in the First Amendment context.  Specifically, the court noted that

> [i]n the First Amendment speech context, intermediate scrutiny is articulated in several different forms.  *See Turner Broad. Sys.*, 512 U.S. at 662, 114 S. Ct. 2445 (requiring the regulation serve "an important or substantial" interest and not "burden substantially more speech than is necessary" to further that interest (internal quotation marks omitted)); *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480, 109 S. Ct. 3028, 106 L. Ed. 2d 388 (1989) (requiring a "substantial" governmental goal and a "reasonable fit" between the regulation and that objective); *Ward*, 491 U.S. at 791, 109 S. Ct.

(continued...)

638 (7th Cir. 2010) (en banc), the Seventh Circuit similarly applied intermediate scrutiny to a federal statute prohibiting the possession of firearms by any person convicted of a misdemeanor crime of domestic violence.  *See id.* at 641.  The intermediate scrutiny test applied by both courts generally requires an analysis of whether the challenged law serves a substantial state interest and whether there is a reasonable fit between the objective and the law.  *See Marzzarella*, 614 F.3d at 98.

---

[6](...continued)
> 2746 (applying the time, place, and manner standard which asks whether the regulation is narrowly tailored to serve a significant governmental interest and leaves open ample alternative channels of communication); *Cent. Hudson*, 447 U.S. at 566, 100 S. Ct. 2343 (requiring the regulation directly advance a substantial interest and be no more extensive than necessary to serve the interest).

*Marzzarella*, 614 F.3d at 97.

The court went on to observe that,

> [a]lthough these standards differ in precise terminology, they essentially share the same substantive requirements.  They all require the asserted governmental end to be more than just legitimate, either "significant," "substantial," or "important."  *See, e.g., Turner Broad. Sys.*, 512 U.S. at 662, 114 S. Ct. 2445; *Ward*, 491 U.S. at 791, 109 S. Ct. 2746.  They generally require the fit between the challenged regulation and the asserted objective be reasonable, not perfect.  *See, e.g., Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556, 121 S. Ct. 2404, 150 L. Ed. 2d 532 (2001); *Fox*, 492 U.S. at 480, 109 S. Ct. 3028.  The regulation need not be the least restrictive means of serving the interest, *see, e.g., Turner Broad. Sys.*, 512 U.S. at 662, 114 S. Ct. 2445; *Ward*, 491 U.S. at 798, 109 S. Ct. 2746, but may not burden more speech than is reasonably necessary, *see, e.g., Turner Broad. Sys.*, 512 U.S. at 662, 114 S. Ct. 2445; *Ward*, 491 U.S. at 800, 109 S. Ct. 2746.

*Id.* at 97-98.

In *Reese*, the Tenth Circuit used a similar approach in examining a federal law which prohibits possession of a firearm by a person subject to a domestic protection order.  *See Reese*, 627 F.3d at 802.  Although the regulation at issue addressed a right protected by the Second Amendment, in that it created a complete prohibition on possession of a firearm, the Tenth Circuit concluded that the statute applies to a narrow class of persons "who, based on their past behavior, are more likely to engage in domestic violence" and was therefore subject to intermediate scrutiny.  *Id.*  Applying intermediate scrutiny, the court found that the government had a substantial interest in keeping firearms out of the hands of people who have been found to pose a credible threat to the physical safety of a family member and that the statute was substantially related to that objective.  *See id.* at 803–04.

More recently, in *Nordyke v. King*, ___ F.3d ___, 2011 WL 1632063 (9th Cir. May 2, 2011), the Ninth Circuit provided the following discussion in deciding to apply "a substantial burden framework" in upholding a county ordinance that prohibited the possession of firearms on county property:

> Applying strict scrutiny to every gun regulation would require courts to assess the effectiveness of a myriad of gun-control laws.  Whenever a law is challenged under the Second Amendment, the government is likely to claim that the law serves its interest in reducing crime. . . .  Because the Supreme Court has already held that "the Government's general interest in preventing crime" is "compelling," *United States v. Salerno*, 481 U.S. 739, 754, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987), the question, under strict scrutiny, would be whether the regulation is narrowly tailored to that interest.  But courts cannot determine whether a gun-control regulation is narrowly tailored to the prevention of crime without deciding whether the regulation is likely to be effective (or, at least, whether less burdensome regulations would be as effective).  Sorting gun-control regulations based on their likely effectiveness is a task better fit for the legislature.  *Cf.* Richard H. Fallon, Jr., *Judicially Manageable Standards and Constitutional Meaning*, 119 Harv. L. Rev. 1274, 1291 (2006) ("A test may be deemed judicially

unmanageable if it would require courts to make empirical findings or predictive judgments for which they lack competence.").

By contrast, the substantial burden test, though hardly mechanical, will not produce nearly as many difficult empirical questions as strict scrutiny. *See Volokh*, *supra*, at 1459–60 (arguing that it is easier to determine whether a law substantially burdens the right to bear arms than to figure out whether a law "will reduce the danger of gun crime"). Indeed, courts make similar determinations in other constitutional contexts. *See, e.g., Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992) (holding that pre-viability abortion regulations are unconstitutional if they impose an "undue burden" on a women's right to terminate her pregnancy); *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984) (stating that content-neutral speech regulations are unconstitutional if they do not "leave open ample alternative channels for communication").

*Id.* at *5. With these considerations in mind, the court held that "only regulations which substantially burden the right to keep and to bear arms trigger heightened scrutiny under the Second Amendment." *Id.* at *7.[7]

This Court joins the majority of other courts to have addressed the issue and concludes that intermediate scrutiny is the appropriate level of scrutiny for this case. Two considerations

---

[7] This "substantial burden" test asks whether the regulation at issue "substantially burdens the right to keep and to bear arms." *Nordyke*, 2011 WL 1632063, at *7 (citation omitted). The court held that, "[w]here, as here, the government restricts the distribution of a constitutionally protected good or service, courts typically ask whether the restriction leaves open sufficient alternative avenues for obtaining the good or service." *Id.* As the Ninth Circuit pointed out, this test has been applied in the abortion and content-neutral speech contexts. *See id.* at *5 (citations omitted).

Although this "substantial burden" test may be appropriate in the context of a regulation that restricts the "distribution of a constitutionally protected good or service," *see id.* at *7, the Court finds that the intermediate scrutiny application which asks whether the law is "substantially related to an important government objective," *Clark*, 486 U.S. at 461, provides the appropriate analysis when a law limits "'the right of law-abiding, responsible citizens to use arms in defense of hearth and home,'" *Heller v. District of Columbia*, 698 F. Supp. 2d 179, 188 (D.D.C. 2010) (quoting *Heller*, 128 S. Ct. at 2821).

support this result.  First, as others—including the *Heller* dissent—have suggested, the Supreme

Court's description of a list of presumptively lawful regulatory measures is at least implicitly

inconsistent with strict scrutiny.  *See, e.g., Heller*, 554 U.S. at 688 (Breyer, J., dissenting) (noting

that "the majority implicitly, and appropriately, reject[ed]" a strict scrutiny standard through its list

of presumptively lawful regulatory measures); *Heller*, 698 F. Supp. 2d at 187 (noting that "the

*Heller* dissent and numerous other courts and legal scholars" have concluded that "a strict scrutiny

standard of review would not square with the majority's references to 'presumptively lawful

regulatory measures'").  Second, the burden imposed by this law falls at least one level outside the

core right recognized in *Heller*, *i.e.*, the right of a law abiding individual to keep and carry a

firearm for the purpose of self defense in the home.  Although plaintiff still owns a house in New

York, which he uses for vacation purposes, that house is no longer his "home."

Having surveyed the approaches followed by other courts, the Court turns now to the law

at issue in this case.  Defendant contends that New York State's firearm licensing scheme

promotes a "substantial and legitimate interest in insuring the safety of the general public," and

"that it is much more difficult to monitor the behavior of mere visitors who live elsewhere."  *See*

Dkt. No. 33-4 at 10-11 (citing *Bach*, 408 F.3d at 91-92).[8]  Moreover, defendant asserts that, "[i]n

essence, by the State limiting its residency-based permits to domiciliaries, the State best

guarantees it is able to monitor those permit-holders."  *See id.* at 11.

The Court agrees.  By limiting handgun licenses to those people who have the greatest

contacts with New York, the law allows the government to monitor its licensees more closely and

better ensure the public safety.  Under intermediate scrutiny, the state's policy need not be perfect,

---

[8] It is clear that, in light of *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), *Bach* is no longer binding on this Court insofar as *Bach* held that the Second Amendment does not apply to the States.

only substantially related to a "significant," "substantial," or "important" governmental interest. *Marzzarella*, 614 F.3d at 98 (citation omitted); *see also Clark v. Jeter*, 486 U.S. 456, 461 (1988). New York State's residency requirement satisfies that standard.

Specifically, the harm caused by gun violence in this country has been well-documented, and government efforts to curtail this threat have a direct impact on domestic security. *See, e.g., BJS's Federal Justice Statistics Program, Department of Justice, Firearm Injury and Death from Crime, 1993-97*, available at http://bjs.ojp.usdoj.gov/content/pub/pdf/fidc9397.pdf (stating that of the 19.2 million incidents of nonfatal violent crime from 1993 through 1997, 28% were committed with a firearm); *BJS's Special Report, Weapon Use and Violent Crime* (September 2003), available at http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=570 (finding that, between 1993 and 2001, firearms were used in 27% of robberies, 8% of assaults, and 3% of rapes and sexual assaults, and also that "U.S. residents were victims of crimes committed with firearms at a[n] annual average rate of 4 crimes per 1,000 persons age 12 or older"); *see also Heller*, 554 U.S. at 694-96 (Breyer, J., dissenting) (discussing statistics related to gun violence).  As such, the government objective promoted by these laws is not only "legitimate," *see Lewis v. United States*, 445 U.S. 55, 66 (1980), but also "important," *Clark*, 486 U.S. at 461.

Moreover, the Court finds that there is a substantial relationship between New York's residency requirement and the government's significant interest.  The statute burdens only a narrow class of persons, *i.e.*, otherwise qualified out-of-state residents who wish to obtain a license to carry a firearm in New York.  The State is in a considerably better position to monitor its residents' eligibility for firearms licenses as compared to nonresidents.  This is even more true if a nonresident licensee is convicted of a crime in another state after his license was already

issued.  New York may never become aware of the fact that this nonresident is no longer eligible for a firearms license.[9]

The Court finds that New York's residency requirement is substantially related to serve the important governmental interests set forth above.  Although prohibiting gun possession by nearly all nonresidents might not be the most precisely focused means to achieve this end, intermediate scrutiny, by definition, permits the government to paint with a broader brush.[10]  Morever, because the government objective is exceptionally compelling in this area, the State must be afforded wider latitude to combat the great social harm inflicted by gun violence.

Based on the foregoing, the Court denies plaintiff's motion for summary judgment and grants defendant's cross-motion for summary judgment on plaintiff's Second Amendment right to bear arms claim.

---

[9] In *Peterson v. Lacabe*, ___ F. Supp. 2d ___, 2011 WL 843909 (D. Colo. Mar. 8, 2011), the plaintiff alleged that Colorado's state statute which only permitted residents to carry concealed handguns violated his rights under, among other things, the Second Amendment.  *See id.* at *1.  In finding the statute constitutional, the court applied intermediate scrutiny and held that "the state's interest in monitoring a potential licensee's eligibility for a concealed handgun permit, and the increased difficulty of doing so for out-of-state residents, . . . overcomes Plaintiff's Second Amendment challenge."  *Id.* at *8.

[10] One commentator has observed that "most legislation will assert broad safety concerns and broad gun control measures to match, covering both 'good' and 'bad' gun possessors and 'good' and 'bad' guns.  Such legislation cannot be narrowly tailored to reach only the bad people who kill with their innocent guns."  Donald Dowd, *The Relevance of the Second Amendment to Gun Control Legislation*, 58 Mont. L. Rev. 79, 111 (1997).  Additionally, Professor Winkler has noted that, "due to the intensity of public opinion on guns, legislation is inevitably the result of hard-fought compromise in the political branches.  To expect such legislation to reflect a tight fit between ends and means is unrealistic."  Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 731 (2007).

**D.    Plaintiff's remaining claims[11]**

*1. Equal protection*

As the Supreme Court has observed, "[t]he Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631 (1996) (citations omitted). Accordingly, the Supreme Court has "attempted to reconcile the principle with the reality by stating that, if a law neither burdens a fundamental right nor targets a suspect class, [the court] will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Id.* (citation omitted); *see also Vacco v. Quill*, 521 U.S. 793, 799 (1997) (holding that the Equal Protection Clause "embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly" (quotation omitted)). Where a state statute burdens a fundamental right or targets a suspect class, however, it is subject to heightened scrutiny under the Fourteenth Amendment's Equal Protection Clause. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

In the present matter, it is clear that New York state residents and nonresidents are not similarly situated in terms of the state's ability to obtain information about and monitor the potential licensee's eligibility or continued eligibility for a firearms license. As such, New York's different treatment of nonresidents does not violate the Equal Protection Clause. *See Peruta v. County of San Diego*, ___ F. Supp. 2d ___, 2010 WL 5137137, *10 (S.D. Cal. Dec. 10, 2010)

---

[11] Although plaintiff couches his Fourth, Fifth and Sixth causes of action in "equal protection" terms, considering his *pro se* status, the Court has construed these claims as also alleging due process violations and violations of the Privileges and Immunities Clause of Article IV. Defendant addressed these potential arguments in his memorandum of law in support of his motion for summary judgment.

(finding residents and nonresidents to be situated differently for the purposes of concealed weapons permit in light of the state's substantial interest in monitoring gun licensees).

Based on the foregoing, the Court denies plaintiff's motion for summary judgment and grants defendant's cross-motion for summary judgment with respect to plaintiff's Equal Protection claims.

### 2. Privileges and immunities

"The constitutional right to travel from one State to another . . . occupies a position fundamental to the concept of our Federal Union.  It is a right that has been firmly established and repeatedly recognized." *United States v. Guest*, 383 U.S. 745, 757 (1966).  One component of the right to travel is the right of a nonresident of a state "to be treated as a welcome visitor rather than an unfriendly alien when temporarily present" in that state. *Saenz v. Roe*, 526 U.S. 489, 500 (1999).  The right is protected by the Privileges and Immunities Clause of Article IV of the United States Constitution,[12] which guarantees that a citizen of one state who travels temporarily in another state is entitled to enjoy the privileges and immunities of the citizens of the state that he visits. *See id.*

The right to travel embraces at least three different components: (1) the right of a citizen of one State to enter and to leave another State; (2) the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State; and (3) for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State. *See id.* at 500-01 (citations omitted).  However, not all regulations that merely have an effect on

---

[12] The Privileges and Immunities Clause provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens of the several States." U.S. Const. art. IV, § 2.

travel raise an issue of constitutional dimension.  Rather, "[a] state law implicates the right to travel when it actually deters such travel, . . . when impeding travel is its primary objective, . . . or when it uses '"any classification which serves to penalize the exercise of that right."'"  *Attorney General of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986) (plurality) (internal citations and quotation omitted).  A law embracing means that are "substantially" related to a "substantial" government interest will survive a right to travel analysis.  *See Bach v. Pataki*, 408 F.3d 75, 88 n.27 (2d Cir. 2005).

Liberally construed, plaintiff's complaint argues that the residency requirement in section 400.00 of the New York Penal Law penalizes him for traveling and spending time outside of New York.  In *Bach*, the Second Circuit concluded that New York has a substantial interest in monitoring gun licenses and that limiting licenses to residents and those working primarily within the state was sufficiently related to that interest.  *See Bach*, 408 F.3d at 88-89.  Although *McDonald* clearly overrules *Bach* insofar as *Bach* held that "the Second Amendment's 'right to keep and bear arms' imposes a limitation on only federal, not state, legislative efforts," *id.* at 84 (footnote omitted); the remaining discussion in *Bach* still remains the law of the Second Circuit and precludes plaintiff's Privileges and Immunities challenge to New York's residency requirement in New York Penal Law § 400.00.  Even if *Bach* did not preclude this claim, the above discussion relating to plaintiff's Second Amendment claims makes clear that New York has a substantial interest in limiting firearm possession to those with the most significant contacts with the State and that section 400.00 of New York's Penal Law is substantially related to that purpose.

Based on the foregoing, the Court denies plaintiff's motion for summary judgment and grants defendant's cross-motion for summary judgment on plaintiff's Privileges and Immunities claim.

### 3. Substantive due process[13]

Substantive due process prohibits the government from taking actions that are "arbitrary," "conscience-shocking," or "oppressive in a constitutional sense." *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (citations omitted). "'[I]ncorrect or ill-advised'" government action is insufficient to give rise to a substantive due process violation. *Id.* (quoting *Bishop v. Wood*, 426 U.S. 341, 350, 96 S. Ct. 2074, 48 L. Ed. 2d 684 (1976)) (other citation omitted). Rather, to state a cognizable claim for a violation of substantive due process, a plaintiff must show that the government exercised power "'without any reasonable justification in the service of a legitimate governmental objective[.]'" *SeaAir N.Y., Inc. v. City of N.Y.*, 250 F.3d 183, 187 (2d Cir. 2001) (quoting *County of Sacramento v. Lewis*, 532 U .S. 833, 846, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)). Indeed, the Second Circuit has noted that "[s]ubstantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority[.]" *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999) (citation omitted).

As defendant correctly notes, none of the alleged governmental conduct gives rise to a substantive due process claim. Clearly, defendant's conduct in denying plaintiff's license application cannot be said to have been "'without any reasonable justification,'" as he was merely

---

[13] Although the complaint does not appear to allege a substantive due process claim, defendant addressed the issue in its memorandum of law.

implementing the law as defined by the courts.  Moreover, New York's regulatory scheme, which requires a thorough background check and sufficient ties to New York before a license will issue, cannot be said to violate substantive due process.  As discussed, the regulatory scheme serves a significant governmental interest and is not unlike the statutory scheme enacted by more than half of the states which likewise restrict the ability of nonresidents to apply for firearms licenses.[14]

Based on the foregoing, the Court denies plaintiff's motion for summary judgment and grants defendant's cross-motion for summary judgment on plaintiff's substantive due process claim.

### 4. Procedural due process

In his Fifth Cause of Action, plaintiff alleges that his Fourteenth Amendment rights were violated when defendant "failed to comply with their own statutory requirements that a decision be reached by the licensing officer within six months or, in the alternative, a reason be provided, in writing to the applicant, setting forth the reason for the failure to approve or deny the application."  *See* Dkt. No. 1 at 4.  In his Sixth Cause of Action, plaintiff alleges that his Fourteenth Amendment rights were violated when defendant determined "that plaintiff was not a resident of the State of New York within the meaning of New York Statutes, and thus ineligible to

---

[14] Ala. Code § 13A-11-75 (2002); Alaska Stat. § 18.65.700 (2002); Ark. Code § 5-73-301 (1999); Calif. Penal Code § 12050(a)(1)(D) (2002); Conn. Gen. Stat. § 29-28 (2002); 11 Del. Code § 1441; Ga. Code § 16-11-129 (2002); Ind. Code § 35-47-2-3 (2002); Ky. Rev. Stat. § 237.110 (2002); La. Rev. Stat. Ann. § 1379.3 (2003); Mich. Comp. Laws § 28.425b (2002); Minn. Stat. § 624.714 (2000); Miss. Code Ann. § 45-9-101 (2002); Mo. Rev. Stat. § 571.090 (2002); Mont. Code Ann. § 45-8-321 (2002); Nev. Rev. Stat. Ann. 202.350 (2002); N.C. Gen. Stat. § 14-415.12 (2002); N.D. Cent. Code § 62.1-04-03 (2001); Okla. Stat. tit. 21, § 1290.9 (2002); Or. Rev. Stat. § 166.291 (2001); S.C. Code. Ann. 23-31-215 (2002); S.D. Codified Laws § 23-7-7 (2002); Tenn. Code Ann. § 39-17-1351 (2002); Tex. Gov't Code Ann. § 411.172 (2002); Va. Code Ann. § 18.2-308 (2002); W. Va. Code § 61-7-4 (2002); Wyo. Stat. § 6-8-104 (2002).

obtain a license, notwithstanding the clear and convincing proof that he was a resident, albeit not domiciled in the State of New York." *See id.* Defendant asserts that plaintiff's claim does not give rise to a procedural due process claim because it merely alleges a violation of state law, which is not cognizable in an action brought pursuant to 42 U.S.C. § 1983.

In order to prevail on a Fourteenth Amendment procedural due process claim pursuant to 42 U.S.C. § 1983, "the plaintiff must show (1) that he possessed a protected liberty or property interest; and (2) that he was deprived of that interest without due process." *Rehman v. State Univ. of N.Y. at Stony Brook*, 596 F. Supp. 2d 643, 656 (E.D.N.Y. 2009) (citing *McMenemy v. City of Rochester*, 241 F.3d 279, 285-86 (2d Cir. 2001)). "Property rights arise from '"an independent source such as state law," [with] federal constitutional law determin[ing] whether that interest rises to the level of a "legitimate claim of entitlement" protected by the Due Process Clause.'" *Pichen v. City of Auburn, N.Y.*, 728 F. Supp. 2d 192, 198 (N.D.N.Y. 2010) (quotation and other citation omitted). However, "[w]here there is a meaningful postdeprivation remedy, there is no due process violation." *Gudema v. Nassau County*, 163 F.3d 717, 724 (2d Cir. 1998) (citation omitted).

Insofar as plaintiff alleges that the delay in processing his application violated his due process rights, the claim fails to state a procedural due process claim. *See Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir. 1987) (holding that, "[a]t most, any violation of state procedural requirements would create liability under state law . . ."). As to the Sixth Cause of Action, because plaintiff was entitled to challenge the denial of his firearms license application in an Article 78 proceeding, plaintiff had available to him a meaningful post-deprivation remedy under state law. *See O'Brien*, 87 N.Y.2d at 439; *see also Gudema*, 163 F.3d at 726 (noting that an

Article 78 proceeding is an adequate state-law remedy).  As such, plaintiff has failed to state a procedural due process claim.

Based on the foregoing, the Court denies plaintiff's motion for summary judgment and grants defendant's cross-motion for summary judgment on plaintiff's procedural due process claims.

### 5. State-law claims

In his complaint, plaintiff references both the New York State Constitution and the New York State Civil Rights Law and, therefore, appears to be asserting state-law causes of action.  *See* Dkt. No. 1 at 3-4.

Application of supplemental jurisdiction is discretionary, and "it requires a balancing of the considerations of comity, fairness to the litigants, judicial economy, and the avoidance of needless decisions of state law."  *Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 809 (2d Cir. 1979) (citation omitted).  Since the Court has dismissed all of plaintiff's federal claims, it declines to exercise supplemental jurisdiction over his state-law claims and dismisses them without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that plaintiff's motion for summary judgment is **DENIED** in its entirety; and the Court further

**ORDERS** that defendant's cross-motion for summary judgment is **GRANTED** in its entirety; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in defendant's favor and close this case.

**IT IS SO ORDERED.**

Dated: May 20, 2011
      Albany, New York

Mae A. D'Agostino
U.S. District Judge