# EXHIBIT A

**General Docket**
**Court of Appeals, 2nd Circuit**

| | |
|---|---|
| **Court of Appeals Docket #:** 11-2420 | **Docketed:** 06/14/2011 |
| **Nature of Suit:** 3440 CIVIL RIGHTS-Other | **Termed:** 12/23/2013 |
| Osterweil v. Bartlett | |
| **Appeal From:** NDNY (SYRACUSE) | |
| **Fee Status:** Paid | |

**Case Type Information:**
  1) Civil
  2) Private
  3) -

**Originating Court Information:**
  **District:** 0206-5 : 09-cv-825
  **Trial Judge:** David R. Homer, U.S. Magistrate Judge
  **Date Filed:** 07/21/2009

| | |
|---|---|
| **Date Order/Judgment:** | **Date NOA Filed:** |
| 05/20/2011 | 06/13/2011 |

**Prior Cases:**
  None

**Current Cases:**
  None

**Panel Assignment:**     Not available

---

| | |
|---|---|
| Alfred G. Osterweil<br>      Plaintiff - Appellant | Daniel Louis Schmutter, Esq., -<br>Direct: 732-549-5600<br>[COR LD NTC Retained]<br>Greenbaum, Rowe, Smith & Davis LLP<br>Metro Corporate Campus One<br>P.O. Box 5600<br>Woodbridge, NJ 07095<br><br>Paul D. Clement, Esq., -<br>[COR NTC Retained]<br>Bancroft PLLC<br>1919 M Street, NW<br>Washington, DC 20036<br><br>David Zachary Hudson, Esq., -<br>Direct: 202-640-6528<br>[COR NTC Retained]<br>Bancroft PLLC<br>Suite 470<br>1919 M Street, NW<br>Washington, DC 20036 |

-----------------------------

| | |
|---|---|
| Andrew M. Cuomo, In his official capacity as Governor of the State of New York<br>      Defendant | |
| Andrew M. Cuomo, In his official capacity as Attorney General of the State of New York<br>      Defendant | |
| George R. Bartlett, III, In his official capacity as Licensing Officer in the County of Schoharie<br>      Defendant - Appellee | Frank Brady, -<br>Direct: 518-486-4502<br>[COR LD NTC Retained]<br>New York State Office of the Attorney General |

The Capitol
Albany, NY 12224

Claude S. Platton, Assistant Solicitor General
Direct: 212-416-6511
[COR LD NTC Retained]
New York State Office of the Attorney General
25th Floor
120 Broadway
New York, NY 10271

Alfred G. Osterweil,

      Plaintiff - Appellant,

v.

George R. Bartlett, III, In his official capacity as Licensing Officer in the County of Schoharie,

      Defendant - Appellee,

David A. Paterson, In his official capacity as Governor of the State of New York, Andrew M. Cuomo, In his official capacity as Attorney General of the State of New York,

      Defendants.

| 06/14/2011 | 1<br>12 pg, 137.19 KB | NOTICE OF CIVIL APPEAL, with district court docket, on behalf of Appellant Alfred G. Osterweil, FILED. [316648] [11-2420] |
|---|---|---|
| 06/14/2011 | 2<br>29 pg, 182.79 KB | DISTRICT COURT ORDER, dated 05/20/2011, RECEIVED.[316661] [11-2420] |
| 06/14/2011 | 3<br>1 pg, 123.41 KB | DISTRICT COURT JUDGMENT, dated 05/20/2011, RECEIVED.[316662] [11-2420] |
| 06/14/2011 | 4<br>8 pg, 87.6 KB | ELECTRONIC INDEX, in lieu of record, FILED.[316664] [11-2420] |
| 06/16/2011 | 6<br>2 pg, 28.63 KB | INSTRUCTIONAL FORMS, to Pro Se litigant, SENT.[316670] [11-2420] |
| 06/21/2011 | 8<br>1 pg, 23.62 KB | NOTICE OF APPEARANCE AS SUBSTITUTE COUNSEL, on behalf of -- Andrew M. Cuomo, David A. Paterson and Appellee George R. Bartlett, III, FILED. Service date 06/21/2011 by US mail. [320439] [11-2420] |
| 06/21/2011 | 9 | ATTORNEY, Frank Brady, [8], in place of attorney Eric T. Schneiderman, SUBSTITUTED.[320619] [11-2420] |
| 06/21/2011 | 10<br>1 pg, 67.34 KB | FORM D, on behalf of Appellant Alfred G. Osterweil, FILED. Service date 06/22/2011 by CM/ECF.[321201] [11-2420] |
| 08/16/2011 | 12<br>2 pg, 39.54 KB | ORDER, dismissing appeal effective 09/06/2011, unless appellant Alfred G. Osterweil submits a acknowledgment and notice of appearance form, copy to pro se appellant, FILED.[366772] [11-2420] |
| 09/06/2011 | 13<br>1 pg, 116.31 KB | NOTICE OF APPEARANCE, on behalf of Appellant Alfred G. Osterweil, FILED. Service date 09/06/2011 by CM/ECF. [383226] [11-2420] |
| 09/07/2011 | 18 | ATTORNEY, Daniel Louis Schmutter for Alfred G. Osterweil, in case 11-2420 , [13], ADDED.[383710] [11-2420] |
| 09/22/2011 | 21<br>1 pg, 39.35 KB | ORDER, dismissing appeal effective 10/06/2011, unless appellant Alfred G. Osterweil submits Form C, FILED.[398109] [11-2420] |
| 10/05/2011 | 22<br>42 pg, 1.2 MB | FORM C, on behalf of Appellant Alfred G. Osterweil, FILED. Service date 10/05/2011 by CM/ECF.[410146] [11-2420] |
| 10/06/2011 | 26<br>1 pg, 37.13 KB | NEW CASE MANAGER, Deborah Holmes, ASSIGNED.[410421] [11-2420] |
| 10/06/2011 | 28<br>1 pg, 35.37 KB | FORM D, on behalf of Appellant Alfred G. Osterweil, FILED. Service date 10/06/2011 by CM/ECF.[410954] [11-2420] |
| 10/06/2011 | 29<br>1 pg, 141.17 KB | CAMP CONFERENCE ORDER: Type of Conference: In-Person, Scheduled Date of Conference: 10/31/2011, Start Time: 3:00 PM, endorsed by Lisa J. Greenberg, FILED.[411022] [11-2420] |
| 10/11/2011 | 31 | SCHEDULING NOTIFICATION, on behalf of Appellant Alfred G. Osterweil, informing Court of proposed due date 01/05/2012, RECEIVED. Service date 10/11/2011 by CM/ECF.[413963] [11-2420] |
| 10/12/2011 | 32<br>2 pg, 56.78 KB | DEFECTIVE DOCUMENT, SCHEDULING NOTIFICATION, [31], on behalf of Appellant Alfred G. Osterweil, FILED.[414952] [11-2420] |
| 10/12/2011 | 33<br>1 pg, 25.04 KB | SCHEDULING NOTIFICATION, informing Court of proposed due date 01/05/2012, RECEIVED. Service date 10/12/2011 by CM/ECF.[415473] [11-2420] |
| 10/14/2011 | 34 | CURED DEFECTIVE SCHEDULING NOTIFICATION [32], [33], on behalf of Appellant Alfred G. Osterweil, FILED.[417022] [11-2420] |
| 10/14/2011 | 37<br>2 pg, 39.29 KB | SO-ORDERED SCHEDULING NOTIFICATION, setting Appellant Alfred G. Osterweil Brief due date as 01/05/2012;. Joint Appendix due date as 01/05/2012, FILED.[418153] [11-2420] |
| 10/18/2011 | 38<br>1 pg, 146.64 KB | CAMP CONFERENCE ORDER: Type of Conference: Amended Telephonic, Scheduled Date of Conference: 10/31/2011, Start Time: 3:00 PM, endorsed by Lisa J. Greenberg, FILED.[420460] [11-2420] |
| 12/09/2011 | 40<br>1 pg, 34.01 KB | NOTICE, for the submission of additional paper copies of the appendix or joint appendix, SENT.[468564] [11-2420] |
| 12/09/2011 | 41<br>5 pg, 175.84 KB | MOTION, to extend time, on behalf of Appellant Alfred G. Osterweil, FILED. Service date 12/09/2011 by CM/ECF. [469393] [11-2420] |
| 12/15/2011 | 47<br>1 pg, 18.27 KB | MOTION ORDER, granting motion to extend time [41] filed by Appellant Alfred G. Osterweil, by RKW, FILED. [474256][47] [11-2420] |

Case 1:09-cv-00825-MAD-CFH   Document 52-1   Filed 04/07/14   Page 6 of 296

| 01/13/2012 | 48<br>2 pg, 46.82 KB | NOTICE OF APPEARANCE AS SUBSTITUTE COUNSEL, on behalf of Appellant Alfred G. Osterweil, FILED. Service date 01/13/2012 by CM/ECF. [498236] [11-2420] |
|---|---|---|
| 01/26/2012 | 49<br>1 pg, 32.18 KB | NOTICE OF APPEARANCE AS ADDITIONAL COUNSEL, on behalf of Appellant Alfred G. Osterweil, FILED. Service date 01/26/2012 by CM/ECF. [507960] [11-2420] |
| 01/26/2012 | 50<br>1 pg, 32.21 KB | NOTICE OF APPEARANCE AS ADDITIONAL COUNSEL, on behalf of Appellant Alfred G. Osterweil, FILED. Service date 01/26/2012 by CM/ECF. [508046] [11-2420] |
| 01/26/2012 | 51 | ATTORNEY, Daniel Louis Schmutter for Alfred G. Osterweil, in case 11-2420 , [48], ADDED.[508216] [11-2420] |
| 01/26/2012 | 52 | ATTORNEY, Paul D Clement for Alfred G. Osterweil, in case 11-2420 , [49], ADDED.[508219] [11-2420] |
| 01/26/2012 | 53 | ATTORNEY, David Zachary Hudson for Alfred G. Osterweil, in case 11-2420 , [50], ADDED.[508227] [11-2420] |
| 01/26/2012 | 54<br>1 pg, 36.82 KB | ACKNOWLEDGMENT AND NOTICE OF APPEARANCE, on behalf of Appellant Alfred G. Osterweil, FILED. Service date 01/26/2012 by CM/ECF.[508579] [11-2420] |
| 01/26/2012 | 55<br>54 pg, 254.34 KB | BRIEF, on behalf of Appellant Alfred G. Osterweil, FILED. Service date 01/26/2012 by CM/ECF.[509365] [11-2420] |
| 01/26/2012 | 56<br>183 pg, 5.05 MB | JOINT APPENDIX, volume 1 of 1, on behalf of Appellant Alfred G. Osterweil, FILED. Service date 01/26/2012 by CM/ECF.[509379] [11-2420] |
| 02/07/2012 | 63<br>1 pg, 34.06 KB | SCHEDULING NOTIFICATION, on behalf of Appellee George R. Bartlett, III, informing Court of proposed due date 04/26/2012, RECEIVED. Service date 02/07/2012 by CM/ECF.[519844] [11-2420] |
| 02/07/2012 | 66<br>2 pg, 39.44 KB | SO-ORDERED SCHEDULING NOTIFICATION, setting Appellee George R. Bartlett, III Brief due date as 04/26/2012, FILED.[520043] [11-2420] |
| 02/15/2012 | 67 | EXTRA PAPER COPIES, Joint Appendix, Volumes, on behalf of Appellant Alfred G. Osterweil, RECEIVED. [525800] [11-2420]--[Edited 02/15/2012 by DH] |
| 04/18/2012 | 68<br>131 pg, 1.98 MB | MOTION, to certify question, on behalf of Appellee George R. Bartlett, III, FILED. Service date 04/18/2012 by CM/ECF. [584194] [11-2420] |
| 04/18/2012 | 69<br>37 pg, 460.03 KB | MOTION, to extend time, on behalf of Appellee George R. Bartlett, III, FILED. Service date 04/18/2012 by CM/ECF. [584231] [11-2420] |
| 04/24/2012 | 72<br>9 pg, 81.35 KB | OPPOSITION TO MOTION to extend time [69], on behalf of Appellant Alfred G. Osterweil, FILED. Service date 04/24/2012 by CM/ECF. [588839][72] [11-2420] |
| 04/27/2012 | 77<br>1 pg, 154.71 KB | MOTION ORDER, denying motion to extend time. Appellee shall file his brief within sixty days from the date of this order, [69] filed by Appellee George R. Bartlett, III; referring motion to certify question [68] filed by Appellee George R. Bartlett, III, by DC, FILED. [593136][77] [11-2420] |
| 04/30/2012 | 79<br>18 pg, 102.57 KB | OPPOSITION TO MOTION to certify question [68], on behalf of Appellant Alfred G. Osterweil, FILED. Service date 04/30/2012 by CM/ECF. [594808][79] [11-2420] |
| 06/01/2012 | 81<br>2 pg, 72.68 KB | NOTICE OF APPEARANCE AS ADDITIONAL COUNSEL, on behalf of Appellee George R. Bartlett, III, FILED. Service date 06/01/2012 by CM/ECF. [625388] [11-2420] |
| 06/01/2012 | 82 | ATTORNEY, Simon Heller for George R. Bartlett III, in case 11-2420 , [81], ADDED.[625481] [11-2420] |
| 06/26/2012 | 83<br>50 pg, 181.61 KB | BRIEF, on behalf of Appellee George R. Bartlett, III, FILED. Service date 06/26/2012 by CM/ECF. [648135] [11-2420] |
| 07/03/2012 | 86<br>1 pg, 127.74 KB | ORAL ARGUMENT STATEMENT LR 34.1 (a), on behalf of filer Attorney Mr. Simon Heller for Appellee George R. Bartlett, III, FILED. Service date 07/03/2012 by CM/ECF. [654291] [11-2420] |
| 07/06/2012 | 88<br>1 pg, 32.36 KB | ORAL ARGUMENT STATEMENT LR 34.1 (a), on behalf of filer Attorney Mr. Daniel Louis Schmutter, Esq. for Appellant Alfred G. Osterweil, FILED. Service date 07/06/2012 by CM/ECF. [656913] [11-2420] |
| 07/10/2012 | 90<br>32 pg, 183.32 KB | REPLY BRIEF, on behalf of Appellant Alfred G. Osterweil, FILED. Service date 07/10/2012 by CM/ECF. [659580] [11-2420] |
| 08/16/2012 | 92 | CASE CALENDARING, for the week of 10/22/2012, B, PROPOSED.[694298] [11-2420] |
| 08/30/2012 | 93 | CASE CALENDARING, for argument on 10/26/2012, B Panel, SET.[707777] [11-2420] |

| | | |
|---|---|---|
| 09/07/2012 | 95<br>2 pg, 81.62 KB | ARGUMENT NOTICE, to attorneys/parties, TRANSMITTED.[713103] [11-2420] |
| 09/07/2012 | 96<br>1 pg, 40.14 KB | NOTICE OF HEARING DATE ACKNOWLEDGMENT, on behalf of Appellant Alfred G. Osterweil, FILED. Service date 09/07/2012 by CM/ECF. [713745] [11-2420] |
| 09/18/2012 | 97<br>1 pg, 35.5 KB | NOTICE OF HEARING DATE ACKNOWLEDGMENT, on behalf of Appellee George R. Bartlett, III, FILED. Service date 09/18/2012 by CM/ECF. [723068] [11-2420] |
| 09/24/2012 | 99<br>1 pg, 37.7 KB | ORDER, dated 09/24/2012, referring motion to certify a question of state law, FILED.[728138] [11-2420] |
| 10/26/2012 | 100 | CASE, before DJ*, JMW, SDO, HEARD.[758533] [11-2420] |
| 11/14/2012 | 101<br>1 pg, 34.19 KB | REQUEST FOR ARGUMENT CD, with fee, RECEIVED.[782902] [11-2420] |
| 11/28/2012 | 102 | ARGUMENT CD, TRANSMITTED.[782905] [11-2420] |
| 01/29/2013 | 103<br>14 pg, 40.85 KB | NON- DISPOSITIVE OPINION, question certified to the New York Court of Appeals, by DJ, FILED.[829365] [11-2420]--[Edited 01/29/2013 by DH]--[Edited 01/29/2013 by DH] |
| 01/29/2013 | 105<br>26 pg, 916.74 KB | ORDER, certifying question to the New York State Court of Appeals, FILED.[829429] [11-2420] |
| 01/29/2013 | 107<br>14 pg, 295.38 KB | CERTIFIED ORDER, dated 01/29/2013, to New York Court of Appeals, FILED.[830188] [11-2420] |
| 02/08/2013 | 112<br>3 pg, 131.73 KB | LETTER, dated 02/01/2013, on behalf of New York State Court of Appeals, RECEIVED. Service date 02/04/2013 by US mail.[841751] [11-2420] |
| 02/26/2013 | 114<br>3 pg, 97.83 KB | LETTER, dated 02/19/2013, on behalf of, State of New York Court of Appeals RECEIVED. Service date 02/21/2013 by US mail.[857646] [11-2420] |
| 04/30/2013 | 116 | ARGUMENT CD, TRANSMITTED.[922838] [11-2420] |
| 05/28/2013 | 117<br>2 pg, 94.12 KB | LETTER, dated 05/24/2013, regarding scheduling, on behalf of State of New York Court of Appeals, , RECEIVED. Service date 05/28/2013 by US mail.[963080] [11-2420] |
| 08/19/2013 | 119<br>5 pg, 221.5 KB | LETTER, dated 08/19/2013, re: letter to counsel, on behalf of State of New York Court of Appeals, RECEIVED. Service date 08/19/2013 by US mail.[1024845] [11-2420] |
| 10/15/2013 | 121<br>1 pg, 57.36 KB | NOTICE OF APPEARANCE AS SUBSTITUTE COUNSEL, on behalf of Appellee George R. Bartlett, III, FILED. Service date 10/15/2013 by CM/ECF. [1065223] [11-2420] |
| 10/15/2013 | 122 | ATTORNEY, Claude S. Platton, [121], in place of attorney Simon Heller, SUBSTITUTED.[1065273] [11-2420] |
| 12/20/2013 | 123<br>11 pg, 82.98 KB | LETTER, on behalf of Appellee George R. Bartlett, III, RECEIVED. Service date 12/20/2013 by CM/ECF. [1120183] [11-2420] |
| 12/23/2013 | 126<br>1 pg, 37.02 KB | NEW CASE MANAGER, Yana Segal, ASSIGNED.[1120616] [11-2420] |
| 12/23/2013 | 127<br>6 pg, 90.84 KB | OPINION, vacating decision of the district court and remanding the case, per curiam (DJ, JMW, S.D. O'CONNOR), FILED.[1120624] [11-2420] |
| 12/23/2013 | 128<br>4 pg, 276.02 KB | CERTIFIED OPINION, dated 12/23/2013, to NDNY (SYRACUSE), ISSUED.[1120629] [11-2420] |
| 12/23/2013 | 132<br>1 pg, 160.69 KB | JUDGMENT, FILED.[1121267] [11-2420] |
| 01/14/2014 | 133<br>1 pg, 415.18 KB | JUDGMENT MANDATE, ISSUED.[1133212] [11-2420] |

Case 1:09-cv-00825-MAD-CFH   Document 52-1   Filed 04/07/14   Page 8 of 296
https://ecf.ca2.uscourts.gov/cmecf/servlet/TransportRoom

Clear All

○ **Documents and Docket Summary**
   **Documents Only**

✓ **Include Page Numbers**

**Selected Pages:** 0          **Selected Size:** 0 KB

View Selected

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 03/28/2014 10:58:38 | | | |
| **PACER Login:** | ny0010 | **Client Code:** | |
| **Description:** | Docket Report (full) | **Search Criteria:** | 11-2420 |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

# EXHIBIT B

# 11-2420 cv

In the

# United States Court of Appeals
## for the Second Circuit

Alfred G. Osterweil,

*Plaintiff - Appellant*,

v.

George R. Bartlett, III,
In his official capacity as Licensing Officer in the County of Schoharie,

*Defendant – Appellee*,

David A. Paterson, in his official capacity as
Governor of the State of New York; Andrew M. Cuomo, in his official capacity as
Attorney General of the State of New York,

*Defendants*.

**On Appeal from the United States District Court
for the Northern District of New York (Syracuse)**

## BRIEF FOR APPELLANT ALFRED G. OSTERWEIL

Paul D. Clement
D. Zachary Hudson
BANCROFT PLLC
1919 M Street, N.W., Suite 470
Washington, D.C. 20036
(202) 234-0090
pclement@bancroftpllc.com

Daniel L. Schmutter
GREENBAUM, ROWE, SMITH
  & DAVIS LLP
P.O. Box 5600
Woodbridge, NJ 07095
(732) 549-5600
dschmutter@greenbaumlaw.com

*Counsel for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Appellant hereby certifies that none of the

parties to this case are corporate entities.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................. i

TABLE OF AUTHORITIES .................................................................................. iii

JURISDICTIONAL STATEMENT ............................................................................ 1

STATEMENT OF ISSUES PRESENTED.................................................................. 1

STATEMENT OF THE CASE................................................................................. 2

STATEMENT OF FACTS ....................................................................................... 4

SUMMARY OF ARGUMENT ................................................................................. 9

STANDARD OF REVIEW ..................................................................................... 16

ARGUMENT ......................................................................................................... 16

I.     New York's Ban On Home Handgun Possession By Part-Time
       State Residents Violates the Second Amendment.......................................... 16

       A.     New York's Ban On Home Handgun Possession By Part-
              Time State Residents Is, At A Minimum, Subject To Strict
              Scrutiny. ............................................................................................. 17

       B.     New York's Ban On Home Handgun Possession By Part-
              Time State Residents Substantially and Unconstitutionally
              Burdens Second Amendment Rights. ................................................. 30

II.    New York's Residency Requirement Arbitrarily Burdens The
       Fundamental Rights Of Part-Time State Residents In Violation Of
       The Equal Protection Clause. ....................................................................... 42

CONCLUSION ....................................................................................................... 45

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ...................................................................35

*Bach v. Pataki*, 408 F.3d 75 (2d Cir. 2005) ...............................................................37

*Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989) .................................40

*Burdick v. Takushi*, 504 U.S. 428 (1992) ....................................................................22

*Carey v. Brown*, 447 U.S. 455 (1980) ........................................................................36

*Chan v. City of Troy*, 559 N.W.2d 374 (Mich. Ct. App. 1996) ................................45

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ................. 15, 42, 43

*Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984) .............................24

*Clark v. Jeter*, 486 U.S. 456 (1988) ..........................................................................18

*Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177 (2007) .............................................23

*\*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..................................... *passim*

*Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214 (1989) ............................35

*Fla. Star v. B.J.F.*, 491 U.S. 524 (1989) ....................................................................36

*Foucha v. Lousiana*, 504 U.S. 71 (1992) ....................................................................18

*Harper v. Va. Bd. of Elections*, 383 U.S. 663 (1966) ...............................................42

*Heller v. District of Columbia*, No. 10-7036, 2011 WL 4551558
(D.C. Cir. Oct. 4, 2011) ..............................................................................................34

*In re Davies*, 506 N.Y.S.2d 626 (Oswego Cnty. Ct., N.Y. 1986) .............................31

*Jeffreys v. City of N.Y.*, 426 F.3d 549 (2d Cir. 2005) ...............................................16

*Johnson v. California*, 543 U.S. 499 (2005) ...............................................................25

*Kramer v. Union Free School District*, 395 U.S. 621 (1969) ........................... 42, 43

iii

*Lawrence v. Texas*, 539 U.S. 558 (2003) ................................................................18

*Mahoney v. Lewis*, 199 A.D.2d 734 (N.Y. App. Div. 1993) ........................ 7, 31, 32

*Maslow v. Bd. of Elections in City of N.Y.*, 658 F.3d 291 (2d Cir. 2011) ..............16

*\*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010) .................................. *passim*

*Nordlinger v. Hahn*, 505 U.S. 1 (1992) ...................................................................44

*People v. Bounsari*, 915 N.Y.S.2d 921 (Rochester City Ct., 2011) ........................45

*People v. Perkins*, 62 A.D.3d 1160 (N.Y. App. Ct. 2009) ......................................31

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) ..............17

*Plyler v. Doe*, 457 U.S. 202 (1982).........................................................................42

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992)................................................ 25, 27

*Reno v. Flores*, 507 U.S. 292 (1993) ......................................................................18

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973)..............................17

*Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82 (2d Cir. 2009) ...................................18

*State v. Chumphol*, 634 P.2d 451 (Nev. 1981) ........................................................45

*Thompson v. Western States Medical Center*, 535 U.S. 357 (2002) .......................22

*Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997)............................22

*Ullman v. United States*, 350 U.S. 422 (1956) ........................................................29

*United States v. Carolene Prods. Co.*, 304 U.S. 144 (1938) ...................................18

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010)...........................................40

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010).......................... 26, 27, 28

*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000).................... 35, 36

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ............................................26

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982) ....................................................................29

*Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353 (2009) ............................................23

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985)...........................18

**Constitutional Provisions**

*U.S. Const. amend. II...............................................................................................16

**Statutes**

28 U.S.C. § 1291 .........................................................................................................1

28 U.S.C. § 1294 .........................................................................................................1

28 U.S.C. § 1331 .........................................................................................................1

42 U.S.C. § 1983 ................................................................................................. 1, 3, 8

N.Y. Penal Law § 261.01(5) ......................................................................................45

N.Y. Penal Law § 265.00(10) ......................................................................................5

N.Y. Penal Law § 265.01(1) ..................................................................................4, 31

N.Y. Penal Law § 265.02(4) ..................................................................................4, 31

N.Y. Penal Law § 265.20 ........................................................................................4, 31

N.Y. Penal Law § 400.00 ............................................................................... 14, 31, 40

N.Y. Penal Law § 400.00(1) ........................................................................................5

N.Y. Penal Law § 400.00(2)(a).................................................................................4, 5

N.Y. Penal Law § 400.00(3) ........................................................................................5

N.Y. Penal Law § 400.00(3)(a).................................................................................3, 6

N.Y. Penal Law § 400.00(4) ...................................................................................5, 38

N.Y. Penal Law § 400.00(11) ....................................................................................39

v

## Other Authorities

Brief for the United States as Amicus Curiae, District of Columbia v. Heller,
554 U.S. 570 (2008) (No. 07-290), 2008 WL 157201 ...................................22

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56
UCLA L. Rev. 1443, 1449 (2009)...................................................................26

Irving Brant, The Fourth President: A Life of James Madison (1970) ...................34

The Federalist No. 46 (James Madison) ...................................................................34

*Citations upon which Appellant primarily relies are marked with asterisks.

## JURISDICTIONAL STATEMENT

This case was originally filed in the United States District Court for the Northern District of New York on July 21, 2009. A7.[1] The District Court had subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as it involves claims arising under 42 U.S.C. § 1983 and the Constitution. On May 20, 2011, the District Court entered a final judgment disposing of all claims. A180; *see* A151 (2011 WL 1983340). Plaintiff-Appellant filed a timely notice of appeal on June 13, 2011. A181. This Court has appellate jurisdiction pursuant to 28 U.S.C. §§ 1291 & 1294.

## STATEMENT OF ISSUES PRESENTED

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), the Supreme Court of the United States made clear that the Second Amendment to the United States Constitution guarantees the fundamental right of an individual to possess a handgun in his home for the purpose of self-defense. According to New York State, however, an individual can only have one such home. Thus, according to New York, if you own a home in New York and live there with your family, but that home is not your primary residence, you have no right to possess a handgun for self-defense.

---

[1] Citations to the District Court docket (No. 09-CV-00825) are designated "Doc." followed by the appropriate document number and page number, and citations to the Joint Appendix are designated "A___."

Plaintiff-Appellant Alfred G. Osterweil ("Mr. Osterweil") owns a home in New York, but only lives in that home part of the year. Because of that fact, he was denied a license to keep a handgun in his New York home. This case requires the Court to decide:

1.    Whether the District Court erred by holding that New York's statutory scheme denying handgun permits to all individuals whose "primary residence" is in another State does not violate the fundamental Second Amendment right to keep and bear arms in defense of hearth and home.

2.    Whether in light of the recognition in *Heller* and *McDonald* of the fundamental nature of Second Amendment rights, the Equal Protection Clause permits New York to distinguish between domiciliary residents and non-domiciliary residents when it comes to the right to keep and bear arms in the home.

## STATEMENT OF THE CASE

Mr. Osterweil is a part-time resident of Schoharie County, New York. Although Mr. Osterweil owns a home in Schoharie, pays property taxes on that home, and spends several months there each year, his "domicile" is in Louisiana. Mr. Osterweil applied for and was denied a license to keep a handgun in his New York home. The licensing officer, George R. Bartlett, III ("Bartlett"), based his denial of Mr. Osterweil's request on his part-time resident status: New York law only provides for the issuance of home handgun licenses to "residents," where

2

"residence" means "domicile," of which there can be only one. A7; *see* N.Y. Penal Law § 400.00(3)(a).

Mr. Osterweil filed this suit against Bartlett and other state officials pursuant to 42 U.S.C. § 1983, alleging that New York's domicile requirement, which denies part-time residents the ability to obtain a permit to possess a handgun in their homes, abridges his fundamental Second Amendment right to keep and bear arms. A7. The complaint further alleged that New York's treatment of part-time residents, as compared to those domiciled in New York, violates the Equal Protection Clause of the Fourteenth Amendment. A7.

The Honorable Mae A. D'Agostino, United States District Court Judge for the Northern District of New York, granted summary judgment in favor of defendants. A180. Notwithstanding *Heller*'s clear recognition of a Second Amendment right to possess a firearm in the home and *McDonald*'s recognition of the Second Amendment's status as a fundamental right fully applicable against state action, the court applied intermediate scrutiny and held that the New York domicile requirement serves the "significant interest" of "allow[ing] the government to monitor its licensees more closely and better ensure public safety," and that "there is a substantial relationship between New York's residency requirement and the government's" interest. A169–A171. The District Court also

3

concluded that "New York's different treatment of nonresidents does not violate the Equal Protection Clause." A172.

Mr. Osterweil now appeals the District Court's judgment.

## STATEMENT OF FACTS

Mr. Osterweil is a retired attorney who previously served in the U.S. Army. A108. For a number of years, Mr. Osterweil lived with his family full time on a 21-acre plot of land in Schoharie County at 310 Rossman Fly Road, Summit, New York. A14. While in Schoharie, Mr. Osterweil served as a commissioner on the Summit Fire District Board of Commissioners and as an unpaid member of the Board of Directors of the Western Catskills Revitalization Corporation. After he retired, he decided to split his time between New York and Louisiana. He now spends the majority of his time in Louisiana and is domiciled there. Mr. Osterweil keeps a .22-caliber revolver in his Louisiana home for purposes of self-defense. A107, A110.

On May 21, 2008, Mr. Osterweil applied to Schoharie County officials for a New York State pistol license pursuant to Penal Law § 400.00(2)(a), without which he may not lawfully possess a handgun in his home under New York law. A7; A25 ¶ 2.[2] To obtain a license, an applicant must meet several requirements.

---

[2] New York law imposes a general ban on handgun possession. N.Y. Penal Law §§ 265.01(1), 265.02(4), 265.20. In order to legally possess a handgun, one must

4

The licensing process begins with the submission of an application to the local licensing officer.[3]  § 400.00(3).  The applicant must be over 21 years of age, of good moral character, not have a history of crime or mental illness, and there must not exist any other "good cause" for denying the license.  § 400.00(1).  The application triggers a local investigation probing the applicant's mental health and criminal history, moral character, and, in some circumstances, whether there is a "need" for the requested license.  § 400.00(4).  The investigating authority also takes the applicant's fingerprints and uses that information to check for criminal history through the New York State Division of Criminal Justice Services ("DCJS"), the National Crime Information Center ("NCIC"), and the Federal Bureau of Investigation. *See ibid*; A57.  The New York licensing law also states that an application for "a license to carry or possess a pistol or revolver" "shall be made … to the licensing officer in the city or county … where the applicant

---

qualify for an enumerated statutory exemption from that prohibition.  Having a § 400.00(2)(a) license provides such an exemption.  It should be noted, however, that the constitutional validity of presumptively banning the exercise of a fundamental right (here, the possession of a handgun for self-defense within the home) and then creating "an exception" to the ban by way of a licensing scheme is a question that is not before the court in this case.

[3] The identity of the licensing officer varies from place to place under New York law.  In many places, the licensing officer is the state "judge or justice of a court of record having his office in the county of issuance."  § 265.00(10).   In some instances, the police commissioner or sheriff plays the role. *Ibid*.

5

resides, is principally employed or has his principal place of business as merchant or storekeeper." § 400.00(3)(a).

Mr. Osterweil's home-handgun license application set this statutory machinery in motion.   The Schoharie County Sheriff initiated the required investigation.  A25 ¶ 3.  He verified the information set forth in Mr. Osterweil's application, contacted his references, conducted a background check using state information resources and the NCIC, and obtained and submitted Mr. Osterweil's fingerprints to the DCJS and the FBI.  A25 ¶ 3.

On June 24, 2008, the Sheriff sent a letter to Mr. Osterweil informing him that he needed to come to the Sheriff's office "to correct and/or complete some information" on his application.  A25–A26 ¶ 4.  In a letter sent on June 25, 2008, Mr. Osterweil informed the Sheriff that since he had applied for the permit he had purchased a home in Louisiana that he intended to use as his primary residence, and that he would now use his Schoharie residence for only part of the year.  A26 ¶ 5.  The letter inquired whether under such circumstances Mr. Osterweil was still eligible for a permit.  A26 ¶ 5.

On August 13, 2008, the DCJS advised the Sheriff that it was unable to determine whether Mr. Osterweil had a criminal record because of "the poor quality of the fingerprint impressions received."  A26 ¶ 8.  And on July 31, 2008, the FBI similarly determined that "the quality of the characteristics" of Mr.

6

Osterweil's fingerprints was "too low to be used." A26 ¶ 9. A second set of fingerprints submitted by Mr. Osterweil were similarly insufficient to permit analysis. A26–A27 ¶ 11.

On February 18, 2009, the Sheriff informed Mr. Osterweil that he was forwarding his application to Bartlett. A27 ¶ 13. In a February 20, 2009 letter, Bartlett informed Mr. Osterweil of what he viewed as the two major obstacles to his application: (1) the absence of fingerprints that could be used by the DCJS and FBI, and (2) his residency. A27 ¶ 14. Mr. Osterweil responded with a letter on March 3, 2009, explaining to Bartlett various techniques that could be employed to address individuals with "worn fingerprints" and pointing out that the Sheriff failed to use such techniques. A27 ¶ 16.

After several exchanges between Mr. Osterweil and Bartlett, Bartlett issued a decision on May 29, 2009, denying Mr. Osterweil's request for a pistol permit. A134 (Exh. 21). Bartlett determined that Mr. Osterweil's application was incomplete because the Sheriff was never able to finish the statutorily required investigation due to the fingerprint issue. But that was not the reason for Bartlett's denial of Mr. Osterweil's application. Bartlett rejected Mr. Osterweil's request after concluding that pistol permits may not be issued to "non-residents," and that Mr. Osterweil was a "non-resident" under New York law. A143–A144 & n.2 (citing *Mahoney v. Lewis*, 199 A.D.2d 734, 735 (N.Y. App. Div. 1993) ("we

7

expressly have held that 'where a statute prescribes "residence" as a qualification for a privilege or the enjoyment of a benefit, the word is equivalent to "domicile". . . .'").   Bartlett further determined that New York's residency requirement was consistent with *Heller*. A145–A150.

Bartlett never concluded that Mr. Osterweil lacked the necessary character or qualifications to obtain a home handgun license. The license denial was predicated entirely on the conclusion that Mr. Osterweil is domiciled in Louisiana and therefore is not a New York resident, notwithstanding that Mr. Osterweil owns a home in New York and lives there part of the year with his wife, that he has family in Summit, and that Mr. Osterweil and his wife have participated and continue to participate in social, political, and community affairs in Schoharie County, including remaining as dues-paying members of the Summit Snow Riders, a local social group, and the Summit Conservation Club. A123.

Mr. Osterweil filed suit pursuant to 42 U.S.C. § 1983 against Bartlett, David A. Patterson, then Governor of the State of New York, and Andrew M. Cuomo, then Attorney General of the State of New York. A7. As relevant here, Mr. Osterweil's complaint alleged that the defendants denied him his fundamental Second Amendment right to keep and bear arms by denying his license request and that this denial ran afoul of the Equal Protection Clause. A10–A11.

8

After the defendants other than Bartlett were dismissed from the suit, Doc.
15, both Mr. Osterweil and Bartlett moved for summary judgment.[4]  A14, A22.
The District Court ruled against Mr. Osterweil.  A151.  First, the District Court
addressed the level of scrutiny applicable to Mr. Osterweil's constitutional claims.
The District Court concluded that "fundamental constitutional rights are not
invariably subject to strict scrutiny," and that strict scrutiny was inappropriate here.
A164.  After reviewing a series of post-*Heller* cases, the District Court held "that
intermediate scrutiny is the appropriate level of scrutiny for this case."  A168.  The
court went on to conclude that the government had a "significant interest" in
"monitor[ing] its licensees . . . [to] better ensure public safety," and that "there is a
substantial relationship between New York's residency requirement and"
achieving that interest.  A164–A171.  The District Court also concluded that "New
York's different treatment of nonresidents does not violate the Equal Protection
Clause."  A172.

## SUMMARY OF ARGUMENT

**I.** The decision below is fundamentally inconsistent with the Supreme
Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and

---

[4] Mr. Osterweil's Second Amendment claims were initially dismissed.  He filed a
motion for reconsideration after the Supreme Court issued its decision in
*McDonald v. Chicago*, 130 S. Ct. 3020 (2010), and Mr. Osterweil's Second
Amendment claims were reinstated.  Doc. 22, 26.

9

*McDonald v. Chicago*, 130 S. Ct. 3020 (2010). *Heller* made clear that the Second Amendment protects individual rights as a general matter and the right to keep and bear a handgun for self-protection in the home in particular. *McDonald* recognized that the right protected by the Second Amendment is not just an individual one, but a fundamental right protected against intrusion from state and local governments via its incorporation through the Fourteenth Amendment. Those decisions make clear that the result here is indefensible—not one word in either decision suggests that the Second Amendment is a part-time right such that a lawful, but not full-year, resident may be denied an ability to possess a handgun in the home—and that the District Court applied a legal standard that provides insufficient protection for the right.

Restrictions on the right to keep and bear arms are subject to strict scrutiny. That conclusion follows directly from both *McDonald*'s holding that the right to keep and bear arms is a fundamental right and from *Heller*'s rejection of rational basis scrutiny and an "interest-balancing" approach, which was simply intermediate scrutiny by another name.

The District Court's reasons for applying only intermediate scrutiny to New York's ban on home handgun possession by part-time residents are unavailing. The District Court suggested that not every law that impedes a fundamental right is subject to strict scrutiny and cited First Amendment cases applying intermediate

10

scrutiny to prove the point. But Justice Breyer also cited First Amendment intermediate scrutiny cases to support his "interest-balancing" approach, and the majority rejected that standard as insufficiently protective of the right. What is more, New York's ban on part-time residents' possession in the home is no mere time, place, and manner restriction. It is a complete prohibition on the core right recognized in *Heller*.

Contrary to the District Court's conclusion, *Heller*'s "list of presumptively lawful regulatory measures" is in no way inconsistent with the application of strict scrutiny. A169. Presumptions can be rebutted, and there are certainly laws that would survive even the strictest of scrutiny or that would not be entitled to Second Amendment protection because the conduct at issue falls outside the scope of that protection. In all events, *Heller*'s underlying logic—that the right to keep and bear arms is fundamental and that restrictions on the right require strict scrutiny—is wholly consistent with its dictum that certain types of restrictions, such as bans on possession by felons and the mentally ill, are "presumptively lawful," *Heller*, 554 U.S. at 627 & n.26. In the end, given the general rule that restrictions on fundamental constitutional rights are subject to strict scrutiny and *McDonald*'s unequivocal holding that Second Amendment rights are fundamental, the contention that restrictions on Second Amendment rights should be permitted

11

under a less-demanding standard reduces to the contention that the right to keep and bear arms is a lesser right. It is not, and *McDonald* settles the matter.

New York's law amounts to a total prohibition of the exercise of the core right protected by the Second Amendment, and is thus unconstitutional. As interpreted and applied by the District Court, New York's handgun licensing scheme effectively eviscerates the right of part-time residents to defend their New York homes using handguns. Citing New York case law, the court concluded that "[n]onresidents without in-state employment are completely excluded from the [State's] license-application procedure," and thus conclusively prohibited from keeping a handgun in their home. A159. That complete ban cannot be squared with *Heller*, which made clear that the core purpose of the Second Amendment right is to allow "law-abiding, responsible citizens to use arms in defense of hearth and home" where the need for self-defense "is most acute." 554 U.S. at 628, 635.

Defense of home is not less vital or constitutionally protected when the hearth is only fired up during a part of the year. If anything, the constitutional right is more vital for part-time residents because part-time residences tend to be more rural and the absence of full-time occupants can make them attractive targets for criminal activity. Moreover, "handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Heller*, 554 U.S. at 629. The New York law makes it impossible for

12

part-time residents like Mr. Osterweil to use handguns "for the core lawful purpose of self-defense and is hence unconstitutional." *Ibid.*

*Heller*'s dispositive treatment of bans on handguns in the home demands reversal of the District Court's decision. But the New York ban on home handgun possession by part-time residents also fails strict scrutiny. The New York law prevents part-time residents who are not domiciliaries from possessing handguns in their homes based on a purported interest in monitoring licensees. But there is no time limit linked to the domicile requirement, as domicile is largely determined by the subjective basis of a person's intent. Indeed, one could be domiciled in New York and spend little-to-no time there. So, a New York domiciliary can have a license to have a handgun in their home spending nearly no time there, and a non-domiciliary who spends nearly all of his time in New York cannot. That the law elides such a broad swath of conduct relevant to its stated monitoring interest completely undermines the assertion that the interest is compelling and clearly demonstrates that the law lacks the necessary narrow tailoring to withstand scrutiny. Furthermore, there is no evidence that the residency requirement in and of itself does anything to further the State's asserted interests.

What is more, categorically excluding *all* non-domiciliaries is certainly not the least restrictive means of achieving the State's monitoring and public safety goals. The part-time resident possession ban is not limited to those individuals

13

who pose a heightened threat to others, or to circumstances that for some other reason might create a particularly acute danger. Moreover, there are myriad other ways that the State could achieve its goals short of an illegitimate and unnecessary categorical ban.

Indeed, New York's ban on part-time resident home handgun possession fails even intermediate scrutiny, properly applied. The District Court found a "substantial relationship between New York's residency requirement and the government's significant interest" primarily because the "State is in a considerably better position to monitor residents' eligibility for firearm licenses as compared to nonresidents." A170. But it is not at all clear that this is true, as Mr. Osterweil's case demonstrates. Beyond his residency and issues with his fingerprints—an issue not unique to "nonresidents"—Mr. Osterweil would have easily qualified for a license under § 400.00. Nothing about his part-time resident status made it more cumbersome to ascertain his eligibility. And the court engaged in no meaningful consideration of the fit between the State's claimed interest and the contours of its regulatory scheme. It is also critical to recognize that New York's policy works a complete ban on a part-time resident's possession in the home. New York does not defer to licensing decisions of the domiciliary state or provide any alternative through which the State's purported interests could be addressed. *Heller* makes

14

crystal clear that a complete ban is not a constitutional option when it comes to handguns in the home.

**II.** New York's ban on non-resident handgun possession suffers from a second fatal flaw: it violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. When "state laws impinge on personal rights protected by the Constitution" "strict scrutiny" applies, and such laws "will be sustained only if they are suitably tailored to serve a compelling state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

As already discussed, the State lacks a compelling interest to justify imposing a complete ban on part-time residents' constitutional right to possess handguns in their home, and has no adequate justification for treating full-time residents and part-time residents differently. Mr. Osterweil has the same interest in protecting his family when staying at his home in Schoharie as do his New York-domiciled neighbors down the street. What is more, the facts of Mr. Osterweil's case show that the conclusion the District Court relied on—that it is harder to obtain information about nonresidents—is incorrect.    Other than usable fingerprints, Bartlett had all the information he needed to decide whether Mr. Osterweil was deserving of a handgun license. The only thing standing between Mr. Osterweil and the license he desired was his part-time residency.

15

## STANDARD OF REVIEW

This case presents "purely legal questions concerning the scope of the" Second Amendment and the Equal Protection Clause of the Fourteenth Amendment, and is thus subject to de novo review. *Maslow v. Bd. of Elections in City of N.Y.*, 658 F.3d 291, 295–96 (2d Cir. 2011). Because the District Court granted Bartlett's motion for summary judgment, any factual issues are construed in the light most favorable to Mr. Osterweil, the non-moving party. *Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005).

## ARGUMENT

## I.   New York's Ban On Home Handgun Possession By Part-Time State Residents Violates the Second Amendment.

The Second Amendment provides that "A well regulated militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court recognized that the Second Amendment protects the individual right to keep and bear arms in the home and for self-defense. And in *McDonald v. Chicago*, 130 S. Ct. 3020, 3021, 3050 (2010), the Court concluded that "the Second Amendment right recognized in *Heller*" was a fundamental right that was fully applicable to the States. Those two precedents taken together should have made it crystal clear that New York's complete ban on a Mr. Osterweil's ability to possess a handgun for defense of his New York

16

property was unconstitutional. But those clear precedents did not stop the District Court from treating Second Amendment rights as second-class rights, wrongly applying intermediate scrutiny to a law that substantially burdens fundamental rights, and upholding a law that categorically and impermissibly bans home handgun possession by part-time residents.

## A.   New York's Ban On Home Handgun Possession By Part-Time State Residents Is, At A Minimum, Subject To Strict Scrutiny.

After *District of Columbia v. Heller* and *McDonald v. Chicago*, it should be clear that restrictions on the right to keep and bear arms are subject to strict scrutiny. Although a number of courts have resisted that conclusion and applied intermediate scrutiny or reserved strict scrutiny for invasions of the "core" of the right, the implications of *Heller* and *McDonald* are clear. That conclusion flows directly from *McDonald*'s holding that the right to keep and bear arms is incorporated through the Fourteenth Amendment because of its fundamental nature and from *Heller*'s rejection of rational basis scrutiny and an "interest-balancing" approach, which was simply intermediate scrutiny by another name.

When a law interferes with "fundamental constitutional rights," it is subject to "strict judicial scrutiny." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 15 (1973); *see Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983) ("strict scrutiny [is] applied when government action impinges upon a fundamental right protected by the Constitution"). Supreme Court precedent is

17

replete with such statements. *See, e.g.*, *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 n.14 (1985) ("governments are entitled to attack problems piecemeal, save where their policies implicate rights so fundamental that strict scrutiny must be applied"); *Lawrence v. Texas*, 539 U.S. 558, 586 (2003) (Scalia, J., dissenting) ("the standard of review that [is] appropriate" for "a fundamental right" is "strict scrutiny") (internal quotation marks omitted); *Reno v. Flores*, 507 U.S. 292, 302 (1993) (due process "forbids the government to infringe certain 'fundamental' liberty interests . . . unless the infringement is narrowly tailored to serve a compelling state interest"); *Foucha v. Lousiana*, 504 U.S. 71, 115 (1992) (Thomas, J., dissenting) ("Certain substantive rights we have recognized as 'fundamental'; legislation trenching upon these is subjected to 'strict scrutiny' . . . ."); *Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("classifications affecting fundamental rights . . . are given the most exacting scrutiny"); *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938) ("There may be narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution . . . ."). And this Court has recognized that it "must evaluate policies with strict scrutiny if they . . . implicate a fundamental right." *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 99 n.6 (2d Cir. 2009).[5]

---

[5] Of course, the levels-of-scrutiny framework does not govern if an enumerated

18

*McDonald* removed all doubt about the fundamental nature of the right to keep and bear arms, declaring that "the right to bear arms was fundamental to the newly formed system of government." 130 S. Ct. at 3037; *see id.* at 3042 ("[T]he Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty."); *id.* at 3041 ("Evidence from the period immediately following the ratification of the Fourteenth Amendment only confirms that the right to keep and bear arms was considered fundamental."); *id.* at 3037 ("The right to keep and bear arms was considered no less fundamental by those who drafted and ratified the Bill of Rights."); *id.* at 3040 (39th Congress' "efforts to safeguard the right to keep and bear arms demonstrate that the right was still recognized to be fundamental"); *id.* at 3041 ("In debating the Fourteenth Amendment, the 39th Congress referred to the right to keep and bear arms as a fundamental right deserving of protection.").

Indeed, whether the right to keep and bear arms is fundamental was the basic question presented in *McDonald*. The Court stated that in deciding "whether the Second Amendment right to keep and bear arms is incorporated in the concept of due process, . . . we must decide whether the right to keep and bear arms is

right directly suggests its own standard, such as the Fourth Amendment's prohibition on "unreasonable searches," or is by its terms absolute where it applies, such as the Sixth Amendment's guarantee that the accused "shall enjoy," *inter alia*, the right to confront witnesses.

19

fundamental to our scheme of ordered liberty." *Id.* at 3036 (emphasis omitted).

And the same basic question featured prominently in *Heller*. The first sentence of

the Court's analysis of this question in *McDonald* states that "*Heller* points

unmistakably to [an affirmative] answer." *Id.*[6] *Heller* explained that, "[b]y the

time of the founding, the right to have arms had become fundamental for English

subjects." 554 U.S. at 593. It was this fundamental "pre-existing right" that the

Second Amendment "codified." *Id.* at 592 (emphasis omitted). Accordingly, the

right to keep and bear arms—like any other fundamental right—should be subject

to strict scrutiny.

*Heller* did not explicitly state that "strict scrutiny" is required of laws that

restrict the rights protected by the Second Amendment. That is because the *Heller*

court eschewed levels of scrutiny in favor of an approach that focused more

directly on history, which provided a clear answer as to the constitutionality of the

ordinance before the Court in *Heller*. As *Heller* explained, "[f]ew laws in the

history of our Nation have come close to the severe restriction of the District's

handgun ban." 554 U.S. at 629; *see also id.* at 634. Nonetheless, *Heller* points

---

[6] Importantly, Justice Thomas joined this part of the opinion of the Court and
agreed that the Second Amendment right is fundamental. *See id.* at 3059 (Thomas,
J., concurring in part and concurring in the judgment) ("[T]he plurality opinion
concludes that the right to keep and bear arms applies to the States through the
Fourteenth Amendment's Due Process Clause because it is 'fundamental' to the
American 'scheme of ordered liberty' . . . . I agree with that description of the
right.").

20

clearly to strict scrutiny as the level of scrutiny that would be required within a levels-of-scrutiny framework or when history does not provide a definitive answer, and *McDonald*'s incorporation holding eliminated any potential doubt on that score. *Heller* may leave room for debate about when to apply strict scrutiny and when a *sui generis* historical approach should be applied, but *Heller* and *McDonald* leave no room for debate about what level of scrutiny applies when levels of scrutiny are applicable.

That strict scrutiny applies to laws that substantially burden Second Amendment rights is confirmed by the approaches that the Supreme Court rejected in *Heller* and *McDonald*. *Heller* explicitly and definitively rejected not only rational basis review, *id.* at 628 n.27, but also the "interest-balancing" approach endorsed by Justice Breyer—which is intermediate scrutiny by another name. *See id.* at 634; *McDonald*, 130 S. Ct. at 3050 (plurality op.) ("while [Justice Breyer's] opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion"). Justice Breyer called his approach "interest-balancing" because of his view that the government's interest in regulating firearms—some version of protecting public safety—would always be important or compelling. Thus, in his view, whether the level of scrutiny applied was strict (requiring a compelling government interest) or intermediate (requiring only an important interest), the government interest would always qualify, and the analysis would

21

really turn on a search for the appropriate degree of fit, which Justice Breyer described as interest-balancing. *See Heller*, 554 U.S. at 689–90 (Breyer, J., dissenting).

Semantics aside, Justice Breyer's approach in substance was simply intermediate scrutiny. Justice Breyer relied (*see id.* at 690) on cases such as *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997), and *Thompson v. Western States Medical Center*, 535 U.S. 357 (2002), which explicitly apply intermediate scrutiny. Even more revealingly, Justice Breyer invoked *Burdick v. Takushi*, 504 U.S. 428 (1992), the case on which the United States principally relied in advocating that the Court adopt intermediate scrutiny. *See* Brief for the United States as Amicus Curiae at 8, 24, 28, District of Columbia v. Heller, 554 U.S. 570 (2008) (No. 07-290), 2008 WL 157201. Justice Breyer's interest-balancing amounted to intermediate scrutiny, and the Court rejected it (and reaffirmed that rejection in *McDonald*).

*Heller* and *McDonald* make clear that the kind of reasonableness review that applies in the intermediate scrutiny context is so malleable that it provides "no constitutional guarantee at all." *Heller*, 554 U.S. at 634. A standard rejected by both *Heller* and *McDonald* as categorically underprotective of Second Amendment rights clearly cannot govern analysis of regulations that substantially burden such

22

rights, and it was entirely inappropriate for the District Court to apply intermediate scrutiny to Mr. Osterweil's Second Amendment challenge.

The District Court's reasons for applying intermediate scrutiny to New York's ban on home handgun possession by part-time residents are unavailing. The District Court first observed that "fundamental constitutional rights are not invariably subject to strict scrutiny." A164. In support of this proposition, the District Court cited First Amendment cases and noted that in some instances "content-neutral restrictions on the time, place and manner of speech are subject to a form of intermediate scrutiny." A164. But the court's invocation of the First Amendment actually underscores the case for strict scrutiny. It can hardly be denied that the default mode of analysis for a direct government restriction of free speech is strict scrutiny. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009); *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188 (2007). To be sure, the Court has over the years developed a more relaxed standard for certain kinds of restrictions that, based on judicial experience, can be subject to a different test. But none of that assists Bartlett. One context where strict scrutiny does not apply (at least currently) is so-called commercial speech. And for just that reason, Justice Breyer invoked a commercial speech case—*Thompson*—for his balancing-approach version of intermediate scrutiny. The Court rejected that standard as

23

insufficiently protective.    Justice Breyer also invoked *Turner*, another First Amendment intermediate scrutiny case.  Once again, the Court rejected it.

The time, place, and manner cases invoked by the District Court are even more obviously inapposite.  Those cases by definition involve limitations—not complete bans like that at issue here—and time, place, and manner restrictions must "leave open ample alternative channels for communication" to be constitutional.  If they do not leave open such alternatives, the consequence is not that strict scrutiny applies; such restrictions are per se unconstitutional.  *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).  The District Court followed the bad example of a handful of other courts, and applied a standard endorsed by Justice Breyer, but rejected by the majority of the Court.  Given the complete ban on Mr. Osterweil's ability to possess a handgun to protect his New York home, the appropriate First Amendment analog is the default mode of analysis for government efforts to ban a category of speech—strict scrutiny applies.

Next, taking a cue from Justice Breyer's *Heller* dissent, *see* 554 U.S. at 687–88, the District Court concluded that *Heller*'s "list of presumptively lawful regulatory measures is at least implicitly inconsistent with strict scrutiny."  A159. Not so.  *Heller*'s underlying logic—that the right to keep and bear arms is fundamental and that restrictions on the right require strict scrutiny—is wholly

24

consistent with its dictum that certain types of restrictions, such as bans on possession by felons and the mentally ill and "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," are "presumptively lawful," *id.* at 626–27 & n.26.

First, a State obviously has a compelling interest in prohibiting firearm possession by violent felons and the insane. The interest in keeping private firearms out of certain truly sensitive places may be compelling as well. Thus, it was of no great moment that the *Heller* Court suggested that in future cases the government might easily prove that laws prohibiting firearm possession by convicted felons, or possession in sensitive places like courthouses or prisons, satisfy strict scrutiny. Because "[t]he fact that strict scrutiny applies says nothing about the ultimate validity of any particular law" predicting that such restrictions will be upheld is in no way inconsistent with requiring strict scrutiny. *Johnson v. California*, 543 U.S. 499, 515 (2005) (internal quotation marks omitted); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 n.6 (1992) (stating that in the First Amendment context "presumptive invalidity does not mean invariable invalidity"). Courts should not overread *Heller*'s "presumptively lawful" dictum to mean any more than that.

Second, it is possible that the *Heller* Court may have been stating merely that, based on its preliminary understanding of the relevant history, such

25

restrictions appear to fall outside the bounds of the right as understood at the time of the Framing, with future cases available to test that proposition and refine the precise contours of the right. *See* 554 U.S. at 635 ("The First Amendment contains the freedom-of speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong-headed views. The Second Amendment is no different . . . . [T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us.").[7] Indeed, in his concurring opinion in *McDonald*, Justice Scalia specifically explained that "[t]he traditional restrictions [on the right to keep and bear arms] go to show the scope of the right, not its lack of fundamental character." *McDonald*, 130 S. Ct. at 3056 (Scalia, J., concurring).

The need for strict scrutiny of restrictions on the rights protected by the Second Amendment is hardly undermined by the recognition that there may be

_____

[7] *See also United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) ("That *some* categorical limits are proper is part of the original meaning . . . ."); *United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010) ("[T]he identified restrictions [could be] presumptively lawful because they regulate conduct outside the scope of the Second Amendment . . . [or] because they pass muster under any standard of scrutiny."); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1449 (2009) ("Sometimes, a constitutional right isn't violated by a restriction because the restriction is outside the terms of the right as set forth by the constitution.").

26

categories of conduct relating to keeping and bearing arms that fall outside the scope of the Second Amendment. After all, the fact that there are categories of unprotected speech is hardly a justification for applying less than strict scrutiny to laws that restrict protected speech. *See, e.g.*, *R.A.V.*, 505 U.S. at 382–83 ("From 1791 to the present . . . our society . . . has permitted restrictions upon the content of speech in a few limited areas . . . . We have recognized that 'the freedom of speech' referred to by the First Amendment does not include a freedom to disregard these traditional limitations."). Just as "a limited categorical approach has remained an important part of our First Amendment jurisprudence," *id.* at 383, *Heller*'s suggestion that certain categories of historically supported restrictions are lawful is entirely consistent with recognizing that restrictions on rights that are protected by the Second Amendment must be subjected to strict scrutiny.

The District Court also heavily relied on a case from the Third Circuit, *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), which declined to apply strict scrutiny. A165–A167. But *Marzzarella* is inapposite. *Marzzarella* addressed a law prohibiting possession of a gun with an obliterated serial number and struck it down under intermediate scrutiny. 614 F.3d at 97. In doing so, the court recognized that the statute at issue "does not severely limit the possession of firearms," and that the "District of Columbia's handgun ban is an example of a law at the far end of the spectrum of infringement on protected Second Amendment

27

rights . . . . It did not just regulate possession of handguns; it prohibited it, even for the stated fundamental interest protected by the right—the defense of hearth and home." *Ibid.* Indeed, the Third Circuit *did* apply strict scrutiny to the serial number obliteration law after applying intermediate scrutiny, presumably because it was not sure that even a law that "does not severely limit the possession of firearms" should be subjected to anything less. *Id.* at 97, 99. The wisdom of the Third Circuit's distinction and approach notwithstanding, it is safe to say that the *Marzzarella* court would not have applied intermediate scrutiny to New York's ban on handgun possession in the homes of part-time residents, and that the District Court was wrong to rely on *Marzzarella* (and cases relying on *Marzzarella*) in so doing.

In the end, given the general rule that restrictions on fundamental constitutional rights are subject to strict scrutiny, the contention that restrictions on Second Amendment rights should be permitted under a less-demanding standard reduces to the contention that the right to keep and bear arms is a lesser right. It is not. Any such contention would have been deeply misguided before *McDonald*, and in light of *McDonald* no such contention is even remotely tenable.

First, the Court has reiterated that it is improper to prefer certain enumerated constitutional rights while relegating others to a lower plane: No constitutional right is "less 'fundamental' than" another, and there is "no principled basis on

28

which to create a hierarchy of constitutional values . . . ." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 484 (1982); *accord Ullman v. United States*, 350 U.S. 422, 428–29 (1956) ("To view a particular provision of the Bill of Rights with disfavor inevitably results in a constricted application of it. This is to disrespect the Constitution.").

Second, the Court has applied this rule against "disrespect[ing] the Constitution" in the specific context of the right to keep and bear arms and has emphatically rejected repeated attempts to deprive that right of the same dignity afforded other fundamental rights.   *Ullman*, 350 U.S. at 428–29.   *Heller* admonished that "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." 554 U.S. at 634. And *Heller* explained that the "Second Amendment is no different" from the First Amendment in that it was the product of interest-balancing by the people themselves. *Id.* at 635. In *McDonald*, confronted with the argument that the Second Amendment right, even though an individual, enumerated right as held by *Heller*, should be deemed less than fundamental, the Court rejected that argument in the plainest terms: "what [respondents] must mean is that the Second Amendment should be singled out for special—and specifically unfavorable— treatment. We reject that suggestion." 130 S. Ct. at 3043. (plurality op.); *see also*

29

*id.* at 3044 (rejecting plea to "treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees").

It is accordingly too late in the day to argue that the right to keep and bear arms is less fundamental than the other individual rights enumerated in the Constitution. There is consequently no basis to review restrictions on that right under anything less demanding than the strict scrutiny that governs challenges to restrictions on other fundamental rights. *Heller*'s historical approach was no less demanding than ordinary strict scrutiny, and certain types of restrictions may be conducive to that approach. But to the extent that a levels-of-scrutiny analysis is to apply, the scrutiny must be strict.

**B.    New York's Ban On Home Handgun Possession By Part-Time State Residents Substantially and Unconstitutionally Burdens Second Amendment Rights.**

New York's law amounts to a total prohibition of the exercise of the core right protected by the Second Amendment, and is thus unconstitutional. As interpreted and applied by the District Court, New York's handgun licensing scheme effectively eviscerates the right of part-time residents to defend their New York homes using handguns. Citing New York case law, the court concluded that "[n]onresidents without in-state employment are completely excluded from the [State's] license-application procedure," and thus conclusively prohibited from

30

keeping a handgun in their home. A159; *see* N.Y. Penal Law §§ 265.01(1), 265.02(4), 265.20, 400.00.[8] As the District Court recognized, "New York courts have limited resident applications to persons who are New York domiciliaries," A159 n.2; *see Mahoney v. Lewis*, 199 A.D.2d 734, 735 (N.Y. App. Div. 1993) ("we have expressly held that 'where a statute prescribes 'residence' as a qualification for a privilege or the enjoyment of a benefit, the word is equivalent to 'domicile' . . . .'"), where "domicile" is defined as a person's "true and permanent home, to which he has at all times the intention of, sooner or later, returning"— where a person "owns a home, maintains voter and motor vehicle registration, and . . . holds a job." *In re Davies*, 506 N.Y.S.2d 626, 628–29 (Oswego Cnty. Ct., N.Y. 1986) (internal quotation marks omitted).[9] Those definitions may work for

---

[8] The New York Supreme Court, Appellate Division, Third District, has upheld the State's general licensing scheme against a *Heller*-based challenge, holding that "article 265 does not effect [a] complete ban on handguns and is, therefore, not [a] 'severe restriction' improperly infringing upon . . . Second Amendment rights." *People v. Perkins*, 62 A.D.3d 1160, 1161 (N.Y. App. Ct. 2009). Whatever the merits of that conclusion, it certainly cannot apply to article 265's application to affect a complete ban on possession of handguns in the homes of part-time residents.

[9] It is not at all clear that *Mahoney*'s evaluation of § 400's residency requirement remains good law in *Heller*'s wake. The *Mahoney* court stated that "we expressly have held that 'where a statute prescribes "residence" as a qualification for a privilege or the enjoyment of a benefit, the word is equivalent to "domicile" . . . .'" and that "possession and use of a pistol are not vested rights but privileges." 199 A.D.2d at 735. The *Mahoney* court's rights/privilege distinction, on which its residence/domicile distinction at least in part relied, was critically

31

some other licensing schemes, but it is not good enough when it comes to a fundamental right. If an individual lawfully owns a home and pays taxes on that home, a state cannot deny the homeowner the constitutional right to protect him on the ground that his legal domicile lies elsewhere.

This complete ban on home handgun possession by part-time New York residents who are not "domiciliaries" cannot be squared with *Heller*. *Heller* held that the District of Columbia's ban on handgun possession in the home violated the Second Amendment. *Heller*, 554 U.S. at 635. In so doing, the Court stated that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation," and that the core purpose of the right is to allow "law-abiding, responsible citizens to use arms in defense of hearth and home" where the need for self-defense "is most acute." *Id.* at 592, 628, 635. "[H]andguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Heller*, 554 U.S. at 629.

The New York law makes it impossible for part-time residents like Mr. Osterweil to use handguns "for the core lawful purpose of self-defense and is

undermined by *Heller*. What is more, *Mahoney*'s domicile requirement may have been wrongly applied to Mr. Osterweil in the first place. *Mahoney* stated that New York's residency requirement necessitated "more than mere ownership of land." *Id.* Mr. Osterweil is not a mere New York land owner; for part of the year, he actually resides in New York and remains involved in the Summit, New York community.

32

hence unconstitutional." *Heller*, 554 U.S. at 630. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense in the home." *Heller*, 554 U.S. at 636; *see McDonald*, 130 S. Ct. at 3044 ("[T]he Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home."); *id.* at 3048 (The right to keep and bear arms is "valued because the possession of firearms [i]s thought to be essential for self-defense."). There is no reason to think that the part-time nature of Mr. Osterweil's occupancy of his New York home should impact the calculus. The Second Amendment is not a second-class right, nor is it a part-time one. An individual living part-time in a home has no less need for self-protection and may in fact have an even greater need. Second homes are often more rural, and the fact that such homes are not constantly inhabited can make them attractive targets for criminal activity.

The scope of Mr. Osterweil's Second Amendment right to defend his hearth and home cannot be eviscerated by an arbitrary temporal distinction. *Heller* did not base its holding on how many months out of the year a person lives in his home, where he is registered to vote, or where he has his driver's license. As explained in *Heller*, and reaffirmed in *McDonald*, the right to keep and bear arms arises from the fundamental right of self-defense, which is most acute in the home.

33

The fundamental right of self-defense is no less acute because one has more than one home, or spends less than twelve months per year in one's home. To be sure, those likely to cause a confrontation or illegally enter a home will be neither impressed nor deterred by the part-time nature of a person's occupancy.[10]

Lest there be any doubt, the New York law at issue here is quite unlike the "longstanding prohibitions on the possession of firearms" that the Court suggested might be acceptable, such as bans on the possession of firearms by felons, the mentally ill, and minors, as well as "laws forbidding the carrying of firearms in sensitive places," "or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626–27. Nor is it an effort to defer

---

[10] The Founding-era sources on which *Heller* relied do not suggest that the part-time nature of Mr. Osterweil's occupancy is of any constitutional relevance. "Justice James Wilson interpreted the Pennsylvania Constitution's arms-bearing right, for example, as a recognition of the natural right to defense 'of one's person or house'—what he called the law of 'self preservation.'" *Heller*, 554 U.S. at 585 (quoting 2 Collected Works of James Wilson 1142, & n.x (K. Hall & M. Hall eds. 2007); *see id.* at 594 (quoting 1 Blackstone 136, 139 (1765)).

And surely the Founders themselves would not have drawn such a distinction. In Federalist paper No. 46, James Madison wrote of what "citizens with arms in their hands" can accomplish. The Federalist No. 46 (James Madison). Madison, a Virginian, would have been shocked to find that his right to possess a weapon was somehow less sacrosanct during his temporary stays in the Capitol for public service than when in his permanent home outside Montpelier, Virginia. *See* Irving Brant, The Fourth President: A Life of James Madison (1970); *cf. Heller v. District of Columbia*, No. 10-7036, 2011 WL 4551558, at *23 (D.C. Cir. Oct. 4, 2011) (Kavanaugh, J., dissenting) ("*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition . . . .").

34

to the licensing decision of another state, whether positive or negative. A part-time resident fully licensed in his state of domicile still cannot lawfully possess a handgun in his New York home. New York's law amounts to a total prohibition of the exercise of the core right protected by the Second Amendment. And the fact that this ban is the product of a regulatory scheme and not a specific legislative prohibition is of no moment; "a statute which, under the pretense of regulating, amounts to a destruction of the right . . . [is] clearly unconstitutional." *Id.* at 629.

*Heller*'s dispositive treatment of bans on handguns in the home demands reversal of the District Court's decision. But the New York ban on home handgun possession by part-time residents also fails strict scrutiny. The District Court more or less conceded as much, admitting that "prohibiting gun possession by nearly all nonresidents might not be the most precisely focused means to achieve th[e State's] end[s]." A171. Such a conceded lack of focus is fatal under strict scrutiny.

Under strict scrutiny, a law infringing a constitutional right must be narrowly tailored to serve a compelling government interest. *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). To be narrowly tailored, a law must actually advance the compelling interest it is designed to serve, and be the least restrictive means of achieving that advancement. *See Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 226 (1989); *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). Burdening a significant amount of conduct not implicating the

35

asserted interest is evidence that the law at issue is inadequately tailored. When applying strict scrutiny, the challenged law is presumed invalid, and the government bears the burden of rebutting that presumption. *Playboy Entm't Grp.*, 529 U.S. at 817.

The interest that the State advanced below in support of the home handgun ban, and that the District Court concluded was "important" and "substantial," was the interest in "allow[ing] the government to monitor its licensees more closely and better ensure public safety." A169. Neither of those interests is sufficient. The interest of the government in monitoring its licensees cannot itself be a compelling interest in any republic worthy of the name. A licensing process with adequate monitoring might be a means to some other compelling end, but it cannot be an end in itself. Public safety, on the other hand, may be compelling, but it is far too general to suffice for constitutional analysis. And combining the two interests does not solve the problem.

When a law or regulation fails to cover a substantial swath of conduct implicating the asserted compelling interest, such underinclusiveness not only demonstrates the absence of narrow tailoring, but also serves as evidence that the interest is not significant enough to justify the regulation. *See Carey v. Brown*, 447 U.S. 455, 465 (1980); *see also Fla. Star v. B.J.F.*, 491 U.S. 524, 541–42 (1989) (Scalia, J., concurring) ("[A] law cannot be regarded as protecting an interest of the

36

highest order ... when it leaves appreciable damage to that supposedly vital interest unprohibited.") (citation and internal quotation marks omitted). Here, the New York law prevents part-time residents who are not domiciliaries from possessing handguns in their homes. But there is no time limit linked to the domicile requirement. One could be domiciled in New York and spend little-to-no time there. So, a New York domiciliary can have a license to have a handgun in their home spending nearly no time there, and a non-domiciliary who spends substantially more time in New York cannot. This completely undermines the assertion that the State's interest in monitoring its licensees is compelling. [11]

---

[11] This Court addressed New York's licensing requirement in *Bach v. Pataki*, 408 F.3d 75, 88 (2d Cir. 2005). In *Bach*, a Virginia resident sought a permit to carry a pistol while visiting his parents. *Id.* at 76. When Bach learned he was not eligible for such a license, he filed suit against the State officials responsible for administering the licensing scheme. *Id.* at 77. *Bach* is, at best, of marginal relevance here. First of all, *Bach* held that the Second Amendment right to keep and bear arms "imposes a limitation on only federal, not state, legislative efforts," and disposed of Bach's Second Amendment claim on that ground. *Id.* at 85–86. Thus *Bach*'s views on the scope and nature of Second Amendment rights are outdated. Second, the facts at issue in Bach are quite different from this case. Mr. Osterweil owns a home in New York and spends part of the year living in that home. The same cannot be said of Bach, who the Court deemed a "mere visitor[]." *Id.* at 92. Finally, though *Bach* concluded that "New York's interest in monitoring gun licensees"—"an interest in continually obtaining relevant behavioral information"—"is substantial and [] New York's restriction of licenses to residents and persons working primarily within the State is sufficiently related to th[at] interest," *id.* at 88, 91, that conclusion was clearly infected by the Court's misapprehension of Second Amendment rights. And, in any event, the Court described the State's interest as "substantial," not "compelling," and thus *Bach*—

37

Even assuming, however, that the State does have a compelling interest in ensuring public safety through monitoring its licensees, the New York part-time resident handgun possession ban is not narrowly tailored to serve that interest. First, as just discussed, there is a profound mismatch between the asserted interest and the actual requirement. Second, there is no evidence that the residency requirement in and of itself does anything to further the State's public safety interest. The application process that an individual must go through to obtain a handgun possession permit in New York is robust. The required investigation involves checking references, consulting FBI databases, and taking fingerprints. *See* N.Y. Penal Law § 400.00(4). The application package is reviewed by a licensing officer, often a judge. *Ibid.* It is hard to imagine what added benefit excluding part-time residents from obtaining licenses could add. Moreover, the logical answer to any legitimate concerns with the ability to monitor those domiciled elsewhere would be deference to the licensing decision of the state of domicile. But this New York will not do. New York cannot simultaneously insist that it must do its own independent licensing process for property owners domiciled elsewhere and that those domiciled elsewhere need not apply.

---

even if it were still good law—would dictate that the State's monitoring interest fails strict scrutiny.

38

What is more, categorically excluding *all* non-domiciliaries is certainly not the least restrictive means of achieving the State's monitoring and public safety goals. The part-time resident possession ban is not limited to those individuals who pose a heightened threat to others, or to circumstances that for some other reason might create a particularly acute danger to the public. Moreover, there are myriad ways that the State could achieve its goals—such as periodically consulting the national and comprehensive NCIC database that it already consults during licensing, requiring annual application updates from part-time residents, or cooperating with the law enforcement organs of other states—short of its illegitimate and unnecessary categorical ban. Indeed, the New York licensing law contemplates that there are available and useful mechanisms for monitoring out-of-state behavior: Penal Law § 400.00(11) provides that a handgun license can be suspended upon conviction for a felony or serious offense "anywhere."

Furthermore, despite the District Court's contrary conclusion, New York's ban on part-time resident in-home handgun possession fails even intermediate scrutiny. The District Court found a "substantial relationship between New York's residency requirement and the government's significant interest" primarily because the "State is in a considerably better position to monitor residents' eligibility for firearm licenses as compared to nonresidents." A170. But it is not at all clear that this is true, as Mr. Osterweil's case demonstrates. Beyond his residency and issues

39

with his fingerprints—an issue not unique to "nonresidents"—Mr. Osterweil would have easily qualified for a license under § 400.00. Nothing about his part-time resident status made it more cumbersome to ascertain his eligibility.

It appears that the District Court only found otherwise based on its decision to ignore *Heller*'s warnings and insert its own policy concerns into the analysis. *See* A170 (listing studies detailing the "well-documented" "harm caused by gun violence"). In doing so, the District Court effectively rendered its ultimate ruling a foregone conclusion. Having already decided that firearms are dangerous, the court had little difficulty in summarily declaring that the State's interest in monitoring was "'significant, 'substantial,' or 'important,'" and that there was "a substantial relationship between New York's residency requirement and the government's significant interest." A170. The court all but eliminated the government's burden to demonstrate that a restriction on a fundamental right is constitutional—a burden of proof that should have applied even under the "intermediate scrutiny" analysis that the District Court purported to apply. *See, e.g.*, *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) ("[U]nless the conduct at issue is not protected by the Second Amendment at all, the Government bears the burden of justifying the constitutional validity of the law."). But even more to the point, the District Court's analysis is reminiscent of the interest-balancing approach

40

advocated by Justice Breyer and rejected by the Court. When it comes to balancing general public safety concerns with the right to possess a handgun for self-protection in the home, the Constitution itself has done all the interest-balancing that is necessary. *See Heller*, 554 U.S. at 635.

In fact, the District Court appears to have applied a level of scrutiny even less protective of Second Amendment rights than Justice Breyer's rejected approach in *Heller*. Justice Breyer presumed that the government would always have a compelling or important interest in regulating Second Amendment rights, meaning courts should focus on the reasonableness of the fit between the regulation and the government's interest. *See Heller*, 554 U.S. at 687–91 (Breyer, J., dissenting). But the District Court did Justice Breyer one better. Once the court concluded that the government had an important interest in monitoring licensees, it deemed that interest sufficient to sustain an outright ban on possession by part-time residents. The court engaged in no meaningful consideration of the fit between the State's interest and its regulatory scheme.

Only the District Court's decision to apply a test less demanding than the unequivocally rejected "interest-balancing" test could explain the result below. A per se ban on home gun ownership for part-time residents would violate any meaningful conception of the Second Amendment or intermediate scrutiny. Courts would not tolerate for one second a regime that granted free speech or the privilege

41

against self-incrimination only to a State's full-time residents.   The Second

Amendment is no different.   Under any appropriate standard of review, this Court

should reverse the District Court's judgment.

## II.   New York's Residency Requirement Arbitrarily Burdens The Fundamental Rights Of Part-Time State Residents In Violation Of The Equal Protection Clause.

New York's ban on non-resident handgun possession suffers from a second

fatal flaw: it violates the Equal Protection Clause of the Fourteenth Amendment to

the United States Constitution.   The Equal Protection Clause commands that no

State shall "deny to any person within its jurisdiction the equal protection of the

laws," which is essentially a direction that all persons similarly situated should be

treated alike.   *Plyler v. Doe*, 457 U.S. 202, 216 (1982).

When "state laws impinge on personal rights protected by the Constitution"

"strict scrutiny" applies, and such laws "will be sustained only if they are suitably

tailored to serve a compelling state interest."   *City of Cleburne v. Cleburne Living

Ctr.*, 473 U.S. 432, 440 (1985); *see Harper v. Va. Bd. of Elections*, 383 U.S. 663,

670 (1966) ("[W]here fundamental rights and liberties are asserted under the Equal

Protection Clause, classifications which might invade or restrain them must be

closely scrutinized.").   For example, in *Kramer v. Union Free School District*, 395

U.S. 621, 626–29 (1969), the Court struck down a law limiting the right to vote in

school district elections to property owners and parents of school children, finding

that the classification failed under strict scrutiny. The Court explained that where fundamental rights are concerned, the issue is not whether the legislative judgment and resulting classification had some basis, but whether the distinctions "do in fact sufficiently further a compelling state interest to justify denying the franchise to appellant and members of his class." *Id.* at 633.

The District Court recognized that "[w]here a statute burdens a fundamental right . . . it is subject to heightened scrutiny under the Fourteenth Amendment's Equal Protection Clause." A172 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)). After stating the appropriate standard, however, the court proceeded to give Mr. Osterweil's equal protection claim short shrift. The Court simply stated: "it is clear that New York state residents and nonresidents are not similarly situated in terms of the state's ability to obtain information about and monitor the potential licensee's eligibility or continued eligibility for a firearm's license. As such, New York's different treatment of nonresidents does not violate the Equal Protection Clause." A172. But that amounts to no more than saying that the State has a rational basis for its classification; it is not an explanation of why strict scrutiny is satisfied.

As already discussed, the State lacks a compelling interest in denying part-time residents the right to possess handguns in their home, and thus there is no justification for treating full-time residents and part-time residents differently. Mr.

43

Osterweil has the same interest in protecting his family when staying at his home in Schoharie as do his domiciliary neighbors down the street. Again, if anything, his lack of year-round occupation may enhance the need for self-protection. Moreover, any state policy for non-domiciliaries that was remotely consistent with the Equal Protection Clause would include deference to the state of domicile as an important component. New York does nothing of the sort. It makes no difference whether a part-time resident is fully licensed in the state of domicile. No matter how many days they spend in their New York home, which is treated like all others for taxing purposes, they have no ability to lawfully possess a handgun for self-defense in that home.

What is more, the facts of Mr. Osterweil's case show that the conclusion the District Court relied on—that it is harder to obtain information about nonresidents—is incorrect. Other than usable fingerprints, Bartlett had all the information he needed to decide whether Mr. Osterweil was deserving of a handgun license. The only thing standing between Mr. Osterweil and the license he desired was his part-time residency.

The Equal Protection Clause "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Mr. Osterweil has the same fundamental right to

44

possess a gun in defense of his New York residence as his New York neighbors.

Holding otherwise is clearly a violation of the Equal Protection Clause.[12]

## CONCLUSION

For the foregoing reasons, the Court should reverse the judgment below.

---

[12] In *People v. Bounsari*, 915 N.Y.S.2d 921 (Rochester City Ct., 2011), a New York court held that N.Y. Penal Law § 261.01(5)—which makes it a crime for a non-citizen to "possess[] any dangerous or deadly weapon"—was unconstitutional. In *Bounsari*, the State "stipulated that the law's constitutionality must be evaluated under a strict scrutiny analysis," but then "did not proffer any state interest, let alone a compelling state interest, to justify New York's discriminatory law." 915 N.Y.S.2d at 923. After considering possible justifications for the law, the court concluded that "[t]here is no conceivable reason that aliens should be distinguished from citizens to achieve the law's otherwise legitimate public safety objectives." *Id. See Chan v. City of Troy*, 559 N.W.2d 374 (Mich. Ct. App. 1996) (Michigan law allowing only U.S. citizens to obtain pistol permits unconstitutional); *State v. Chumphol*, 634 P.2d 451 (Nev. 1981) (Nevada law prohibiting aliens from possessing concealable arms unconstitutional). It would be strange indeed if lawful resident aliens, who happen to be residents of New York, are entitled to greater rights under the Second Amendment than U.S. citizens who are also residents of New York, but for only part of the year.

45

Respectfully submitted,

/s/ Daniel L. Schmutter _____

Paul D. Clement
D. Zachary Hudson
BANCROFT PLLC
1919 M St., N.W., Suite 470
Washington, D.C.  20036
Telephone: (202) 234-0900
pclement@bancroftpllc.com

Daniel L. Schmutter
GREENBAUM, ROWE, SMITH
  & DAVIS LLP
P.O. Box 5600
Woodbridge, NJ 07095
(732) 549-5600
dschmutter@greenbaumlaw.com

*Counsel for Plaintiff-Appellant*

January 26, 2012

46

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(B), the undersigned certifies that the brief complies with the applicable type-volume limitations. The brief contains 11,200 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This certificate relies upon Microsoft Word 2010's word count feature; the program used in drafting this brief. The brief complies with the typeface requirements for Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Words' word processing program in 14-point Times New Roman font.

Dated: January 26, 2012                Respectfully submitted,

                                       /s/ Daniel L. Schmutter_____
                                       Daniel L. Schmutter
                                       GREENBAUM, ROWE, SMITH
                                        & DAVIS LLP
                                       P.O. Box 5600
                                       Woodbridge, NJ 07095
                                       (732) 549-5600
                                       dschmutter@greenbaumlaw.com

# EXHIBIT C



# 11-2420

# United States Court of Appeals
## for the Second Circuit

ALFRED G. OSTERWEIL,

*Plaintiff-Appellant,*

v.

GEORGE R. BARTLETT, III, in his official capacity as
Licensing Officer in the County of Schoharie

*Defendant-Appellee*

DAVID A. PATERSON, in his official capacity as
Governor of the State of New York, ANDREW M. CUOMO,
in his official capacity as Attorney General of the State of New York,

*Defendants.*

On Appeal from the United States District Court
for the Northern District of New York

## BRIEF FOR APPELLEE

ERIC T. SCHNEIDERMAN
*Attorney General of the
State of New York*
Attorney for Appellee
120 Broadway
New York, New York 10271
(212) 416-8025

BARBARA D. UNDERWOOD
*Solicitor General*
RICHARD DEARING
*Deputy Solicitor General*
SIMON HELLER
*Assistant Solicitor General*
*of Counsel*

Dated: June 26, 2012

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iii

PRELIMINARY STATEMENT................................................................. 1

ISSUES PRESENTED .............................................................................. 7

STATEMENT OF THE CASE ................................................................... 8

    A.   New York's Residency Requirement for Handgun
          Licenses .................................................................................. 8

    B.   Statement of Facts ................................................................ 11

         1.   Plaintiff Alfred Osterweil ............................................... 11

         2.   Osterweil's Application for a Handgun License............ 12

    C.   Procedural History ................................................................ 15

         1.   The Complaint ................................................................. 15

         2.   The District Court's Grant of Summary Judgment
             to Defendant Bartlett ..................................................... 16

SUMMARY OF ARGUMENT ................................................................. 18

ARGUMENT .......................................................................................... 21

POINT I  -  THIS COURT SHOULD CERTIFY TO THE NEW
             YORK COURT OF APPEALS THE QUESTION
             WHETHER "RESIDES" MEANS "IS DOMICILED"
             IN PENAL LAW   § 400.00(3)(a)........................................ 21

             A. The Court of Appeals Should Be Given the
                Opportunity to Construe Penal Law
                § 400.00(3)(a). ................................................................. 21

B. The Residency Provision in Penal Law
§ 400.00(3)(a) Is Better Construed Not To Impose
a Domicile Requirement. .............................................. 26

POINT II - EVEN IF § 400.00(3)(a) REQUIRED APPLICANTS
TO BE DOMICILED IN THE STATE, IT WOULD
BE CONSTITUTIONAL AS APPLIED TO
OSTERWEIL'S LICENSE APPLICATION...................... 29

A. Rational Basis Scrutiny Applies To The Extent
Osterweil's Application Requested A License for
Target Practice and Hunting ....................................... 32

B. If Osterweil's Application Were Viewed as
Seeking a License for Use Only on His Own
Premises For Self-Defense,  At Most Intermediate
Scrutiny Would Apply and It Would be Satisfied
By A Domicile Requirement. ......................................... 35

1. Intermediate scrutiny applies to a regulation
that substantially burdens Second Amendment
rights. ....................................................................... 36

2. A domicile requirement applied to Osterweil
would satisfy intermediate scrutiny because it
would serve important state interests. ................... 37

POINT III - A DOMICILE REQUIREMENT, AS APPLIED TO
OSTERWEIL, DOES NOT VIOLATE THE EQUAL
PROTECTION CLAUSE.................................................. 42

CONCLUSION ....................................................................... 44

# TABLE OF AUTHORITIES

**Cases** **Page**

*Alliance of Am. Insurers v. Chu*,
77 N.Y.2d 573 (1991) ........................................ 27

*Arizonans for Official English v. Arizona*,
520 U.S. 43 (1997) ........................................ 24

*Bach v. Pataki*,
408 F.3d 75 (2d Cir. 2005) ........................................ passim

*Blumenthal v. Crotty*,
346 F.3d 84 (2d Cir. 2003) ........................................ 16

*Clark v. Jeter*,
486 U.S. 456 (1988) ........................................ 37

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ........................................ 1, 28, 36, 37

*Gan v. City of N.Y.*,
996 F.2d 522 (2d Cir. 1993) ........................................ 15-16

*Hayden v. Paterson*,
594 F.3d 150 (2d Cir. 2010) ........................................ 43

*Matter of Dalton v. Drago*,
72 A.D.3d 1243 (3d Dep't 2010) ........................................ 10

*Matter of Mahoney v. Lewis*,
199 A.D.2d 734 (3d Dep't 1993) ........................................ 1, 11, 28

*Matter of O'Connor v. Scarpino*,
83 N.Y.2d 919 (1994) ........................................ 10

*McDonald v. City of Chicago*,
130 S. Ct. 3020 (2010) ........................................ 1, 28, 32

*Morris v. Schroder Capital Mgmt. Int'l,*
  445 F.3d 525 (2d Cir. 2006) .................................................................. 22

*Nicholson v. Scopetta,*
  344 F.3d 154 (2d Cir. 2003) .......................................................... 24, 25

*Norton v. Sam's Club,*
  145 F.3d 114 (2d Cir. 1998) ................................................................. 17

*Portalatin v. Graham,*
  624 F.3d 69 (2d Cir. 2010) ..................................................................... 5

*Schall v. Martin,*
  467 U.S. 253 (1984) .............................................................................. 38

*Schenck v. Pro-Choice Network of W. N.Y.,*
  519 U.S. 357 (1997) .............................................................................. 38

*Tunick v. Safir,*
  209 F.3d 67 (2d Cir. 2000) ........................................................ 22, 24, 25

*United States v. Decastro,*
  No. 10-3773, 2012 WL 1959072 (2d Cir. June 1, 2012) .............. passim

*United States v. Salerno,*
  481 U.S. 739 (1987) .............................................................................. 38

## State Statutes

Penal Law
  § 265.00 ..................................................................................... 1, 8, 10
  § 265.01 ................................................................................................ 8
  § 265.03 ................................................................................................ 8
  § 265.20 ................................................................................................ 9
  § 400.00 ....................................................................................... passim

## Court Rules

Second Cir. Local Rule § 0.27 ..................................................................... 4

N.Y. Ct. of Appeals Rule [22 N.Y.C.R.R.] § 500.27 ............................... 4, 25

## PRELIMINARY STATEMENT

Under New York law an individual seeking a license to possess a handgun must apply for the license in the county[1] "where the applicant resides, is principally employed or has his principal place of business as merchant or storekeeper." Penal Law § 400.00(3)(a). One New York intermediate appellate court—but not the New York Court of Appeals—has interpreted the statutory phrase "where the applicant resides" to mean "where the applicant is domiciled," with the result that that an applicant who is applying for a license on the basis of his place of residence rather than his place of business must be domiciled in New York. *Matter of Mahoney v. Lewis*, 199 A.D.2d 734, 735 (3d Dep't 1993). This decision pre-dated by nearly two decades the Supreme Court's holdings in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), that the Second Amendment guarantees an individual right to possess a handgun for self-defense in the home that may not be infringed by the States.

---

[1] In the case of New York City, the application must be made to the city licensing officer, who by statute is the city police commissioner. Penal Law § 265.00(10).

Plaintiff Alfred Osterweil applied for a license in Schoharie County, New York, to possess a handgun for "target practice and hunting." At the time of the application, Osterweil was domiciled in Schoharie County, and he filed his application with Judge George R. Bartlett, a Schoharie County judge serving in his administrative capacity as firearms licensing officer, and the defendant in this case. While the license application was pending, Osterweil changed his domicile from New York to Louisiana, and so notified the firearms licensing officer. Judge Bartlett denied the license on the ground that Osterweil averred that he was not domiciled in New York. (Schoharie County lies within the jurisdiction of the Appellate Division, Third Department—the court that decided *Mahoney*.)

Rather than seek judicial review of that determination in the state courts—which could have reconsidered *Mahoney* in light of *Heller*— Osterweil filed suit against Bartlett in the United States District Court for the Northern District of New York. Osterweil's complaint alleges that the denial of the license violated his federal and state constitutional rights including, specifically, his Second Amendment right to bear arms. The complaint does not seek injunctive relief against

2

the enforcement of any provision of New York's statutes regulating firearms; nor does it seek a declaration that any such provision was unconstitutional. Instead, the complaint requests a federal court order directing issuance of "the type of permit originally applied for" (J.A. 11).

The district court (D'Agostino, J.), granted summary judgment to Bartlett. The court construed New York law to prohibit Osterweil as a nondomiciliary from obtaining a license as a New York resident. It then rejected Osterweil's arguments that the denial of his application violated his Second Amendment right because it found that limiting handgun licenses to domiciliaries "allows the government to monitor its licenses more closely and better insure public safety," and that this interest satisfied the intermediate scrutiny applicable to Osterweil's claim (J.A. 169). The court also rejected Osterweil's claims under the Equal Protection Clause, which it construed to include claims under the Privileges and Immunities and Due Process Clauses as well. Finally, the court declined to exercise jurisdiction over Osterweil's state-law claims.

Before deciding this appeal, this Court should certify to the New York Court of Appeals the question whether a person "resides" in a

3

place within the meaning of Penal Law § 400.00(3)(a) only if the person is domiciled there, or whether a part-time resident domiciled elsewhere also "resides" in a place for purposes of that statute. *See* Second Cir. Local Rule § 0.27; N.Y. Ct. of Appeals Rule [22 N.Y.C.R.R.] § 500.27. This question is "an unsettled and significant question of state law that will control the outcome" of this case, as required by Second Circuit Local Rule § 0.27, and it is a "determinative question[] of New York law . . . for which no controlling precedent of the Court of Appeals exists," as required by New York Court of Appeals Rule § 500.27(a). This Court should not decide a constitutional challenge to a state statute predicated on an interpretation of that statute that is likely incorrect.

The New York Court of Appeals has never construed the residency provision of Penal Law § 400.00(3)(a), and is likely not to construe it as imposing a domicile requirement for several reasons, as set forth below. First, the statute uses the language of residence rather than domicile. Second, the Third Department's 1993 *Mahoney* decision construing Penal Law § 400.00(3)(a) to impose a domicile requirement was issued well before *Heller* and *McDonald*, and was premised on a view of the Second Amendment that has now been rejected. Third, the New York

4

Court of Appeals would likely be guided by the principle that statutes should generally be construed to avoid constitutional doubts. For all these reasons, the phrase "where the applicant resides" in Penal Law § 400.00(3)(a) is best construed to include individuals who reside in New York seasonally and are domiciled elsewhere. If the New York Court of Appeals so construes the statute, appellant's constitutional challenge will be moot and this court will have no occasion to reach the constitutional issues Osterweil seeks to raise on this appeal.

In the event that the Court declines to certify the state law question, it should affirm the decision in this case on the merits, on the ground that any domicile requirement, to the extent one exists, would not violate the Second Amendment as applied to Osterweil's license application.[2] Osterweil applied for a license to possess a handgun for the purpose of target practice and hunting (J.A. 41), and not for the

---

[2] Alternatively, this Court could perhaps reach its own conclusion that New York's firearm licensing law requires residence rather than domicile in New York, and affirm on that ground, but in light of a decision to the contrary from an intermediate state appellate court, certification of the question to the state Court of Appeals would be more prudent and more respectful of the primary responsibility of the state courts for the construction of state law. *See Portalatin v. Graham*, 624 F.3d 69, 89-90 (2d Cir. 2010) (en banc).

5

purpose of self-defense in his Schoharie County residence. This Court has ruled that rational basis review applies to laws regulating gun possession that do not substantially burden the Second Amendment right to possess a handgun in the home for self-defense. If possession of a firearm for the purpose of target practice and hunting is protected by the Second Amendment at all, a domicile requirement for handgun licenses for that purpose would burden that right at most peripherally. The domicile requirement for a New York license would of course not bar a part-year resident from possessing a handgun for target practice and hunting in the State of his domicile. Nor would a domicile requirement bar a part-year New York resident from using firearms for target practice and hunting, because no license is required in New York to possess a long gun, such as a shotgun or rifle. Because of this minimal burden, rational basis review would apply, and the State's interests in investigating and monitoring the activities of those holding a handgun license would easily provide a rational basis for imposing a domicile requirement, if New York law indeed imposed such a requirement. Even if Osterweil's application were construed as an application to possess a handgun at his New York house for the

6

purposes of self-defense, the appropriate level of scrutiny is intermediate scrutiny, and the state interests in monitoring the activities of those holding a handgun license—which this Court has deemed substantial—would justify a domicile requirement.

## ISSUES PRESENTED

Penal Law § 400.00(3)(a) requires persons seeking a handgun license to apply for a license in the city or county "where the applicant resides." The questions presented are:

1.    Whether the court should certify to the New York Court of Appeals the question whether that provision requires only New York residence and not New York domicile, when the New York Court of Appeals has never construed the provision and the interpretation described above (a) is consistent with the statutory text, (b) avoids the constitutional question Osterweil seeks to raise here, and (c) was rejected only by a single intermediate state appellate court in reliance on a view of the law that has since been repudiated by *Heller* and *McDonald*, namely, that possession of a handgun is a privilege and not a right.

7

2.     Whether the district court properly determined that, if New York requires an applicant for a handgun license to be domiciled in New York, that requirement is constitutional under the Second and Fourteenth Amendments as applied to Osterweil's application for a handgun license.

## STATEMENT OF THE CASE

### A.  New York's Residency Requirement for Handgun Licenses

New York law makes it a misdemeanor to possess an unlicensed handgun (or other designated firearm), loaded or unloaded, in any location, Penal Law § 265.01, and makes it a class C felony to possess an unlicensed loaded handgun (or other designated firearm) outside the home, *id.* § 265.03(3). Long guns—including most rifles and shotguns— are excluded from these prohibitions.[3] Consequently, the possession and

---

[3] Penal Law § 265.00(3) defines "firearm" to include pistols and revolvers; shotguns with barrels less than eighteen inches in length; rifles with barrels less than sixteen inches in length; "any weapon made from a shotgun or rifle" with an overall length of less than twenty-six inches; and assault weapons.

8

carrying of long guns—commonly used for hunting—are not generally prohibited or subject to licensing in New York.

Licensed handguns are also exempted from the Penal Law's prohibitions on possession of firearms. *Id.* § 265.20(a)(3).[4] The law specifies the types of licenses available that authorize possession of a pistol or revolver. The licenses generally include: (1) a license to "have and possess in his dwelling by a householder"; (2) a license to "have and possess in his place of business by a merchant or storekeeper"; (3) a license to "have and carry concealed while so employed by a messenger employed by a banking institution or express company"; and (4) a license to "have and carry concealed, without regard to employment or place of possession, by any person when proper cause exists for the issuance thereof." *Id.* § 400.00(2)(a)-(c) & (f).[5] A "carry concealed" license may be restricted to specific purposes set forth in the license

---

[4] Other exemptions from the prohibition also exist, *inter alia*, for persons in state and federal military service and peace and police officers. Penal Law § 265.20(1).

[5] The remaining categories include licenses for certain state judges, certain state and local prison employees, and possessors and carriers of certain antique pistols. Penal Law § 400.00(2)(d), (e) & (g).

9

application, such as use in target practice or hunting.    *Matter of O'Connor v. Scarpino*, 83 N.Y.2d 919, 921 (1994).

Section 400.00 also sets forth the standards for obtaining a handgun license. Applications for a handgun license are made to firearms licensing officers, Penal Law § 400.00(3)(a), who, in most of New York, are state judges. Penal Law § 265.00(10).[6] An applicant may obtain judicial review of the denial of a license in whole or in part by filing a petition under article 78 of the Civil Practice Law and Rules. *See, e.g., Matter of Dalton v. Drago*, 72 A.D.3d 1243 (3d Dep't 2010).

Penal Law § 400.00(3)(a) requires that an application for a handgun license must be submitted in the city or county "where the applicant resides, is principally employed or has his principal place of business as merchant or storekeeper." In 1993, the Appellate Division, Third Department addressed the meaning of the statutory language requiring applications, except those seeking use of a handgun during employment or operation of a shop, to be filed "where the applicant

---

[6] In New York City, Nassau County, and Suffolk County, designated police officials serve as licensing officers.    Penal Law § 265.00(10).

10

resides." The court concluded that this language required an applicant to file for a license in the city or county of his domicile, meaning the residence he intends to be his fixed and permanent home. In reaching that holding, the court relied heavily on the notion that possession of a firearm is a privilege, not a right. *Mahoney*, 199 A.D.2d at 735.

The New York Court of Appeals has never had occasion to construe the meaning of § 400.00(3)(a), and no court in New York, including the Third Department, has addressed the meaning of the provision after the United States Supreme Court's rulings in *Heller* and *McDonald*.

### B.  Statement of Facts

#### 1.  Plaintiff Alfred Osterweil

Plaintiff Alfred Osterweil is a retired attorney (J.A. 17). As of March 2009, he owned four houses—two in Summit, New York, and two in Many, Louisiana—all of which he considered "his home" (J.A. 18). Sometime between May 21, 2008, and June 25, 2008, Osterweil changed his primary residence from New York to Louisiana (J.A. 46). Since then, he has continued to retain at least one house in Summit, New York for use as a "summer home" (*see* J.A. 14). Although the record is sparse

11

concerning the use and occupation of the Summit house, Osterweil has affirmed that his adult daughter lived in the house during a recent winter (J.A. 21).

### 2. Osterweil's Application for a Handgun License

In May 2008, when his primary residence was in Summit, New York, Osterweil submitted an application for a handgun license to the Sheriff's Department in Schoharie County, where Summit is located (J.A. 9, 25). Osterweil checked the box on the application for a "premises" license, but wrote in space provided on the application that he sought the license for the purpose of "target practice and hunting" (J.A. 41).

A few weeks later, the Sheriff informed Osterweil that he needed to "complete and/or correct" his application. The Sheriff explained that a "premises" license would be valid only "inside the residence" for which he applied, and that Osterweil's desire to use a handgun for "target practice and hunting" would require him to obtain a "carry concealed" license (J.A. 44).

On June 25, 2008, Osterweil told the Sheriff that he had purchased a home in Louisiana and intended to make Louisiana his "primary residence." Osterweil inquired whether this change in his residency status would disqualify him from obtaining a permit, stating that if it would, he saw "no sense in correcting the application" to clarify that he was seeking a concealed-carry permit (J.A. 46.)

Thereafter, Osterweil, the Sheriff, and Judge Bartlett, the firearm licensing officer for Schoharie County, exchanged several letters regarding Osterweil's application. Osterweil was informed that his fingerprints had been determined to be unusable (due to low quality) by both the Federal Bureau of Investigation and the New York State Division of Criminal Justice Services (J.A. 35). *See* Penal Law § 400.00(4) (requiring officer investigating applicant for firearms license to take the applicant's fingerprints and send one copy to the State Division of Criminal Justice Services and one to the Federal Bureau of Investigation for criminal records searches). Judge Bartlett advised Osterweil that, in addition to the lack of fingerprint quality, his out-of-state domicile might pose an obstacle to licensure (J.A. 79-80). On several occasions between March and May 2009, the judge offered to

13

permit Osterweil to appear before him for a hearing, but Osterweil expressed no real interest in doing so (*see* J.A. 36-37).

On May 29, 2009, Judge Bartlett issued a decision and order denying Osterweil's application for a handgun license on the ground that Osterweil was not domiciled in New York (J.A. 144). Because Schoharie County is located within the Third Department, Judge Bartlett cited the *Mahoney* decision as controlling on the meaning of the residency provision in § 400.00(3)(a). The judge rejected Osterweil's claim that New York's residency requirement, as previously construed by the Third Department, violated the Second Amendment under the Supreme Court's decision in *Heller* (J.A. 143-150). Judge Bartlett did not decide whether the quality of Osterweil's fingerprints would also prevent him from obtaining a license or determine whether Osterweil had satisfied all other requirements for licensure under New York law (J.A. 150 n.3).

Osterweil did not seek judicial review of Judge Bartlett's decision in the state courts. Thus, Osterweil did not seek to have the Third Department reconsider its earlier ruling in light of *Heller*—let alone seek to have the New York Court of Appeals address for the first time

14

the proper construction of the residency provision in Penal Law § 400.00(3)(a).

## C. Procedural History

### 1. The Complaint

The complaint, filed by Osterweil *pro se*, asserts causes of action under the Second Amendment and the Equal Protection Clause of the Fourteenth Amendment, as well as claims under "the New York Constitution and Civil Rights Laws" (J.A. 10-11), against Bartlett in his official capacity as licensing officer.[7] The complaint requests an order directing that the defendants "provide plaintiff with the type of permit originally applied for, for costs of suit and such other damages and relief as the Court deems reasonable and appropriate" (J.A. 11).[8]

---

[7] The complaint also named then-Governor David A. Paterson and then-Attorney General Andrew M. Cuomo in their official capacities. Both defendants were dismissed by Memorandum Decision and Order dated February 24, 2010. (See Dkt. No. 15.) Osterweil's brief on appeal does not challenge the dismissal of these two defendants.

[8] Osterweil's appellate brief does not say whether he intends to pursue his request for money damages. Any claim for damages clearly fails as a matter of law based on Eleventh Amendment and qualified immunity defenses (*see* J.A. 13). The Eleventh Amendment bars damages against a state official sued in his official capacity, *Gan v. City*
(continued on the next page)

## 2. The District Court's Grant of Summary Judgment to Defendant Bartlett

The district court granted summary judgment to Bartlett on all claims. Citing *Mahoney*, the court assumed that the statutory residency requirement operated as a domicile requirement (J.A. 159-160). The court held that intermediate scrutiny was the appropriate legal standard for analyzing Osterweil's Second Amendment claim (J.A. 169), and held that the statute satisfied intermediate scrutiny because "there is a substantial relationship between New York's residency requirement and the government's significant interest" in monitoring eligibility for firearms licenses (J.A. 170). The district court then rejected Osterweil's equal protection claim, finding that "New York state residents and nonresidents are not similarly situated in terms of the state's ability to

---

*of N.Y.*, 996 F.2d 522, 529 (2d Cir. 1993), and Bartlett would be entitled to qualified immunity for his actions in his individual capacity, given that no clearly established law at the time even suggested that Bartlett's actions violated the Second Amendment, *see Blumenthal v. Crotty*, 346 F.3d 84, 102-03 (2d Cir. 2003).

16

obtain information about and monitor the potential licensee's eligibility or continued eligibility for a firearms license" (J.A. 172).[9]

Osterweil filed a notice of appeal. After Osterweil submitted his brief, Bartlett filed a motion asking this Court to certify to the New York Court of Appeals the dispositive legal question whether the statutory residency provision is properly construed as a domicile requirement, particularly in light of the decisions in *Heller* and *McDonald*. Circuit Judge Chin referred the motion to the merits panel (Dkt. No. 77).

---

[9] The district court construed other claims by Osterweil, couched by him as equal protection claims, as claims that denial of his license application violated his right to travel under the Privileges and Immunities Clause and his right to substantive and procedural due process (J.A. 172 n.11). The district court rejected each, and Osterweil has not pursued any of these arguments on appeal. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."). The court declined to exercise supplemental jurisdiction over Osterweil's state-law claims (J.A. 178).

17

## SUMMARY OF ARGUMENT

Appellant Osterweil's arguments in this appeal rest on two fundamentally incorrect premises. First, he is proceeding as if New York State's highest court has authoritatively construed the residency language of Penal Law § 400.00(3)(a) as a domicile requirement that bars him from obtaining his handgun license. Second, he is litigating this appeal as if he had applied for a handgun license for the purpose of self-defense in the home, when in fact he sought a handgun license for target practice and hunting.

Osterweil's false premise regarding a domicile requirement is based on a construction of New York's firearms license-application statute made by a single intermediate state appellate court years before *Heller* and *McDonald*, which construction relied on the absence of a Second Amendment right to possess a handgun. That construction is unlikely to be adopted by the New York Court of Appeals now because it raises doubts about the constitutionality of the statute. Thus, this Court should certify to the New York Court of Appeals this unsettled, significant, and dispositive question of state law. Certification would avoid both the unnecessary decision of hypothetical constitutional

18

questions, and potential conflict with the State's highest court on a matter of state law.

In the event that the Court declines to certify the case to the New York Court of Appeals, it should affirm the district court's grant of summary judgment on the merits. The Second Amendment right at issue here is not the core right recognized in *Heller* and *McDonald*: the right to possess a handgun in the home for self-defense. Instead, the interest actually at issue on the facts of this case is Osterweil's interest, as reflected in his handgun license application, in possessing a handgun for target practice and hunting. Under this Court's recent decision in *United States v. Decastro*, rational-basis review applies unless a law imposes a "substantial burden" on Second Amendment rights. No. 10-3773, 2012 WL 1959072 (2d Cir. June 1, 2012). A New York domicile requirement, as applied to Osterweil, would impose no such substantial burden, because it would not prevent him from possessing a handgun for target practice and hunting in the State of his domicile, and would permit him to use long guns for target practice and hunting during his summers in New York. Consequently, rational-basis review would apply, and New York's interest in facilitating effective investigation and

19

monitoring of persons holding New York handgun licenses would easily suffice to sustain the law.

Even if a domicile requirement, as applied to Osterweil's request for a handgun license for target practice and hunting, were deemed to impose a substantial burden on his Second Amendment right to self-defense of the home, the law would at most be reviewed under intermediate scrutiny. And a domicile requirement applied to Osterweil would survive intermediate scrutiny because it serves the substantial state interest in monitoring the activities of firearms licensees, especially given Osterweil's inability to produce usable fingerprints for a criminal background check.

## ARGUMENT

## POINT I

## THIS COURT SHOULD CERTIFY TO THE NEW YORK COURT OF APPEALS THE QUESTION WHETHER "RESIDES" MEANS "IS DOMICILED" IN PENAL LAW § 400.00(3)(a)

### A. The Court of Appeals Should Be Given the Opportunity to Construe Penal Law § 400.00(3)(a).

Osterweil's constitutional arguments are premised on the notion that the residency provision in Penal Law § 400.00(3)(a) requires an applicant for a firearm license to be domiciled in New York. This question has never been definitively resolved under New York law, however. Defendant Bartlett understandably felt constrained by the Third Department's 1993 *Mahoney* decision to apply the statute as a domicile requirement. But the New York Court of Appeals has never construed § 400.00(3)(a), and no New York court, including the Third Department, has addressed the meaning of the provision since the Supreme Court decided *Heller* and *McDonald*. This Court should certify to the New York Court of Appeals the question whether § 400.00(3)(a) imposes a domicile requirement, because the answer to that question may well eliminate the need to decide whether a domicile requirement,

21

if New York law imposed one, would comport with the Second Amendment.

The general standards governing certification are well established in this Circuit. "In determining whether to certify a question our Court considers . . . : (1) the absence of authoritative state interpretations of the state statute; (2) the importance of the issue to the state . . . ; and (3) the capacity of certification to resolve the litigation." *Morris v. Schroder Capital Mgmt. Int'l*, 445 F.3d 525, 531 (2d Cir. 2006) (quotation marks and citations omitted). All three factors point decisively toward certification here. First, there is no authoritative state court decision construing Penal Law § 400.00(3)(a): the New York Court of Appeals has never addressed the issue, and, as explained below, the reasoning of the Third Department's 1993 *Mahoney* decision has been called into serious question by the Supreme Court's decisions in *Heller* and *McDonald*. Second, the issue is of great importance to the State because the proper interpretation of § 400.00(3)(a) is essential to the day-to-day administration of New York's regulation and licensing of handguns. *See Tunick v. Safir*, 209 F.3d 67, 78 (2d Cir. 2000) (certifying where question of law concerned "more than [New York's] generic

22

interest in enforcement of its laws," and instead "entail[ed] core governmental functions"). Third, if the Court of Appeals were to hold that the residency provision does not impose a domicile requirement, but rather permits part-year residents owning property in New York to apply for a handgun license, this litigation would thereby be resolved.[10]

This Court has recognized that certification serves particularly critical federalism interests in cases like this one, where a state statute implemented by state officials is under federal constitutional challenge, and the state courts have not yet had the opportunity to resolve questions of statutory interpretation that bear directly on the constitutional issues raised. In such cases, certification allows the Court to avoid deciding the constitutionality of a state statute "unnecessarily

---

[10] Even if the putative domicile requirement of Penal Law § 400.00(3)(a) were eliminated, whether by statutory interpretation or constitutional adjudication, Osterweil would nevertheless not be entitled to the relief he requested—an order directing issuance of a handgun license—because it has not yet been determined whether he satisfies all valid statutory requirements for eligibility. For example, because of the low quality of his fingerprints, a state official has not completed an investigation of "all statements . . . in the application," Penal Law § 400.00(4), including a criminal background search to verify that Osterweil has not been convicted of "a felony or a serious offense," *id.* § 400.00(1)(c).

or prematurely," and prevent "the potential for 'friction-generating error' between the federal and state court systems.'" *Tunick*, 209 F.3d at 72, 77 (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 (1997)).

Certification has the further benefit in these cases of allowing the canon of constitutional avoidance to come into play. Where a state law is at issue, "only the state court can ultimately determine whether a saving interpretation is appropriate under the canons of interpretation of the particular state whose statutes it is called upon to construe." *Id.* at 75. "[S]tate law [may] allow state courts to rewrite state statutes to a degree that would be impermissible for federal courts dealing with federal laws." *Id.* at 76. The "question of the extent to which the state court can go when interpreting its own laws is paradigmatically one of state law, and it is one that federal courts are singularly unsuited to answer." *Id.*

These same considerations of comity and federalism also animate the well-established doctrine of *Pullman* abstention. Indeed, "[c]ertification today covers territory once dominated by . . . '*Pullman* abstention.'" *Arizonans*, 520 U.S. at 75; *accord Nicholson v. Scopetta*,

24

344 F.3d 154, 168 (2d Cir. 2003) (quoting *Arizonans*). The *Pullman* doctrine holds that a federal court "must abstain from [its] equity jurisdiction when a federal constitutional ruling could be avoided 'by a controlling decision of a state court,' and a state court decision can be pursued consistent 'with full protection of the constitutional claim.'" *Nicholson,* 344 F.3d at 167 (quoting *R.R. Comm'n v. Pullman Co.,* 312 U.S. 496, 500–01 (1941)).

Because both factors are present here, abstention would be appropriate were certification not available. But certification is available under the rules of the New York Court of Appeals, Rule § 500.27, and certification is preferable to abstention because it permits a faster resolution of the proper construction of New York's residency provision by allowing the case to be sent directly to the state's highest court. *See Tunick*, 209 F.3d at 79 ("[T]he delay created by certification is almost never as great as that imposed by abstention."). This Court has recognized that it "may elect to certify, rather than abstain" where it would be more efficient to do so, *Nicholson,* 344 F.3d at 168, and for efficiency reasons it should opt to certify, not abstain, here.

There is little risk that any delay due to certification would harm Osterweil's asserted constitutional rights. He has acknowledged that he uses his New York house only as a "summer house" (J.A. 16), and it seems unlikely that this case can be decided before the end of the summer of 2012, whether or not this Court certifies the dispositive legal question to the state high court. And Osterweil's interest in using handguns for target practice and hunting in New York in the summer of 2013 will not be affected by the time it may take for this Court to certify the question to the Court of Appeals and to receive from that Court any answer it may choose to provide.

## B. The Residency Provision in Penal Law § 400.00(3)(a) Is Better Construed Not To Impose a Domicile Requirement.

Certification is especially appropriate here, because the procedure not only respects the authority of the state courts to construe state law, but also will likely avoid the constitutional challenge that Osterweil seeks to present. First, the plain language of Penal Law § 400.00(3)(a) may easily be construed not to impose a domicile requirement. The statutory text—which requires an applicant to apply for a handgun license "where the applicant resides"—is readily construed to allow an

26

application to be submitted in a city or county where the applicant owns a part-time residence, even if the residence is not the applicant's domicile. Thus, if the issue is presented to the state courts, the canon of constitutional avoidance alone may well settle the matter. *See, e.g., Alliance of Am. Insurers v. Chu*, 77 N.Y.2d 573, 585 (1991) (canon requires New York Court of Appeals "to avoid interpreting a statute in a way that would render it unconstitutional if such a construction can be avoided").

Even without invoking the avoidance canon, § 400.00(3)(a) is better read not to impose a domicile requirement. By its terms, the phrase "where the applicant resides" specifies the place where a license application must be filed, not a substantive requirement for licensure as such. Penal Law § 400.00(1), governing eligibility for firearms licenses, contains numerous substantive eligibility requirements, but no requirement of domicile in New York. The residency provision in § 400.00(3)(a) thus seems to serve primarily the purpose of requiring a person to apply for a handgun license where the license would be used, where the application can be best investigated, and where officials may monitor the presence of firearms in their communities.

27

The location of a person's part-time residence in New York is an appropriate and convenient place for the person to apply for a handgun license, regardless of whether the residence is also the person's domicile. Thus, although it is reasonable to construe the phrase "where the applicant resides" as effectively imposing a state residency requirement—someone who does not reside in any city or county of the State cannot apply to any licensing officer—the likely purpose of the phrase is satisfied without construing it to impose a requirement that the applicant be domiciled in New York.

Furthermore, the primary reason that the Third Department previously gave for construing the residency provision as a domicile requirement is no longer valid. The court in *Mahoney* recognized that "the technical distinction [between domicile and residency] is well appreciated." 199 A.D.2d at 735. The court nonetheless construed the residency provision to require domicile on the ground that possession of a firearm is a privilege, not a right. *Id.* The Supreme Court's decisions in *Heller* and *McDonald* squarely refute any such notion. *Heller*, 554 U.S. at 576-626; *McDonald*, 130 S. Ct. at 3026. This intervening change in law alone makes it highly unlikely that the Court of Appeals—or

28

indeed, even the Third Department itself—would today adopt *Mahoney*'s construction of the residency provision in Penal Law § 400.00(3)(a).

## POINT II

### EVEN IF § 400.00(3)(a) REQUIRED APPLICANTS TO BE DOMICILED IN THE STATE, IT WOULD BE CONSTITUTIONAL AS APPLIED TO OSTERWEIL'S LICENSE APPLICATION

Osterweil's standing under *Bach v. Pataki,* 408 F.3d 75, 82 (2d Cir. 2005), to bring a constitutional challenge to the licensing officer's denial of his application is doubtful at best. Under *Bach*, a person challenging a licensing scheme must first apply for the license unless such an application would be futile. *Id.* at 83.   Osterweil failed to pursue his application by seeking state court review of the continuing validity of the domicile requirement adopted in *Mahoney*. The purpose of generally requiring an application for a license before challenging a licensing scheme is to "prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Id.* at 82  (quotation marks and citations omitted).  When Osterweil's license application was addressed at the administrative review level,

29

the Supreme Court's decision in *Heller* had already cast strong doubt on *Mahoney*'s reasoning. Thus, seeking state court review of the licensing officer's decision would have been far from futile: it might have led to reconsideration by the Third Department itself in light of *Heller*'s recognition of an individual right to bear arms, and state court review might have clarified the type of license Osterweil actually sought— whether he sought a license for premises, or for concealed carrying for the purpose of hunting and target practice. Now, due to Osterweil's failure to pursue his application through state court review, this Court is faced with a dispute that may well be predicated on an incorrect view of the New York statute at issue. Thus, under *Bach*, Osterweil lacks standing.

Even if Osterweil has standing, his arguments on the merits of his constitutional challenge fall short. First, he repeatedly invokes the Second Amendment right of an individual to possess a firearm in his home for the purpose of self-defense. But these arguments may well be misplaced, because Osterweil did not seek a handgun license for the purpose of self-defense in the home. *See Decastro*, 2012 WL 1959072, at *7 (rejecting availability of overbreadth analysis in Second Amendment

30

case). Rather, he sought a "premises" license for use in target practice and hunting—a type of license that does not exist—and his complaint sought an order directing issuance of "the type of permit originally applied for" (J.A. 11).

Consequently, if this statute were deemed to contain a domicile requirement, its constitutionality could be at issue here not as applied to a license for possession of a handgun in the home for self-defense, as Osterweil now contends, but rather as applied to the license he sought—a license for possession of a handgun for the purpose of target practice and hunting. As applied to a license for target-practice and hunting, as explained below, there can be no doubt that a domicile requirement would be constitutional. Alternatively, even if Osterweil's application were viewed as seeking a license for self-defense of his New York house, a domicile requirement would be constitutionally permissible as to Osterweil.

31

## A. Rational Basis Scrutiny Applies To The Extent Osterweil's Application Requested A License for Target Practice and Hunting.

Osterweil initially filed an application for a "premises" license, explaining his purpose as "target practice and hunting," which is not a purpose consistent with a premises license. He never corrected this internally inconsistent application. To the extent his application is properly viewed as seeking a license to carry a weapon for the purpose of target practice and hunting, it plainly falls outside the core concerns of the Second Amendment as elaborated in *Heller* and *McDonald*. These decisions established that "the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense." *McDonald*, 130 S. Ct. at 3050.

In *Decastro*, decided after *Heller* and *McDonald,* this Court considered a federal statute that similarly did not directly implicate the right of self-defense in the home. *Decastro* addressed a Second Amendment challenge to 18 U.S.C. § 922(a)(3), which prohibits, with certain exceptions, the transport of a firearm purchased outside a person's State of residence into the State of residence. 2012 WL 1959072, at *1. This Court observed that *Heller* and *McDonald*

32

approved laws prohibiting the carrying of firearms in sensitive places and regulating the commercial sale of arms, and concluded therefore that "time, place and manner restrictions may not significantly impair the right to possess a firearm for self-defense, and may impose no appreciable burden on Second Amendment rights." *Id.* at \*4. Moreover, the Court stated that *Heller* and *McDonald* emphasize "the practical impact of a challenged regulation on the ability of citizens to possess and use guns for the core lawful purpose of self-defense." *Id.* Accordingly, this Court determined that "heightened scrutiny [under the Second Amendment] is triggered only by those restrictions that (like the complete prohibition on handguns struck down in *Heller*) operate as a substantial burden on the ability of law-abiding citizens to possess an use a firearm for self-defense (or for other lawful purposes)." *Id.* at \*5.[11] The Court further held that a "law that regulates the availability of

---

[11] *Decastro* found this "substantial burden" trigger for heightened scrutiny consistent with the treatment of "other fundamental constitutional rights," such as the right to marry, the right to vote, the right to choose an abortion, and the right to free speech. 2012 WL 1959072, at \*5-\*6.

33

firearms is not a substantial burden . . . if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense." *Id.* at *6.

Under *Decastro*, rational basis scrutiny, not any form of heightened scrutiny, would apply here, because any domicile requirement, as applied to Osterweil's application for a license restricted to target practice and hunting, would not substantially burden his Second Amendment rights. A domicile requirement would bar Osterweil only from possessing a handgun for target practice and hunting during the summer months that he spends in New York (to the extent any of his planned hunting would be permitted in the summer). New York's domicile requirement would obviously not bar him from target practice and hunting during the majority of the year, which he apparently spends in his domicile of Louisiana or elsewhere outside New York. Nor would a domicile requirement for handgun licenses used for target practice and hunting bar Osterweil from possessing a long gun during summers in New York for use in target practice or hunting (*see* J.A. 148 ("New York law allows a non-resident, such as the applicant, to possess long guns")). The record contains no evidence that establishes, or even suggests, that Osterweil requires (for some reason)

34

a handgun, rather than a long gun, for any planned target practice and hunting in New York. Particularly in light of the absence of any assertion of a self-defense purpose in his application for a license, the availability of adequate alternatives for Osterweil to pursue target practice and hunting means that any domicile requirement, as applied to Osterweil, would not be subject to heightened scrutiny under *Decastro*. Osterweil does not suggest that a domicile requirement would fail rational basis scrutiny, and, indeed, for reasons explored more fully below, because a domicile requirement would satisfy intermediate scrutiny, it would also satisfy rational basis scrutiny.

**B.   If Osterweil's Application Were Viewed as Seeking a License for Use Only on His Own Premises For Self-Defense,   At Most Intermediate Scrutiny Would Apply and It Would be Satisfied By A Domicile Requirement.**

Even if Osterweil's Second Amendment right to possess a handgun in his New York house for self-defense were at issue here—and his actual license application leaves that question in doubt—a domicile requirement, as applied to Osterweil, would satisfy the applicable intermediate scrutiny.

35

### 1. Intermediate scrutiny applies to a regulation that substantially burdens Second Amendment rights.

As this Court has observed, in both *Heller* and *McDonald*, the Supreme Court "declined to announce the precise standard of review applicable to laws that infringe the Second Amendment because the laws at issue . . . would be unconstitutional '[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights.'" *Decastro*, 2012 WL 1959072, at \*4 (quoting *Heller*, 554 U.S. at 628-29). As discussed above, under *Decastro*, heightened scrutiny is reserved for "regulations that burden the Second Amendment right substantially." *Id.* at \*5.

Assuming that Osterweil sought a handgun license for self-defense in his New York house, the appropriate level of heightened scrutiny would be at most intermediate scrutiny, as the district court found here. Osterweil's brief urges this Court to apply strict scrutiny, but does not cite a single case supporting application of strict scrutiny, even with respect to the "core" home self-defense component of the Second Amendment right. Nor has Osterweil cited a single case holding that strict scrutiny applies to a regulation of handgun possession in

36

each of several houses that an individual owns. On the contrary, strict scrutiny is not the appropriate standard of review even for regulations that substantially burden the "core" Second Amendment right of self-defense in the home. *See Heller*, 554 U.S. at 688 (Breyer, J., dissenting) (observing that Court's opinion rejects strict scrutiny "by broadly approving a set of laws . . . whose constitutionality under a strict scrutiny standard would be far from clear"). Because Osterweil has presented no authority and no persuasive argument supporting application of strict scrutiny to a domicile requirement applied to a handgun license for self-defense in one of several houses an individual owns, this Court should apply at most intermediate scrutiny.

## 2. A domicile requirement applied to Osterweil would satisfy intermediate scrutiny because it would serve important state interests.

To satisfy intermediate scrutiny, a state regulation "must be substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Application of a domicile requirement to Osterweil's application easily satisfies this test.

As is the case with many handgun laws, New York's licensing regime aims to protect the public safety and prevent handgun crime.

37

The state interests in public safety and crime prevention are undoubtedly compelling. *See United States v. Salerno*, 481 U.S. 739, 748 (1987); *Schall v. Martin*, 467 U.S. 253, 264 (1984); *see also Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997) (content-neutral injunction against First Amendment conduct justified by government interest in "public safety and order"). Indeed, plaintiff's brief concedes (Br. at 36) that the state interest in public safety "may be compelling."

These interests would justify applying a domicile requirement to Osterweil's license application, if New York law did so. In *Bach v. Pataki*, this Court specifically discussed the important interests served by the residency provision in Penal Law § 400.00(3)(a). 408 F.3d at 91. The Court there rejected a challenge to the residency provision brought under the Second Amendment and the Privileges and Immunities Clause of article IV of the Constitution. *Bach* did not address whether the residency provision would be constitutional if applied as a domicile requirement, because the plaintiff in that case was neither a resident nor a domiciliary of New York. *See id.* at 76.

38

To be sure, *Bach* rejected the plaintiff's Second Amendment claim on the ground that the Second Amendment does not apply to state laws regulating gun possession, *id.* at 84, and the Supreme Court's decisions in *Heller* and *McDonald* have overruled that holding. Nonetheless, this Court's analysis in *Bach* regarding the purposes served by New York's residency requirement, which it undertook in addressing the plaintiff's challenge under the Privileges and Immunities Clause,[12] remains accurate and persuasive. In addition, as explained below, the Court's analysis in *Bach* would apply in large part to a domicile requirement, not only to a simple residency requirement.

The Court's analysis in *Bach* demonstrates that a domicile requirement would satisfy intermediate scrutiny. *Bach* identified a

_____

[12] *Bach*'s analysis of the importance of the State's interest in monitoring licensees' activities, as well as the tailored connection between that interest and a residency requirement, is contained in the Court's discussion of Bach's right to travel claim arising under the Privileges and Immunities Clause. Under that Clause, when a State discriminates against citizens of another State, it may successfully defend that discrimination by showing a "substantial reason" for the discrimination and a reasonably tailored relationship between "'the degree of discrimination exacted and the danger sought to be averted by enactment of the discriminatory statute.'" *Bach*, 408 F.3d at 88 (quoting *Blumenthal*, 346 F.3d at 94 ).

39

substantial state interest in treating residents and nonresidents differently for the purpose of obtaining a handgun license. This interest also justifies treating domiciliaries and nondomiciliaries differently, because a part-time resident's activities outside the State are just as much beyond the State's control as are those of a visitor. The Court recognized that the State's monitoring interest "in continually obtaining relevant behavioral information" about individuals licensed to possess firearms is substantial and justifies treating non-residents differently from residents in its firearm licensing statutes. *Bach*, 408 F.3d at 91. The State has a reduced ability to monitor both nonresidents and part-time residents for two main reasons. First, "[t]he State can only monitor those activities that actually take place in New York. Thus, New York can best monitor the behavior of those licensees who spend significant amounts of time in the State." *Id.* at 92. Here, the record does not establish how much time Osterweil spends in New York, even during the summer. Second, "other States . . . cannot adequately play the part of monitor for the State of New York or provide it with a stream of behavioral information approximating what New York would gather" because "[t]hey do not have the incentives to do so." *Id.* The Court in

*Bach* also found New York's "nonresident distinction" in its firearm licensing statutes to be "tailored to the State's [substantial] monitoring interest." *Id.* at 94. A requirement that treats domiciliaries differently from nondomiciliaries with only seasonal residence in New York would also be tailored to the monitoring interest; a part-time resident may spend even less time in the State than a visitor.

*Bach*'s analysis, applied to Osterweil, means that the denial of his license application on nondomicile grounds would survive intermediate scrutiny. Indeed, if anything, New York's substantial interest in monitoring is even stronger with respect to Osterweil. First, as the district court observed, Osterweil's vacation house in New York "is no longer his 'home'" (J.A. 169). Indeed, the record does not disclose how much time he spends in the house he owns in Schoharie County; on the contrary, the record suggests that his adult daughter has used the house as her residence (*see* J.A. 124). It may be that Osterweil himself spends only a handful of days a year in New York. Second, Osterweil has not provided fingerprints usable by the federal and state governments. In the absence of what his own brief calls "usable fingerprints" (Br. at 44), New York is yet more limited in its ability to

41

monitor Osterweil's activities—especially his out-of-state activities—
than it was in its ability to monitor the plaintiff in *Bach*, and the State's
justification for denying Osterweil a handgun license would be
correspondingly stronger than the interests discussed in *Bach*.

Thus, as applied to Osterweil and on this record, a domicile
requirement would survive intermediate scrutiny because it would
serve the State's substantial interest in monitoring the activities of
firearms licensees.

## POINT III

### A DOMICILE REQUIREMENT, AS APPLIED TO OSTERWEIL, DOES NOT VIOLATE THE EQUAL PROTECTION CLAUSE

Osterweil claims that a domicile requirement, applied to him and
his application for a target-practice and hunting license, violates the
Equal Protection Clause because it treats him differently from a person
who is domiciled in New York, and that this different treatment fails
strict scrutiny. But Osterweil, as a part-time resident of New York, is
not similarly situated to a person domiciled in New York. Indeed,
because of his "worn fingerprints" (J.A. 143), Osterweil himself is not

42

even similarly situated to other part-time residents of New York whose fingerprints are usable by criminal justice agencies. This difference between Osterweil and the vast majority of other applicants for handgun licenses alone means that there is no equal protection violation because he is not similarly situated to persons domiciled in New York.

Even if Osterweil were similarly situated to other applicants, he has provided no support for applying strict scrutiny to his equal protection claim. As shown *supra*, at most intermediate scrutiny would apply to Osterweil's Second Amendment claim. There is no justification for apply a higher level of scrutiny to Osterweil's equal-protection claim, which is premised on a classification based on his Second Amendment right, than would be applied to the underlying constitutional right itself. *Cf. Hayden v. Paterson*, 594 F.3d 150, 170 (2d Cir. 2010) (felon disenfranchisement statute not subject to strict scrutiny even though it affects fundamental right to vote).

43

## CONCLUSION

For the foregoing reasons, the Court should grant the State's motion for certification of a controlling question of law to the New York Court of Appeals or, in the alternative, affirm the judgment of the district court.

Dated:   June 26, 2012
       New York, New York

Respectfully submitted,

ERIC T. SCHNEIDERMAN
*Attorney General of the*
*State of New York*
Attorney for Appellee

By:   /s/ Simon Heller
     SIMON HELLER
     Assistant Solicitor General

120 Broadway, 25th Floor
New York, NY 10271
(212) 416-8025

BARBARA D. UNDERWOOD
*Solicitor General*
RICHARD DEARING
*Deputy Solicitor General*
SIMON HELLER
*Assistant Solicitor General*
*of Counsel*

44

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, Oren L. Zeve, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 8,311 words and complies with the type-volume limitations of Rule 32(a)(7)(B).

/s/ Oren L. Zeve
Oren L. Zeve

# EXHIBIT D

# 11-2420 cv

## In the

# United States Court of Appeals
## for the Second Circuit

Alfred G. Osterweil,

*Plaintiff - Appellant*,

v.

George R. Bartlett, III,
In his official capacity as Licensing Officer in the County of Schoharie,

*Defendant – Appellee*,

David A. Paterson, in his official capacity as
Governor of the State of New York; Andrew M. Cuomo, in his official capacity as
Attorney General of the State of New York,

*Defendants*.

**On Appeal from the United States District Court
for the Northern District of New York (Syracuse)**

## REPLY BRIEF FOR APPELLANT ALFRED G. OSTERWEIL

Paul D. Clement
D. Zachary Hudson
BANCROFT PLLC
1919 M Street, N.W., Suite 470
Washington, D.C. 20036
(202) 234-0090
pclement@bancroftpllc.com

Daniel L. Schmutter
GREENBAUM, ROWE, SMITH
  & DAVIS LLP
P.O. Box 5600
Woodbridge, NJ 07095
(732) 549-5600
dschmutter@greenbaumlaw.com

*Counsel for Plaintiff-Appellant*

Case 11-2420   Document 90   Page 2   07/10/2012   653588

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... ii

INTRODUCTION AND SUMMARY ...................................................................... 1

ARGUMENT .............................................................................................................. 3

I.   Because This Case Turns On The Scope Of Mr. Osterweil's
     Federal Constitutional Rights, Certification Is Unnecessary. ......................... 3

II.  Bartlett's Attempts To Distract This Court From Addressing The
     Constitutional Issue At The Heart Of This Case Are Unavailing. ................ 10

III. New York's Ban On In-Home Handgun Possession By Part-Time
     State Residents Violates The Second Amendment. ....................................... 17

     A.   A Complete Ban On In-Home Handgun Possession Cannot
          Survive *Heller*. ................................................................................... 17

     B.   New York's Ban On In-Home Handgun Possession By Part-
          Time Residents Fails Strict Scrutiny. .................................................. 19

IV.  New York's Ban On In-Home Handgun Possession By Part-Time
     State Residents Violates The Equal Protection Clause. ................................. 23

CONCLUSION ........................................................................................................ 25

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES<sup>*</sup>

**Page(s)**

## Cases

*Arizonans for Official English v. Arizona*,
  520 U.S. 43 (1997)...........................................................................................7

*Bach v. Pataki*,
  408 F.3d 75 (2d Cir. 2005) ............................................................................11

*Baker v. Carr*,
  369 U.S. 186 (1962).......................................................................................10

*Bogle-Assegai v. Connecticut*,
  470 F.3d 498 (2d Cir. 2006) ..........................................................................12

*City of New York v. Golden Feather Smoke Shop, Inc.*,
  597 F.3d 115 (2d Cir. 2010) ............................................................................5

*Conn. Dep't of Envtl. Prot. v. OSHA*,
  356 F.3d 226 (2d Cir. 2004) ............................................................................8

*DiBella v. Hopkins*,
  403 F.3d 102 (2d Cir. 2005) ............................................................................5

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)................................................................................. passim

*Elrod v. Burns*,
  427 U.S. 347 (1976).........................................................................................8

*Emp't Div., Dep't of Human Res. of Oregon v. Smith*,
  494 U.S. 872 (1990).......................................................................................16

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) .................................................................. 16, 17

*Hartford Courant Co. v. Pellegrino*,
  380 F.3d 83 (2d Cir. 2004) ..............................................................................9

_____

<sup>*</sup> Citations upon which Appellant primarily relies are marked with asterisks.

ii

Case 1:09-4420   Document 00   Page 4   01/19/2011   539540   51

*Highland Capital Mgmt. v. Schneider*,
   460 F.3d 308 (2d Cir. 2006) ..............................................................................4

*In re Mahoney v. Lewis*,
   199 A.D.2d 734 (N.Y. App. Div. 1993) ...........................................................6

*Jackson-Bey v. Hanslmaier*,
   115 F.3d 1091 (2d Cir. 1997) ..........................................................................10

*Jeffreys v. City of New York*,
   426 F.3d 549 (2d Cir. 2005) ............................................................................15

*Johnson v. California*,
   543 U.S. 499 (2005)..........................................................................................20

*Kramer v. Union Free Sch. Dist. No. 15*,
   395 U.S. 621 (1969)..........................................................................................24

*\*McDonald v. City of Chicago*,
   130 S. Ct. 3020 (2010)..................................................................................2, 13

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
   460 U.S. 37 (1983)............................................................................................21

*Tinelli v. Redl*,
   199 F.3d 603 (2d Cir. 1999) ..............................................................................5

*Tunick v. Safir*,
   209 F.3d 67 (2d Cir. 2000) ............................................................................5, 7

*United States v. Decastro*,
   No. 10-3773, 2012 WL 1959072 (2d Cir. June 1, 2012) ................. 15, 16, 21

*Vt. Right to Life Comm., Inc. v. Sorrell*,
   221 F.3d 376 (2d Cir. 2000) ..............................................................................9

**Constitutional Provisions**

*\*U.S. Const. amend. II ............................................................................................12

*\*U.S. Const. amend. XIV..........................................................................................24

iii

Case 11-2420   Document 3C   Page 5   07/10/2011   358580   32

## Statute

N.Y. Penal Law § 400.00 ............................................................................... 5, 6, 12

## Other Authorities

N.Y. State Bar Ass'n, Certification of Questions of State Law in the Second
    Circuit (2007), *available at* http://www.nysba.org/Content/
    ContentFolders4/CommercialandFederalLitigationSection/
    ComFedReports/AppPracCertofQuestions2ndCircuit.pdf ............................. 8

iv

Case 11:24-9   Document 90   Page 8   07/10/201:   135953   82

## INTRODUCTION AND SUMMARY

Appellee Bartlett's brief is notable for what it concedes.  Bartlett  concedes "that the Second Amendment guarantees an individual right to possess a handgun for self-defense in the home that may not be infringed by the States."  Bartlett Br. 1; *see id.* at 18–19.  Bartlett admits that this right likely extends to protect home handgun possession for "individuals who reside in New York seasonally and are domiciled elsewhere."  *Id.* at 5.  Bartlett also appears to accept that if either strict scrutiny or the categorical approach of *Heller* applies to the New York law at issue here, the law cannot survive.  *Id.* at 35–42.

That Bartlett and Mr. Osterweil agree on the nature and scope of the Second Amendment right should make this an easy case for this Court to resolve.  Indeed, Bartlett dedicates only a few pages of his brief to an actual defense of the domicile requirement, and all of that depends on the assumption that the law is subject to a standard of review far more lenient than that compelled by *Heller* and *McDonald*. Instead, Bartlett uses the balance of his brief to raise a host of meritless arguments in an attempt to distract this Court from reaching the core—and easily answered— question presented: whether the Second Amendment protects the right of a part-time New York resident to possess a handgun in his home.  Bartlett urges this Court to certify the question to the New York State Court of Appeals so that the New York court can consider the impact of the Federal Constitution on the

prevailing view in the New York courts. He also asserts that Mr. Osterweil lacks standing to bring this suit based on the denial of his license, and—in an argument newly crafted on appeal—that what Mr. Osterweil really wanted was a handgun for target practice, which is afforded minimal Second Amendment protection.

None of these efforts to keep this Court from deciding the merits of the federal constitutional question presented here is valid, and the merits of the constitutional question are straightforward. Despite his best efforts, Bartlett cannot explain away the fact that denying an in-home handgun license to a part-time resident is inconsistent with the Second Amendment and the Supreme Court's recent decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010). As those cases make clear, the Second Amendment right, especially when it comes to self-defense in the home, is fundamental. It is not a seasonal right that can be denied during the summer, or limited to full-year residents. The Supreme Court has made clear that any law that categorically bans the possession of handguns in the home is unconstitutional. That is exactly what the New York law at issue here, as interpreted and applied by the District Court, does and thus that law is invalid.

2

## ARGUMENT

### I.     Because This Case Turns On The Scope Of Mr. Osterweil's Federal Constitutional Rights, Certification Is Unnecessary.

The primary issue in this case is whether Mr. Osterweil can be denied the right to possess a handgun in his New York home consistent with the Second Amendment. This Court does not need to certify that federal constitutional question to the New York State Court of Appeals. As Mr. Osterweil argued in his motion opposing certification, *see* Doc. 79[1], this case requires interpreting the scope of the Second Amendment right to bear arms, the Supreme Court's decisions in *Heller* and *McDonald* fleshing out that right, and the Equal Protection Clause of the Federal Constitution. This Court—not the New York State Court of Appeals— is the appropriate forum for the resolution of these issues.

Despite the federal constitutional issue at the heart of this case, Bartlett argues that certification is necessary, for the most part repeating the arguments contained in his motion for certification. *See* Doc. 68. Bartlett first argues that the New York State Court of Appeals should be given the opportunity to decide the issue, suggesting that "critical federalism interests" require certification. Bartlett Br. 23. But federalism interests are at their nadir when it comes to considering

---

[1] Citations to the District Court docket (No. 09-CV-00825) are designated "N.D.N.Y. Doc."; citations to the docket in this case on appeal (No. 11-2420) are designated "Doc."; and citations to the Joint Appendix are designated "A___."

.5:: 11-2420   Document 90   Page: 9   07/10/2012   659580   ::1

federal constitutional limits on state action under the Fourteenth Amendment. By incorporating the fundamental protections of the Bill of Rights, including the Second Amendment, and requiring states to treat persons equally, the Fourteenth Amendment restricts state action, rather than preserving some special role for state courts. To be sure, the constitutional violation of Mr. Osterweil's rights was accomplished by Bartlett's application of New York law. That does not mean, however, that this Court must certify the underlying constitutional question to a New York court. Bartlett concedes that the scope of state law before *Heller* and *McDonald* was well-settled, and that a change in federal constitutional law is the primary basis for reconsidering those decisions. In light of the primacy of the federal constitutional questions, certification makes no sense here.

Next, Bartlett submits that certification is warranted because the validity of New York's handgun licensing regime "is of great importance to the State." *Id.* at. 22. But respect for Mr. Osterweil's fundamental constitutional rights is even more important to Mr. Osterweil, and federal courts exist to protect and adjudicate such federal rights. In all events, "importance to the State" is hardly a sufficient basis for certification. Indeed, because this Court only "resort[s] to certification sparingly," *Highland Capital Mgmt. v. Schneider*, 460 F.3d 308, 316 (2d Cir. 2006), certification is "not proper" unless the issue presents a complex question of New York law, there is a split in authority regarding the issue in the state courts, or

4

there is insufficient state law precedent available to guide this Court's appraisal of the matter, *Tinelli v. Redl*, 199 F.3d 603, 606 n.5 (2d Cir. 1999). *See DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005); *City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 127 (2d Cir. 2010). This dispute has none of those attributes. The issue at the heart of the case is a straightforward matter of federal constitutional law and the only precedents necessary to decide the case are *Heller* and *McDonald*.

Bartlett also suggests that certification is required here because the New York State Court of Appeals may opt to apply the cannon of constitutional avoidance to N.Y. Penal Law § 400.00(3)(a)'s residency requirement and thus save the statute. But the case that Bartlett cites for this proposition—*Tunick v. Safir*, 209 F.3d 67 (2d Cir. 2000)—critically undermines it. In *Tunick*, this Court expressly recognized that it was inappropriate to certify a case simply because a plaintiff challenges a state law on constitutional grounds, the state's highest court has not issued an authoritative interpretation of the statute, and the constitutional question could potentially be avoided by adopting a specific reading of the state statute at issue. *Id.* at 73–74. So it is here. Just because the New York State Court of Appeals *might* construe § 400.00(3)(a) in a manner that makes that statute consistent with the Second Amendment does not mean that this Court *must* certify the question.

5

Relatedly, Bartlett contends that if the New York State Court of Appeals interprets § 400.00(3)(a) to allow "individuals who reside in New York seasonally" to obtain handgun licenses, Mr. Osterweil's "constitutional challenge will be moot and this court will have no occasion to reach the constitutional issues Osterweil seeks to raise on this appeal." Bartlett Br. at 5. But Bartlett's primary contention is that it is the Federal Constitution as authoritatively construed in *Heller* and *McDonald* that would cause the New York Court of Appeals to reconsider *In re Mahoney v. Lewis*, 199 A.D.2d 734 (N.Y. App. Div. 1993). Thus, this is not a case of true constitutional avoidance—at least one court will have to consider the federal constitutional question, and there is no sound reason that it should not be this Court. Bartlett emphasizes the scenario where the New York Court of Appeals reinterprets New York law in light of *Heller* and *McDonald.* But the alternative outcome underscores the centrality of the federal constitutional question and the inappropriateness of certification in this case. If the New York State Court of Appeals holds that nothing in *Heller*, *McDonald*, or the Second Amendment more broadly, counsels against adopting the same view of New York law as that espoused in *Mahoney*, and adopted by Bartlett and the District Court, this Court would then have to address the same Second Amendment questions, creating the very real risk of a split in authority on the scope of Second Amendment rights in a single case.     That possibility of different resolutions of the same Second

6

Amendment issues (albeit considered in a constitutional avoidance posture by the New York court and directly by this Court) demonstrates why the real issue in this case is a constitutional one—not an issue of state law—that should be decided by this Court. To the extent that the concern informing whether certification is appropriate is "[t]he potential for the '"friction-generating error" between the federal and state court systems,'" *Tunick*, 209 F.3d at 94 (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 (1997)), as Bartlett suggests, the possibility of not just friction but diametrically opposed views of the same constitutional question counsels against certification, not for it.

As Mr. Osterweil pointed out in his opposition to Bartlett's certification motion, certification in this case will also result in an intolerable and unnecessary delay in vindicating his constitutional right to possess a handgun in his New York home—a right made manifestly clear by *Heller* and *McDonald*. And this Court has recognized that "the effect of certification, and its attendant delay, on the constitutional right here asserted . . . . cannot be ignored." *Tunick*, 209 F.3d at 87. Bartlett attempts to downplay the ongoing irreparable harm caused by the continuing delay in this case, concluding that "[t]here is little risk that any delay due to certification would harm Osterweil's asserted constitutional rights." Bartlett Br. 26. This is so, Bartlett contends, because Mr. Osterweil uses his New York home only in the summer, this case will not be decided this summer—certification

7

or not—and that the case, even with certification, will be decided by the summer of 2013. First and foremost, Bartlett misapprehends the nature of constitutional rights and grossly underestimates the seriousness with which the law views the violation of those rights. *Cf. Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Conn. Dep't of Envtl. Prot. v. OSHA*, 356 F.3d 226, 231 (2d Cir. 2004) (same). Mr. Osterweil applied for the license at the crux of this case more than four years ago. For Bartlett to suggest that any added delay will not exacerbate the injury that Mr. Osterweil has already suffered reveals just how little value Bartlett assigns to Second Amendment rights.

What is more, it is not at all clear that the factual premise underlying Bartlett's ill-founded timing argument is correct. "In New York, the average time from the Court of Appeals' receipt of a request for certification to determining whether to accept is 38 days and the average time from certification to resolution is approximately seven months." N.Y. State Bar Ass'n, Certification of Questions of State Law in the Second Circuit 6 (2007), *available at* http://www.nysba.org/ Content/ContentFolders4/CommercialandFederalLitigationSection/ComFedReport s/AppPracCertofQuestions2ndCircuit.pdf. So if the Court does decide to certify the question after argument, which could be months from now, and the New York Court of Appeals accepts certification and decides the question in a manner inconsistent with Mr. Osterweil's Second Amendment rights, it is optimistic to

8

think that this case will come to a close before summer 2013. But if certification is
to occur, this Court should do everything it can to expedite proceedings to
minimize any further delay in the recognition of Mr. Osterweil's constitutional
rights.

As an alternative to certification, Bartlett briefly suggests that if the Court
does not certify, it should consider abstaining under the *Pullman* doctrine. Bartlett
Br. 24–25. Abstention would be wholly inappropriate here. Even if the necessary
preconditions for *Pullman* abstention were met—and they are not—abstention
would not be the proper course. As this Court has recognized, "important federal
rights can outweigh the interests underlying the *Pullman* doctrine." *Vt. Right to
Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 385 (2d Cir. 2000) (internal quotation
marks and brackets omitted). And when the wrong alleged is a violation of
constitutional rights, as it is here, "the weight of the" "issues involved counsels
against abstaining." *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 100 (2d Cir.
2004).

But more fundamentally, neither certification nor abstention is necessary
because, as Bartlett concedes, "the Second Amendment guarantees an individual
right to possess a handgun for self-defense in the home that may not be infringed
by the States," Bartlett Br. 1, and Bartlett's denial of Mr. Osterweil's application
for an in-home handgun license violates that right. This Court does not need to ask

9

Case 1:09-cv-00825   Document 90   Page 15   07/15/2012   659680   11

the New York State Court of Appeals to tell it what Bartlett admits, the Second Amendment compels, and *Heller* and *McDonald* make plain.

## II.     Bartlett's Attempts To Distract This Court From Addressing The Constitutional Issue At The Heart Of This Case Are Unavailing.

Although the Second Amendment issue at the heart of this case—whether *Heller* extends to the homes of part-time residents—is straightforward, Bartlett distorts the facts and the law in an effort to distract the Court from addressing that straightforward question.   After devoting a significant portion of his brief to arguing for certification on the premise that *Heller and McDonald* are game-changing decisions that will cause the New York courts to revisit their approach to residence, Bartlett shifts gears and asserts that denying Mr. Osterweil's license was not constitutionally problematic notwithstanding *Heller* and *McDonald*.     But Bartlett can accomplish this about-face only by distorting the record and suggesting that Mr. Osterweil lacks standing, or that this case involves hunting and target practice rather than protection of the home.

Little ink need be wasted on Bartlett's standing argument.  Mr. Osterweil applied for and was denied a license to possess a handgun in his home in violation of his constitutional right to bear arms and he has standing to challenge that denial in federal court. *Cf. Baker v. Carr*, 369 U.S. 186, 205–07 (1962); *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997).   Bartlett elides this obvious conclusion, and instead questions Mr. Osterweil's standing on the basis of *Bach v.*

10

*Pataki*, 408 F.3d 75 (2d Cir. 2005). But *Bach* distinguishes itself. In *Bach*, this Court held that Bach had standing to challenge New York's handgun licensing requirement even though he did *not* apply for a license. As Mr. Osterweil applied for a license and was denied that license, he has standing *a fortiori*. To the extent that *Bach* is relevant to the question of Mr. Osterweil's standing in this case at all, it is to show that Mr. Osterweil would have had standing even if he had not applied for a license. Because the prevailing view of New York law required that one be a domiciliary to obtain an in-home handgun license, Mr. Osterweil "had nothing to gain . . . by completing and filing an application." *Bach*, 408 F.3d at 82–83. But Mr. Osterweil did apply for a license, and that application was denied. Because the grounds of that denial were inconsistent with Mr. Osterweil's fundamental Second Amendment right, he has standing to challenge that denial.

Moving on from his standing argument, Bartlett next asserts—for the first time in this litigation—that Mr. Osterweil's Second Amendment right to bear arms was not violated when his license application was denied because he sought that license for "target practice and hunting," not self-defense. This argument is forfeited and flawed both legally and factually.

There is no need for this Court to consider this newly-minted argument on appeal. There is nothing remotely jurisdictional that would justify this Court excusing Bartlett's failure to raise this argument earlier. *See Bogle-Assegai v.*

11

Caso 1:13-cv-...   Document 90   Page 17   07/10/2012   653586   19

*Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006) ("[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal.") (internal quotation marks omitted).

Of course, the real reason that Bartlett did not raise this argument is that it was crystal clear through the course of the back and forth in the application process that Mr. Osterweil wanted to possess a handgun for, *inter alia,* use on his New York premises for self-protection. When Mr. Osterweil filled out his "State of New York Pistol/Revolver Application," he was instructed to indicate whether he was applying for a license to "carry concealed," "possess on premises," or "possess/carry during employment." A41. He put an "X" in the "possess on premises" box—the form at issue instructs the applicant to "check only one." A41. As New York law explains, a "possess on premises" permit authorizes an individual to "have and possess" "a pistol or revolver" "in his dwelling." N.Y. Penal Law § 400.00(2)(a).

The right to have and possess a pistol or revolver in one's dwelling—what Mr. Osterweil asked the State's permission to do—is the core right that the Second Amendment protects. The Second Amendment states that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II. That Amendment confers an individual right to "possess and carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, and it is "valued because the possession of

12

firearms [i]s thought to be essential for self-defense," *McDonald*, 130 S. Ct. at 3048. The Founders and Framers "of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty" *because* it is essential to self-defense. *Id.* at 3042. An individual need not proclaim that he needs a weapon to defend himself in order to be entitled to his Second Amendment right. Nor does the fact that he may want to use the firearm for other purposes as well in any way detract from his constitutional right to possess the firearm for self-defense purposes. The right ensures that he is able to do so should the need arise. Thus Mr. Osterweil did not need to explain to the State why he was invoking his right to possess a handgun in his home. That he sought to do so suffices to bring his request fully within the core of what the Second Amendment protects.

The absurd result of applying Bartlett's logic helps demonstrate the point. Under Bartlett's view of the Second Amendment, he could deny the application of any individual seeking an in-home handgun permit if that person did not write "for self-defense purposes" on the application. The Second Amendment contains no such requirement, and neither *Heller* nor *McDonald* even hint that a citizen must attest to their intent to use a gun to protect their home to be entitled to the core right that the Second Amendment protects.

13

Case 11 3432   Document 90   Page 13   11/18/2013   685534

In any event, by the time Bartlett denied Mr. Osterweil's application for an in-home hand-gun license on May 29, 2009, it was crystal clear that Mr. Osterweil sought that license not only for "target practice and hunting," but to protect his hearth and home. This reality presumably explains why this argument did not surface during the earlier stages of the litigation. Mr. Osterweil applied for the license in question on May 21, 2008. A9; A25 ¶ 2. In a letter to Bartlett on July 10, 2008, Mr. Osterweil stated that he sought the "license to purchase and hold a handgun." A52. In that same letter, Mr. Osterweil informed Bartlett that *Heller* "stat[ed] that the Second Amendment was adopted to permit all citizens to own and bear arms to protect them in their homes." *Id.* Mr. Osterweil then inquired "[i]f the amendment was meant to permit me to protect myself in my home, is it not logical to assume that I have the same right in a second home?" *Id.*

Mr. Osterweil reiterated these points in a letter to Bartlett on March 4, 2009, stating that he was entitled to a license because "[t]he entire purpose of the Second Amendment [is] . . . to [e]nsure the safety of each individual in his home." A97. Though he was not required to do so, Mr. Osterweil clearly communicated to Bartlett why he wanted to possess a handgun in his New York home: to protect his family.[2]

---

[2] Furthermore, in his summary judgment motion in the District Court, Mr. Osterweil invoked his "fundamental right to be secure in one's home," arguing that

14

But Bartlett's argument is not only forfeited and factually flawed, it is legally beside the point. The right protected by the Second Amendment neither requires that citizens declare their intended use for a firearm nor circumscribes the use of a firearm for hunting, target-shooting, or self-protection purposes.[3] Any firearm can be used for target shooting, and such practice only makes the firearm more useful for other purposes, such as self-defense and hunting. Moreover, one of the key insights of *Heller* is that firearms that were useful for militia use or hunting purposes were also useful for the self-defense justification of the Framers for treating the Second Amendment as a fundamental, individual right. *See Heller*, 554 U.S. at 636–37.

This Court recently recognized the general point in *United States v. Decastro*, No. 10-3773, 2012 WL 1959072, at *4 (2d Cir. June 1, 2012). As this

---

a state's attempt "to limit Plaintiff to being armed to protect his family in only one of his homes would be in direct conflict with the overriding concept and thrust of the Second Amendment." N.D.N.Y. Doc. 30 at 5–6. Bartlett did not respond to this motion by arguing that Mr. Osterweil never invoked this right. Instead, consistent with his view of this case (until now), he argued that Mr. Osterweil's license was appropriately denied because he was not domiciled in New York. *See* N.D.N.Y. Doc. 33-4 at 8–12.

[3] To the extent that any factual issue as to Mr. Osterweil's motivation to apply for a license is relevant, properly before this Court, and in doubt, because the District Court granted Bartlett's motion for summary judgment, any doubt as to a factual issue must be resolved in Mr. Osterweil's favor. *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

15

Court stressed, *Heller* and *McDonald* "emphasized the practical impact of a challenged regulation on the ability of citizens to possess and use guns for the core lawful purpose of self-defense." *Decastro*, 2012 WL 1959072, at \*4.  As a practical matter, were the State able to prohibit an individual from engaging in target practice with a handgun, that would significantly hinder that individual's ability to "use guns for the core lawful purpose of self-defense." *Id.*  And as a constitutional matter, the protective ambit that attaches to a fundamental constitutional right necessarily includes the protection of the activities necessary to effectually exercise that right.  *Cf. Emp't Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 877–78 (1990).[4]

The Court of Appeals for the Seventh Circuit has also recognized as much.  In *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011), that Court stated that "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."  Thus, preventing individuals "from engaging in target practice . . . . is a serious encroachment on the

---

[4] Bartlett contends that a state law prohibiting individuals from obtaining handgun licenses to engage in target practice would be subject to rational basis review. Bartlett Br. 32.  That is clearly wrong.  "If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." *Heller*, 554 U.S. 628 n.27.

16

right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Id.* at 708.[5]

## III.    New York's Ban On In-Home Handgun Possession By Part-Time State Residents Violates The Second Amendment.

After Bartlett's attempts to distract this Court from the core question in this case are discarded, the resolution of the core constitutional question—to which Bartlett dedicates but a few pages of his brief—is straightforward. The District Court in this case held that under New York's licensing regime individuals like Mr. Osterweil—part-time residents who are non-domiciliaries—"are completely excluded from the [State's] license-application procedure." A159.    That categorical ban is flatly inconsistent with *Heller*'s holding and its pronouncement that the Second Amendment protects the fundamental right of "law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 628.

### A.    A Complete Ban On In-Home Handgun Possession Cannot Survive *Heller*.

As explained in Mr. Osterweil's opening brief, in the wake of *Heller*, New York's ban on in-home handgun possession by part-time residents cannot stand.

---

[5] As *Ezell* noted, this understanding of the Second Amendment right is confirmed by the historical sources upon which *Heller* relied. *See* 651 F.3d at 704. *Heller* quoted Thomas Cooley's 1868 Treatise on Constitutional Limitations, stating that the right "to bear arms implies something more than the mere keeping; it implies the learning to handle and use them . . . ." 554 U.S. at 617–18.

17

Case 11 741 .   Document 90   Page 13   04/10/2017   37. 44   92

Osterweil Br. 30–42. *Heller* invalidated a District of Columbia law categorically banning such possession. 554 U.S. at 635. The New York law's proscription is limited to part-year residents, but it is no less categorical or severe. It prohibits an entire class of law-abiding individuals who would otherwise be able to possess handguns in their home from doing so based on the fact that they are not domiciled in New York. Neither the Second Amendment nor *Heller* draws a distinction between part-time and full-time residents. *Heller* and *McDonald* in no way suggest that a citizen's right to protect his hearth and home is limited to one home and one hearth. Nor is the need for self-defense in any way reduced for part-time residents. If anything, the fact that residents are not present year round may make part-time residences particularly attractive targets for thieves and make the self-defense right particularly important. *See* Osterweil Br. 12, 33. Bartlett makes no real response to the argument that the categorical approach of *Heller* dooms a categorical rule of denying permits to part-time residents. Bartlett attempts to dilute the standard of review and justify its ban under rational basis or intermediate scrutiny, but that ignores the reality that *Heller*'s categorical approach dooms the New York law without needing to reach the level of scrutiny question.  A requirement that one must be domiciled in a state in order to exercise his fundamental right to protect his home cannot be squared with the Second Amendment as interpreted in *Heller*.

18

Case  11-2420   Document  00   Page 24   07/10/2012   600502

**B.    New York's Ban On In-Home Handgun Possession By Part-Time Residents Fails Strict Scrutiny.**

Bartlett likewise fails to advance any sort of argument that a domicile requirement could survive such scrutiny.  Instead, he asserts that strict scrutiny is inappropriate in this case for two reasons.   First, Bartlett argues that Mr. Osterweil's opening brief does "not cite to a single case supporting application of strict scrutiny, even with respect to the 'core' home self-defense component of the Second Amendment right."   Bartlett Br. 36.   Not so.   Citations to *Heller* and *McDonald*—Supreme Court cases demanding the application of strict scrutiny in this case if a level of scrutiny is needed—are plentiful in Mr. Osterweil's opening brief.   *Heller* and *McDonald* clearly establish that to the extent that levels-of-scrutiny analysis is necessary to resolve the question in this case, the scrutiny must be strict.  Osterweil Br. 17–30.  Moreover, the absence of citations to cases beyond *Heller* and *McDonald* only underscores the extreme nature of New York's denial of Second Amendment rights to part-time residents.

Bartlett's second, broader argument is that "strict scrutiny is not the appropriate standard of review even for regulations that substantially burden the 'core' Second Amendment right of self-defense in the home."  Bartlett Br. 37.  By Bartlett's lights, this conclusion is compelled by *Heller* because in Justice Breyer's *Heller* dissent he noted that the majority opinion rejects strict scrutiny "by broadly

19

approving a set of laws . . . whose constitutionality under a strict scrutiny standard would be far from clear." 554 U.S. at 688.

Bartlett makes at least two mistakes. First, he misapprehends the interaction between majority and dissenting opinions (both in the Supreme Court and courts more generally). The former are authoritative, the latter are not. Indeed, dissenting opinions are notorious for sometimes exaggerating the consequences of the majority and other times minimizing differences that are in fact significant. The best source for the meaning of a majority decision is the majority decision. And the Court's opinion in *Heller* squarely rejected the application of rational basis and intermediate scrutiny when Second Amendment rights are burdened. *Id.* at 628 n.27, 634. That means that neither level of scrutiny is appropriate. The fact that Justice Breyer, in dissent, suggests that the majority rejected the application of strict scrutiny reveals nothing more than the dissenters' opinion.

Second, Bartlett implicitly makes the same error as Justice Breyer. The fact that *Heller* listed some laws that may not offend the Second Amendment—such as laws banning the possession of firearms in sensitive places—does not undermine the application of strict scrutiny generally, let alone when it comes to regulations affecting possession in the home. *See Heller*, 554 U.S. at 626–27 & n.26. "The fact that strict scrutiny applies says nothing about the ultimate validity of any particular law," *Johnson v. California*, 543 U.S. 499, 515 (2005) (internal

20

Case 11 2420   Document 30   Page 25   04/109012   659586

quotation marks omitted), and thus anticipating in dictum that some laws will likely be valid says nothing about the applicability of strict scrutiny.

As the Court pointed out in *Heller* in rejecting Justice Breyer's "'interest-balancing' approach"—otherwise known as "intermediate scrutiny"—the Second Amendment right to bear arms is a fundamental right and there is "no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest balancing' approach." *Heller*, 554 U.S. at 634–35. This Court recently recognized the fundamental nature of the Second Amendment right in *Decastro*, stating that the Second Amendment right is a right that is "fundamental to our scheme of ordered liberty." 2012 WL 1959072, at *5. And "when government action impinges upon a fundamental right protected by the Constitution"—as it does here—strict scrutiny applies. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983).

Again, Bartlett does not engage in an analysis of how denying Mr. Osterweil's application for an in-home handgun license could possibly survive strict scrutiny. The justifications that Bartlett offers in making his intermediate scrutiny arguments make clear that it cannot. Bartlett contends that the domicile requirement is justified by two state interests. The first is New York's interest in protecting "the public safety" and preventing "handgun crime." Bartlett Br. 37. If protecting public safety and preventing handgun crime were interests sufficient to

21

allow the State to prevent in-home handgun possession, then the District of Columbia handgun ban would still be on the books. It is not. As *Heller* made clear, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." 554 U.S at 636. Banning handgun possession in the home in the name of public safety is one of them.

Next, citing this Court's decision in *Bach*, Bartlett contends that the State has an interest in "monitoring" its licensees sufficient to justify the restraint that New York law imposes on Mr. Osterweil's Second Amendment right. Bartlett Br. 40. But whatever validity that argument has in the context of an individual merely passing through a State, the possession of an in-state residence provides a basis for the imposition of all manner of state regulations and responsibilities that the state can sufficiently monitor. The State cannot simply throw up its hands and suggest the job becomes too difficult in a context when it implicates a fundamental constitutional right. Moreover, as argued in Mr. Osterweil's opening brief, the fact that New York allows domiciliaries who may spend little-to-no time in New York to obtain in-home handgun licenses critically undermines Bartlett's argument that the state has a substantial interest in withholding licenses from part-time residents. *See* Osterweil Br. 36–37. For this reason, New York's ban fails even intermediate scrutiny.

Perhaps in recognition of the weakness of these arguments as a general matter, Bartlett attempts to invoke the fact that Mr. Osterweil "has not provided fingerprints usable by the federal and state governments" as highlighting the importance of the State's monitoring interest as applied to Mr. Osterweil specifically. Bartlett Br. 41. That argument is misplaced. According to Bartlett himself, he denied Mr. Osterweil's request for a "license on the ground that Osterweil averred that he was not domiciled in New York." Bartlett Br. 2. Mr. Osterweil's worn fingerprints had nothing to do with the reason that his license application was ultimately denied and they have nothing to do with the case as it appears before this Court.

At the end of the day, whether it be because it is fatally inconsistent with *Heller* or because it cannot survive strict scrutiny (or even intermediate scrutiny), denying Mr. Osterweil a license to possess a handgun in his New York home violates the Second Amendment.[6]

## IV.   New York's Ban On In-Home Handgun Possession By Part-Time State Residents Violates The Equal Protection Clause.

New York's ban on in-home handgun possession is also constitutionally problematic because it treats similarly situated individuals differently, in violation

---

[6] Bartlett's effort to invoke rational basis review fails for all the reasons that his effort to recharacterize Mr. Osterweil's application for a premises license as limited to target-shooting and hunting fails. *See supra* pp. 11–16.

Case 1:2420   Document 30   Page 24   07/10/2012   065500   24

of the Equal Protection Clause. U.S. Const. amend. XIV, § 1. Here again, strict scrutiny applies: when the state draws distinctions as to who can and cannot exercise a fundamental right, those distinctions must further a compelling state interest. *See Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626–29 (1969). As explained, New York's proffered interest in protecting the public safety and monitoring its licensees is insufficient to justify restraining the exercise of a fundamental right. Therefore, New York's differential treatment of domiciliaries and part-time residents with respect to the exercise of that right violates the Equal Protection Clause.

In a manner similar to his shrugging off of strict scrutiny analysis, Bartlett does not seriously contend that the State has a compelling interest in treating Mr. Osterweil differently from his New York neighbors. Bartlett points out an obvious difference between Mr. Osterweil and New York domiciliaries: the domiciliaries are domiciled in New York and Mr. Osterweil is not. Bartlett Br. 42–43. But to state the difference is not to explain why it matters or what interest is sufficiently compelling to allow one group to exercise its fundamental constitutional rights and not the other.

Bartlett raises the same "fingerprints" canard in opposing Mr. Osterweil's equal protection challenge as he raised in support of the State's monitoring interest. Bartlett Br. 42. That argument is no more relevant here. Again, Bartlett confuses

24

the issue of the constitutional validity of the State's domicile requirement with the

other requirements that must be met for a domiciliary to obtain a license. The only

requirement at issue here is the State's domicile requirement and that requirement

runs afoul of the Equal Protection Clause.

## CONCLUSION

For the foregoing reasons, the Court should reverse the judgment below.

Respectfully submitted,

|  |  |
|---|---|
|  | /s/ Daniel L. Schmutter |
| Paul D. Clement | Daniel L. Schmutter |
| D. Zachary Hudson | GREENBAUM, ROWE, SMITH |
| BANCROFT PLLC | & DAVIS LLP |
| 1919 M St., N.W., Suite 470 | P.O. Box 5600 |
| Washington, D.C.  20036 | Woodbridge, NJ 07095 |
| Telephone: (202) 234-0900 | (732) 549-5600 |
| pclement@bancroftpllc.com | dschmutter@greenbaumlaw.com |

*Counsel for Plaintiff-Appellant*

July 10, 2012

25

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(B), the undersigned certifies that the brief complies with the applicable type-volume limitations. The brief contains 6,014 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This certificate relies upon Microsoft Word 2010's word count feature; the program used in drafting this brief. The brief complies with the typeface requirements for Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Words' word processing program in 14-point Times New Roman font.

Dated: July 10, 2012

/s/ Daniel L. Schmutter
Daniel L. Schmutter
GREENBAUM, ROWE, SMITH
  & DAVIS LLP
P.O. Box 5600
Woodbridge, NJ 07095
(732) 549-5600
dschmutter@greenbaumlaw.com

C . - 11-2429   Document 90   Page 32   07/10/2012   650580   32

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2012, I electronically filed with the Clerk's Office of the United States Court of Appeals for the Second Circuit this Reply Brief for Appellant Alfred G. Osterweil and further certify that the parties' counsel will be notified of, and receive, this filing through the Notice of Docket Activity generated by this electronic filing.

Dated: July 10, 2012

/s/ Daniel L. Schmutter
Daniel L. Schmutter
GREENBAUM, ROWE, SMITH
  & DAVIS LLP
P.O. Box 5600
Woodbridge, NJ 07095
(732) 549-5600
dschmutter@greenbaumlaw.com

# EXHIBIT E

11-2420
Osterweil v. Bartlett

## UNITED STATES COURT OF APPEALS
### For the Second Circuit

August Term, 2012

Argued: October 26, 2012          Decided: January 29, 2013

Docket No. 11-2420-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ALFRED G. OSTERWEIL,

Plaintiff-Appellant,

v.

GEORGE R. BARTLETT, III,

Defendant-Appellee.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Before: JACOBS, <u>Chief Judge</u>, WALKER, <u>Circuit Judge</u>, AND
O'CONNOR, <u>U.S. Supreme Court Justice (Ret.)</u>

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Part-time New York resident, who is not a domiciliary of the
State, appeals from the grant of summary judgment denying
injunctive relief from New York's statutory handgun licensing
requirement.  The United States District Court for the Northern
District of New York (D'Agostino, <u>J.</u>) concluded that the statute
limits the grant of handgun licenses to domiciliaries of the
State.  We hold that certification of this statute's
interpretation to the New York Court of Appeals is warranted.

Question Certified.

> PAUL D. CLEMENT, Bancroft PLLC,
> Washington, D.C. (D. Zachary
> Hudson, Bancroft PLLC, Washington,
> D.C.; Daniel L. Schmutter,
> Greenbaum, Rowe, Smith & Davis

1

LLP, Woodbridge, New Jersey, <u>on
the brief</u>), <u>for Plaintiff-
Appellant</u>.

SIMON HELLER, Assistant Solicitor
General, New York State Office of
the Attorney General, New York,
New York, <u>for Defendant-Appellee</u>.

<u>O'Connor, Supreme Court Justice (Ret.)</u>:  This case asks us
to evaluate the constitutionality of certain aspects of New
York's handgun licensing regime.  As we explain, we believe we
should not reach that question before certifying a predicate
question of state law to the New York Court of Appeals.

I

Appellant Alfred Osterweil applied for a handgun license in
May 2008.  Following the directions of New York Penal Law
§ 400.00(3)(a), he applied for a license "in the city or county
. . . where [he] resides."[1]  At that time, his house in Summit,
New York--part of Schoharie County--was still his primary
residence and domicile.  While his application was pending,
however, Osterweil moved his primary residence to Louisiana,
keeping his home in Summit as a part-time vacation residence.

---

[1] In relevant part, New York Penal Law § 400.00(a)(3)
provides that

> [a]pplications shall be made and renewed, in the case
> of a license to carry or possess a pistol or revolver,
> to the licensing officer in the city or county, as the
> case may be, where the applicant resides, is
> principally employed or has his principal place of
> business as merchant or storekeeper.

2

He then sent a letter to the Schoharie licensing authorities
inquiring whether this move made him ineligible for a license.
A46.  Shortly thereafter, in July 2008, Osterweil sent another
letter suggesting that if his change of domicile foiled his
license application, a constitutional problem would result.
A52-A53.  This second letter came after the United States
Supreme Court held in District of Columbia v. Heller, 544 U.S.
570 (2008), that the Second Amendment protects an individual
right to bear arms, and that the core of this right is the right
to self-defense in the home.

Osterweil's application was eventually forwarded to
appellee George Bartlett, a judge of the county court in
Schoharie and licensing officer for the county.  He interpreted
§ 400.00(3)(a)'s apparent residence requirement as a domicile
requirement, relying on a 1993 decision from New York's
Appellate Division, Third Department holding that, "as used in
this statute, the term residence is equivalent to domicile."
Mahoney v. Lewis, 199 A.2d 734, 735 (3d Dep't 1993).  Because
Osterweil "ha[d] candidly advised the Court that New York State
is not his primary residence and, thus not his domicile," Judge
Bartlett denied the license.  See A144.

Judge Bartlett further concluded that a domicile
requirement was constitutional under the Second Amendment, even
after Heller, because of the State's interest in monitoring its

3

handgun licensees to ensure their continuing fitness for the use of deadly weapons. A145-A149. He applied New York precedent suggesting that the State's licensing regime would not violate Heller "'so long as it is not enforced in an arbitrary and capricious manner.'" A150 (citation omitted). Osterweil could have sought review of that determination in the state courts by means of an Article 78 proceeding, see, e.g., Mahoney, 199 A.D.2d at 735, but he did not.[2]

Instead, he filed a federal suit alleging that New York's domicile requirement violated the Second and Fourteenth Amendments and seeking, among other remedies, an injunction ordering the State to give him a license. See A11.  The district court first determined that intermediate scrutiny was appropriate for the Second Amendment issue, and then held that a domicile requirement satisfied intermediate scrutiny because "the law allows the government to monitor its licensees more closely and better ensure the public safety." 819 F. Supp. 2d 72, 85 (N.D.N.Y. 2011).  It further held that New York's restrictions did not violate the Equal Protection Clause or any

---

[2] Judge Bartlett's decision appears to have been taken in an administrative capacity; in other cities or counties, this role is fulfilled by non-judicial personnel. Accordingly, the State has not argued that Judge Bartlett's denial of the license is a judicial decision with any preclusive effect in this litigation, and we deem any such argument forfeit.

4

other part of the Fourteenth Amendment. Id. at 86-90. It thus
granted summary judgment to the State.

On appeal to this Court, Osterweil maintains that a
domicile requirement for handgun ownership is unconstitutional.
The State's primary response, however, is that there is no
domicile requirement under New York law. It argues that New
York's highest court has never held that the law requires
domicile, that the text speaks only of residence, that the New
York Court of Appeals would likely apply only a residence
requirement as a matter of constitutional avoidance, and that if
the statute is construed as requiring only residence, "this
litigation would thereby be resolved." Appellee's Br. 23. It
thus urges that we certify the domicile-or-residence question to
the New York Court of Appeals, or apply Pullman abstention and
decline to decide the case at all. See R.R. Comm'n v. Pullman
Co., 312 U.S. 496 (1941). As discussed below, we agree that the
state-law issue that the State identifies is a predicate to a
serious constitutional question, and that certification is the
appropriate course.

II

Under Second Circuit Local Rule 27.2, we may certify to the
New York Court of Appeals "determinative questions of New York
law [that] are involved in a case pending before [us] for which
no controlling precedent of the Court of Appeals exists." See

5

<u>also</u> N.Y. Const. Art. 6, § 3(b)(9) & N.Y. Comp. Codes R. & Regs.
tit. 22, § 500.27(a). Before we certify such a question, we
must answer three others: "(1) whether the New York Court of
Appeals has addressed the issue and, if not, whether the
decisions of other New York courts permit us to predict how the
Court of Appeals would resolve it; (2) whether the question is
of importance to the state and may require value judgments and
public policy choices; and (3) whether the certified question is
determinative of a claim before us." <u>Barenboim v. Starbucks</u>
<u>Corp.</u>, 698 F.3d 104, 109 (2d Cir. 2012). Here, we answer each
in favor of certification.

First, it is clear that the New York Court of Appeals has
not answered the question before us. Neither party identifies a
decision of that Court interpreting the word "resides" in this
statute, or illuminating whether the Court would be likely to
impose a residence requirement or a domicile requirement.
Indeed, that Court has never held that this statute imposes even
a residence requirement. As the State noted at oral argument,
§ 400.00(3)(a) is phrased in the form of a procedural rule about
<u>where to file</u> to get a license, not a limitation on <u>who may get</u>
<u>one</u>.

Recourse to that Court's broader opinions regarding
residence requirements makes the water murkier, not clearer. It
has sometimes equated residence with domicile, and sometimes

6

not.[3]  Indeed, it has said that "[t]he sense in which these words

are used in a particular statute may depend upon the nature of

the subject-matter of the statute as well as the context in

which the words are used." Rawstorne v. Maguire, 192 N.E. 294,

295 (N.Y. 1934); see also id. ("We are told that the Legislature

used the words 'residing within the State' as synonymous with

'domiciled within the State.'  Doubtless such words are

frequently used . . . as if they had the same meaning, but they

are not identical . . . ."). Thus, the New York Court of

Appeals has not told us how to interpret this particular

statute, and has clarified only that the question we face is one

of judgment that involves interpreting the intent of the state

legislature. Id. That job is surely best left to the state

courts, especially when they "'stand willing to address

questions of state law on certification from a federal court.'"

Arizonans for Official English v. Ariz., 520 U.S. 43, 79 (1997)

(quoting Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 510

(1985) (O'Connor, J., concurring)).

---

[3] Compare, e.g., People v. Platt, 22 N.E. 937, 938 (N.Y.
1889) (in statute listing qualifications for political office,
residence means domicile); with Rawstorne v. Maguire, 192 N.E.
294, 295 (N.Y. 1934) (refusing to "limit the provisions for
substituted service upon persons 'residing within the State' to
those who not only reside, but are domiciled here"); see also
Matter of Contento v. Kohinke, 42 A.D.2d 1025, 1025 (N.Y. 3d
Dep't 1973) ("[T]he term 'reside' (or 'residence') is not one
that can be given a uniform definition wherever it appears in
legislation, but must be construed in relationship to the
particular statute involved.").

Of course, we need not certify a question when we can

"'predict how the highest court of the forum state would resolve

the uncertainty or ambiguity.'" State Farm Mut. Auto. Ins. Co.

v. Mallela, 372 F.3d 500, 505 (2d Cir. 2004) (quoting Travelers

Ins. Co. v. 633 Third Assocs., 14 F.3d 114, 119 (2d Cir. 1994)).

Here, the language is plain, the State itself urges that

§ 400.00(3)(a) imposes only a residence requirement, and a

serious constitutional controversy results from any other view,

see infra at 11.  Yet we think it best here to resist the

State's invitation to construe the statute ourselves.  See

Appellee's Br. 5 n.2.  We have said that it is appropriate to

predict what the New York Court of Appeals will do from "the

decisions of other New York courts," Barenboim, 698 F.3d at 109

(emphasis added), not based on our instinct that the Court of

Appeals will find those courts' decisions unconvincing or

overcome by events.  For us to adopt an anticipated construction

of a state statute based on our own reading of the text and the

current constitutional landscape would put state officials like

Judge Bartlett in a particularly hard spot in the next case,

uncertain whether to follow the binding decision of the Third

Department in Mahoney or the all-fours decision of a federal

circuit court.  Indeed, any ruling we might make on this state

law question would not be binding on New York state courts and

thus has the potential for sowing confusion.  See, e.g., Oneida

8

Indian Nation of N.Y. v. Pifer, 43 A.D.3d 579, 581 (3d Dep't 2007) ("Federal court rulings on issues of state law are not binding on state courts") (citing In re 1616 Second Ave. Rest., 550 N.E.2d 910, 913 (N.Y. 1990)). One of the chief virtues of certification is that it avoids such pitfalls.

Next, we ask whether the question "is of importance to the state" and whether it is the kind of question that "may require value judgments and public policy choices." Barenboim, 698 F.3d at 109. It certainly is, and it certainly does. The regulation of firearms is a paramount issue of public safety, and recent events in this circuit are a sad reminder that firearms are dangerous in the wrong hands. See James Barron, Gunman Massacres 20 Children at School in Connecticut; 28 Dead, Including Killer, N.Y. Times, Dec. 15, 2012, at A1. Questions like the one before us require a delicate balance between individual rights and the public interest, and federal courts should avoid interfering with or evaluating that balance until it has been definitively struck. Moreover, the New York Court of Appeals has made clear that the question whether to read "residence" as requiring residence or domicile requires interpretation of the value and policy judgments of the state legislature. This is accordingly an area of state concern in which the principles of cooperative federalism hold greatest sway.

9

Finally, we ask whether the state-law question is dispositive. We certify here on the understanding that it is. The State has represented that, if "resides" in § 400.00(3)(a) means only resides and does not also mean domicile, then Osterweil would meet this requirement and "this litigation would thereby be resolved." Appellee's Br. 23. Of course, it is possible that the Court of Appeals will say that the word "resides" in § 400.00(a)(3) imposes some other requirement akin to domicile that is a barrier to Osterweil's license. It would then remain for us to decide the constitutional question, but even then we benefit from certification because "construction by the state judiciary . . . might . . . at least materially change the nature of the problem." Bellotti v. Baird, 428 U.S. 132, 147 (1976) (quotation marks omitted).

### III

Notwithstanding that certification gives him an extra chance to get his license, Osterweil prefers that we stick with Mahoney's domicile-only rule and evaluate its constitutionality. He argues that an important federal constitutional right is at stake, that certification will engender needless delay, and that the presence of an issue of constitutional avoidance will actually exacerbate state federal tension by having both a state court and a federal court opine on a constitutional question in the same case. We find these arguments unconvincing.

10

To begin, we agree with both parties that there is a
serious constitutional question in this case.  This Court has
recently held that "Second Amendment guarantees are at their
zenith within the home," Kachalsky v. County of Westchester, 701
F.3d 81, 89 (2d Cir. 2012), and a domicile requirement will
operate much like the bans struck down in Heller and McDonald v.
Chicago, 130 S. Ct. 3020 (2010), for part-time New York
residents whose permanent homes are elsewhere.  At the same
time, this Court has acknowledged that the ground opened by
Heller and McDonald is a "vast 'terra incognita'" that "has
troubled courts since Heller was decided."  Kachalsky, 701 F.3d
at 89 (quoting United States v. Masciandaro, 638 F.3d 458, 475
(4th Cir. 2011) (Wilkinson, J.)).  It is open to Osterweil to
make his domicile in New York, so even a domicile requirement
may not be the kind of absolute ban that the U.S. Supreme Court
has already addressed, and some regulation of itinerant handguns
is clearly valid.  See Kachalsky, 701 F.3d at 100 ("[E]xtensive
state regulation of handguns has never been considered
incompatible with the Second Amendment or, for that matter, the
common-law right to self-defense.").  Thus, we would confront a
serious and very difficult question of federal constitutional
law if required to evaluate a domicile requirement.

The presence of a serious constitutional question is a good
reason to certify, however, not a reason to race ahead.  The

11

Supreme Court has made clear that certification is the
appropriate course when a narrowing construction of state law
that avoids the federal question is possible--even, and perhaps
especially, when important federal rights are at stake.
Arizonans, 520 U.S. at 78; Bellotti, 428 U.S. at 147
(certification is appropriate where the "state statute is
susceptible of a construction by the state judiciary 'which
might avoid in whole or in part the necessity for federal
constitutional adjudication.'") (quoting Harrison v. NAACP, 360
U.S. 167, 177 (1959)).  In so doing, the Court has "[w]arn[ed]
against premature adjudication of constitutional questions . . .
when a federal court is asked to invalidate a State's law, for
the federal tribunal risks friction-generating error when it
endeavors to construe a novel state Act not yet reviewed by the
State's highest court." Arizonans, 520 U.S. at 79.  The
prospect of disagreement over the seriousness of a
constitutional question is always present when a federal court
certifies in a case like this one, but this has always led the
Supreme Court to counsel in favor of certification, not against
it. Osterweil cites no case from the Supreme Court, this Court,
or any other, where certification was disapproved because a
state court might take a different view of a federal
constitutional question in adopting a limiting construction or
in refusing to do so.

12

As for timing, while some delay from certification is inevitable, the State has assured us that it will seek to expedite the process.  Moreover, Pullman abstention--the other course available here--would take even longer.  As a case that involves "unsettled state law issues . . . preliminary to consideration of a federal constitutional question," this case falls within the heartland of Pullman abstention.  See Hart & Wechsler, The Federal Courts & The Federal System 1062-1063 (6th ed. 2009) (collecting cases); Pullman, 312 U.S. at 499-501. Certification now "covers territory once dominated by . . . Pullman abstention" precisely because it "allows a federal court faced with a novel state-law question to put the question directly to the State's highest court, reducing the delay, cutting the cost, and increasing the assurance of gaining an authoritative response."  Arizonans, 520 U.S. at 75.  Yet given that Pullman abstention would have been appropriate before certification, and that certification is far faster and more convenient for all involved, we have less cause for concern over delay.

Finding that certification is appropriate, we therefore certify the following question to the New York Court of Appeals:

> Is an applicant who owns a part-time residence in New
> York but makes his permanent domicile elsewhere
> eligible for a New York handgun license in the city or
> county where his part-time residence is located?

13

The New York Court of Appeals may, of course, reformulate or expand upon this question as it deems appropriate.

It is hereby **ORDERED** that the Clerk of the Court transmit to the Clerk of the New York Court of Appeals a certificate in the form attached, together with a copy of this opinion and a complete set of the briefs, appendices, and record filed by the parties in this Court. This panel will retain jurisdiction to decide the case once we have had the benefit of the views of the New York Court of Appeals or once that court declines to accept certification. Finally, we order the parties to bear equally any fees and costs that may be requested by the New York Court of Appeals.

## CERTIFICATE

The following question is hereby certified to the New York Court of Appeals pursuant to Second Circuit Local Rule 27.2 and New York Compilation of Codes, Rules and Regulations, title 22, section 500.27(a), as ordered by the United States Court of Appeals for the Second Circuit:

> Is an applicant who owns a part-time residence in New York but makes his permanent domicile elsewhere eligible for a New York handgun license in the city or county where his part-time residence is located?

=================================================================
This memorandum is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------
No. 119
Alfred G. Osterweil,
            Appellant,
        v.
George R. Bartlett, III,
            Respondent.


            Daniel Louis Schmutter, for appellant.
            Francis A. Brady, III, for respondent.




    *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *


Certification of a question by the United States Court of Appeals
for the Second Circuit, pursuant to section 500.27 of this
Court's Rules of Practice, accepted and the issues presented are
to be considered after briefing and argument.  Chief Judge
Lippman and Judges Graffeo, Read, Smith, Pigott and Rivera
concur.

Decided February 19, 2013

# EXHIBIT F

*To be Argued by:*
PAUL D. CLEMENT
*(Time Requested: 10 Minutes)*

Appeal No. CTQ-2013-00001

# Court of Appeals

*of the*

# State of New York

ALFRED G. OSTERWEIL,

*Appellant,*

– against –

GEORGE R. BARTLETT, III, in his Official capacity as Licensing Officer
in the County of Schoharie,

*Respondent.*

ON APPEAL FROM THE QUESTION CERTIFIED BY THE UNITED STATES
COURT OF APPEALS FOR THE SECOND CIRCUIT IN DOCKET NO. 11-2420-CV

## BRIEF FOR APPELLANT

DANIEL L. SCHMUTTER
GREENBAUM, ROWE, SMITH
    & DAVIS LLP
P.O. Box 5600
Woodbridge, New Jersey 07095
Tel.: (732) 549-5600
Fax: (732) 549-1881

– and –

PAUL D. CLEMENT
D. ZACHARY HUDSON
BANCROFT PLLC
1919 M Street, NW, Suite 470
Washington, DC 20036
Tel.: (202) 234-0090
Fax: (202) 234-2806

*Attorneys for Appellant*

Date Completed: May 7, 2013

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

JURISDICTIONAL STATEMENT ........................................................................... 1

PRELIMINARY STATEMENT ............................................................................... 2

STATEMENT OF FACTS ....................................................................................... 4

SUMMARY OF ARGUMENT ............................................................................... 11

ARGUMENT ......................................................................................................... 13

I.    A Ban On Home Handgun Possession By Part-Time State
      Residents Violates The Second Amendment. ............................................... 13

      A.    A Ban On Home Handgun Possession By Part-Time State
            Residents Prevents The Exercise Of The Core Right
            Identified In *Heller* And Is Thus Unconstitutional. ........................... 14

      B.    A Ban On Home Handgun Possession By Part-Time State
            Residents Fails Under Any Arguably Applicable Standard of
            Scrutiny. ............................................................................................... 17

II.   A Ban On Home Handgun Possession By Part-Time State
      Residents Violates The Equal Protection Clause. ........................................ 26

III.  This Court Should Construe New York Law Governing Home
      Handgun Possession As Not Requiring Domicile. ....................................... 29

CONCLUSION ...................................................................................................... 31

# TABLE OF AUTHORITIES

## Cases

*Alliance of Am. Insurers v. Chu*,
    77 N.Y.2d 573 (Ct. App. 1991) ...................................................................30

*Anonymous v. City of Rochester*,
    13 N.Y.3d 35 (Ct. App. 2009) .....................................................................19

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004)....................................................................................19

*Bach v. Pataki*,
    408 F.3d 75 (2d Cir. 2005) ..........................................................................21

*Carey v. Brown*,
    447 U.S. 455 (1980)....................................................................................22

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)....................................................................................27

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)............................................................................. *passim*

*Eu v. S.F. Cnty. Democratic Cent. Comm.*,
    489 U.S. 214 (1989)....................................................................................19

*Fla. Star v. B.J.F.*,
    491 U.S. 524 (1989)....................................................................................22

*Florida v. Jardines*,
    No. 11-564 (U.S. Mar. 26, 2013)..................................................................26

*Harper v. Va. Bd. of Elections*,
    383 U.S. 663 (1966)....................................................................................27

*Hernandez v. Robles*,
    7 N.Y.3d 338 (Ct. App. 2006) .....................................................................19

*In re Mahoney v. Lewis*,
    605 N.Y.S.2d 168 (App. Div., 3d Dep't 1993) ...............................................7

*Kachalsky v. Cnty. of Westchester*,
    701 F.3d 81 (2d Cir. 2012) ................................................................ 18, 22, 24

*Longwood Central School District v. Springs Union Free School District*,
    1 N.Y.3d 385 (Ct. App. 2004) ........................................................................30

*Matter of Contento v. Kohinke*,
    42 A.D.2d 1025 (App. Div., 3d Dep't 1973)..................................................30

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010) ..................................... *passim*

*People v. Abdullah*,
    870 N.Y.S.2d 886 (Crim. Ct., Kings County 2008) ........................................2

*People v. Bounasri*,
    915 N.Y.2d 921 (Rochester City Ct. 2011) ............................................ 19, 28

*People v. Perkins*,
    880 N.Y.S.2d 209 (App. Div., 3d Dep't 2009) ...................................... 13, 17

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
    460 U.S. 37 (1983)..........................................................................................19

*Plyler v. Doe*,
    457 U.S. 202, 212 (1982) ...............................................................................26

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973)............................................................................................19

*State of New York v. Collins*,
    435 N.Y.S.2d 161 (App. Div., 3d Dep't 1981) ................................................7

*Ullman v. United States*,
    350 U.S. 422 (1956)........................................................................................25

*United States v. Decastro*,
    682 F.3d 160 (2d Cir. 2012) ..........................................................................18

*United States v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000)........................................................................................20

*Valley Forge Christian Coll.*
   *v. Americans United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982)........................................................................................25

## Constitutional Provisions

U.S. Const. amend. II ......................................................................................... *passim*

U.S. Const. amend. XIV ..................................................................................26, 27

## Statutes

28 U.S.C. § 1291 ..............................................................................................1

28 U.S.C. § 1294 ..............................................................................................1

28 U.S.C. § 1331 ..............................................................................................1

42 U.S.C. § 1983 ...........................................................................................1, 8

N.Y. Civil Rights Law, art. 2, § 4 .........................................................................13

N.Y. Penal Law § 261.01(5) .................................................................................28

N.Y. Penal Law § 265.00(10) ...............................................................................5

N.Y. Penal Law § 265.01(1) .................................................................................5

N.Y. Penal Law § 265.02(4) .................................................................................5

N.Y. Penal Law § 265.20.....................................................................................5

N.Y. Penal Law § 400.00 ..............................................................................*passim*

## JURISDICTIONAL STATEMENT

This case was originally filed pro se in the United States District Court for the Northern District of New York on July 21, 2009. A7. The District Court had subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as it involved claims arising under 42 U.S.C. § 1983 and the Constitution. On May 20, 2011, the District Court entered a final judgment disposing of all claims. A180; *see* A151. Plaintiff-Appellant filed a timely notice of appeal on June 13, 2011. A181. The United States Court of Appeals for the Second Circuit had appellate jurisdiction pursuant to 28 U.S.C. §§ 1291 & 1294. The Second Circuit certified one question to the New York Court of Appeals pursuant to New York Court of Appeals Rule 500.27 and Second Circuit Rule 27.2:

> Is an applicant who owns a part-time residence in New York but makes his permanent domicile elsewhere eligible for a New York handgun license in the city or county where his part-time residence is located?

A197. This Court accepted the certified question on February 19, 2013. A198.

## PRELIMINARY STATEMENT

The Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), marked a watershed moment in Second Amendment jurisprudence. Resolving a question that had been the subject of ongoing debate for the better part of a century, the Court concluded that the text, structure, and history of the Second Amendment confirm that it "confer[s] an individual right to keep and bear arms." *Id.* at 595. Two years later, the Court made clear in *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3026 (2010), that this individual right is a fundamental one that applies with full force to the States.

Given that *Heller*'s holding was contrary to the law that had governed most of the Nation, including the State of New York, see *People v. Abdullah*, 870 N.Y.S.2d 886 (Crim. Ct., Kings County 2008), one would have expected to see states and municipalities respond by examining their laws to determine whether they were consistent with the fundamental individual right the Supreme Court recognized. Instead, many states have doubled down. The nearly five years since *Heller* was decided have been marked by intransigence if not outright defiance of the Court's decision. States continue to enforce pre-*Heller* regulatory regimes, premised on the mistaken belief that the Second Amendment does not protect an individual right, as if nothing happened.

2

The State of New York's conduct in this litigation is a prime example. Appellant Alfred G. Osterweil ("Mr. Osterweil") was denied a license to keep a handgun in his New York home because he is a part-time resident of the State. Although *Heller* came down before his permit request was denied and *McDonald* issued during the District Court proceedings, the State steadfastly maintained that those decisions did not change the reality that, as a part-time resident, Mr. Osterweil had no right to possess a handgun for defense of his home. Indeed, while Mr. Osterweil litigated pro se in federal district court, New York was quite happy to fight tooth and nail for a ban on home handgun possession by part-time New York residents despite the lack of cogent basis to distinguish *Heller*. Only after Mr. Osterweil retained counsel on appeal did New York begrudgingly recognize some tension between the denial of Mr. Osterweil's permit and *Heller*'s teaching that the core purpose of the Second Amendment right is to allow "law-abiding, responsible citizens to use arms in defense of hearth and home" where the need for self-defense "is most acute." 554 U.S. at 628, 635.

Even then, however, the State of New York did not simply concede that the Second Amendment and a ban on issuing licenses to part-time residents were fundamentally incompatible. Instead, the State continued to defend a policy banning premises licenses for part-time residents, while suggesting that certification to this Court would be appropriate. The time has come for this Court

3

to make clear what should have been obvious the day *McDonald* confirmed that *Heller* was fully applicable to the laws of New York: a ban on part-time residents' possession of handguns for defense of hearth and home is fundamentally incompatible with *Heller* and the Second Amendment. New York statutory law, which speaks of residence and not domicile, does not compel a contrary view and thus must be interpreted consistently with the Second Amendment.

## STATEMENT OF FACTS

Mr. Osterweil is a retired attorney who previously served in the U.S. Army. A108. For a number of years, Mr. Osterweil lived with his family full-time on a 21-acre plot of land in Schoharie County in Summit, New York. A15. While in Schoharie, Mr. Osterweil served as a commissioner on the Summit Fire District Board of Commissioners and as an unpaid member of the Board of Directors of the Western Catskills Revitalization Corporation. After he retired, he decided to split his time between New York and Louisiana. He now spends the majority of his time in Louisiana and is domiciled there. Mr. Osterweil keeps a .22-caliber revolver in his Louisiana home for purposes of self-defense. A109, A110.

On May 21, 2008, Mr. Osterweil applied to Schoharie County officials for a New York State pistol license pursuant to N.Y. Penal Law § 400.00(2)(a), without which he may not lawfully possess a handgun in his home under New York law.

4

A7; A25 ¶ 2.[1]  To obtain a license, an applicant must meet several requirements. The licensing process begins with the submission of an application to the local licensing officer.[2]  § 400.00(3).  The applicant must be over 21 years of age, of good moral character, not have a history of crime or mental illness, and there must not exist any other "good cause" for denying the license.  § 400.00(1).  The application triggers a local investigation probing the applicant's mental health and criminal history, moral character, and, in some circumstances, whether there is a "need" for the requested license.  § 400.00(2).  The investigating authority also takes the applicant's fingerprints and uses that information to check for criminal history through the New York State Division of Criminal Justice Services ("DCJS"), the National Crime Information Center ("NCIC"), and the Federal Bureau of Investigation. *See id*; A57. The New York licensing law also states that an application for "a license to carry or possess a pistol or revolver" "shall be made . . . to the licensing officer in the city or county . . . where the applicant resides, is

---

[1] As this Court is well aware, New York law imposes a general ban on handgun possession. N.Y. Penal Law §§ 265.01(1), 265.02(4), 265.20. In order to legally possess a handgun, one must qualify for an enumerated statutory exemption from that prohibition. Having a § 400.00(2)(a) license provides such an exemption.

[2] The identity of the licensing officer varies from place to place under New York law. In many places, the licensing officer is the state "judge or justice of a court of record having his office in the county of issuance." § 265.00(10). In some instances, the police commissioner or sheriff plays the role. *Id.*

5

principally employed or has his principal place of business as merchant or storekeeper." § 400.00(3)(a).

Mr. Osterweil's home-handgun license application set this statutory machinery in motion. The Schoharie County Sheriff initiated the required investigation. A25 ¶ 3. He verified the information set forth in Mr. Osterweil's application, contacted his references, conducted a background check using state information resources and the NCIC, and obtained and submitted Mr. Osterweil's fingerprints to the DCJS and the FBI. A25 ¶ 3.

On June 24, 2008, the Sheriff sent a letter to Mr. Osterweil informing him that he needed to come to the Sheriff's office "to correct and/or complete some information" on his application. A25–A26 ¶ 4. In a letter sent on June 25, 2008, Mr. Osterweil informed the Sheriff that since the time he had submitted his original permit application he had purchased a home in Louisiana that he intended to use as his primary residence, and that he would now use his Schoharie residence for only part of the year. A26 ¶ 5. The letter inquired whether under such circumstances Mr. Osterweil was still eligible for a permit. A26 ¶ 5.

On February 18, 2009, the Sheriff informed Mr. Osterweil that he was forwarding his application to Bartlett. A27 ¶ 13. As relevant here, in a February 20, 2009 letter, Bartlett informed Mr. Osterweil that his non-resident status would likely prevent the issuance of a home handgun license. A27 ¶ 14.

6

After several exchanges between Mr. Osterweil and Bartlett, Bartlett issued a decision on May 29, 2009, denying Mr. Osterweil's request for a pistol permit. A134 (Exh. 21). Bartlett concluded that pistol permits may not be issued to "non-residents," and that Mr. Osterweil was a "non-resident" under New York law. A143–A144 & n.2. That conclusion was primarily based on Bartlett's application of *In re Mahoney v. Lewis*, 605 N.Y.S.2d 168 (App. Div., 3d Dep't 1993), which held that § 400.00(3) requires that an individual be a New York domiciliary to be eligible for a handgun license. *See id.* at 168–69 ("we expressly have held that 'where a statute prescribes "residence" as a qualification for a privilege or the enjoyment of a benefit, the word is equivalent to "domicile"'" (quoting *State of New York v. Collins*, 435 N.Y.S.2d 161, 162 (App. Div., 3d Dep't 1981)). Bartlett further determined that New York's domicile requirement was consistent with *Heller*. A145–A150.

Bartlett never concluded that Mr. Osterweil lacked the necessary character or qualifications to obtain a home handgun license. The license denial was predicated entirely on the conclusion that Mr. Osterweil is domiciled in Louisiana and therefore is not a New York resident, notwithstanding that Mr. Osterweil owns a home in New York and lives there part of the year with his wife, that he has family in Summit, and that Mr. Osterweil and his wife have participated and continue to participate in social, political, and community affairs in Schoharie

7

County, including remaining as dues-paying members of the Summit Snow Riders, a local social group, and the Summit Conservation Club. A123.

Mr. Osterweil, proceeding pro se, filed suit pursuant to 42 U.S.C. § 1983 against Bartlett, David A. Patterson, then Governor of the State of New York, and Andrew M. Cuomo, then Attorney General of the State of New York. A7–A8. Bartlett and his co-defendants were represented by the New York State Department of Law and the Office of the Attorney General of the State of New York. As relevant here, Mr. Osterweil's complaint alleged that the defendants denied him his fundamental Second Amendment right to keep and bear arms by denying his license request based on his part-time resident status and that this denial ran afoul of the Equal Protection Clause. A10–A11.

After the defendants other than Bartlett were dismissed from the suit, A200, both Mr. Osterweil and Bartlett moved for summary judgment.[3] A14, A22. The New York Attorney General's Office argued that *Heller* and *McDonald* did not call into question state law "limiting its residency-based permits to domiciliaries" and that limiting home handgun possession to domiciliaries was consistent with "long-standing New York precedent." A219–A220 (citing *Mahoney*). The New York Attorney General's Office told the federal court that Mr. Osterweil's

---

[3] Mr. Osterweil's Second Amendment claims were initially dismissed. He filed a motion for reconsideration after the Supreme Court issued its decision in *McDonald*, and Mr. Osterweil's Second Amendment claims were reinstated.

8

contention that the Second Amendment protected his right to keep a handgun in his

New York home was predicated on a misreading of *Heller* and *McDonald*. A218.

The District Court was convinced by New York's arguments and ruled against Mr.

Osterweil, holding that limiting home handgun licenses to domiciliaries did not

violate the Second Amendment or the Equal Protection Clause. A164–A172.

Mr. Osterweil retained counsel and appealed the District Court's denial of

his constitutional rights. Just eight days before New York's brief was due to the

Second Circuit (and a full 83 days after Mr. Osterweil's attorneys filed their

opening brief) New York filed a motion asking the Second Circuit to certify the

following question to this Court: "Does the applicant residency requirement in

New York's pistol permit statute, N.Y. Penal Law § 400.00(3), require not merely

residency but domicile in the State of New York?" A254. In sharp contrast to the

views it expressed in federal district court, New York opined that "[f]ollowing the

Supreme Court's recent and dramatic shift in Second Amendment jurisprudence,

there is reason to question whether the Court of Appeals would" conclude that

New York law requires domicile as a precondition for a home handgun license.

A251; *see* A236 (Bartlett Affirmation admitting that the "continuing vitality" of

New York precedent "requir[ing] not merely residence but domicile" to be eligible

for a handgun license "has been cast in doubt by subsequent Supreme Court

jurisprudence"). After that motion was referred to the merits panel, New York

9

reiterated its view that a domicile requirement was constitutionally suspect in its brief on the merits and again requested certification. *See* A264 (admitting that the Second Amendment right likely extends to protect home handgun possession for "individuals who reside in New York seasonally and are domiciled elsewhere"); A188 (noting New York's argument in the Second Circuit "that the New York Court of Appeals would likely apply only a residence requirement" in light of *Heller* and *McDonald*). At the same time, however, New York also argued—in seeming conflict with the premise of its request for certification—that a domicile requirement would be constitutional under intermediate scrutiny.

Despite the ongoing denial of Mr. Osterweil's constitutional rights, the Second Circuit certified the following question to this Court:

> Is an applicant who owns a part-time residence in New York but makes his permanent domicile elsewhere eligible for a New York handgun license in the city or county where his part-time residence is located?

A197. This Court accepted the certified question. A198.[4]

---

[4] New York represented to the Second Circuit that Mr. Osterweil's Second Amendment right to protect his New York home, which has now been continuously violated for nearly *five years*, would not be affected by certification as he only uses his New York home in the summer and the matter would be resolved before the summer of 2013. A285. As Mr. Osterweil's reply brief is not even due until June 25, 2013—and as Mr. Osterweil pointed out in response to the State's flawed contention, *see* A317–A318 ("it is optimistic to think that this case will come to a close before summer 2013" if certification occurs)—New York was obviously wrong. In all events, we respectfully request that this Court expedite consideration of this matter in light of the ongoing denial of Mr. Osterweil's

## SUMMARY OF ARGUMENT

Mr. Osterweil applied for a license to possess a handgun in his New York home nearly five years ago. Bartlett's denial of that request, which was defended by the State of New York and signed off on by a federal district court, was predicated on the view that N.Y. Penal Law § 400.00(3) prohibits home handgun possession by part-time New York residents not domiciled in New York. Bartlett, New York, and the District Court all should have known better: a categorical ban on home handgun possession by part-time residents directly conflicts with the Second Amendment right to keep and bear arms and the guarantee of equal protection under the law.

*Heller* made clear that the Second Amendment protects individual rights as a general matter and the right to keep and bear a handgun for self-protection in the home in particular. *McDonald* recognized that the right protected by the Second Amendment is not just an individual one, but a fundamental right protected against intrusion from state and local governments. Those decisions make clear that the policy applied by the state official here—a ban on home handgun possession by part-time residents—is indefensible. Not one word in either decision suggests that the Second Amendment is a part-time right such that a lawful, but not full-year, resident may be denied an ability to possess a handgun in the home.

Second Amendment rights based on what the State all but concedes is a misconstruction of New York law.

11

As Justice O'Connor recognized in her opinion certifying the question to this Court, a ban on home handgun possession by part-time residents is tantamount to a complete prohibition of the exercise of the core right protected by the Second Amendment. A domicile requirement effectively eviscerates the right of part-time residents to defend their New York homes using handguns. Such a ban—which mirrors the ban struck down in *Heller*—cannot stand. Defense of home is not less vital or constitutionally protected when the hearth is only fired up during a part of the year. If anything, the constitutional right is more vital for part-time residents because part-time residences tend to be more rural and the absence of full-time occupants can make them attractive targets for criminal activity.

*Heller* leaves no doubt that a ban like that imposed on Mr. Osterweil violates the Second Amendment under any level of scrutiny; it is simply antithetical to the constitutional right. Given the State's track record it is unclear exactly what interests it will assert in this Court. The ones it has trotted out to this point fail to justify a categorical ban on home handgun possession by part-time residents. An interest in monitoring licensees cannot justify such a severe restriction on a fundamental right. And a generic interest in public safety and crime prevention cannot justify an absolute ban. If it could, the law struck down in *Heller* would still be in force.

12

Were that not enough, a ban on home handgun possession by part-time residents runs afoul of the Equal Protection Clause. Part-time residents like Mr. Osterweil have just as much of a right to protect their hearth and home as their full-time resident neighbors. Indeed, the part-time nature of Mr. Osterweil's residence may make his need for home handgun possession when he is in-residence even greater.

In sum, the ban on part-time residents' possession of handguns for self-protection in the home applied by the state official is fundamentally incompatible with the Second Amendment and *Heller*. New York law, which speaks only of residence, not domicile, does not compel this clearly unconstitutional result. The certified question should be answered in the affirmative.

## ARGUMENT

## I.   A Ban On Home Handgun Possession By Part-Time State Residents Violates The Second Amendment.

The Second Amendment provides that "A well regulated militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II; *see* N.Y. Civil Rights Law, art. 2, § 4 ("A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms cannot be infringed."); *People v. Perkins*, 880 N.Y.S.2d 209, 210 (App. Div., 3d Dep't 2009) (a violation of the Second Amendment is "by extension" a violation of Civil Rights Law § 4). In

13

*District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court recognized that the Second Amendment protects the fundamental right of "law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 628. And in *McDonald v. Chicago*, 130 S. Ct. 3020, 3021, 3050 (2010), the Court concluded that "the Second Amendment right recognized in *Heller*" was a fundamental right that was fully applicable to the States. Those two precedents taken together make it crystal clear that a complete ban on home handgun possession by part-time residents like that applied to Mr. Osterweil is unconstitutional.

## A. A Ban On Home Handgun Possession By Part-Time State Residents Prevents The Exercise Of The Core Right Identified In *Heller* And Is Thus Unconstitutional.

A complete ban on home handgun possession by part-time New York residents cannot be squared with *Heller*. *Heller* held that the District of Columbia's ban on handgun possession in the home violated the Second Amendment. *Heller*, 554 U.S. at 635. In so doing, the Court stated that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation," and that the core purpose of the right is to allow "law-abiding, responsible citizens to use arms in defense of hearth and home" where the need for self-defense "is most acute." *Id.* at 592, 628, 635. "[H]andguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id.* at 629.

14

The proscription applied to Mr. Osterweil is limited to part-year residents, but it is no less categorical or severe than the ban struck down in *Heller*. As Justice O'Connor's opinion certifying the question to this Court recognized, "a domicile requirement will operate much like the bans struck down in *Heller* and *McDonald* . . . for part-time New York residents whose permanent homes are elsewhere." A194. Such a requirement prohibits an entire class of law-abiding individuals who would otherwise be able to possess handguns in their homes "for the core lawful purpose of self-defense" from doing so based on the bare fact that they are not domiciled in New York. *Heller*, 554 U.S. at 630. But neither the Second Amendment nor *Heller* draws a distinction between part-time and full-time residents. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense in the home." *Heller*, 554 U.S. at 636; *see McDonald*, 130 S. Ct. at 3044 ("[T]he Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home."); *id.* at 3048 (The right to keep and bear arms is "valued because the possession of firearms [i]s thought to be essential for self-defense.").

There is no reason to think that the part-time nature of Mr. Osterweil's occupancy of his New York home should impact the calculus. The Second Amendment is not a second-class right, nor is it a part-time one. An individual

15

living part-time in a home has no less need for self-protection and, in fact, may have an even greater need for protection when in-residence. Second homes are often more rural than primary residences, and the fact that such homes are not constantly inhabited can make them attractive targets for criminal activity.

The scope of Mr. Osterweil's Second Amendment right to defend his hearth and home cannot be eviscerated by an arbitrary temporal distinction. *Heller* did not base its holding on how many months out of the year a person lives in his home, where he is registered to vote, or where he has his driver's license. As explained in *Heller*, and reaffirmed in *McDonald*, the right to keep and bear arms arises from the fundamental right of self-defense, which is most critical in the home. The fundamental right of self-defense is no less acute because one has more than one home, or spends less than twelve months per year in one's home. Those likely to cause a confrontation or illegally enter a home will be neither impressed nor deterred by the part-time nature of a person's occupancy.

Lest there be any doubt, a domicile requirement is quite unlike the "longstanding prohibitions on the possession of firearms" that the *Heller* Court suggested might be acceptable, such as bans on the possession of firearms by felons, the mentally ill, and minors, as well as "laws forbidding the carrying of firearms in sensitive places," "or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626–27. Nor would a domicile

16

requirement reflect an effort to defer to the licensing decision of another state, whether positive or negative. Under the ban applied to Mr. Osterweil, a part-time resident fully licensed in his state of domicile still would not be able to lawfully possess a handgun in his New York home.[5]

The Second Amendment right, especially when it comes to self-defense in the home, is fundamental; it is not a seasonal right that can be denied during the summer, or limited to full-year residents. The Supreme Court has made clear that any law that categorically bans the possession of handguns in the home is unconstitutional. That is exactly what the law at issue here, as interpreted and applied to Mr. Osterweil during the last five years, does and it is thus unconstitutional.

**B.    A Ban On Home Handgun Possession By Part-Time State Residents Fails Under Any Arguably Applicable Standard of Scrutiny.**

*Heller*'s dispositive treatment of bans on handguns in the home mandates that any law requiring domicile as a precondition for home handgun possession is unconstitutional. The Court can thus follow *Heller*'s lead and find the policy

---

[5] The New York Supreme Court, Appellate Division, Third District, has upheld the State's general licensing scheme against a *Heller*-based challenge, holding that "article 265 does not effect a complete ban on handguns and is, therefore, not a 'severe restriction' improperly infringing upon . . . Second Amendment rights." *Perkins*, 880 N.Y.S.2d at 210. Whatever the merits of that conclusion, it provides no support for the argument that the complete ban applied to Mr. Osterweil is somehow permissible.

17

applied here unconstitutional without specifying a level of scrutiny. Like the law in *Heller*, the policy applied to Mr. Osterweil is unconstitutional because it is antithetical to the core Second Amendment right. In all events, a ban on home handgun possession by part-time residents also fails any arguably applicable level of scrutiny.

"In *Heller*, the Supreme Court concluded that the Second Amendment codifies a pre-existing 'individual right to possess and carry weapons in case of confrontation." *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 88 (2d Cir. 2012) (quoting *Heller*, 554 U.S. at 592). That right was "fundamental to the newly formed system of government" at the Founding, *McDonald*, 130 S. Ct. at 3037, and is "fundamental to our scheme of ordered liberty," *United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012). *See McDonald*, 130 S. Ct. at 3042 ("[T]he Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty."); *id.* at 3041 ("Evidence from the period immediately following the ratification of the Fourteenth Amendment only confirms that the right to keep and bear arms was considered fundamental."); *id.* at 3037 ("The right to keep and bear arms was considered no less fundamental by those who drafted and ratified the Bill of Rights."); *id.* at 3040 (39th Congress' "efforts to safeguard the right to keep and bear arms demonstrate that the right was still recognized to be fundamental"); *id.* at

18

3041 ("In debating the Fourteenth Amendment, the 39th Congress referred to the right to keep and bear arms as a fundamental right deserving of protection.").

When a law interferes with "fundamental constitutional rights," it is subject to "strict judicial scrutiny." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 15 (1973); *see, e.g.*, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983) ("strict scrutiny [is] applied when government action impinges upon a fundamental right protected by the Constitution"); *Anonymous v. City of Rochester*, 13 N.Y.3d 35, 45 (Ct. App. 2009) (laws "interfering with the exercise of" a fundamental right are "subject to strict scrutiny"); *Hernandez v. Robles*, 7 N.Y.3d 338, 375 (Ct. App. 2006) (when a law "burdens a fundamental right . . . it is subjected to strict scrutiny"). A law survives strict scrutiny only when it is narrowly tailored to serve a compelling government interest. *See People v. Bounasri*, 915 N.Y.2d 921, 922 (Rochester City Ct. 2011). To be narrowly tailored, a law must actually advance the compelling interest it is designed to serve, and be the least restrictive means of achieving that advancement. *See Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 226 (1989); *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). Burdening a significant amount of conduct not implicating the asserted interest is evidence that the law at issue is inadequately tailored. When applying strict scrutiny, the challenged law is presumed invalid, and the

19

government bears the burden of rebutting that presumption. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000).[6]

A domicile requirement like the one applied to Mr. Osterweil comes nowhere close to withstanding strict scrutiny. In the Second Circuit, New York argued that "a domicile requirement" "serves the substantial state interest in monitoring the activities of firearms licensees . . . ." A279. The State also noted its "interests in public safety and crime prevention." A297. Those interests fall well short of justifying the ban accomplished by a domicile requirement.

First and foremost, by arguing that "a domicile requirement" "serves the *substantial* state interest in monitoring the activities of firearms licensees," *id.* at 20 (emphasis added), New York essentially conceded that such a requirement would not serve a *compelling* interest as required to survive strict scrutiny. In all events, such a contention would be unavailing. The interest of the government in monitoring its licensees cannot itself be a compelling interest in any republic worthy of the name. A licensing process with adequate monitoring might be a means to some other compelling end, but it cannot be an end in itself.

---

[6] That strict scrutiny applies to laws that substantially burden Second Amendment rights is confirmed by the approaches that the Supreme Court rejected in *Heller* and *McDonald*. *Heller* explicitly and definitively rejected not only rational basis review, 554 U.S. at 628 n.27, but also the "interest-balancing" approach endorsed by Justice Breyer—which is intermediate scrutiny by another name. *See id.* at 634; *McDonald*, 130 S. Ct. at 305 (plurality op.) ("while [Justice Breyer's] opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion").

20

In the Second Circuit, New York contended that *Bach v. Pataki*, 408 F.3d 75 (2d Cir. 2005), justified its reliance on an interest in monitoring licensees. Not so. *Bach* stated that New York had a "substantial and legitimate interest"—not a compelling one—"in monitoring gun licensees" in the context of a "mere visitor[']s" challenge to the State's licensing laws. *Id.* at 87, 91–92. Whatever validity that argument has in the context of an individual merely passing through a State, the possession of an in-state residence provides a basis for the imposition of all manner of state regulations and responsibilities that the state can sufficiently monitor. The State cannot simply throw up its hands and suggest the job becomes too difficult when a fundamental right is implicated.[7]

An asserted interest in promoting public safety and preventing crime fares no better. To be sure, the Second Circuit has recognized that the State of "New York has [a] substantial, indeed compelling, governmental interest[] in public

---

[7] *Bach* held that the Second Amendment right to keep and bear arms "imposes a limitation on only federal, not state, legislative efforts," and disposed of Bach's Second Amendment claim on that ground. *Bach*, 408 F.3d at 84–86. Thus *Bach*'s views on the scope and nature of Second Amendment rights are outdated. Moreover, though *Bach* concluded that "New York's interest in monitoring gun licensees"—"an interest in continually obtaining relevant behavioral information"—"is substantial and [] New York's restriction of licenses to residents and persons working primarily within the State is sufficiently related to th[at] interest," *id.* at 87, 91, that conclusion was clearly infected by the Court's misapprehension of Second Amendment rights. And, in any event, the Court described the State's interest as "substantial," not "compelling," and thus *Bach*— even if it were still good law—would dictate that the State's monitoring interest fails strict scrutiny.

safety and crime prevention." *Kachalsky*, 701 F.3d at 97. But that interest cannot be invoked in support of the domicile requirement applied to Mr. Osterweil. If protecting public safety and preventing handgun crime were interests sufficient to allow the State to prevent home handgun possession, then the District of Columbia handgun ban would still be on the books. It is not. As *Heller* made clear, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." 554 U.S at 636. Banning handgun possession in the home in the name of public safety and crime prevention is one of them.

When a law or regulation fails to cover a substantial swath of conduct implicating the asserted compelling interest, such underinclusiveness not only demonstrates the absence of narrow tailoring, but also serves as evidence that the interest is not significant enough to justify the regulation. *See Carey v. Brown*, 447 U.S. 455, 465 (1980); *see also Fla. Star v. B.J.F.*, 491 U.S. 524, 541–42 (1989) (Scalia, J., concurring) ("[A] law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.") (citation and internal quotation marks omitted). A domicile requirement prevents part-time residents who are not domiciliaries from possessing handguns in their homes. But there is no time limit linked to the domicile requirement. One could be domiciled in New York and spend little-to-no time there. So, a New York domiciliary can have a license to have a handgun in

22

their home spending nearly no time there, and a non-domiciliary who spends substantially more time in New York cannot. That completely undermines the assertion that the State's interest in monitoring its licensees is compelling.

Even assuming against fact and logic that the State did have a compelling interest in ensuring public safety through monitoring its licensees, a part-time resident handgun possession ban would not be narrowly tailored to serve that interest. First, as just discussed, there is a profound mismatch between the asserted interest and the actual requirement. Second, the State has not provided evidence—not even while Mr. Osterweil was proceeding pro se—that a residency requirement in and of itself does anything to further its public safety interest. The application process that an individual must go through to obtain a home handgun possession permit in New York is robust. The required investigation involves checking references, consulting FBI databases, and taking fingerprints. *See* N.Y. Penal Law § 400.00(4). The application package is reviewed by a licensing officer, often a judge. *Id.* It is hard to imagine what benefit excluding part-time residents from obtaining licenses could add. Moreover, the logical answer to any legitimate concerns with the ability to monitor those domiciled elsewhere would be deference to the licensing decision of the state of domicile, not a categorical ban in direct conflict with *Heller*.

23

What is more, excluding *all* non-domiciliaries is certainly not the least restrictive means of achieving the State's monitoring and public safety goals. A part-time resident possession ban would not be limited to those individuals who pose a heightened threat to others, or to circumstances that for some other reason might create a particularly serious danger to the public. Moreover, there are myriad ways that the State could achieve its goals—such as periodically consulting the national and comprehensive NCIC database that it already consults during licensing, requiring annual application updates from part-time residents, or cooperating with the law enforcement organs of other states—short of an illegitimate and unnecessary categorical ban. Indeed, New York licensing law contemplates that there are available and useful mechanisms for monitoring out-of-state behavior: N.Y. Penal Law § 400.00(11) provides that a handgun license can be suspended upon conviction for a felony or serious offense "anywhere."

A domicile requirement would fail intermediate scrutiny for much the same reasons. Under that test, a regulation "passes constitutional muster if it is substantially related to the achievement of an important governmental interest." *Kachalsky*, 701 F.3d at 96. Back when Mr. Osterweil was proceeding pro se and New York was zealously advocating for a domicile requirement, at the State's urging the District Court found a "substantial relationship between New York's residency requirement and the government's significant interest" primarily because

24

the "State is in a considerably better position to monitor its residents' eligibility for firearm licenses as compared to nonresidents." A170.  But it is not at all clear that this is true, as Mr. Osterweil's case demonstrates.  Beyond some issues not unique to nondomiciliaries (i.e., issues with worn fingerprints) Mr. Osterweil would have easily qualified for a license under § 400.00.  Nothing about his part-time resident status made it more cumbersome to ascertain his eligibility.  And as already described, there is no relationship, let alone a substantial one, between a domicile requirement and the State's general interests in public safety and crime prevention.

Any contention that a domicile requirement is constitutionally permissible reduces to the contention that the right to keep and bear arms—which the Supreme Court has made clear is a fundamental right—is a lesser right.  It is not.  The Court has repeatedly stressed that it is improper to prefer certain enumerated constitutional rights while relegating others to a lower plane: No constitutional right is "less 'fundamental' than" another, and there is "no principled basis on which to create a hierarchy of constitutional values . . . ." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 484 (1982); *accord Ullman v. United States*, 350 U.S. 422, 428–29 (1956) ("To view a particular provision of the Bill of Rights with disfavor inevitably results in a constricted application of it.  This is to disrespect the Constitution.").  *Heller* admonished that the "very enumeration of the" Second Amendment "right takes

25

out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." 554 U.S. at 634. And *Heller* explained that the "Second Amendment is no different" from the First Amendment in that it was the product of interest-balancing by the people themselves. *Id.* at 635. Courts would not tolerate for one second a regime that granted free speech or the freedom of association only to a State's full-time residents. The Second Amendment is no different.

As the Supreme Court recently reaffirmed, constitutional rights are nowhere more sacrosanct than in the home. *See Florida v. Jardines*, No. 11-564, slip op. at 4 (U.S. Mar. 26, 2013). At the end of the day, whether it be because it is fatally inconsistent with *Heller* or because it cannot survive strict scrutiny (or even intermediate scrutiny), a ban on home handgun possession by part-time residents like that applied to Mr. Osterweil violates the Second Amendment.

## II.   A Ban On Home Handgun Possession By Part-Time State Residents Violates The Equal Protection Clause.

A ban on part-time resident home handgun possession suffers from a second fatal flaw: it violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The Equal Protection Clause commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. *Plyler v. Doe*, 457 U.S. 202, 212, 216 (1982). When "state laws

26

impinge on personal rights protected by the Constitution" in discriminatory fashion "strict scrutiny" applies, and such laws "will be sustained only if they are suitably tailored to serve a compelling state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *see Harper v. Va. Bd. of Elections*, 383 U.S. 663, 670 (1966) ("[W]here fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized.").

As already discussed, New York lacks a compelling interest in denying part-time residents the right to possess handguns in their home, and thus there is no justification for treating full-time residents and part-time residents differently. Mr. Osterweil has the same interest in protecting his family when staying at his home in Schoharie as do his domiciliary neighbors down the street. Again, if anything, his lack of year-round occupation may enhance the need for self-protection when he is in-residence. Moreover, any state policy for non-domiciliaries that was remotely consistent with the Equal Protection Clause would include deference to the state of domicile as an important component. The New York law as applied to Mr. Osterweil does nothing of the sort. It makes no difference whether a part-time resident is fully licensed in his state of domicile. No matter how many days they spend in their New York home, which is treated like all others for taxing and other

27

regulatory purposes, nondomiciliaries are barred from lawfully possessing a handgun for self-defense in that home.

*People v. Bounasri*, 915 N.Y.S.2d 921 (Rochester City Ct., 2011), is instructive. The *Bounasri* Court held that N.Y. Penal Law § 261.01(5)—which makes it a crime for a non-citizen to "possess[] any dangerous or deadly weapon"—violated the constitutional right to equal protection. After considering possible justifications for the law, the court concluded that "[t]here is no conceivable reason that aliens should be distinguished from citizens to achieve the law's otherwise legitimate public safety objectives." 915 N.Y.S.2d at 923. The same is true of a law that baselessly distinguishes between part-time residents and domiciliaries. It would be strange indeed if lawful resident aliens, who happen to be residents of New York and may be aliens precisely because their true domicile is in a foreign nation, are entitled to greater rights under the Second Amendment than U.S. citizens who are also residents of New York, but for only part of the year.

Given the fundamental nature of the Second Amendment right to possess handguns for defense of hearth and home, the only practical explanation for a policy limiting that right to domiciliaries is that non-domiciliaries do not vote in the state elections that ultimately produce state policies. But that suggests the presence—not the absence—of an equal protection violation. The Framers

28

enshrined certain rights to put them beyond policy debate and the Fourteenth Amendment ensured that such fundamental rights would be enjoyed throughout the Republic. Discriminating against part-time residents when it comes to such a fundamental right flies in the face of the constitutional rights we all enjoy equally by virtue of the Fourteenth Amendment. Mr. Osterweil has the same fundamental right to possess a gun in defense of his New York residence as his New York neighbors. The contrary policy applied to Mr. Osterweil is clearly a violation of the Equal Protection Clause.

### III. This Court Should Construe New York Law Governing Home Handgun Possession As Not Requiring Domicile.

As relevant here, N.Y. Penal Law § 400.00(3)(a) provides that:

> [a]pplications shall be made and renewed, in the case of a license to carry or possess a pistol or revolver, to the licensing officer in the city or county, as the case may be, *where the applicant resides*, is principally employed or has his principal place of business as merchant or storekeeper.

(emphasis added). Despite the fact that Mr. Osterweil "resides" part-time in his New York home, this provision was construed by state authorities to require domicile and applied to deny Mr. Osterweil the license he requested. But the statute does not obviously require domicile and any doubt should be resolved against a domicile requirement given the grave constitutional concerns that such a requirement would raise.

29

First, and most obviously, the word domicile does not appear in § 400.00(3)(a). The statute merely requires that an applicant apply for a license to possess a handgun "in the city or the county where . . . the applicant resides." *Id.* Mr. Osterweil plainly resides in the county in which he applied for the license, just not all-year-long.

Second, while New York courts frequently construe the terms "reside" and "residence" as used in New York law to mean "domicile," see, e.g., *Longwood Central School District v. Springs Union Free School District*, 1 N.Y.3d 385, 388 (Ct. App. 2004), that is not always the case. As Justice O'Connor noted, New York courts have recognized that "'the term "reside" (or "residence") is not one that can be given uniform definition wherever it appears in legislation, but must be construed in relationship to the particular statute involved.'" A190 n.3 (quoting *Matter of Contento v. Kohinke*, 42 A.D.2d 1025, 1025 (App. Div., 3d Dep't 1973)). Sometimes "resides" just means "resides"—domicile is not required.

This is clearly one of those times, especially given the constitutional problems a domicile requirement would pose. This Court's precedents require it "to avoid interpreting a statute in a way that would render it unconstitutional if such a construction can be avoided . . . ." *Alliance of Am. Insurers v. Chu*, 77 N.Y.2d 573, 585 (Ct. App. 1991). Tying whether an individual can possess a handgun in his home to that individual's status as a domiciliary is flatly

30

inconsistent with both the Second Amendment and the Equal Protection Clause. Accordingly, this Court should interpret N.Y. Penal Law § 400.00(3) to allow individuals who—like Mr. Osterweil—"reside" in New York, but are not New York domiciliaries, to possess handguns in their homes.

## CONCLUSION

For the foregoing reasons, this Court should answer the certified question in the affirmative and hold that a ban on home handgun possession by part-time residents violates the Second Amendment and the Equal Protection Clause and that N.Y. Penal Law § 400.00(3) makes home handgun possession permits available to part-time New York residents.

Respectfully submitted,

Paul D. Clement
D. Zachary Hudson
BANCROFT PLLC
1919 M St., N.W., Suite 470
Washington, D.C.  20036
Telephone: (202) 234-0900
pclement@bancroftpllc.com

Daniel L. Schmutter
GREENBAUM, ROWE, SMITH
   & DAVIS LLP
P.O. Box 5600
Woodbridge, NJ 07095
(732) 549-5600
dschmutter@greenbaumlaw.com

*Counsel for Appellant*

May 7, 2013

31

# EXHIBIT G

Appeal No. CTQ-2013-00001

To be argued by:
SIMON HELLER
10 minutes requested

On Certification from the U.S. Court of Appeals for the Second Circuit

# State of New York
# Court of Appeals

ALFRED G. OSTERWEIL,

*Appellant,*

-against-

GEORGE R. BARTLETT, III, &c,

*Respondent.*

## BRIEF FOR RESPONDENT

ERIC T. SCHNEIDERMAN
*Attorney General of the*
*State of New York*
Attorney for Respondent
120 Broadway
New York, New York 10271
(212) 416-8025
(212) 416-8962 (facsimile)

BARBARA D. UNDERWOOD
*Solicitor General*
RICHARD DEARING
*Deputy Solicitor General*
SIMON HELLER
*Assistant Solicitor General*
*of Counsel*

Dated: June 5, 2013

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................ iii

PRELIMINARY STATEMENT ......................................................... 1

QUESTION PRESENTED ................................................................ 4

STATEMENT OF THE CASE ......................................................... 4

    A.   New York's Handgun Licensing Statute ........................ 4

    B.   Statement of Facts .......................................................... 8

         1.   Osterweil's Application for a Handgun
             License ................................................................... 9

         2.   The Denial of Osterweil's License Application .... 11

    C.   The Federal Court Proceeding ..................................... 13

         1.   The District Court's Grant of Summary
             Judgment to Bartlett ............................................ 13

         2.   Osterweil's Appeal to the Second Circuit ............. 15

ARGUMENT

THE RESIDENCY LANGUAGE OF THE HANDGUN
LICENSING STATUTE SHOULD NOT BE
CONSTRUED TO IMPOSE A DOMICILE
REQUIREMENT ...................................................................... 18

    A.   The Context, Structure, and History of the
        Statute Support a Requirement of Residency and
        Not Domicile .................................................................. 21

i

# TABLE OF CONTENTS (cont'd)

**Page**

B. The Canon of Constitutional Avoidance Further
Supports the Construction of the Statute To
Require Residence, Not Domicile ................................. 25

CONCLUSION ................................................................................ 30

# TABLE OF AUTHORITIES

**Cases** **Page**

*Antone v. Gen. Motors Corp.*,
  64 N.Y.2d 20 (1984) ...................................................... 18, 19, 20

*Ashwander* v. *TVA*,
  297 U.S. 288 (1936) .................................................................. 26

*Bach v. Pataki*,
  408 F.3d 75 (2d Cir. 2005) ....................................................... 28

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)............................................................... 3, 28

*Engel v. CBS, Inc.*,
  93 N.Y.2d 195 (1999) ................................................................ 27

*Lyng* v. *Nw. Indian Cemetery Protective Ass'n*,
  485 U.S. 439 (1988)................................................................... 26

*Matter of Dalton v. Drago*,
  72 A.D.3d 1243 (3d Dep't 2010)................................................ 12

*Matter of Hosley v. Curry*,
  85 N.Y.2d 447 (1995) ................................................................ 20

*Matter of Mahoney v. Lewis*,
  199 A.D.2d 734 (3d Dep't 1993)............................................ 2, 11

*Matter of O'Connor v. Scarpino*,
  83 N.Y.2d 919 (1994) ................................................................. 6

*Matter of Wrigley*,
  8 Wend. 134 (1831) ................................................................... 20

*McDonald v. City of Chicago*,
  130 S. Ct. 3020 (2010)........................................................... 2, 28

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                            **Page(s)**

*Overstock.com, Inc. v. N.Y. State Dep't of Taxation & Fin.*,
20 N.Y.3d 586 (2013) .................................................................. 25

*People ex rel. Simpson v. Wells*,
181 N.Y. 252 (1905)..................................................................... 25

*People v. Felix*,
58 N.Y.2d 156, *appeal dismissed for want of substantial
federal question*, 464 U.S. 802 (1983) ........................................ 26

*People v. Finkelstein*,
9 N.Y.2d 342 (1961) ..................................................................... 26

*Peterson v. Martinez*,
707 F.3d 1197 (10th Cir. 2012)................................................... 28

*Rawstorne v. Maguire*,
265 N.Y. 204 (1934)..................................................................... 20

*Rooney v. Tyson*,
91 N.Y.2d 685 (1998) ................................................................... 27

*United States v. Decastro*,
682 F.3d 160 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 838
(2013)............................................................................................ 29

## Constitution

N.Y. Const. art. VI, § 3(b)(9) ........................................................... 27

## Statutes

Penal Law
  § 265.00 ................................................................................... 5, 6
  § 265.01 ...................................................................................... 4
  § 265.03 ...................................................................................... 4
  § 265.20 ...................................................................................... 5
  § 400.00 ............................................................................. passim

## TABLE OF AUTHORITIES (cont'd)

**Miscellaneous Authorities**                                    **Page(s)**

Letter from Edward P. Mulrooney, N.Y. City Police Comm'r,
    to Governor Franklin D. Roosevelt (Aug. 29, 1931),
    *reprinted in Public Papers of Governor Franklin D.
    Roosevelt*, 1931 (1937)........................................................... 7, 23

Message to the Legislature (Sept. 1, 1931), *reprinted in
    Public Papers of Governor Franklin D. Roosevelt*, 1931
    (1937)..................................................................................... 7, 23

v

## PRELIMINARY STATEMENT

In a federal action challenging a provision in New York's handgun licensing statute, Penal Law § 400.00(3)(a), under the Second Amendment to the United States Constitution, the United States Court of Appeals for the Second Circuit has certified to this Court the following question of New York law:

> Is an applicant who owns a part-time residence in New York but makes his permanent domicile elsewhere eligible for a New York handgun license in the city or county where his part-time residence is located?

This question arises because Alfred Osterweil's application for a handgun license was denied by Judge George Bartlett, the Schoharie County firearms licensing officer, on the ground that Osterweil was not domiciled in New York. Osterweil has challenged that denial on Second Amendment grounds in federal court. Because the proper interpretation of the relevant statute is in question, the Second Circuit has asked for an authoritative construction of the statute before considering the constitutional challenge to it.

New York's firearms licensing statute provides that an application for a handgun license must "be made and renewed . . . to the licensing officer in the city or county . . . where the applicant resides, is principally employed, or has his principal place of business as merchant or storekeeper." Penal Law § 400.00(3). Judge Bartlett denied the application at issue here in reliance on a 1993 decision of the Appellate Division, Third Department, construing the term "resides" in that statute to mean "is domiciled." *Matter of Mahoney v. Lewis,* 199 A.D.2d 734, 735 (3d Dep't 1993). Both parties to this action now urge this Court to answer the certified question by rejecting that holding, and instead construing the statute to authorize the issuance of a handgun license to a New York resident who is not domiciled in New York.

*Mahoney*'s interpretation of the statute should be rejected for several reasons. First, the Third Department based its decision in part on the view that possession of a handgun is a privilege, not a right, *id.* at 735. But the United States Supreme Court has now squarely rejected that view in *McDonald v. City of Chicago*, 130 S.

2

Ct. 3020 (2010). Thus, one of the fundamental underpinnings of *Mahoney* has been removed, and for that reason alone the continuing vitality of the decision is doubtful.  Second, a domicile requirement would raise serious constitutional questions under *District of Columbia v. Heller,* 554 U.S. 570 (2008), and *McDonald*, and this Court should construe the statute to avoid such questions. And third, apart from constitutional considerations, the text, purpose, and history of the statute strongly support a construction of the statute that makes residents who are not domiciled in New York eligible for handgun licenses.

Osterweil urges this Court to hold expressly that a domicile requirement *would* violate the Second Amendment (*see* Br. for Appellant at 13-31) but that question is not properly before this Court. The Court's precedents make clear that acceptance of a certified question brings to this Court only the certified question of state law, and not the federal constitutional claims that may depend on the answer to that question. Moreover, the doctrine of constitutional avoidance counsels a court to *avoid* constitutional questions, and not to decide them unnecessarily.

3

## QUESTION PRESENTED

Is an applicant who owns a part-time residence in New York but makes his permanent domicile elsewhere eligible for a New York handgun license in the city or county where his part-time residence is located?

## STATEMENT OF THE CASE

### A.   New York's Handgun Licensing Statute

New York law makes it a misdemeanor to possess an unlicensed handgun (or other designated firearm), loaded or unloaded, in any location, Penal Law § 265.01, and makes it a class C felony to possess an unlicensed loaded handgun (or other designated firearm) outside the home, *id.* § 265.03(3).[1] Long guns, including most rifles and shotguns, are excluded from these prohibitions. So the possession and carrying of long guns—

---

[1] Unless otherwise indicated, all Penal Law citations refer to the law prior to enactment of the N.Y. SAFE Act, ch. 1 (2013).

4

commonly used for hunting—are not generally prohibited or subject to licensing in New York.[2]

Licensed handguns are exempted from the Penal Law's prohibitions on possession of firearms. *Id.* § 265.20(a)(3).[3] Penal Law § 400.00(2) lists the types of licenses that authorize possession of a pistol or revolver, which include: (1) a license to "have and possess in his dwelling by a householder"; (2) a license to "have and possess in his place of business by a merchant or storekeeper"; (3) a license to "have and carry concealed while so employed by a messenger employed by a banking institution or express company"; and (4) a license to "have and carry concealed, without regard to employment or place of possession, by any person when proper cause exists for the issuance thereof." *Id.*

---

[2] Penal Law § 265.00(3) defines "firearm" to include pistols and revolvers; shotguns with barrels less than eighteen inches in length; rifles with barrels less than sixteen inches in length; "any weapon made from a shotgun or rifle" with an overall length of less than twenty-six inches; and assault weapons.

[3] Other exemptions from the prohibition also exist, *inter alia*, for persons in state and federal military service, and for peace and police officers. Penal Law § 265.20(a)(1).

§ 400.00(2)(a)-(c) & (f).[4] A "carry concealed" license may be restricted to specific purposes set forth in the license application, such as use in target practice or hunting. *Matter of O'Connor v. Scarpino*, 83 N.Y.2d 919, 921 (1994).

Penal Law § 400.00(3) governs the application process for licenses, and contains the provision whose construction is at issue here. In most counties, licensing officers are judges; in New York City, and in Nassau and Suffolk counties, police officials act as licensing officers. Penal Law § 265.00(10). As part of a detailed paragraph prescribing the method of applying for a handgun license, § 400.00(3) states that an application for a handgun license must be made in the city or county "where the applicant resides, is principally employed or has his principal place of business as merchant or storekeeper." The legislative history shows that the precursor to this provision was added to the statute to prevent New York City residents from forum-shopping

---

[4] The remaining categories include licenses for certain state judges, certain state and local prison employees, and possessors and carriers of certain antique pistols. Penal Law § 400.00(2)(d), (e) & (g).

6

by obtaining pistol permits from judges in counties outside the City where, at the time, "little or no investigation" of the applicant preceded issuance of a license. Letter from Edward P. Mulrooney, N.Y. City Police Comm'r, to Governor Franklin D. Roosevelt (Aug. 29, 1931), *reprinted in Public Papers of Governor Franklin D. Roosevelt*, 1931, at 184 (1937); *see also* Message to the Legislature (Sept. 1, 1931), *reprinted in Public Papers, supra,* at 182, 183 (recommending that Legislature adopt proposals in the Mulrooney letter).

Penal Law § 400.00(1) lists the eligibility requirements for a handgun license. Generally, an applicant must: (1) be twenty-one years of age or older; (2) have good moral character; (3) have no convictions for felonies or serious offenses; (4) state whether he or she has ever suffered a mental illness or been confined to a health-care facility because of mental illness; and (5) have no prior revocation of a license or current judicial order of protection. In

7

addition, there must not be "good cause" to deny a license. Penal Law § 400.00(1)(a)-(e), (g).[5]

Domicile is not listed as a precondition to eligibility for a handgun license. To the contrary, a separate provision specifically contemplates issuance of licenses to persons not usually resident in New York. Penal Law § 400.00(7) instructs that when a license "is issued to an alien, or to a person not a citizen of and usually a resident in the state, the licensing officer shall state in the license the particular reason for the issuance and the names of the persons certifying to the good character of the applicant." *Id.* § 400.00(7).

### B.  Statement of Facts

As of March 2009, Alfred Osterweil owned four houses—two in Summit, New York, and two in Many, Louisiana—all of which he considered his "home" (A. 18). Sometime between May 21,

---

[5] Persons honorably discharged from the United States armed forces or the New York national guard are exempt from the age restriction. Penal Law § 400.00(1)(a).  Westchester county applicants, except such honorably discharged service members, must also pass a firearms safety course. *Id.* § 400.00(1)(f).

8

2008, and June 25, 2008, Osterweil changed his primary residence from New York to Louisiana (*see* A. 34, 46). Since then, he has continued to retain at least one house in Summit, New York for use as a "vacation home" (*see* A. 14). The record contains little information as to the amount of time Osterweil spends annually in New York.

### 1. Osterweil's Application for a Handgun License

In May 2008, when his primary residence was in Summit, New York, Osterweil submitted an application for a handgun license to the Sheriff's Department in Schoharie County, where Summit is located (A. 9, 25). Osterweil checked the box on the application for a "premises" license—which is meant to designate an application for the statutory "householder" license—but he wrote in a space provided on the application that he sought the license for the purpose of "target practice and hunting" (A. 41). A few weeks later, the Sheriff informed Osterweil that he needed to "complete and/or correct" his application. The Sheriff explained that a premises license would be valid only "inside the residence"

for which he applied, and that Osterweil's desire to use a handgun for "target practice and hunting" would require him to obtain a "carry concealed" license. (A. 44.)

In June 2008, Osterweil told the Sheriff that he had purchased a home in Louisiana and intended to make Louisiana his primary residence. Osterweil inquired whether this change in his residency status would disqualify him from obtaining a permit, stating that if it would, he saw "no sense in correcting the application" to clarify whether he was seeking a concealed-carry license or a premises license. (A. 46.)

Thereafter, Osterweil, the Sheriff, and Judge Bartlett exchanged several letters regarding Osterweil's application. Osterweil was informed that his fingerprints had been determined to be unusable (due to low quality) by both the Federal Bureau of Investigation and the New York State Division of Criminal Justice Services (A. 35). *See* Penal Law § 400.00(4) (requiring officer investigating applicant for firearms license to take the applicant's fingerprints and send one copy to the State Division of Criminal Justice Services and one to the Federal Bureau of Investigation

10

for criminal records searches). Judge Bartlett advised Osterweil
that, in addition to the lack of fingerprint quality, his out-of-state
domicile might pose an obstacle to licensure (A. 79-80).

### 2. The Denial of Osterweil's License Application

On May 29, 2009, Judge Bartlett issued a decision and order
denying Osterweil's application for a handgun license on the
ground that Osterweil was not domiciled in New York (A. 144,
150; *see* A. 135-150). Judge Bartlett cited the *Mahoney* decision
from the Third Department as controlling on the meaning of the
residency provision in § 400.00(3)(a). In *Mahoney*, the court
confirmed the denial of a concealed-carry license to a New Jersey
domiciliary who also owned property in New York, holding that
the residency language of § 400.00(3)(a) "is equivalent to domicile
and requires something more than mere ownership of land." 199
A.D.2d at 735. This holding was based on the court's view that the
residency language constituted a "qualification for a privilege,"
and that the "possession and use of a pistol are not vested rights
but privileges." *Id.* (quotation marks omitted). Judge Bartlett's

11

denial of Osterweil's license was a direct application of *Mahoney*'s domicile requirement. The judge also rejected Osterweil's claim that the statute's residency language, as construed by *Mahoney* to require domicile, violated the Second Amendment under the Supreme Court's decision in *Heller* (A. 143-150). Judge Bartlett did not decide whether the quality of Osterweil's fingerprints would independently prevent him from obtaining a license or determine whether Osterweil had satisfied the other requirements for licensure under New York law (A. 150 n.3).

Osterweil did not seek review of Judge Bartlett's decision in a C.P.L.R. article 78 proceeding, as he could have done. *See, e.g., Matter of Dalton v. Drago*, 72 A.D.3d 1243 (3d Dep't 2010). Thus, Osterweil did not ask the Appellate Division, Third Department to reconsider *Mahoney*'s interpretation of the residency language in Penal Law § 400.00(3)(a)—something Judge Bartlett did not have the authority to do. Nor did Osterweil ask this Court to provide an authoritative construction of the statute—something this Court has not previously been asked to do.

12

## C.  The Federal Court Proceeding

Instead of pursuing state-court review of the denial of his license—review that could have resulted in a rejection of *Mahoney*'s domicile interpretation as early as 2009—Osterweil filed a complaint in the United States District Court for the Northern District of New York, asserting causes of action under the Second Amendment and the Equal Protection Clause of the Fourteenth Amendment, as well as claims under "the New York Constitution and Civil Rights Laws" (A. 10-11), against Bartlett in his official capacity as licensing officer (*see* A. 8-11; *see also* A. 187). The complaint requests an order directing that the defendants "provide plaintiff with the type of permit originally applied for, for costs of suit and such other damages and relief as the Court deems reasonable and appropriate" (A. 11).

### 1.  The District Court's Grant of Summary Judgment to Bartlett

By suing in federal court, Osterweil delayed for several years any possibility of obtaining a New York appellate court decision re-examining § 400.00(3). Because this Court does not accept

13

certification of questions of New York law from federal district courts, certification to this Court became possible only after federal district court proceedings were concluded and Osterweil's federal litigation was on appeal. Osterweil's choice to launch federal litigation against Bartlett rather than seek state-court review of Bartlett's decision meant that the parties litigated this case in the federal district court within the framework of *Mahoney*.

The district court granted summary judgment to Judge Bartlett on all claims. Citing *Mahoney*, the court assumed that the statutory residency requirement operated as a domicile requirement (A. 159-160). The court held that intermediate scrutiny was the appropriate legal standard for analyzing Osterweil's Second Amendment claim (A. 168-169), and held that the statute satisfied intermediate scrutiny because "there is a substantial relationship between New York's residency requirement and the government's significant interest" in monitoring eligibility for firearms licenses (A. 170). The district court then rejected Osterweil's equal protection claim, finding that "New York state residents and nonresidents are not similarly

14

situated in terms of the state's ability to obtain information about and monitor the potential licensee's eligibility or continued eligibility for a firearms license" (A. 172).[6]

## 2. Osterweil's Appeal to the Second Circuit

Osterweil filed a notice of appeal. In April 2012, after Osterweil submitted his brief, Bartlett filed a motion asking the Second Circuit to certify to this Court the following dispositive legal question: "Does the applicant residency requirement in New York's pistol permit statute, N.Y. Penal Law § 400.00(3), require not merely residency but domicile in the State of New York?" Osterweil opposed this motion. (Opp'n to Mot., ECF No. 72.) The motion was referred to the Second Circuit merits panel. (Mot. Order, ECF No. 77.) Bartlett repeated the request for certification

---

[6] The district court construed other federal claims by Osterweil, couched by him as equal protection claims, as claims that denial of his license application violated his right to travel under the Privileges and Immunities Clause and his right to substantive and procedural due process, and rejected each claim (A. 172 n.11). The district court declined to exercise supplemental jurisdiction over Osterweil's state-law claims (A. 178). He abandoned all these arguments in his federal appeal.

15

in his brief on the merits and described some of the reasons that
the residence language in the statute would best be read to
require only residence (A. 280-288). In his reply brief and at oral
argument, Osterweil again opposed certification (A. 312-319).

After oral argument on the merits of Osterweil's appeal, the
Second Circuit, in an opinion by Justice O'Connor, certified to this
Court the question of the proper construction of the residence
phrase in Penal Law § 400.00(3)(a) (A. 184-197).  The court found
that each of the factors it examines in deciding whether to certify
a question of law favored certification. First, the court observed
that this Court has never construed the residency language of
§ 400.00(3)(a), and that "[r]ecourse to [the] Court's broader
opinions regarding residence requirements makes the water
murkier, not clearer" (A. 189). The Second Circuit also rejected the
option of construing the statute itself by predicting how this Court
would construe it because doing so would "put state officials like
Judge Bartlett in a particularly hard spot in the next case,
uncertain whether to follow the binding decision . . . in *Mahoney*
or the all-fours decision of a federal circuit court" (A. 191). Second,

16

the Second Circuit found that the construction of the statute was an issue of great importance to the State because "regulation of firearms is a paramount issue of public safety" (A. 192). Third, the court found that the certified question would be dispositive, noting that if this Court construed the statute to require only residence and not domicile, that construction would resolve the controversy in this case, and even if this Court adopted a domicile construction, the federal court would still benefit from the precise construction placed on the statute by this Court (A. 193)/ Finally, the Second Circuit rejected Osterweil's argument that the Circuit should address the constitutionality of a domicile requirement without certification, in order to avoid delay and the risk that both this Court and the Second Circuit would "opine on a constitutional question in the same case." (A. 193.)

This Court accepted certification on February 19, 2013 (A. 198). [7]

---

[7] The State asked this Court to expedite the proceedings, consistent with representations made to the Second Circuit. (*See* A. 196.) Osterweil made a similar request. While this Court
(*continued on next page*)

17

## ARGUMENT

### THE RESIDENCY LANGUAGE OF THE HANDGUN LICENSING STATUTE SHOULD NOT BE CONSTRUED TO IMPOSE A DOMICILE REQUIREMENT

Constitutional concerns loom large in this litigation, and we will address them in due course. But in fact a straightforward analysis of the statute answers the certified question independent of those constitutional questions. This Court has long observed that the terms "residence" and "domicile" are "not identical." *Antone v. Gen. Motors Corp.*, 64 N.Y.2d 20, 28 (1984). "[W]hile a person can have but one domicile, he can have more than one residence." *Id.*

A person is a "resident" if he or she has "a significant connection with some locality in the State as the result of living there for some length of time during the course of a year." *Id.* at 30. Thus, a person who owns or rents an abode in a county or city

accepted certification on February 19, 2013, within three weeks of the Second Circuit order, Osterweil did not file his brief until May 7, 2013—too late for the case to be calendared before the summer recess.

of the State and actually lives there "for some length of time during the course of a year" is a resident for that part of the year.[8]

On the other hand, "[e]stablishment of a domicile in a State generally requires a physical presence in the State *and* an intention to make the State a *permanent* home." *Id.* at 28 (emphasis added). Thus, a person who is a New York domiciliary is necessarily a resident of the State, but a person may be a domiciliary of another State (or another nation) and nonetheless be a resident of New York. Finally, persons who are merely visiting the State or in transit through the State, and who thus lack "a fixed and permanent abode or dwelling-place for the time

---

[8] While Osterweil asserts that he is a part-year resident, the record here does not establish the length of time each year that Osterweil lives in the house or houses he owns in New York. If this Court construes the statute to require only residence and not domicile, thereby removing the only obstacle challenged by Osterweil in this federal lawsuit, his application for a permit will still require the licensing officer to resolve at least two questions not answered on the current record: whether in fact he continues to reside in his New York house or houses on a part-time basis, and whether he can produce readable fingerprints as required to enable the Division of Criminal Justice Services to conduct Osterweil's criminal background check. *See* Penal Law § 400.00(4).

19

being," are neither residents nor domiciliaries. *Matter of Wrigley*, 8 Wend. 134, 140 (1831).

This Court has held that when a statute uses the term "resides," rather than "is domiciled," this choice of language presumptively demonstrates that the Legislature intended to impose a residency requirement, not a domicile requirement. *See Antone*, 64 N.Y.2d at 29. This presumption may be overcome in particular cases where "the nature of the subject-matter of the statute as well as the context in which the words are used," *Rawstorne v. Maguire*, 265 N.Y. 204, 208 (1934), or where legislative history, *Antone*, 64 N.Y.2d at 29, establishes that the Legislature meant for statutory language phrased in terms of residency to impose the more restrictive requirement of domicile. Consequently, this Court has in some contexts construed "residence" to mean "domicile." *See, e.g., Matter of Hosley v. Curry*, 85 N.Y.2d 447, 451 (1995).

Here, the text of Penal Law § 400.00(3) uses the language of residence rather than domicile: it requires applications for handgun licenses not based on employment or operation of a

business to be filed "where the applicant resides." The context, purpose, and history of the statutory language confirm, rather than rebut, the presumption that a residence requirement was intended. And if there were any doubt on the point, the principle that statutes should be construed in a manner that avoids constitutional questions would resolve it in favor of a residency requirement.

### A. The Context, Structure, and History of the Statute Support a Requirement of Residency and Not Domicile.

In order to obtain a premises or concealed-carry license to possess a handgun, an applicant must file his or her application in the county or city where he or she "resides." The statute's use of residency language establishes a presumption against a domicile construction, and nothing in the structure of legislative history of the statute rebuts that presumption. Instead, the context, structure and history of the statute strongly support construing the statute as requiring only residency.

The context of the language concerning residency does not suggest that the Legislature meant the language to be read as

21

requiring domicile. As the Second Circuit observed, the statutory context shows that the phrase is simply "a procedural rule about *where to file* to get a license, not a limitation on *who may get one*" (A. 189 (emphasis in original)). The phrase is not located in the eligibility subsection of the statute, but rather in the subsection governing the procedural requirements for handgun license applications. The statute therefore imposes a venue requirement for license applications. This forum-selection purpose does not support reading "resides" as "is domiciled," since persons may conveniently and appropriately apply for a handgun license in the city or county of their place of residence, whether or not they are domiciled there.

The history of the statutory language confirms that a residency requirement, not a domicile requirement, is intended. For two decades after New York's handgun licensing statute was passed in 1911, the statute contained no language regarding residency or domicile. Residency language was added to the statute in 1931 in order to address the problem of New York City residents obtaining licenses in counties outside the city where

22

there was less thorough investigation of applicants. Letter from Mulrooney, *supra*; *see also* Message to the Legislature, *supra*, (recommending that Legislature adopt proposals in the Mulrooney letter). The history of the 1931 amendment confirms that the residency language was designed as a venue provision—to prevent forum-shopping by applicants—not as a way to bar part-time residents of the State from obtaining licenses altogether in New York.

Penal Law § 400.00(7) further refutes any contention that the Legislature meant to impose a domicile requirement for handgun licenses. Section 400.00(7) expressly contemplates that handgun licenses may be issued to "an alien, or to a person not a citizen of and usually a resident in the state" and directs the licensing officer, in such case, to state in the license "the particular reason for the issuance and the names of the persons certifying to the good character of the applicant."[9]

---

[9] If Osterweil otherwise qualifies for a handgun license (see n.8, *supra*), the requirement means that his license would include the names of the character references he provided on his (*continued on next page*)

23

The 1993 decision of the Third Department in *Mahoney* provides no persuasive reason to read the statutory language regarding residency as specifying a domicile requirement. *Mahoney* did not undertake an analysis of the structure of Penal Law § 400.00, and completely overlooked the language in § 400.00(7) expressly acknowledging that handgun licenses may be issued to aliens and to persons who are not citizens of and usually resident in the State. *Mahoney* also incorrectly assumed that the phrase "where the applicant resides" should be treated as a qualification for licensure, even though it does not appear in the subsection of the statute listing substantive eligibility requirements. And *Mahoney* construed the residency language of the statute to mean domicile based in part on the notion that possession of a handgun is a privilege rather than a right. That notion has now been squarely repudiated by the Supreme Court,

application, and would state the reason for issuance of the license—presumably either self-defense in his New York home or target practice and hunting (*see* A. 41). This information is ordinarily furnished by all license applicants; the quoted provision requires only that they be listed on the license for an alien or "a person not a citizen of and usually a resident in the state."

24

which in *Heller* recognized an individual's right to possess a handgun in his home for purposes of self-defense, and in *McDonald* made clear that the right recognized in *Heller* is enforceable against the States.

For all these reasons, *Mahoney* was wrongly decided, and should not be adopted by this Court as the law of New York.

### B. The Canon of Constitutional Avoidance Further Supports the Construction of the Statute To Require Residence, Not Domicile.

Even if the text, structure, and history of Penal Law § 400.00 left room for doubt, which they do not, the statute should be construed to require only residence and not domicile under the principle that statutes should be construed so as to avoid serious constitutional questions. This Court has stressed that "[n]o statute should be declared unconstitutional if by any reasonable construction it can be given a meaning in harmony with the fundamental law." *People ex rel. Simpson v. Wells*, 181 N.Y. 252, 257 (1905). *See also, e.g., Overstock.com, Inc. v. N.Y. State Dep't of Taxation & Fin.*, 20 N.Y.3d 586, 593 (2013). This canon of construction is dispositive here.

The Second Circuit's opinion makes clear that a domicile requirement would present "a serious and very difficult question of federal constitutional law" (A. 194). Osterweil goes several steps further, arguing at length that a domicile requirement would clearly be unconstitutional, and even urging this Court actually to decide that federal constitutional question in this appeal. For purposes of this case, however, it suffices to conclude that a domicile requirement would present a serious constitutional question, and that the statute may reasonably be read as imposing only a residency requirement. *See, e.g.*, *People v. Finkelstein*, 9 N.Y.2d 342, 345 (1961). It is not necessary to decide the constitutional question that would be presented by a different interpretation of the statute, and indeed to do so would violate the basic principle that courts should avoid the unnecessary decision of constitutional questions. *Lyng* v. *Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988); *Ashwander* v. *TVA*, 297 U.S. 288, 346-47 (1936) (Brandeis, J., concurring); *People v. Felix*, 58 N.Y.2d 156, 161, *appeal dismissed for want of substantial federal question*, 464 U.S. 802 (1983).

26

Osterweil's further contentions are not properly before the Court. This Court's response to a question certified by the Second Circuit "should be dispositive of the precise law query as transmitted" to the Court. *Rooney v. Tyson*, 91 N.Y.2d 685, 690 (1998). This means that "[e]verything else—including especially the relevant application and actual decision of the case—is, of course, within the *exclusive* juridical competence of the Second Circuit Court of Appeals." *Id.* (emphasis added). Indeed, because this Court's authority to answer questions certified by a federal appeals court derives from a state constitutional provision limiting authorizing the court "to answer questions of New York law," N.Y. Const. art. VI, § 3(b)(9), the Court's "province is bounded by 'questions of *New York law* . . . which may be determinative,'" *Engel v. CBS, Inc.*, 93 N.Y.2d 195, 207 (1999) (emphasis added). Consequently, there is no basis for the Court to resolve questions of federal constitutional law in this appeal.

If this Court were inclined to reach those questions, notwithstanding the weighty reasons not to do so, it would find that the issues are more complex and the questions more difficult

27

than suggested by Osterweil. In particular, Osterweil claims that a domicile requirement would be invalid under *Heller* and *McDonald* as an absolute ban on home possession of handguns. Br. at 14-17. But a New York domicile requirement would not be an absolute ban because, as the Second Circuit noted, "[i]t is open to Osterweil to make his domicile in New York" (A. 194), and because a New York domicile requirement would not limit Osterweil's ability to possess a handgun in his Louisiana homes.[10] Moreover, *Heller* and *McDonald* plainly leave room for reasonable regulation of handgun possession, *see Heller*, 554 U.S. at 626-27 & n.26; *McDonald*, 130 S. Ct. at 3047, and the exclusion of a non-resident from licensure serves important state interests in monitoring the conduct of licensees, and thus survives intermediate scrutiny. *See Bach v. Pataki*, 408 F.3d 75, 91-92 (2d Cir. 2005). *Cf. Peterson v. Martinez*, 707 F.3d 1197, 1223 (10th Cir. 2012) (Lucero, J., concurring) (citing *Bach* with approval).

_____

[10] Indeed, Osterweil states in his brief (at 4) that he keeps a revolver in his Louisiana home.

28

Under more recent Second Circuit precedent, moreover, no heightened scrutiny is given to statutes regulating firearms where "adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense." *United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 838 (2013). A court could find that Osterweil's needs for home self-defense or hunting during limited periods of residency in New York are met by possession of a long gun, which under New York law does not require a license.

Osterweil accordingly overstates the strength of the constitutional arguments against a domicile requirement. But this Court need not, should not, and indeed cannot answer any federal constitutional question in this appeal on certified questions of New York law. The issue of statutory construction presented here is definitively resolved under the principle that statutes should be interpreted to avoid serious constitutional questions, to any extent that the issue is not already resolved by the text, structure, and history of the statute showing that it imposes only a residency requirement, not a domicile requirement.

29

## CONCLUSION

For the foregoing reason, this Court should answer the certified question in the affirmative.

Dated:  New York, NY
        June 6, 2013

                                    Respectfully submitted,

                                    ERIC T. SCHNEIDERMAN
                                      *Attorney General of the*
                                      *State of New York*
                                    Attorney for Judge Bartlett

                        By:  _Simon Heller_____

                                    SIMON HELLER
                                    Assistant Solicitor General

                                    120 Broadway
                                    New York, NY 10271
                                    (212) 416-8025

BARBARA D. UNDERWOOD
  *Solicitor General*
RICHARD DEARING
  *Deputy Solicitor General*
SIMON HELLER
  *Assistant Solicitor General*
        *of Counsel*

                    Reproduced on Recycled Paper

                                    30

# EXHIBIT H

*To be Argued by:*
DANIEL L. SCHMUTTER
*(Time Requested: 10 Minutes)*

Appeal No. CTQ-2013-00001

# Court of Appeals

*of the*

# State of New York

ALFRED G. OSTERWEIL,

*Appellant,*

– against –

GEORGE R. BARTLETT, III, in his Official capacity as Licensing Officer
in the County of Schoharie,

*Respondent.*

ON APPEAL FROM THE QUESTION CERTIFIED BY THE UNITED STATES
COURT OF APPEALS FOR THE SECOND CIRCUIT IN DOCKET NO. 11-2420-CV

## REPLY BRIEF FOR APPELLANT

DANIEL L. SCHMUTTER
GREENBAUM, ROWE, SMITH
& DAVIS LLP
P.O. Box 5600
Woodbridge, New Jersey 07095
Tel.: (732) 549-5600
Fax: (732) 549-1881

– and –

PAUL D. CLEMENT
D. ZACHARY HUDSON
BANCROFT PLLC
1919 M Street, NW, Suite 470
Washington, DC 20036
Tel.: (202) 234-0090
Fax: (202) 234-2806

*Attorneys for Appellant*

Date Completed: June 24, 2013

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

ARGUMENT .........................................................................................................3

I.    The Ongoing Violation Of Mr. Osterweil's Second Amendment Right To Possess A Handgun In His Part-Time Residence Must Come To An End. .........................................................................................3

II.   A Ban On Home Handgun Possession By Part-Time State Residents Violates The Second Amendment. .................................................6

    A.    A Ban On Home Handgun Possession By Part-Time State Residents Categorically Prohibits The Exercise Of The Core Second Amendment Right Identified In *Heller*. ...................................6

    B.    A Ban On Home Handgun Possession By Part-Time State Residents Fails Under Any Arguably Applicable Standard Of Scrutiny. .........................................................................................10

III.  This Court Should Construe New York Law Governing Home Handgun Possession As Not Requiring Domicile. ........................................15

CONCLUSION .....................................................................................................20

ADDENDUM ............................................................................................... Add-1

# TABLE OF AUTHORITIES

## Cases

*Alliance of Am. Insurers v. Chu*,
    77 N.Y.2d 573 (Ct. App. 1991) .......................................................................16

*Bach v. Pataki*,
    408 F.3d 75 (2d Cir. 2005) ............................................................................14

*Burdick v. Takushi*,
    504 U.S. 428 (1992)........................................................................................12

*City of Los Angeles v. Alameda Books, Inc.*,
    535 U.S. 425 (2002)........................................................................................14

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)................................................................................. *passim*

*Edward J. DeBartolo Corp.*
    *v. Florida Gulf Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568 (1988)........................................................................................19

*In re Mahoney v. Lewis*,
    605 N.Y.S.2d 168 (App. Div., 3d Dep't 1993) .................................................1

*Longwood Cent. School Dist. v. Springs Union Free School Dist.*,
    1 N.Y.3d 385 (Ct. App. 2004) ........................................................................16

*McDonald v. City of Chicago*,
    130 S. Ct. 3020 (2010)............................................................................. *passim*

*NLRB v. Catholic Bishop of Chicago*,
    440 U.S. 490 (1979)........................................................................................18

*People ex rel. Simpson v. Wells*,
    181 N.Y. 252 (1905)........................................................................................17

*Thompson v. Western States Med. Ctr.*,
    535 U.S. 357 (2002)........................................................................................12

*Turner Broadcasting Sys., Inc. v. FCC*,
    520 U.S. 180 (1997)........................................................................................12

ii

**Constitutional Provisions**

U.S. Const. amend. II ...................................................................................... *passim*

U.S. Const. amend. XIV ........................................................................................15

N.Y. Const. art. VI, § 3(b)(9)................................................................................17

**Statutes & Regulation**

N.Y. Penal Law § 400.00(3) ........................................................................... *passim*

N.Y. Penal Law § 400.00(11) ...............................................................................14

N.Y. Stat. Law § 150 (McKinney)..........................................................................17

N.Y. Comp. Codes R. & Regs. tit. 22, § 500.27(f)................................................18

**Other Authorities**

Advisory Grp. to N.Y. State & Fed. Judicial Council, Practice Handbook
     on Certification of State Law Questions by the U.S. Court of
     Appeals for the Second Circuit to the N.Y. State Court of Appeals
     (2d ed. 2006)....................................................................................................5

Brief for the United States as Amicus Curiae, *District of Columbia v.
Heller*, 554 U.S. 570 (2008) (No. 07-290), 2008 WL 157201 ......................12

## INTRODUCTION AND SUMMARY OF ARGUMENT

The State's approach to this case is a study in contradiction. In federal district court—where Mr. Osterweil litigated pro se—the State insisted that New York law contains a domicile requirement. The State now belatedly contends only residence is required. The State once championed *In re Mahoney v. Lewis*, 605 N.Y.S.2d 168 (App. Div., 3d Dep't 1993), as reflecting a "long-standing" requirement of New York Law, A220, but now belatedly argues that "*Mahoney* was wrongly decided" and "provides no persuasive reason" for requiring domicile, State Br. 24-25. The State argued in the U.S. Court of Appeals for the Second Circuit that *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), marked a "dramatic shift in Second Amendment jurisprudence" that may render a domicile requirement unconstitutional. A251. The State now contends that *Heller* and *McDonald* are, in fact, distinguishable from the law as applied to Mr. Osterweil, and yet this Court should nonetheless abandon the "long-standing" rule of *Mahoney*. The State argues that the Court should construe N.Y. Penal Law § 400.00(3) as not requiring domicile in order to avoid Second Amendment problems, but then asserts that a domicile requirement can survive intermediate scrutiny because it serves the State's interest in monitoring its licensees.

Mr. Osterweil and the State thus agree that the certified question should be answered in the affirmative, but little more. The State's attempt to dodge the blame for the ongoing denial of Mr. Osterweil's constitutional rights blinks reality. It is the State that opposed Mr. Osterweil's attempt to vindicate his rights in federal court, while he litigated pro se, and the State that then dragged its feet once it decided to change course after Mr. Osterweil obtained counsel. The State's argument that a ban on home handgun possession by part-time residents might be permissible under the Second Amendment—either because it is distinguishable from the bans at issue in *Heller* and *McDonald* or because it can survive intermediate scrutiny—amounts to a refusal to acknowledge the holdings of *Heller* and *McDonald* and the fundamental nature of Second Amendment rights. And the State's contention that this Court should avoid Second Amendment issues altogether even while recognizing that "[c]onstitutional concerns loom large in this litigation," State Br. 18, is as inexplicable as it is unexplained.

Denying an in-home handgun license to a part-time resident is incompatible with the Second Amendment and the Supreme Court's decisions in *Heller* and *McDonald*. As those cases make clear, the Second Amendment right, especially when it comes to self-defense in the home, is fundamental. It is not a seasonal right that can be denied during the summer, or limited to full-year residents. The Supreme Court has held that a law that categorically bans the possession of

2

handguns in the home is unconstitutional. When it comes to part-time residents, that is exactly what a domicile requirement does. As a result, this Court should answer the certified question in the affirmative and hold that, consistent with the Second Amendment, § 400.00(3) requires residence and not domicile.

## ARGUMENT

**I.     The Ongoing Violation Of Mr. Osterweil's Second Amendment Right To Possess A Handgun In His Part-Time Residence Must Come To An End.**

The violation of Mr. Osterweil's constitutional right to possess a handgun in defense of his home is longstanding and remains ongoing; he applied for a license to keep a handgun in his New York home more than five years ago, and he has been continuously denied that license. There is nothing obscure or fairly debatable about the responsibility for this denial of fundamental constitutional rights. It was a state official who denied Mr. Osterweil's license application and the State was perfectly happy to give a full-throated defense to that denial while Mr. Osterweil litigated pro se in District Court. Accordingly, the State adds insult to constitutional injury by insinuating that it is really Mr. Osterweil's fault that his Second Amendment rights have been continuously denied for half a decade.

The State's efforts to avoid the blame for the continuing denial of Mr. Osterweil's constitutional rights are wholly unavailing. The State faults Mr. Osterweil for attempting to vindicate his federal constitutional rights in federal

3

court, and suggests that had Mr. Osterweil instead pursued administrative review of his license denial through a state court proceeding, this case might have been over years ago. *See* State Br. 13-14. One of the many problems with that argument is that the State only changed its view of the law after Mr. Osterweil hired counsel on appeal in the Second Circuit. There is no reason to believe that the State would have taken a different position on the meaning of § 400.00(3) in state court than it did in the federal district court. The State nowhere suggested in its district court papers that its argument was somehow forum dependent.

Relatedly, the State suggests that the delay in vindicating Mr. Osterweil's constitutional rights is explicable, at least in part, by the unavailability of certification until Mr. Osterweil appealed his case to the Second Circuit. But the State's endorsement of *Mahoney* and a domicile requirement in the federal district court was unqualified, and was in no way labeled a stop-gap measure until certification could be sought. Not once did the State inform the federal district court or Mr. Osterweil—then litigating pro se—that it thought *Mahoney* misread § 400.00(3), or that a correction of *Mahoney* would be promptly sought via certification.

And, of course, certification was not promptly sought once it became available. The State's attempt to claim it is a victim of circumstance is critically undermined by the reality that it waited almost a year to seek certification once it

4

became a viable option. Mr. Osterweil filed his notice of appeal to the Second Circuit on June 13, 2011. *See* A6. The State could have filed a motion to certify a question to this Court that same day. *See* Advisory Grp. to N.Y. State & Fed. Judicial Council, Practice Handbook on Certification of State Law Questions by the U.S. Court of Appeals for the Second Circuit to the N.Y. State Court of Appeals 3 (2d ed. 2006) ("Motions to certify questions of state law may be filed with the Clerk of Court any time after the notice of appeal has been filed . . . ."). Instead, the State waited until April 18, 2012, to seek certification—a full 10 months after it could have filed a certification motion, 83 days after Mr. Osterweil's attorneys filed their opening brief, and eight days before the State's brief was due. The blame for the ongoing denial of Mr. Osterweil's constitutional rights rests with the State and the State alone.

The State may have already foreshadowed its next delay tactic. The State's brief to this Court notes that Mr. Osterweil owns two homes in Summit, New York, but then states that the "record contains little information as to the amount of time Osterweil spends annually in New York." State Br. 9. Later, in a footnote, the State mentions that "[w]hile Osterweil asserts that he is a part-year resident, the record here does not establish the length of time each year that Osterweil lives in the house or houses he owns in New York" and whether he "continues to reside in his New York house or houses on a part-time basis" will need to be determined.

5

State Br. 19 n.8. Reading between the lines it will be unsurprising if the next step

in the State's resistance to the clear implications of *Heller* and *McDonald* will be

to contend that Mr. Osterweil does not spend enough time "residing" in New York

to qualify for a premises possession permit under New York law. While that

position would be flatly inconsistent with the State's representations to the Second

Circuit, *see* Add-4 (Tr. of Oral Arg. 22) (a ruling in Mr. Osterweil's favor "would

remove the bar that he's challenging in this case"); Add-8 ("if the statute

authorizes issuance of licenses to part-time residents . . . then there would be no

bar on that ground to Mr. Osterweil's license"); Add-9 ("I see no reason to think

that [the state official] would find other means to further deny a license"),

consistency has not been the hallmark of the State's litigation strategy in this case.

The more than five-year denial of Mr. Osterweil's constitutional rights must

come to an end. In addition to answering the certified question in the affirmative,

this Court should take steps to ensure that the State can no longer put off the

vindication of Mr. Osterweil's Second Amendment rights.

## II.    A Ban On Home Handgun Possession By Part-Time State Residents Violates The Second Amendment.

### A.    A Ban On Home Handgun Possession By Part-Time State Residents Categorically Prohibits The Exercise Of The Core Second Amendment Right Identified In *Heller*.

As described in Mr. Osterweil's opening brief, *Heller* and *McDonald* make

plain that a complete ban on home handgun possession by part-time New York

6

residents is unconstitutional. *See* Osterweil Br. 14-17. While the State appears to acknowledge as much at one point, State Br. 3, it nonetheless contends that a domicile requirement like that imposed on Mr. Osterweil is not the same as the bans struck down in *Heller* and *McDonald*. The State contends that "a New York domicile requirement would not be an absolute ban" like those addressed by the Supreme Court because (1) Mr. Osterweil could make his domicile in New York and be eligible for a handgun premises possession permit and (2) a New York domicile requirement does "not limit [Mr.] Osterweil's ability to possess a handgun in his Louisiana homes." State Br. 28.

Little ink need be wasted on the State's efforts to undermine the dispositive nature of *Heller* and *McDonald*. The State's contention that a domicile requirement does not amount to a categorical ban because Mr. Osterweil can change his domicile only underscores how little the State values Second Amendment rights. Presumably even the State would recognize that a ban on free speech or free exercise is no less categorical because those denied their fundamental rights could always move elsewhere. And, of course, Messrs. Heller and McDonald could have equally avoided the categorical bans at issue by moving elsewhere.

In all events, as Justice O'Connor recognized in her opinion certifying the question to this Court, "a domicile requirement will operate much like the bans

7

struck down in *Heller* and *McDonald* . . . for part-time New York residents whose permanent homes are elsewhere." A194. Given the reality that Mr. Osterweil is a part-year resident, the question is whether the Second Amendment permits the State to deny him any ability to obtain a handgun for self-defense in his part-time residence. The answer clearly supplied by *McDonald* and *Heller* is no. And the State's suggestion that Mr. Osterweil could always move and re-establish his New York domicile is reminiscent of the law student who wants to change the hypothetical. But there is nothing hypothetical about the denial of Mr. Osterweil's Second Amendment rights. He is, in fact, a part-time resident of New York, and *Heller* and *McDonald* entitle him to relief. There is certainly no hint in either *Heller* or *McDonald* that part-time and full-time residents should be treated differently for Second Amendment purposes. The Second Amendment guarantees the right of "law-abiding, responsible citizens to use arms in defense of hearth and home" where the need for self-defense "is most acute." *Heller*, 554 U.S. at 592, 628, 635. The fundamental right of self-defense is no less acute because one has more than one home, or spends less than twelve months per year in one's home. As far as the Second Amendment is concerned, part-time and full-time residents and residences are identical.

The State's argument that a domicile requirement does not amount to a categorical ban because non-domiciliaries can possess handguns in the state where

8

they are domiciled fares no better. That Heller might have been able to possess a handgun in a home outside of Washington, D.C., did not impact the Supreme Court's analysis. The same should be true here. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense in the home." *Id.* at 636. It does not matter whether the home is a part-time or full-time residence.

The State also argues that "[a] court could find that Osterweil's needs for home self-defense . . . during limited periods of residency in New York are met by possession of a long gun, which under New York law does not require a license." State Br. 29. In the pantheon of arguments squarely foreclosed by *Heller*, the argument that long guns suffice has to rank very near the top. Defenders of the District of Columbia handgun ban argued this point at length and to no avail. The State may disagree with *Heller*, but *Heller* is the law: "handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." 554 U.S. at 629. Accordingly, the State's contention that the constitutional harms done by a categorical part-time resident

9

home handgun ban are somehow ameliorated by the availability of long guns is a constitutional nonstarter.[1]

*Heller* and *McDonald* control here—a categorical ban on home handgun possession by part-time residents is unconstitutional.

## B. A Ban On Home Handgun Possession By Part-Time State Residents Fails Under Any Arguably Applicable Standard Of Scrutiny.

After its failed attempt to distinguish a part-time resident handgun ban from the prohibitions at issue in *Heller* and *McDonald*, the State asserts that such a ban could "survive[] intermediate scrutiny" because "the exclusion of a non-resident from licensure serves important state interests in monitoring the conduct of licensees." State Br. 28. Not so.

Setting aside the obvious and inherent conflict between the State's argument in favor of constitutional avoidance and its contention that a domicile requirement is not unconstitutional, the State makes two mistakes. First, to the extent that levels-of-scrutiny analysis is necessary to decide whether a part-time resident

---

[1] The State also notes that "*Heller* and *McDonald* plainly leave room for reasonable regulation of handgun possession," State Br. 28, citing the portions of those decisions discussing bans on the possession of firearms by felons, the mentally ill, and minors, as well as "laws forbidding the carrying of firearms in sensitive places," *Heller*, 554 U.S. at 626-27. The precise meaning of this language in *Heller* has been the subject of considerable debate. But one thing is beyond debate: a ban on possession of handguns in the home is not a "reasonable regulation of handgun possession." That is the unequivocal holding of *Heller*, and it is dispositive here.

10

handgun ban is constitutional, the scrutiny must be strict.[2]   As Mr. Osterweil

explained in his opening brief, the Second Amendment right to possess and carry

firearms is a fundamental right and laws abrogating fundamental rights are subject

to strict scrutiny. Osterweil Br. 18-20.

The State's argument that intermediate scrutiny applies to categorical bans

on home handgun possession like that at issue in *Heller* was rejected by *Heller*

itself. *Heller* explicitly and definitively rejected the "interest-balancing" approach

endorsed by Justice Breyer—which is intermediate scrutiny by another name.

*Heller*, 554 U.S. at 634; *McDonald*, 130 S. Ct. at 3050 (plurality op.) ("while

[Justice Breyer's] opinion in *Heller* recommended an interest-balancing test, the

Court specifically rejected that suggestion"). Justice Breyer called his approach

"interest-balancing" because of his view that the government's interest in

regulating firearms—some version of protecting public safety—would always be

important or compelling. Thus, in his view, whether the level of scrutiny applied

was strict (requiring a compelling government interest) or intermediate (requiring

only an important interest), the government interest would always qualify, and the

analysis would really turn on a search for the appropriate degree of fit, which

---

[2] This Court could of course "follow *Heller*'s lead and find the policy applied here unconstitutional without specifying a level of scrutiny.  Like the law in *Heller*, the policy applied to Mr. Osterweil is unconstitutional because it is antithetical to the core Second Amendment right."  Osterweil Br. 17-18.

11

Justice Breyer described as interest-balancing. *See Heller*, 554 U.S. at 689-90 (Breyer, J., dissenting).

Semantics aside, Justice Breyer's approach in substance was simply intermediate scrutiny. Justice Breyer relied (*see id.* at 690) on cases such as *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997), and *Thompson v. Western States Medical Center*, 535 U.S. 357 (2002), which explicitly apply intermediate scrutiny. Even more tellingly, Justice Breyer invoked *Burdick v. Takushi*, 504 U.S. 428 (1992), the case on which the United States principally relied in advocating that the Court adopt intermediate scrutiny. *See* Brief for the United States as Amicus Curiae 8, 24, 28, *District of Columbia v. Heller*, 554 U.S. 570 (2008) (No. 07-290), 2008 WL 157201. Justice Breyer's interest-balancing was simply intermediate scrutiny by another name, and the Court rejected it (and reaffirmed that rejection in *McDonald*). *See* Add-6 (observing that the State's argument that something other than strict scrutiny applies to a domicile requirement is "essentially [the] position . . . that Justice Breyer took in . . . and was rejected by the Supreme Court by the majority" in *Heller* (Walker, J.)).

In all events, a ban on part-time resident home handgun possession fails under both strict and intermediate scrutiny.[3] The State effectively concedes that a

---

[3] Not even the State is so bold as to argue that something less than intermediate scrutiny applies. Any argument to that effect is foreclosed by *Heller*. *See* 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms

12

part-time resident handgun ban fails strict scrutiny by not even attempting to address strict scrutiny in its brief. *See* State Br. 28. And the "important state interest[] in monitoring the conduct of licensees" that the State cites is not a compelling interest that can justify the ban under strict scrutiny. State Br. 28. Monitoring licensees might play a part in achieving some other compelling end, but it cannot be an end in itself.

What is more, any claim to a compelling interest in monitoring licensees rings hollow in light of the fact that domiciliaries who may spend little-to-no time in New York are eligible for premises possession permits. There is no time limit linked to the domicile requirement as enforced against Mr. Osterweil. As a result, a New York domiciliary can have a license to have a handgun in his home spending nearly no time there, and a non-domiciliary who spends substantially more time in New York cannot. That mismatch makes any claim that some compelling interest related to monitoring licensees is served in a tailored way by a part-time resident handgun ban untenable.

For much the same reasons, an asserted interest in monitoring licensees cannot support a ban on home handgun possession by part-time residents under intermediate scrutiny. The State has never provided or cited to any evidence— which is clearly the State's burden under any form of heightened scrutiny, *see City*

was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.").

13

*of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438-40 (2002)—that a ban on home handgun possession by part-time residents actually promotes its claimed interest in monitoring (or any other interest for that matter). That may be because there is no evidence to support the claim. New York licensing law already contemplates that there are available and useful mechanisms for monitoring out-of-state behavior: N.Y. Penal Law § 400.00(11) provides that a handgun license can be suspended upon conviction for a felony or serious offense "anywhere." Moreover, as noted in Mr. Osterweil's opening brief, the answer to any concerns with effectively monitoring those domiciled elsewhere would be deference to the licensing decision of the state of domicile, not a categorical ban that is flatly inconsistent with *Heller*.[4]

The notion that an interest in monitoring licensees justifies the severe restriction on Second Amendment rights enforced against Mr. Osterweil is fatally undermined by the State's own arguments. The State urges this Court to hold that New York law "authorize[s] the issuance of a handgun license to a New York resident who is not domiciled in New York." State Br. 2. As the State notes, "this Court has in some contexts construed 'residence' to mean 'domicile,'" such as when "'the nature of the subject-matter of the statute'" counsels in favor of "the

---

[4] As explained in Mr. Osterweil's opening brief, *Bach v. Pataki*, 408 F.3d 75 (2d Cir. 2005), cannot justify the State's reliance on an asserted interest in monitoring its licensees. *See* Osterweil Br. 21; *see also* Add-1 (noting that *Bach* was decided "under a different regime" and "before *Heller*" (Walker, J.)).

14

more restrictive requirement of domicile." State Br. 20. If the State's interest in monitoring its licensees is as strong as it asserts—strong enough to justify burdening a fundamental constitutional right—one would think that the State would argue that this is one of the times that a statutory residence requirement actually requires domicile. That it is not critically undermines the State's asserted interest. *See* Add-36 (noting that the State's argument that § 400.00(3) does not require domicile is in conflict with its argument that a domicile requirement serves the State's monitoring interest (Walker, J.)).

A ban on home handgun possession by part-time residents like that applied to Mr. Osterweil is fatally inconsistent with *Heller* and can survive neither strict nor intermediate scrutiny.[5]

## III. This Court Should Construe New York Law Governing Home Handgun Possession As Not Requiring Domicile.

This Court should interpret N.Y. Penal Law § 400.00(3) to allow individuals who—like Mr. Osterweil—"reside" in New York, but are not New York domiciliaries, to possess handguns in their homes. *See* Osterweil Br. 29-31. Tying an individual's ability to possess a handgun in his home to that individual's status as a domiciliary is flatly inconsistent with both the Second Amendment and the Equal Protection Clause. This Court's precedents require it "to avoid interpreting a

---

[5] A ban on part-time resident home handgun possession also violates the Equal Protection Clause of the Fourteenth Amendment. *See* Osterweil Br. 26-29. The State does not argue otherwise.

15

statute in a way that would render it unconstitutional if such a construction can be avoided," *Alliance of Am. Insurers v. Chu*, 77 N.Y.2d 573, 585 (Ct. App. 1991), and a clearly unconstitutional construction can be avoided here. While New York courts often construe "residence" and "reside" to mean "domicile," *see, e.g*., *Longwood Cent. School Dist. v. Springs Union Free School Dist.*, 1 N.Y.3d 385, 388 (Ct. App. 2004), that is not always the case. Accordingly, this court should construe § 400.00(3) to require only residency.

Despite the State's contention that a part-time resident home handgun ban would likely be permissible under the Second Amendment, the State also argues that this Court should interpret § 400.00(3) "to require only residence and not domicile under the principle that statutes should be construed so as to avoid serious constitutional questions." State Br. 25. As explained, the state is only half right. But for the fact that applying the rule of *Mahoney* would flatly violate the Second Amendment, there would be no reason for this Court to move away from that long-established construction of New York law. The reason to abandon the rule of *Mahoney* is the Second Amendment as construed in *Heller* and *McDonald*. And no principle of sound judicial decisionmaking counsels in favor of the State's suggestion, *see* State Br. 26, that this Court should obscure that the reason for it to construe the statute in Mr. Osterweil's favor is the constitutional arguments that he has been making consistently throughout this litigation.

16

New York law does not compel the odd approach to constitutional avoidance that New York advocates. The relevant statutory provision provides that "[t]he courts should not strike down a statute as unconstitutional unless such statute clearly violates the Constitution." N.Y. Stat. Law § 150 (McKinney). And the leading case cited by the State provides that "'[n]o statute should be declared unconstitutional if by any reasonable construction it can be given a meaning in harmony with the fundamental law.'" State Br. 25 (quoting *People ex rel. Simpson v. Wells*, 181 N.Y. 252, 257 (1905)). Neither the relevant statute nor relevant case law says that "when a case involves a constitutional issue that drives the statutory analysis courts should avoid acknowledging the constitutional issue."

The fact that this case comes to the Court on certification rather than direct appeal should not impact the Court's approach to constitutional avoidance. Contrary to the State's suggestion, *see* State Br. 27, nothing in the New York constitutional provision authorizing this Court to answer certified questions makes it somehow inappropriate to consider the Second Amendment implications of a domicile requirement. The relevant constitutional provision states that this Court may "answer questions of New York law"—it does not forbid this Court from considering constitutional issues in the course of answering those questions. N.Y. Const. art. VI, § 3(b)(9). Indeed, the New York statutory provision outlining certification procedures expressly contemplates that a certified question may

17

involve constitutional issues: "If the constitutionality of an act of the Legislature of this State is involved in a certification to which the State of New York or one of its agencies is not a party, the clerk of the court shall notify the Attorney General . . . ." N.Y. Comp. Codes R. & Regs. tit. 22, § 500.27(f). This provision is not at issue here because the State has been directly involved in this case for more than four years, but it makes clear that constitutional issues are not off limits on certification.

Deciding whether the canon of constitutional avoidance should be applied necessarily requires consideration of the constitutional issues to be avoided. The Supreme Court's approach to constitutional avoidance in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979), is instructive. In *Catholic Bishop*, the Court held that the National Labor Relations Act did not authorize the NLRB to exercise jurisdiction over lay faculty members at church-operated schools largely because holding otherwise might have required invalidating the statute on First Amendment grounds. The Court arrived at that decision only after an in-depth consideration of the contours of the constitutional rights at stake. *See id.* at 501-504; *id.* at 504 ("We see no escape from conflicts flowing from the Board's exercise of jurisdiction over teachers in church-operated schools and the consequent serious First Amendment questions that would follow" and thus must decide whether the Act can be read to avoid such problems.); *see also Edward J. DeBartolo Corp. v.*

18

*Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575-76 (1988) (thoroughly exploring the relevant constitutional issues in the process of deciding whether those issues could be avoided). The *Catholic Bishop* Court did not adopt a particular interpretation of the statute at issue based on some amorphous fear that doing otherwise might violate the Constitution in an unspecified way. Instead, the court reviewed the relevant constitutional arguments, expressly acknowledged that one interpretive approach would be constitutionally problematic, and then adopted an interpretation consistent with the Constitution.

That approach makes sense. The contention that a court must alter its interpretation of a statute merely because a litigant raises a constitutional issue, and without further review of the constitutional claim, is an invitation to litigants to raise frivolous constitutional arguments to obtain desired interpretive results and tantamount to an assertion that courts should abdicate their judicial responsibility to interpret statutes in cases involving constitutional claims. The former is ill-advised and the latter is plainly wrong. A court should allow its interpretation of a statute to be impacted by the Constitution only after determining whether a specific interpretation of that statute would run afoul of the Constitution.

In this case, there is more than mere tension between the view of § 400.00(3) pressed by the State in federal district court and imposed by the state official to deny Mr. Osterweil's license application—a domicile requirement and the Second

19

Amendment right to keep and bear arms in defense of hearth and home are incompatible. Accordingly, this Court should hold that, at least in this case, "resides" simply means "resides."[6]

## CONCLUSION

For the foregoing reasons, this Court should answer the certified question in the affirmative and hold that a ban on home handgun possession by part-time residents violates the Second Amendment and the Equal Protection Clause and that N.Y. Penal Law § 400.00(3) makes home handgun possession permits available to part-time New York residents.

_____

[6] The State also asserts that the Court need not resort to constitutional avoidance because "the context, structure and history" of § 400.00(3) "strongly support construing the statute as requiring only residency," State Br. 21, 25, which begs the question why the State did not argue as much in federal district court, where Mr. Osterweil litigated this case pro se, or in the Second Circuit, where the State conceded that the federal appellate court had the power to decide the question of whether § 400.00(3) requires domicile to the extent the issue was "clear cut," Add-6.

Respectfully submitted,

Paul D. Clement
D. Zachary Hudson
BANCROFT PLLC
1919 M St., N.W., Suite 470
Washington, D.C.  20036
Telephone: (202) 234-0900
pclement@bancroftpllc.com

Daniel L. Schmutter
GREENBAUM, ROWE, SMITH
  & DAVIS LLP
P.O. Box 5600
Woodbridge, NJ 07095
(732) 549-5600
dschmutter@greenbaumlaw.com

*Counsel for Appellant*

June 24, 2013

21

# ADDENDUM

# 11-2420 cv

---

In the

## United States Court of Appeals
### for the Second Circuit

———————————

Alfred G. Osterweil,

*Plaintiff – Appellant,*

v.

George R. Bartlett, III,
In his official capacity as Licensing Officer in the County of Schoharie,

*Defendant – Appellee,*

David A. Paterson, in his official capacity as
Governor of the State of New York; Andrew M. Cuomo, in his official capacity as
Attorney General of the State of New York,

*Defendants.*

———————————

**EXCERPTS FROM
TRANSCRIPT OF ORAL ARGUMENT
May 23, 2013**

———————————

7

| | |
|---|---|
| 1 | essentially the same, first of all, |
| 2 | constitutional question in the same case. |
| 3 | WALKER:  Can we -- you know, you don't |
| 4 | have unlimited time here and I wondered if we |
| 5 | could move to the justification that the state |
| 6 | is offering here of this monitoring practice. |
| 7 | There was a decision by our court a number of |
| 8 | years ago that I think Judge Newman wrote the |
| 9 | opinion in which he addressed this question. |
| 10 | But that was under a different regime.  That |
| 11 | was before Heller, correct? |
| 12 | MR. CLEMENT:  That was both before Heller |
| 13 | and equally importantly in the context of a |
| 14 | nonresident.  And so whatever the strength of |
| 15 | the argument is with somebody who has no |
| 16 | connection to the state of New York other than |
| 17 | the fact they wanna visit -- I think that case |
| 18 | involved somebody who wanted to visit family in |
| 19 | New York -- |
| 20 | WALKER:  -- yeah. |
| 21 | MR. CLEMENT:  -- I think it's a very |
| 22 | different situation when you have somebody who |

**Add-2**
ORAL ARGUMENT

8

1   has a part-time residence here.  In this case

2   in particular, Mr. Osterweil -- this used to

3   be his full-time residence.  So he continues to

4   maintain very significant ties to the

5   community.  The ability to -- to monitor him, I

6   think it's actually far superior to somebody

7   who could be a technical domiciliary but

8   actually spend most of their time some place

9   else, but just they have their intention to

10   return to New York.  I mean, you think about a

11   college student --

12     WALKER:  -- so I take it that your --

13   your basic point that he -- he wants a gun to

14   keep in his home to protect his home and

15   family, which is at the heart of the second

16   amendment guarantee that has been expounded in

17   these two Supreme Court cases.  But there was

18   some talk here about the possibility he might

19   want it for target practice or hunting as well.

20   And I wonder if that changes the -- the mix, it

21   changes the calculus.  Are there core -- sort

22   of core issues, core uses of a gun that really

**Add-3**
ORAL ARGUMENT

9

1      are protected by the right instead of less core

2      uses that might -- might -- might receive a

3      lesser degree of protection?

4           MR. CLEMENT:  Well, there -- there --

5      certainly the core that was protected in Heller

6      and McDonald and then I think there's an open

7      question as to how far that extends.

8           WALKER:  Uh-huh.

9           MR. CLEMENT:  And the seventh circuit, for

10     example, in the Azoe (phonetic) case has

11     already held that something like target

12     practice is protected within the core of the

13     right, because, you know, the last thing you

14     want is a bunch of people with the right to

15     possess arms that don't know how to shoot.

16          WALKER:  Hunting may be different.

17          MR. CLEMENT:  Hunting I suppose could be

18     different.  You know, I'd be happy to argue why

19     hunting is still protected.

20          WALKER:  Right.

21          MR. CLEMENT:  But the point is I do think

22     that that's an issue that is both forfeited and

22

1          wasn't required to submit an article 78.

2                    MR. HELLER:  I'm not suggesting that he

3          was required to --

4                    JACOBS:  -- I mean, it's enough -- I

5          mean, how many litigations does he really have

6          to go through in order to get a license to have

7          a handgun?

8                    MR. HELLER:  I don't think he needs to go

9          through additional litigations regarding the

10         domicile requirements because this court can

11         now by certification obtain a -- the proper

12         reading of the statute which would remove the

13         bar that he's challenging in this case.  And I

14         also wanna address the claim of delay.

15                   O'CONNOR:  Well, specifically, what do

16         you suggest this court do?

17                   MR. HELLER:  Specifically this court

18         should certify the meeting of the residence

19         language in subsection three.

20                   WALKER:  In which case the state will

21         take the position before the New York Court of

22         Appeals that there's no domiciliary

23

1           requirement, is that -- is that what you're

2           saying?

3                   MR. HELLER:   That's correct that that's

4           what the statute means.

5                   WALKER:   And there's nothing of course

6           that would compel us to certify.   If the

7           question's open and shut we could just decide

8           the question ourselves, too.

9                   MR. HELLER:   The court could do that, of

10          course.   And I think the -- the statute but for

11          the Mahoney decision, the statute on its face

12          would achieve that.

13                  JACOBS:   So between -- what you're

14          saying is we should certify it in order to ask

15          the New York Court of Appeals which end is up.

16                  MR. HELLER:   Well, I think --

17                  JACOBS:   -- you're saying it's easy as

18          pie.   Why would we need to bother them?

19                  MR. HELLER:   I think the reason to certify

20          is to put an end to any doubt.   But this court

21          could, as we suggested in our brief and

22          footnote, decide the question itself if it

24

1       views the -- the question's clear cut, of

2       course.

3               WALKER:  Moving -- moving to the

4       substance, leaving the certification out,

5       you're arguing here that there is no strict

6       scrutiny test -- that strict scrutiny is not

7       the appropriate test here, and that it's

8       some -- some lesser form of scrutiny.  Is that

9       correct?

10              MR. HELLER:  That's right.

11              WALKER:  And you're taking essentially

12      a position, were you not, that Justice Breyer

13      took in -- in -- in and -- and was rejected by

14      the Supreme Court by the majority where he used

15      a balancing of interest?

16              MR. HELLER:  I don't think we're taking

17      the position that puts specifically Justice

18      Breyer took.  We're taking the position that the

19      majority, I think, of virtually every court of

20      appeals to address the appropriate standard of

21      review is taken, which is they've come down in

22      the end and found that intermediate scrutiny is

25

1        the appropriate standard.

2                WALKER:  Well, I -- okay.  So maybe

3        that's true but if there's -- how many cases --

4        and you can correct me on this 'cuz you're more

5        aware of this than I am -- how many of these

6        cases involve possession of the gun in the home

7        for personal protection as opposed to other

8        uses?  It seems to me that if Heller stands for

9        anything, it stands for the right of a person

10       to have a gun in their home, assuming all the

11       other qualifications are met, they're not

12       felons and so forth, and they appropriately get

13       an appropriate permit, to have a gun in their

14       home, for -- for defense purposes.  That's the

15       core right here.  And under those circumstances

16       have these cases applied intermediate or less

17       of scrutiny to that kind of context.

18                MR. HELLER:  I don't think any of those

19       courts have looked at severe restrictions on

20       possession of handguns in the home other than

21       Heller and McDonald.

22                WALKER:  Right.

1    part-time or fractional or some short period

2    of -- some fragment of the year, that -- that

3    there's no constitutional right to -- to

4    possess a firearm to protect that particular

5    home.

6            MR. HELLER: Well --

7            JACOBS: -- which would seem to present

8    a constitutional question that the New York

9    Court of Appeals couldn't resolve.

10           MR. HELLER: If -- if the statute

11   authorizes issuance of licenses to part-time

12   residents, as we believe it does on its face,

13   then there would be no bar on that ground to

14   Mr. Osterweil's license. That may go beyond

15   what the constitution requires --

16           JACOBS: -- I don't see Judge Bartlett

17   issuing the license. I mean, it's not like

18   he's pushing on an open door. I mean, you're

19   here. We're all here. It's because -- because

20   of -- the license will not issue.

21           MR. HELLER: I think the only -- Judge

22   Bartlett's only reason for stated reason for

33

1    denying this license was he felt bound by the

2    Mahoney decision.

3         O'CONNOR:  What are you saying?  I can't

4    hear you.

5         MR. HELLER:  The only --

6         O'CONNOR:  -- the only reason --

7         MR. HELLER:  -- the only reason that Judge

8    Bartlett, the licensing officer, denied this

9    license is because he felt bound by the Mahoney

10   decision.  I see no reason to think that he

11   would find other means to further deny a

12   license, assuming Mr. Osterweil pursues the

13   license application.  There --

14        (The recording was concluded.)

15        MR. HELLER:  You know, he would clarify

16   whether it's for target practice and for

17   hunting or for -- for a use on his premises or

18   perhaps the overlap over both.  And assuming he

19   can provide fingerprints, which he hadn't been

20   able to do, presumably the license would be

21   issued.

22        WALKER:  Well, you seem to want

36

1          MR. HELLER:  He -- I don't think

2     Mr. Osterweil, as far as I know, has made no

3     effort to try to get fingerprints taken again.

4     The judge --

5          JACOBS:  -- he tried it was two or

6     three times, based on my recollection.

7          MR. HELLER:  I think it was -- I

8     believe -- it may have been three, but I think

9     it was perhaps two times.  In any event, I do

10    think that there's no bar to Mr. Osterweil

11    making a renewed application at any time for a

12    license if he wants one if he wants it.  Or --

13         WALKER:  -- so the other thing I wonder

14    is why -- because of the position that you're

15    taking, you're not -- it seems to me that

16    you're -- that it reflects upon the state's

17    view of the -- of the efficacy of the

18    monitoring regime rational.  Apparently there's

19    no need to monitor Mr. Osterweil even though

20    he's a -- domiciled in Louisiana, because they

21    can -- they can -- if it's a part-time

22    resident, that's fine.  And if a part-time

37

1          resident is here for two or three months we'll

2          give him the permit.  Now, whatever happened to

3          the monitoring regime that you -- that you

4          press in your papers?

5              MR. HELLER:  The monitoring interest, the

6          interest in monitoring that we press in our

7          papers justifies this if indeed it's a domicile

8          requirement, and that's because of course it's

9          the more -- the more time a person spends in

10         the state, the easier it is for the state to

11         monitor possible disqualifying activity --

12             WALKER:  -- but we know that

13         domiciliaries need not spend much time in the

14         state.  Mr. Clement gave the example of a

15         student.  There can be other examples.  A

16         person who's a traveling sales man and so

17         forth.

18             MR. HELLER:  That's right, but typically a

19         domiciliary has important ties to the state,

20         driver's license in the state, identifying

21         information linking him or her to the state,

22         paying taxes in the state.

38

 1          WALKER:  All I'm saying is you're gonna

 2      monitor the domicile that comes to --

 3      domiciliary who comes here part-time, but

 4      you're not gonna bother to -- to monitor and

 5      you can't monitor effectively -- presumably

 6      somebody who has a residence here is not

 7      domiciled elsewhere, a little -- but he's only

 8      in the residence for a couple of weeks a year.

 9      It just -- it seems like -- like an ill-fitting

10      suit of clothes, the monitoring rational under

11      those circumstances.

12          MR. HELLER:  I think the more -- again,

13      the more -- the more time a person spends in

14      the state, even if they're a part-time

15      resident, the greater the ability of the state

16      to monitor -- monitor their activities.

17          WALKER:  Yeah.  But you'll give a

18      permit to somebody who's not -- not here a lot,

19      as I understand it, under your -- under your

20      rational.

21          MR. HELLER:  Well, I think the statute

22      authorizes issuance of licenses to someone who

39

1          is a resident of the state even if they're a

2          part-time resident.

3                JACOBS:   But -- but the -- the more you

4          argue that, the question is how much time

5          someone --

6                     (The recording was concluded.)

7                JACOBS:   -- spends in the state the

8          less important it becomes whether someone is a

9          domiciliary, because there are people who are

10         imprisoned for life in one state who are still

11         domiciled in the state that they were in before

12         they committed their crime.  And there are

13         people who are living in Europe who sold their

14         American homes, they're -- 'cuz they're working

15         abroad for their employer, could be for four or

16         five years and they're still domiciled in

17         Illinois or Indiana or whatever.  So your

18         argument is really coming down to part-time

19         presence rather than the -- the -- the question

20         we started with, which is the construal of a

21         statute, which is what the New York Court of

22         Appeals would be best situated to do.

40

1              MR. HELLER:  Again, I think the New York

2         Court of Appeals is likely to say that this

3         statute does not require domicile, New York

4         domicile, that someone who lives in a residence

5         for some portion of time in New York is

6         eligible to obtain a firearms license.  That --

7         that resolves the question that Mr. Osterweil

8         has posed in this case.

9              JACOBS:  Yeah, but that -- yeah, but --

10             MR. HELLER:  -- and disposes of -- of this

11        litigation.

12             JACOBS:  But presumably Judge Bartlett

13        has already arrived at this conclusion, you

14        have arrived at this conclusion, and he feels

15        bound -- that just means that the New York

16        Court of Appeals has to do some work in order

17        to satisfy Judge Bartlett, which I don't think

18        will be their point of view.

19             MR. HELLER:  Well, it may be that they --

20        that they of course can decline to -- to answer

21        --

22             JACOBS:  -- (inaudible).

47

1                    CERTIFICATE OF TRANSCRIBER

2              I, Jackie A. Scheer, do hereby certify

3         that the foregoing transcript is a true and

4         correct record of the recorded proceedings;

5         that said proceedings were transcribed to the

6         best of my ability from the audio recording as

7         provided; and that I am neither counsel for,

8         related to, nor employed by any of the parties

9         to this case and have no interest, financial or

10        otherwise in its outcome.

11

12

13

14

15        *Jackie Scheer*

16        JACKIE A. SCHEER

17

18

19

20

21

22

# EXHIBIT I

=================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------
No. 167
Alfred G. Osterweil,
          Appellant,
        v.
George R. Bartlett, III,
          Respondent.




          Daniel L. Schmutter, for appellant.
          Claude S. Platton, for respondent.




PIGOTT, J.:

          The United States Court of Appeals for the Second

Circuit, by certified question, asks us to decide whether an

applicant who owns a part-time residence in New York but makes

his permanent domicile elsewhere is eligible for a New York

- 1 -

handgun license in the city or county where his part-time
residence is located.  We answer the certified question in the
affirmative, on the basis of the relevant statute.  As we explain
below, it is therefore unnecessary for us to decide the
constitutional issues raised by appellant.

I.

Appellant Alfred G. Osterweil, a resident of Summit,
New York, a town in Schoharie County, applied on May 21, 2008 for
a New York State pistol/revolver license pursuant to Penal Law §
400.00.  The Schoharie County Sheriff initiated the required
background investigations (see Penal Law § 400.00 [4]).  On June
25, in the course of correspondence on an unrelated matter,
Osterweil informed the Sheriff that he had bought a home in
Louisiana and that he intended to "make that state my primary
residence," while keeping "a vacation property here in Schoharie
County."  Osterweil asked whether he would still be eligible for
a handgun license.

Osterweil's letter raised an important question.  Penal
Law § 400 (3) (a) provides that "[a]pplications shall be made and
renewed, in the case of a license to carry or possess a pistol or
revolver, to the licensing officer in the city or county, as the
case may be, where the applicant resides, is principally employed
or has his principal place of business as merchant or
storekeeper" (emphasis added).

At the heart of Osterweil's query is the distinction

- 2 -

between residence and domicile. Generally, establishing residence "turns on whether [one] has a significant connection with some locality in the State as the result of living there for some length of time during the course of a year" (Antone v General Motors Corp., Buick Motor Div., 64 NY2d 20, 30 [1984]), whereas "[e]stablishment of a domicile in a [place] generally requires a physical presence in the [place] and an intention to make the [place] a permanent home" (id. at 30), i.e. intent to remain there for the foreseeable future. It follows that an individual can have more than one residence, but only one domicile (see id. at 28). Osterweil maintained a residence in Schoharie County, but could no longer claim it as his domicile. Therefore, if a New York domicile is required for a handgun license, the statute makes him ineligible.

The Sheriff forwarded Osterweil's application and query to respondent George R. Bartlett, III, Schoharie County Court Judge and also the county's licensing officer. Osterweil submitted an affidavit to Judge Bartlett, stating that he and his wife continued to play a role in "social, political and community affairs" in Summit, even though they no longer made their primary residence there. He also cited the United States Supreme Court's recent decision in District of Columbia v Heller (554 US 570 [2008]), in which the Supreme Court struck down a District of Columbia law banning the possession of handguns in the home, holding that "the absolute prohibition of handguns held and used

for self-defense in the home" is unconstitutional under the
Second Amendment (id. at 636; see also McDonald v City of
Chicago, 130 S Ct 3020 [2010]).

In May 2009, Judge Bartlett denied Osterweil's
application for a handgun license, relying on Penal Law § 400 (3)
(a) and an Appellate Division decision, Mahoney v Lewis (199 AD2d
734 [3d Dept 1993]), which held that "as used in this statute the
term residence is equivalent to domicile" (id. at 735).  Judge
Bartlett further ruled that such a domicile requirement was
constitutional, under Heller, as a lawful regulatory measure.

II.

In July 2009, Osterweil commenced this action pursuant
to 42 USC § 1983 in the United States District Court for the
Northern District of New York, alleging that Judge Bartlett had
violated his Second Amendment right to keep and bear arms and his
Fourteenth Amendment right to equal protection, by denying his
license application on the ground of his domicile.  He sought an
injunction ordering the State to grant his application.  Judge
Bartlett, represented by the Attorney General's office, and
Osterweil each moved for summary judgment.

On May 20, 2011, the District Court granted Judge
Bartlett summary judgment, rejecting Osterweil's Second Amendment
and Fourteenth Amendment claims (see Osterweil v Bartlett, 819 F
Supp 2d 72, 85-87 [NDNY 2011]).  On appeal, before the United
States Court of Appeals for the Second Circuit, Osterweil

reiterated his position that a domicile requirement for handgun
possession is unconstitutional. The Attorney General now argued
that Penal Law § 400 (3) (a) does not in fact contain a domicile
requirement, obviating the need to reach the constitutional
issues. On January 29, 2013, the Second Circuit, in an opinion
by retired United States Supreme Court Justice Sandra Day
O'Connor, certified the following question to us:

> "Is an applicant who owns a part-time
> residence in New York but makes his permanent
> domicile elsewhere eligible for a New York
> handgun license in the city or county where
> his part-time residence is located?"
> (Osterweil v Bartlett, 706 F3d 139, 145 [2d
> Cir 2013]).

We accepted the certified question, pursuant to section
500.27 of our Rules of Practice (20 NY3d 1058 [2013]), and now
answer it in the affirmative.

III.

In this unusual case, both appellant and respondent
would have us answer the certified question in the affirmative.
However, respondent asks us to answer the question purely on the
basis of the statute, whereas appellant urges us to rule that the
law cannot require domicile for handgun license eligibility
because that would be unconstitutional.

We take a straightforward approach to this dispute. If
Penal Law § 400 (3) (a) does not require domicile, then there is
no need to decide the constitutionality of a hypothetical statute
that requires domicile. The question concerning the meaning of

the statute at issue – the question certified to us – must be
answered prior to any question concerning its constitutional
validity.  This is not a case in which we are faced with an
ambiguous statute requiring us to favor an interpretation that
renders it constitutional over constructions that would
invalidate it.

IV.

Penal Law § 400 (3) (a) states that applications for a
license to carry a pistol or revolver "shall be made and renewed
. . . to the licensing officer in the city or county, as the case
may be, where the applicant resides, is principally employed or
has his principal place of business as merchant or storekeeper."
The applicant's residence is referred to in the context of
delineating the procedure whereby an individual files an
application for a license.  The applicant is instructed to apply
to the licensing officer in the city or county where he resides
(or is principally employed, etc.).  The plain language of the
statute is not consistent with the theory that the law requires
an applicant to establish domicile as an eligibility requirement.
Were it so, we would expect to see the manner of proof of
domicile set out in the statute.

Moreover, the legislative history of the statutes that
underlay Penal § 400 evinces an intent to ensure that an
applicant for a handgun license applies in his place of
residence, rather than an intent to limit licenses to applicants

who make their domicile in New York. The residency language was
added to the Penal Law by Chapter 792 of the Laws of 1931.
Former Penal Law § 1897 was amended by adding a subdivision, 9-a,
which read as follows:

> "No license shall be issued by the police
> commissioner of the city of New York except
> to a resident of that city. Outside of the
> city of New York, no license shall be issued
> by a judge or justice of a court of record
> except to a resident of the county in which
> the office of such judge or justice is
> located. A license may be issued, however,
> to a qualified person principally employed in
> such city or county and to a merchant or
> storekeeper having his principal place of
> business in such city or county" (L 1931, ch.
> 792, § 4; see 1931 McKinney's Session Laws of
> NY at 2390).

At the beginning of September 1931, the month in which
this law was passed, Governor Roosevelt wrote to the Legislature,
sitting in extraordinary session, attaching a letter he had
received from the Police Commissioner of New York City. The
Police Commissioner recommended that then Penal Law § 1897 be
amended to ensure "[t]hat permits to carry a pistol upon the
person or to be kept upon the premises be issued only by the
police commissioner or chief of police of any city in this State
and in the rural communities by the sheriff of the county"
(Letter from Edward P. Mulrooney, New York City Police
Commissioner, to Governor Franklin D. Roosevelt [Aug 29, 1931],
reprinted in Public Papers of Governor Franklin D. Roosevelt,
1931 at 184 [1937]). Commissioner Mulrooney spelled out the
reasons:

- 8 -                                           No. 167

> "Many persons of unsavory reputation, or
> with criminal records, are apprehended in
> [New York City] and are found in the
> possession of pistol permits issued by a
> judge or justice of a court of record in
> other counties of the State.
>      In [New York City] permits are issued by
> the police commissioner only after the
> applicant is fingerprinted, photographed and
> investigated, whereas in other counties of
> the State, permits are issued with little or
> no investigation . . ." (id.).

Summarizing the issue, Governor Roosevelt wrote that

"[i]t is a fact that the present issuing of revolver permits by

judges anywhere in the State is working badly, and permits must

be more carefully guarded" (Message to the Legislature [September

1, 1931], reprinted in Public Papers of Governor Franklin D.

Roosevelt, 1931 at 183).

This history indicates that the residence language was

introduced to prevent New York City residents from obtaining

handgun permits in counties where, at the time, investigations of

applicants were much less thorough than in the City.  It is

therefore evident that the law was originally designed to ensure

that licenses were obtained where applicants resided, and to

discourage "forum-shopping," rather than to exclude certain

applicants from qualifying at all.

The corresponding residence language in today's Penal

Law § 400 (3) (a) is derived from former Penal Law § 1903, which

was added in 1963 (L 1963, ch. 136, § 8; see 1963 McKinney's

Session Laws of NY at 155), and then adopted in the revised Penal

Law provisions of 1965 (L 1965, ch. 1030; see 1965 McKinney's

- 8 -

Session Laws of NY at 1691). Appellant points to no legislative history from the 1960s suggesting that the relevant intent of the Legislature was different then from what it had been in 1931.  We conclude that there was no intent by the Legislature to exclude applicants on the basis of domicile.

Finally, and most conclusively, Penal Law § 400.00 itself contemplates that licenses may be issued to individuals who do not make their domicile in New York.  When a license to carry or possess a pistol or revolver "is issued to an alien, or to a person not a citizen of and usually a resident in the state, the licensing officer shall state in the license the particular reason for the issuance and the names of the persons certifying to the good character of the applicant" (Penal Law § 400.00 [7]). Since a handgun license may be issued, under the statute, to a person who is "not . . . usually a resident" in New York State, it is clear that there is no requirement of domicile.

V.

Because we hold that Penal Law § 400.00 (3) (a) does not preclude an individual who owns a part-time residence in New York but makes his permanent domicile in another state from applying for a New York handgun license, we have no occasion to decide whether a contrary law would be unconstitutional.

Accordingly, the certified question should be answered in the affirmative.

                                - 10 -                         No. 167

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Following certification of a question by the United States Court
of Appeals for the Second Circuit and acceptance of the question
by this Court pursuant to section 500.27 of the Rules of Practice
of the New York State Court of Appeals, and after hearing
argument by counsel for the parties and consideration of the
briefs and the record submitted, certified question answered in
the affirmative.  Opinion by Judge Pigott.  Chief Judge Lippman
and Judges Graffeo, Read, Smith, Rivera and Abdus-Salaam concur.

Decided October 15, 2013

# EXHIBIT J

11-2420-cv
Osterweil v. Bartlett

1                 **UNITED STATES COURT OF APPEALS**
2
3                   **FOR THE SECOND CIRCUIT**
4
5                    October Term, 2012
6
7
8    (Argued: October 26, 2012     Decided: December 23, 2013)
9
10                 Docket No. 11-2420-cv
11
12 - - - - - - - - - - - - - - - - - - -x
13
14 ALFRED G. OSTERWEIL,
15
16           Appellant,
17
18      - v.-
19
20 GEORGE R. BARTLETT, III,
21
22           Appellee.
23
24 - - - - - - - - - - - - - - - - - - -x
25
26 Before:      JACOBS, WALKER, Circuit Judges, AND O'CONNOR,
27               U.S. Supreme Court Justice (Ret.)*.

28 Counsel:              PAUL D. CLEMENT, Bancroft PLLC,
29                    Washington, D.C. (D. Zachary
30                    Hudson, Bancroft PLLC,
31                    Washington, D.C.; Daniel L.
32                    Schmutter, Greenbaum, Rowe,
33                    Smith & Davis LLP, Woodbridge,
34                    New Jersey, on the brief), for
35                    Plaintiff-Appellant.

_____

      * The Honorable Sandra Day O'Connor, Associate Justice
(Ret.) of the United States Supreme Court, sitting by
designation.

```
 1
 2                              SIMON HELLER, Assistant
 3                              Solicitor General, New York
 4                              State Office of the Attorney
 5                              General, New York, New York, for
 6                              Defendant-Appellee.
 7
 8  PER CURIAM:
 9       Appellant Alfred Osterweil applied for a handgun
10  license in May 2008.  Following the directions of New York
11  Penal Law § 400.00(3)(a), he applied for a license "in the
12  city or county . . . where [he] resides."¹  His house in
13  Schoharie County, New York, was then his primary residence
14  and domicile, but while his application was pending,
15  Osterweil moved his primary residence to Louisiana, keeping
16  his home in Schoharie County as a part-time vacation
17  residence.
18
19       Osterweil's application was eventually forwarded to
20  appellee George Bartlett, a judge of the county court in
21  Schoharie County and licensing officer for the county.  He
22  interpreted § 400.00(3)(a)'s apparent residence requirement
23  as a domicile requirement, relying on a 1993 decision from
24  New York's Appellate Division, Third Department, holding
25  that, "as used in this statute, the term residence is
26  equivalent to domicile."  Mahoney v. Lewis, 199 A.D.2d 734,
27  605 N.Y.S.2d 168 (3d Dep't 1993).  Because Osterweil "ha[d]
28  candidly advised the Court that New York State is not his
29  primary residence and, thus not his domicile," Judge
30  Bartlett denied the license.  Judge Bartlett further
31  concluded that a domicile requirement was constitutional
32  under the Second Amendment, notwithstanding District of
33  Columbia v. Heller, 554 U.S. 570 (2008), because of the
34  State's interest in monitoring its handgun licensees to
```

———————————

[1]    In relevant part, New York Penal Law §
400.00(3)(a) provides that "[a]pplications shall be made and
renewed, in the case of a license to carry or possess a
pistol or revolver, to the licensing officer in the city or
county, as the case may be, where the applicant resides, is
principally employed or has his principal place of business
as merchant or storekeeper."

1    ensure their continuing fitness for the use of deadly
2    weapons.
3
4        Following the denial of his application, Osterweil
5    filed suit in the United States District Court for the
6    Northern District of New York, alleging that New York's
7    domicile requirement violated the Second and Fourteenth
8    Amendments and seeking, among other remedies, an injunction
9    ordering the State to give him a handgun license.   The
10   district court granted summary judgment to the State,
11   holding in relevant part that the domicile requirement
12   satisfied intermediate scrutiny because "the law allows the
13   government to monitor its licensees more closely and better
14   ensure the public safety." Osterweil v. Bartlett, 819 F.
15   Supp. 2d 72, 85 (N.D.N.Y. 2011).
16
17       On appeal, the State maintained that section
18   400.00(3)(a) does not, in fact, impose a domicile
19   requirement.  If no such requirement existed, there would,
20   we reasoned, be no need to reach the sensitive
21   constitutional question presented by this appeal.  To allow
22   the New York Court of Appeals to resolve for itself the
23   existence of a domicile requirement, we certified the
24   following question to that Court:
25
26               Is an applicant who owns a part-time
27               residence in New York but makes his
28               permanent domicile elsewhere eligible for
29               a New York handgun license in the city or
30               county where his part-time residence is
31               located?
32
33   Osterweil v. Bartlett, 706 F.3d 139, 145 (2d Cir. 2013).
34
35       On October 15, 2013, the New York Court of Appeals
36   answered the certified question in the affirmative.  In
37   Osterweil v. Bartlett, – NY3d –, 2013 NY Slip Op 6637 (Oct.
38   15 2013), the Court held that "Penal Law § 400.00(3)(a) does
39   not preclude an individual who owns a part-time residence in
40   New York but makes his permanent domicile in another state
41   from applying for a New York handgun license." Id. at *5.
42   The Court found this conclusion clear from the plain
43   statutory language, which refers only to an applicant's
44   residence and which expressly contemplates issuance of a

3

1    handgun to a nondomiciliary.  See id. at *3, *5; Penal Law §
2    400.00(7).  Moreover, the Court observed, "the law was
3    originally designed to ensure that licenses were obtained
4    where applicants resided, and to discourage
5    'forum-shopping,' rather than to exclude certain applicants
6    from qualifying at all."  Osterweil, – NY3d –, 2013 NY Slip
7    Op 6637, at *5.

9         Accordingly, New York Penal Code § 400.00(3)(a) imposes
10   no requirement that Osterweil be domiciled in New York to
11   obtain a handgun license there; his status as a part-time
12   resident is sufficient.  The State's briefing represented
13   that, if the verb "resides" in § 400.00(3)(a) refers only to
14   residence and does not require domicile, then Osterweil
15   would satisfy this requirement and "this litigation would
16   thereby be resolved."  Appellee's Br. 23.  We agree.

18        Given this conclusion, we decline to reach the
19   constitutional question raised by Osterweil's appeal, which
20   is based on a flawed reading of the licensing statute.  We
21   hereby vacate the decision of the District Court and remand
22   for further proceedings consistent with this opinion.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit